## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CHRISTINE CRAWFORD, DELORES
CRAWFORD, JUNETH N. DANIEL,
YVES DOMINIQUE, VAN JAKES,
RALPH KING, KEITH MANNING,
KENNETH MANNING, DAWN MUSSENDEN,
LAETITIA JOHNSON, CARRIE SALONE,
FLOYD SIMS, LARRY BROWN,
JOHN MASON, RONNIE THORNTON,
LISA GUNTER, MITCHELL MCGUIRE,
LOIS MCGUIRE, HAYES FERRELL,
YVONNE KNOX, ARTHUR SCOTT,
ERROL SERVICE, MELVIN JONES,
GEORGE GIPSON, MICHAEL SIMON,
VICTOR BRUCE, DAVID WHITE,
JOHN TILLMAN, ALLEN STAFFORD,
KURT HOLLOWAY, KENT JONES,
HAROLD LEWIS, JEREMY LEWIS,
PHILIP DOUGLAS, LAWRENCE HOLLAND,
WILLIAM RASUL, LEROY WALKER, JR.,
JEFFERY ROGERS, JOSEPH MBANEFO,
ANNIS ALSTON-STALEY, HARRY STALEY,
GORDON THORNTON, DWAYNE RICHARD
JOHNSON, SERGE TANCREDE, KAREN
TANCREDE, ERROL THYBULLE,
WISE FINLEY, JEREMIAH SIMMONS,
DARRYL UMPHRIES, JACQUELINE
GEORGE, JOKETRA HALL, and
LEWIS ANDERSON

CASE NO.:  1:20-cv-05132

JURY TRIAL DEMANDED

        Plaintiffs,

v.

McDONALD'S USA, LLC, a Delaware
limited liability company, and
McDONALD'S CORPORATION, a
Delaware corporation,

        Defendants.

_____/

## **COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

JURISDICTION AND VENUE ................................................................................ 6

THE PARTIES ......................................................................................................... 7

   A.  Plaintiffs .......................................................................................................... 7

   B.  Defendant ...................................................................................................... 15

COMMON FACTUAL ALLEGATIONS .............................................................. 16

   A.  The McDonald's Franchise Model:  Unequal Bargaining Power, The Franchise Agreement, and Misleading Franchise Disclosure Documents ................... 16

        (i)     *The Cost to Operate a McDonald's Franchise* ........................... 19

        (ii)    *A Financial Suicide Mission: The Cost to Operate a Black McDonald's Franchise* ................................................................................... 20

   B.  McDonald's History of Discrimination Against Black Franchisees ........... 21

        (i)     *Boycott in Cleveland 1969* ....................................................... 21

        (ii)    *Trouble Under the Golden Arches:  Black Franchisee Sues McDonald's for Racial Steering* .................................................................... 21

        (iii)   *McDonald's Admits Racial Steering and Need for Parity* ........ 23

        (iv)   *Change in McDonald's Leadership in 2015:  Reverse Course for Black Franchisees* ............................................................................... 25

        (v)    *McDonald's Leadership is Once Again on Notice of Ongoing Disparate Treatment of Black Franchisees; Continues Making False Promises* ....... 27

   C.  "Big Mac Attack" on Black Owner/Operators:  McDonald's Intentional and Covert Racial Discrimination ........................ 28

        (i)     *Take it or Leave it:  Steering to High-Cost and Low-Volume Locations* .................................. 28

(ii)    *McDonald's Requires Plaintiffs to Make Significant Initial Investments: Rebuilds and Renovations* ........................................................................31

(iii)    *McDonald's Arbitrarily Denies Plaintiffs Opportunities for Growth* ......33

(iv)    *McDonald's False Promise of "Rent Relief" and Misleading Financial Assistance* ................................................................................................34

(v)    *Targeted and Unreasonable Inspections and Grading* ..........................36

(vi)    *No Choice But to Sell:  McDonald's Forced Exit Scheme* ......................36

**CAUSES OF ACTION** ................................................................................................38

Count I – Violation of 42 U.S.C. § 1981 ..........................................................38

Count II – Bad Faith Breach of Contract ..........................................................41

Count III – Fraudulent Inducement and Fraudulent Omission ..........................44

Count IV – Punitive Damages ..........................................................................46

**PRAYER FOR RELIEF** .............................................................................................46

**DEMAND FOR JURY TRIAL** ..................................................................................47

## COMPLAINT

Plaintiffs, Christine Crawford, Delores Crawford, Juneth N. Daniel, Yves Dominique, Van Jakes, Ralph King, Keith Manning, Kenneth Manning, Dawn Mussenden, Laetitia Johnson, Carrie Salone, Floyd Sims, Larry Brown, John Mason, Ronnie Thornton, Lisa Gunter, f/k/a Lisa McKenzie, Mitchell McGuire, Lois McGuire, Hayes Ferrell, Yvonne Knox, Arthur Scott, Errol Service, Melvin Jones, George Gipson, Michael Simon, Victor Bruce, David White, John Tillman, Allen Stafford, Kurt Holloway, Kent Jones, Harold Lewis, Jeremy Lewis, Philip Douglas, Lawrence Holland, William Rasul, LeRoy Walker, Jr., Jeffery Rogers, Joseph Mbanefo, Annis Alston-Staley, Harry Staley, Gordon Thornton, Dwayne Richard Johnson, Serge Tancrede, Karen Tancrede, Errol Thybulle, Wise Finley, Jeremiah Simmons, Darryl Umphries, Jacqueline George, Joketra Hall, and Lewis Anderson (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this action against Defendants, McDonald's USA LLC ("McDonald's USA"), a Delaware limited liability company, and McDonald's Corporation, a Delaware corporation ("McDonald's Corporation," together with McDonald's USA, "McDonald's" or "Defendants"), and allege as follows:

## INTRODUCTION

1.  Plaintiffs are Black, former McDonald's franchisees, who bought into McDonald's public commitment to the Black communities it serves only to be misled and denied equal opportunity to economic success by McDonald's systematic and covert racial discrimination.

2.  Plaintiffs entered the McDonald's franchise system with the expectation that it would open the door to opportunities to develop thriving businesses to pass on to their children.

3.  Plaintiffs were more than McDonald's franchisees; they were employers and pillars in their communities. In many cases, they became parental figures providing the safety and security often lacking in the depressed, crime-ridden neighborhoods that McDonald's steered them to.

4.     For more than 50 years, McDonald's has branded itself as a socially conscious company, committed to strengthening Black entrepreneurship, and embracing racial opportunity as a critical component of its corporate culture.

5.     On June 16, 2020, McDonald's Chief Executive Officer, Christopher Kempczinski, appeared on CNBC's "Mad Money with Jim Cramer" and stated that, "*McDonald's has created more millionaires within the Black community than probably any other corporation on the planet*."

6.     In response to the murder of George Floyd and the Black Lives Matter movement, McDonald's proclaimed, "*We do not tolerate inequity, injustice, or racism*."  McDonald's advertisements read, "They were all one of us.  We see them in our customers.  We see them in our crew members.  *We see them in our franchisees*.  And this is why the entire McDonald's family grieves.  It's why we stand for them and any other victims of systematic oppression and violence."

7.     As recently as McDonald Corporation's Verified Complaint against its former CEO, Stephen J. Easterbrook, McDonald's continues to falsely represent a corporate commitment to equality:  "Today, [McDonald's] continues its efforts to cultivate a safe, nondiscriminatory, and respectful workplace, including most recently through a renewed values statement that makes clear McDonald's commitment to operating its business with integrity and *creating equal opportunities*." *McDonald's Corporation v. Easterbrook*, Case Id. 2020-0658, Verified Compl. [D.E. 1], at ¶ 34 (Del. Ch. Aug. 10, 2020) (emphasis added).

8.     These statements are patently **<u>false</u>** and highlight the dichotomy between McDonald's corporate ethos as a recruiter and developer of Black entrepreneurs and its record on race: McDonald's has a decades-long history of racial discrimination against its own Black franchisees.

9.     McDonald's proclaims a commitment to racial equality, profits from its Black customers, yet places Black franchisees in locations that are destined to fail, with low-volume sales

2

and high operating costs, leading to consistent profit shortfalls or losses, impeding Black franchisees' efforts to grow as they acquire other stores, necessary for success under McDonald's own franchise model, to force Black franchisees out, repeating this pattern of misconduct over and over again.

10.   McDonald's racial discrimination has resulted in an increasing cash flow gap between McDonald's Black franchisees as compared to White ones.  This cash flow gap **more than tripled** from 2010 to 2019, per National Black McDonald's Operators Association ("NBMOA") data.

11.   Plaintiffs' average annual sales of $2 million was **more than $700,000 under** McDonald's national average of $2.7 million between 2011 and 2016, and $2.9 million in 2019.

12.   As a result, the historic high of approximately 400 Black McDonald's franchisees in 1998 has been **more than cut in half**.  Today, there are less than 200 Black franchisees.  *See* Figure 1 below, based on NBMOA and McDonald's data.

**Exodus of Black Franchisees 1998 – 2020**

| END OF YEAR | BLACK FRANCHISEES |
|---|---|
| 1998 | 377 |
| 1999 | 368 |
| 2000 | 350 |
| 2001 | 347 |
| 2002 | 333 |
| 2003 | 319 |
| 2004 | 320 |
| 2005 | 313 |
| 2006 | 305 |
| 2007 | 304 |
| 2008 | 304 |
| 2009 | 294 |
| 2010 | 285 |
| 2011 | 283 |
| 2012 | 276 |
| 2013 | 270 |
| 2014 | 261 |
| 2015 | 255 |
| 2016 | 236 |
| 2017 | 222 |
| 2018 | 207 |
| 2019 | 194 |
| 2020 | 186 |

Figure 1:  Number of Black McDonald's Franchisees

3

13.     At the same time, from 1998 to date, the total number of McDonald's franchised restaurants **more than doubled**.  *See* Figure 2 below, based on data from McDonald's Corporation.

**Total Number of Franchised McDonald's Restaurants 1998 - 2020**

| YEAR | TOTAL FRANCHISES |
|------|------------------|
| 1998 | 15,086 |
| 1999 | 15,949 |
| 2000 | 16,795 |
| 2001 | 17,395 |
| 2002 | 17,864 |
| 2003 | 18,132 |
| 2004 | 18,248 |
| 2005 | 18,334 |
| 2006 | 22,880 |
| 2007 | 24,471 |
| 2008 | 25,465 |
| 2009 | 26,216 |
| 2010 | 26,338 |
| 2011 | 27,075 |
| 2012 | 27,882 |
| 2013 | 28,691 |
| 2014 | 29,544 |
| 2015 | 30,081 |
| 2016 | 31,230 |
| 2017 | 34,108 |
| 2018 | 35,085 |
| 2019 | 36,059 |
| 2020 | 38,999 |

Figure 2: Number of McDonald's Franchised Restaurants

14.     These differences are statistically significant and are the result of Defendants' racial bias and barriers within the McDonald's franchise system, effectuated by Defendants through systematic and covert racial discrimination targeted against Black franchisees.

4

15.     McDonald's knowingly discriminated against Plaintiffs, Black franchisees, a protected class under federal law (42 U.S.C. §1981), who were parties to franchise agreements with McDonald's, by, including, but not limited to:

a.      Steering Plaintiffs to locations with low-volume sales and higher operating costs, such as higher security costs due to crime, higher insurance rates, and higher employee turnover, because of their race;

b.      Excluding Plaintiffs from the purchase of restaurants in the open market because of their race;

c.      Providing Plaintiffs with misleading financial information to induce them to purchase McDonald's least desirable franchises;

d.      Requiring Plaintiffs to invest in rebuilds and/or renovations within short time frames not required of White franchisees;

e.      Excluding Plaintiffs from the same growth opportunities to higher-volume, lower-cost stores offered to White franchisees;

f.      Failing to provide any legitimate business reasons for repeated denials of franchise opportunities to Plaintiffs over many years;

g.      Denying Plaintiffs meaningful support to allow them to overcome financial hardships, while White franchisees were routinely provided such assistance, including, but not limited to, permanent rent relief and impact funding;

h.      Depriving Plaintiffs of the same legacy opportunities offered to White franchisees through McDonald's Next Generation ("Next Gen") program;

i.      Retaliation against Plaintiffs for rejecting offers to continue operations in crime-ridden neighborhoods with low-volume sales, including through targeted, increased, and unreasonable inspections;

j.      Disparate treatment with respect to inspections and grading of Plaintiffs' restaurants as part of a scheme to generate bad business reviews to force Plaintiffs out of the McDonald's system because of their race; and/or

k.      Placing Plaintiffs in untenable positions of economic duress, denying them eligibility for growth and renewal of their agreements, and arbitrarily denying final approval of their buyers, so that Plaintiffs had no choice but to exit on McDonald's terms, at a loss.

16.     Through these series of repeated and interrelated events, McDonald's intentionally and covertly deprived Plaintiffs of the same rights enjoyed by White franchisees to the creation, performance, enjoyment, and all benefits of their contractual relationships with Defendants.

17.     But for Plaintiffs' race, McDonald's would have offered Plaintiffs profitable restaurant locations, opportunities for growth and expansion, on equal terms as White franchisees, rather than forcing them out after decades of sweat and tears dedicated to the franchise.

18.     McDonald's discriminatory and fraudulent practices were not apparent to Plaintiffs when committed, and only became apparent when viewed in light of the later acts establishing a pattern of systematic and covert racial discrimination targeted against Black franchisees.

## <u>JURISDICTION AND VENUE</u>

19.     This is an action based on McDonald's denial of Plaintiffs' right to equality in their contracts in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (<u>Count I</u>), bad faith breach of contract (<u>Count II</u>), fraudulent inducement and omission (<u>Count III</u>), and for punitive damages (<u>Count IV</u>).

20.     This Court has subject matter jurisdiction over Plaintiffs' 42 U.S.C. § 1981 claims pursuant to 28 U.S.C. §§ 1331, 1332, 1343(a)(3), and 42 U.S.C. § 1988.

21.     This Court has subject matter jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because they are so related to Plaintiffs' federal question claims that they form part of the same case or controversy.

22.     Plaintiffs' claims are properly joined under the permissive joinder provisions of Rule 20, Fed. R. Civ. P., as their claims arise out of the same series of transactions or occurrences and raise common questions of law or fact.

23.     This Court has personal jurisdiction over Defendants because McDonald's Corporation is headquartered in this District and McDonald's USA maintains its principal place of business in Chicago, Illinois.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants reside in this District, where its principal place of business is located, and a substantial part of the events giving rise to Plaintiffs' claims occurred in Chicago, Illinois, which is within this District.

## THE PARTIES

### A.     Plaintiffs

25.     Plaintiffs are members of a federally-protected class who owned and operated McDonald's restaurant(s).

26.     Plaintiff Christine Crawford and her mother, Delores Crawford, are South Carolina residents and former McDonald's Atlanta Region franchise owner/operators.  Delores Crawford became a McDonald's franchisee in 1988, while her daughter, Cristine Crawford, became one in 2005.  The Crawfords were forced out in 2018.  Between 2010 and 2018, the Crawfords owned and lost seven (7) stores due to McDonald's misconduct.  They are Black.

27.     Plaintiff Juneth N. Daniel is a Florida resident and a former Alabama Region McDonald's franchise owner/operator who became a franchisee in 2008 and was forced out in 2018. Between 2010 and 2018, Daniel owned and lost four (4) stores due to McDonald's misconduct.  She is Black.

28.     Plaintiff Yves Dominique is a Georgia resident and a former Atlanta Region McDonald's franchise owner/operator who became a franchisee in 2008 and was forced out in 2017. Between 2010 and 2017, Dominique owned and lost six (6) stores due to McDonald's misconduct. He is Black.

29.     Plaintiff Van Jakes is a Georgia resident and a former Atlanta Region McDonald's franchise owner/operator who became a franchisee in 1992 and was forced out in 2016.  Between 2010 and 2016, Jakes owned and lost five (5) stores due to McDonald's misconduct.  He is Black.

30.     Plaintiff Ralph King is a Missouri resident and a former Missouri Region McDonald's franchise owner/operator who became a franchisee in 1983 and was forced out in 2019.  Between 2010 and 2019, King owned and lost thirteen (13) stores due to McDonald's misconduct.  He is Black.

31.     Plaintiff Keith Manning is a North Carolina resident and a former North Carolina Region McDonald's franchise owner/operator who became a franchisee in 1992 and was forced out in 2017.  Between 2010 and 2017, Keith Manning owned and lost ten (10) stores due to McDonald's misconduct.  He is Black.

32.     Plaintiff Kenneth Manning is a Georgia resident and a former Alabama and Atlanta Region McDonald's franchise owner/operator who became a franchisee in 2001 and was forced out in 2017.  Between 2010 and 2017, Kenneth Manning owned and lost seventeen (17) stores due to McDonald's misconduct.  He is Black.

33.     Plaintiff Dawn Mussenden is a Georgia resident and a former New York and Atlanta Region McDonald's franchise owner/operator who became a franchisee in 1990 and was forced out in 2017.  Between 2010 and 2017, Mussenden owned and lost five (5) stores due to McDonald's misconduct.  She is Black.

34.     Plaintiff Laetitia Johnson is a Georgia resident and a former Atlanta Region McDonald's franchise owner/operator who became a franchisee in 1995 and was forced out in 2018. Between 2010 and 2018, Johnson owned and lost four (4) stores due to McDonald's misconduct.  She is Black.

35.     Plaintiff Carrie Salone is a Georgia resident and a former Atlanta Region McDonald's franchise owner/operator who became a franchisee in 2003 and was forced out in 2018.  Between 2010 and 2018, Salone owned and lost two (2) stores due to McDonald's misconduct.  She is Black.

36.     Plaintiff Floyd Sims is a Georgia resident and a former Atlanta Region McDonald's franchise owner/operator who became a franchisee in 2000 and was forced out in 2018.  Between 2010 and 2018, Sims owned and lost seven (7) stores due to McDonald's misconduct.  He is Black.

37.     Plaintiff Larry Brown is an Iowa resident and a former Iowa Region McDonald's franchise owner/operator who became a franchisee in 2000 and was forced out in 2017.  Between 2010 and 2017, Brown owned and lost ten (10) stores due to Defendants' misconduct.  He is Black.

38.     Plaintiff John Mason is a North Carolina resident and a Virginia and North Carolina Region McDonald's franchise owner/operator who became a franchisee in 2004 and was forced out in 2018.  Between 2010 and 2018, Mason owned and lost four (4) stores due to McDonald's misconduct.  He is Black.

39.     Plaintiff Ronnie Thornton is a North Carolina resident and a former Raleigh/Durham Region McDonald's franchise owner/operator who became a franchisee in 1998 and was forced out in 2017.  Between 2010 and 2017, Thornton owned and lost five (5) stores due McDonald's misconduct.  He is Black.

40.     Plaintiff Lisa Gunter, f/k/a Lisa McKenzie, is a North Carolina resident and a former Raleigh/Durham Region McDonald's franchise owner/operator who became a franchisee in 2007 and was forced to out in 2018.  Between 2010 and 2018, Gunter owned and lost two (2) stores due to McDonald's misconduct.  She is Black.

41.     Plaintiff Mitchell McGuire and his wife, Lois McGuire, are New Jersey residents and former New York Metro Region McDonald's franchise owner/operators who became franchisees in

2000 and were forced out in 2016. Between 2010 and 2016, the McGuires owned and lost one (1) store due to McDonald's misconduct. They are Black.

42. Plaintiff Hayes Ferrell is a Georgia resident and a former Atlanta Region McDonald's franchise owner/operator who became a franchisee in 1989 and was forced out in 2016. Between 2010 and 2016, Ferrell owned and lost one (1) store due to McDonald's misconduct. He is Black.

43. Plaintiff Yvonne Knox is a Michigan resident and a former Detroit Region McDonald's franchise owner/operator who became a franchisee in 1981 and was forced out in 2016. Between 2010 and 2016, Knox owned and lost one (1) store due to McDonald's misconduct. She is Black.

44. Plaintiff Arthur Scott is a Michigan resident and a former Detroit Region McDonald's franchise owner/operator who became a franchisee in 1994 and was forced out in 2017. Between 2010 and 2017, Scott owned and lost eight (8) stores due to McDonald's misconduct. He is Black.

45. Plaintiff Errol Service is a Michigan resident and a former Detroit Region McDonald's franchise owner/operator who became a franchisee in 1994 and was forced out in 2020. Between 2010 and 2020, Service owned and lost seventeen (17) stores due to McDonald's misconduct. He is Black.

46. Plaintiff Melvin Jones is a Florida resident and a former Detroit Region McDonald's franchise owner/operator who became a franchisee in 1999 and was forced out in 2018. Between 2010 and 2018, Jones owned and lost three (3) stores due to McDonald's misconduct. He is Black.

47. Plaintiff George Gipson is a Missouri resident and a former St. Louis Region McDonald's franchise owner/operator who became a franchisee in 1994 and was forced out in 2017. Between 2010 and 2017, Gipson owned and lost three (3) stores due to McDonald's misconduct. He is Black.

10

48.     Plaintiff Michael Simon is a New Jersey resident and a former Raleigh Region McDonald's franchise owner/operator who became a franchisee in 2013 and was forced out in 2017. Between 2010 and 2017, Simon owned and lost three (3) stores due to McDonald's misconduct. He is Black.

49.     Plaintiff Victor Bruce is an Indiana resident and a former Indianapolis Region McDonald's franchise owner/operator who became a franchisee in 1994 and was forced out in 2016. Between 2010 and 2016, Bruce owned and lost three (3) stores due to McDonald's misconduct. He is Black.

50.     Plaintiff David White is an Indiana resident and a former Indianapolis Region McDonald's franchise owner/operator who became a franchisee in 1999 and was forced out in 2018. Between 2010 and 2018, White owned and lost five (5) stores due to McDonald's misconduct. He is Black.

51.     Plaintiff John Tillman is a Texas resident and a former Houston Region McDonald's franchise owner/operator who became a franchisee in 1990 and was forced out in 2019. Between 2010 and 2019, Tillman owned and lost fourteen (14) stores due to McDonald's misconduct. He is Black.

52.     Plaintiff Allen Stafford is a Georgia resident and a former Atlanta Region McDonald's franchise owner/operator who became a franchisee in 1992 and was forced out in 2017. Between 2010 and 2017, Stafford owned and lost five (5) stores due to Defendants' misconduct. He is Black.

53.     Plaintiff Kurt Holloway is a Texas resident and a former Houston Region McDonald's franchise owner/operator who became a franchisee in 1997 and was forced out in 2017. Between 2010 and 2017, Holloway owned and lost two (2) stores due to McDonald's misconduct. He is Black.

54.     Plaintiff Kent Jones is a Tennessee resident and a former Nashville Region McDonald's franchise owner/operator who became a franchisee in 2003 and was forced out in 2017. Between 2010 and 2017, Jones owned and lost one (1) store due to McDonald's misconduct. He is Black.

55.     Plaintiff Harold Lewis is a Nevada resident and a former Las Vegas Region McDonald's franchise owner/operator who became a franchisee in 1987 and was forced out in 2015. Between 2010 and 2015, Harold Lewis owned and lost nine (9) stores due to McDonald's misconduct. He is Black.

56.     Plaintiff Jeremy Lewis, Harold Lewis' son, is a Nevada resident and a former Las Vegas Region McDonald's franchise owner/operator who became a franchisee in 2015 and was forced out in 2015. Between 2010 and 2015, Jeremy Lewis owned and lost one (1) store due to McDonald's misconduct. He is Black.

57.     Plaintiff Philip Douglas is an Illinois resident and a former Chicago Region McDonald's franchise owner/operator who became a franchisee in 1997 and was forced out in 2014. Between 2010 and 2014, Douglas owned and lost three (3) stores due to McDonald's misconduct. He is Black.

58.     Plaintiff Lawrence Holland is a Georgia resident and a former Atlanta Region McDonald's franchise owner/operator who became a franchisee in 2003 and was forced out in 2013. Between 2010 and 2013, Holland owned and lost two (2) stores due to McDonald's misconduct. He is Black.

59.     Plaintiff William Rasul is a Georgia resident and a former Atlanta Region McDonald's franchise owner/operator who became a franchisee in 1999 and was forced out in 2010. Rasul owned and lost three (3) stores due to McDonald's misconduct. He is Black.

60.     Plaintiff LeRoy Walker, Jr. is a Mississippi resident and a former Mississippi Region McDonald's franchise owner/operator who became a franchisee in 1984 and was forced out in 2015. Between 2010 and 2015, Walker owned and lost one (1) store due to McDonald's misconduct.  He is Black.

61.     Plaintiff Jeffery Rogers is a Florida resident and a former Jacksonville Region McDonald's franchise owner/operator who became a franchisee in 2005 and was forced out in 2011. Between 2010 and 2011, Rogers owned and lost one (1) store due to McDonald's misconduct.  He is Black.

62.     Plaintiff Joseph Mbanefo is a New York resident and a former New York Region McDonald's franchise owner/operator who became a franchisee 1996 and was forced out in 2012. Between 2010 and 2012, Mbanefo owned and lost four (4) stores due to McDonald's misconduct. He is Black.

63.     Plaintiff Annis Alston-Staley and her husband, Harry Staley, are South Carolina residents and former New Jersey Region McDonald's franchise owner/operators who became franchisees in 1995 and were forced out in 2015.  Between 2010 and 2015, the Staleys owned and lost six (6) stores due to McDonald's misconduct.  They are Black.

64.     Plaintiff Gordon Thornton is a North Carolina resident and a former Raleigh/Durham Region McDonald's franchise owner/operator who became a franchisee in 1993 and was forced out in 2012.  Between 2010 and 2012, Thornton owned and lost four (4) stores due to McDonald's misconduct.  He is Black.

65.     Plaintiff Dwayne Richard Johnson is a Pennsylvania resident and a former Philadelphia Region McDonald's franchise owner/operator who became a franchisee in 1993 and

was forced out in 2012. Between 2010 and 2012, Johnson owned and lost one (1) store due to McDonald's misconduct. He is Black.

66.     Plaintiff Serge Tancrede and his wife, Karen Tancrede, are Texas residents and former Philadelphia Region McDonald's franchise owner/operators who became franchisees in 2004 and were forced out in 2011. Between 2010 and 2011, the Tancredes owned and lost one (1) store due to McDonald's misconduct. They are Black.

67.     Plaintiff Errol Thybulle is a New York resident and a former New York Region McDonald's franchise owner/operator who became a franchisee in 1990 and was forced out in 2011. Between 2010 and 2011, Thybulle owned and lost two (2) stores due to McDonald's misconduct. He is Black.

68.     Plaintiff Wise Finley is a Michigan resident and a former Detroit Region McDonald's franchise owner/operator who became a franchisee in 1987 and was forced out in 2016. Between 2010 and 2016, Finley owned and lost three (3) stores due to McDonald's misconduct. He is Black.

69.     Plaintiff Jeremiah Simmons is a New York resident and a former New York Region McDonald's franchise owner/operator who became a franchisee in 1998 and was forced out in 2010. Simmons owned and lost one (1) store due to McDonald's misconduct. He is Black.

70.     Plaintiff Darryl Umphries is an Oklahoma resident and a former Oklahoma City Region McDonald's franchise owner/operator who became a franchisee in 2004 and was forced out in 2014. Between 2010 and 2014, Umphries owned and lost two (2) stores due to McDonald's misconduct. He is Black.

71.     Plaintiff Jacqueline George is a Florida resident and a former Columbus, Ohio Region McDonald's franchise owner/operator who became a franchisee in 1990 and was forced out in 2012.

14

Between 2010 and 2012, George owned and lost three (3) stores due to McDonald's misconduct. She is Black.

72.     Plaintiff Joketra Hall is a Florida resident and a former Atlanta Region McDonald's franchise owner/operator who became a franchisee in 2005 and was forced out in 2010. Hall owned and lost two (2) stores due to McDonald's misconduct. She is Black.

73.     Plaintiff Lewis Anderson is a Florida resident and a former Great Southern Region McDonald's franchise owner/operator who became a franchisee in 2002 and was forced out in 2016. Between 2010 and 2016, Anderson owned and lost four (4) stores due to McDonald's misconduct. He is Black.

74.     As a result of Defendants' racial discrimination, retaliation, bad faith breach of contract, and fraud alleged herein, each of the individual Plaintiffs above have suffered substantial damages in the forms described below and amounts that will be proven at trial.

75.     By agreement with Defendants, who were previously provided by Plaintiffs earlier this year with a draft complaint, as of June 8, 2020 all viable statutes of limitation applicable to Plaintiffs' claims were tolled.

    **B.      Defendants**

76.     Defendant McDonald's USA is a Delaware limited liability corporation with its principal place of business located at 110 North Carpenter Street, Chicago, Illinois. McDonald's USA is a wholly-owned subsidiary of McDonald's Corporation and the franchisor of the McDonald's franchise system, which develops, operates, franchises, and services a system of fast-food restaurants in the United States.

77.     Defendant McDonald's Corporation is a publicly traded Delaware corporation with its principal place of business located at One McDonald's Plaza, Oak Brook, Illinois. McDonald's

15

Corporation is the sole member of McDonald's USA, and is the worldwide franchisor of the McDonald's franchise system.

## COMMON FACTUAL ALLEGATIONS

78.     McDonald's offered Plaintiffs what, at first, appeared to be a once-in-a-lifetime opportunity to invest in and become a part of America's best-known international corporation.

79.     Yet, by covertly restricting and steering Plaintiffs to older and underperforming store locations because of their race, misleading financial representations and omissions, exclusion from growth opportunities, unequal renovation and rebuild requirements, and application of harsher and unreasonable grading and inspection standards, McDonald's intentionally impeded Plaintiffs' ability to succeed and grow within the franchise they dedicated their lives to.

### A.     The McDonald's Franchise Model:  Unequal Bargaining Power, The Franchise Agreement, and Misleading Franchise Disclosure Documents

80.     McDonald's is a heavily franchised business model.  As of May 1, 2020, approximately 95% of all U.S. restaurants are franchised to independent franchisees and about 5% are franchised to company-owned McDonald's ("McOpCo") restaurants.

81.     McDonald's requires every franchisee to sign its standard Franchise Agreement in order to operate one or more, new or existing, McDonald's restaurants located on real estate owned or leased by McDonald's, and leased to the franchisee through an Operator's Lease ("Lease"), for a twenty (20) year term.  True and correct copies of McDonald's USA's standard Franchise Agreement (Traditional), A-1, and an exemplar of Plaintiff Dominique's Franchise Agreement, A-2, are attached as **Composite Exhibit "A"** (the "Franchise Agreement").[1]

---

[1] McDonald's has possession of Plaintiffs' individual Franchise Agreements.  Upon information and belief, the Franchise Agreements attached hereto contain the same or substantially similar terms as each of the Franchise Agreements entered into with the individual Plaintiffs.  Upon information and belief, McDonald's Corporation is the franchisor of any Franchise Agreement entered into (and not later amended or superseded) prior to approximately 2005, and McDonald's USA is the franchisor of any Franchise Agreement entered into since approximately 2005.

82.     The Franchise Agreement provides in relevant part:

> <u>General Services of McDonald's</u>.  McDonald's shall advise and consult with Franchisee periodically in connection with the operation of the Restaurant and also, upon Franchisee's request, at other reasonable times. . .McDonald's shall also make available to Franchisee **all** additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes generally available, from time to time, **to all its franchisees** operating McDonald's restaurants.

(Franchise Agreement, Ex. A, at ¶ 3) (emphasis added).  Pursuant to Section 12, titled "Compliance with Entire System," McDonald's and Plaintiffs further agreed as follows:

> McDonald's shall have the right to inspect the Restaurant at all **reasonable** times to ensure that Franchisee's operation thereof is in compliance with the standards and policies of the McDonald's System.

> Franchisee shall comply with the entire McDonald's System, including, but not limited to, the following: (c) Keep the Restaurant constructed and equipped in accordance with the building blueprints and equipment layout plans that are standard in the McDonald's System or as such blueprints and plans may be **reasonably** changed from time to time by McDonald's.

(*Id*., at ¶ 12) (emphasis added).

83.     Through McDonald's Franchise Disclosure Document ("<u>FDD</u>"), a true and correct copy of which is attached as **Exhibit "B"** hereto,[2] McDonald's provides prospective franchisees with "Financial Performance Representations," that include *pro forma* statements with the national average sales of domestic traditional McDonald's restaurants opened at least one (1) year prior.  For example, the most recent 2020 FDD attached hereto provides, in pertinent part, as follows:

> ***All Domestic Traditional Restaurants***

> Of the approximately 12,032 domestic traditional McDonald's restaurants opened at least 1 year as of December 31, 2019, approximately 79% had annual sales volumes in excess of $2,300,000;

---

[2] By way of example, attached is the most recent version of McDonald's FDD, issued May 1, 2020.  McDonald's issues its FDD annually and provides all prospective franchisees with the FDD prior to joining the McDonald's franchise system. McDonald's has possession of the individual disclosure documents it provided to Plaintiffs.

approximately 70% had annual sales volumes in excess of $2,500,000; and approximately 60% had annual sales volumes in excess of $2,700,000. The average annual sales volume of domestic traditional McDonald's restaurants open at least 1 year as of December 31, 2019, was $3,009,000 during 2019. The highest and lowest annual sales volume in 2019 for these domestic traditional McDonald's restaurants was $12,654,000 and $654,000, respectively. The median annual sales volume of domestic traditional McDonald's restaurants open at least 1 year as of December 31, 2019, was **$2,910,000 during 2019**.

### Traditional Franchised Restaurants

Of the approximately 11,435 domestic traditional franchised McDonald's restaurants opened at least 1 year as of December 31, 2019, approximately 78% had annual sales volumes in excess of $2,300,000; approximately 68% had annual sales volumes in excess of $2,500,000; and approximately 58% had annual sales volumes in excess of $2,700,000. The average annual sales volume of domestic traditional franchised McDonald's restaurants open at least 1 year as of December 31, 2019, was $2,970,000 during 2019. The highest and lowest annual sales volume in 2019 for these domestic traditional McDonald's restaurants was $12,654,000 and $654,000, respectively. The median annual sales volume of domestic traditional franchised McDonald's restaurants open at least 1 year as of December 31, 2019, was **$2,867,000 during 2019**.

### Traditional Company Owned Restaurants

Of the approximately 597 domestic traditional McOpCo restaurants opened at least 1 year as of December 31, 2019, approximately 99% had annual sales volumes in excess of $2,300,000; approximately 98% had annual sales volumes in excess of $2,500,000; and approximately 95% had annual sales volumes in excess of $2,700,000. The average annual sales volume of domestic traditional McOpCo restaurants open at least 1 year as of December 31, 2019, was $3,758,000 during 2019. The highest and lowest annual sales volume in 2019 for these domestic traditional McOpCo restaurants was $8,182,000 and $2,047,000, respectively. The median annual sales volume of domestic traditional McOpCo restaurants open at least 1 year as of December 31, 2019, was **$3,629,000 during 2019**.

(FDD, Ex. B, at Item 19) (emphasis added).

84.     At all times material hereto, and upon information and belief, Plaintiffs' average annual sales were **more than $700,000 under** McDonald's disclosed national averages of $2.7 million between 2011 and 2016, and $2.9 million in 2019.

85.     McDonald's dictates uniformity of the operational structure and revenue expectations of all its franchisees' stores, even though they are cognizant that Black-owned and operated McDonald's franchises generate significantly lower revenue and assume higher operational costs than the national average due to the low-income and high-cost locations it steers its Black franchisees to.

86.     McDonald's knew or should have known that these differential revenue and operating costs of Black-operated franchises as compared to White-operated franchises are not random or due to poor management. These differences are statistically significant and are the result of the historical racial bias and barriers built into the McDonald's franchise system.

87.     Acquisition of a McDonald's franchise under these conditions was nothing short of a "financial suicide mission."

(i)     *The Cost to Operate a McDonald's Franchise*

88.     To purchase a McDonald's franchise, McDonald's requires an initial down payment of 40% of the total cost for a new restaurant, or 25% of the total cost for an existing restaurant.[3] Generally, McDonald's requires a minimum of $500,000 of non-borrowed personal resources. *See* n. 3. The balance of the purchase price may be financed for no more than seven (7) years. *Id.*

89.     Periodically, franchisees at their cost, are required by McDonald's to rebuild, renovate, and/or make major remodels to their restaurants.

90.     Owner/operators pay McDonald's the following ongoing fees:

   a.     **Service fee**: A monthly fee based upon the restaurant's sales performance (as of this filing date, a service fee of 4.0% of gross sales); and

---

[3]   McDonald's website, *Buying a Franchise*, *available at* https://www.mcdonalds.com/us/en-us/about-us/franchising/acquiring-franchising.html.

b. **Rent**: A monthly base rent or percentage rent that is a percentage of monthly sales and that may include rent escalations, including, but not limited to, fixed-rent escalations, escalations based on an inflation index, and fair-value adjustments, with terms ranging from annually to every five (5) years.

(Franchise Agreement, Ex. A, at ¶¶ 8–9; FDD, Ex. B, at Items 5–7, and Ex. A, at pp. 11–12).

91.    Franchisees are also responsible for acquiring and maintaining insurance coverage upon taking possession of the restaurant, which name McDonald's as an additional insured. (Franchise Agreement, Ex. A, at ¶ 17).

### (ii)    *A Financial Suicide Mission:  The Cost to Operate a Black McDonald's Franchise*

92.    Unequal bargaining power characterizes the relationship between franchisees and McDonald's and this bargaining disparity is even more palpable for Black applicants and operators.

93.    This unequal bargaining position made it easy for McDonald's to award Black franchisees entering the system the oldest stores, in need of the most reinvestment, in tough and depressed areas, that had been routinely rejected by White franchisees, many of which McDonald's wanted to close, but needed someone to operate until McDonald's could sell its real estate.

94.    McDonald's offered Plaintiffs locations with higher operating costs, such as security, insurance, and employee training and turnover, and which required substantial renovations and rebuilds, as compared to White-owned franchises.

95.    McDonald's discriminatory practices led to low cash flow and decreased equity for Black owner/operators, forcing Black owner/operators, including Plaintiffs, into significant debt and, in many cases, bankruptcy.

96.    According to documents from the NBMOA, this cash flow gap between Black and White McDonald's franchisees **more than tripled** between 2010 and 2019.

97.     For McDonald's, it was a win-win strategy to collect high rent and fees for substandard stores, built upon a history of discrimination it successfully executed for decades.

**B.      McDonald's History of Discrimination Against Black Franchisees**

98.     The McDonald's franchise system was established in 1955, but Black franchisees were denied entry until 1968, following the assassination of Dr. Martin Luther King Jr.

**(i)     *Boycott in Cleveland 1969***

99.     A boycott of McDonald's in 1969 made headlines in Ohio and led to the first Black franchisees in the McDonald's system opening stores in depressed areas of Cleveland.

100.     In a January 25, 1970, article regarding the first Black owned and operated McDonald's franchise, the New York Times reported: "Spokesman for Negro groups, who banded together to form Operation Black Unity have been demanding black ownership of four existing McDonald's units … **All are in predominantly Negro areas**." *Cleveland Negro Wins a Franchise*, N.Y. Times, Jan. 25, 1970, *available at* https://www.nytimes.com/1970/01/25/archives/cleveland-negro-wins-a-franchise-9month-controversy-over-restaurant.html (emphasis added).

101.     In 1972, the National Black McDonald's Operators Association, also known as the NBMOA, was founded to help promote growth in the industry by Black owner/operators.

**(ii)    *Trouble Under the Golden Arches:  Black Franchisee Sues McDonald's for Racial Steering***

102.     By the 1980s, Black franchisees were operating in the McDonald's franchise system, but McDonald's did not treat Black franchisees as equals to White franchisees.

103.     In 1983, Charles Griffis, a Black McDonald's owner/operator in the Los Angeles market, filed a race discrimination countersuit against McDonald's, alleging, among other things, that McDonald's systematically excluded Blacks from buying stores in White neighborhoods.

104.     In a March 12, 1984, New York Times article, Griffis detailed his experience:

**My stores are in hellholes**, he said. They get robbed once or twice a month, and I pay $20,000 a month in security services they don't pay in good neighborhoods. We had a murder in one and we still get the windows smashed and the bathrooms vandalized. **I've upgraded my stores a lot and I don't see why I shouldn't have a shot at a store in a good neighborhood**.

Tamar Lewin, *McDonald's is Battling with Black Franchisee*, N.Y. Times, March 12, 1984,

*available at* https://www.nytimes.com/1984/03/12/business/mcdonald-s-is-battling-with-black-franchisee.html; *see also* excerpt of the article below (emphasis added).

105.     In response to McDonald's racial practices, and Griffis' situation, the New York

chapter of the NBMOA also wrote to McDonald's New York Regional Vice President at the time to

advise that, "**black McDonald's owner-operators are primarily confined to ghetto areas and not**

**allowed to expand as fast as their white counterparts**." *Id*. (emphasis added).

### *MCDONALD'S IS BATTLING WITH BLACK FRANCHISEE*



"Charles Griffis came to California in 1977 when he heard he might be able to buy a McDonald's franchise in Santa Barbara… It turns out, though, that the store was in Los Angeles on Santa Barbara Street, right in the middle of the ghetto… It was an old store in real bad shape."

". . .[Rev. Jesse] Jackson wrote McDonald's on behalf of his Operation PUSH to complain that blacks felt they were 'being subjected to a double standard' in that they were **confined to inner-city areas with high maintenance and security costs, and were usually offered only recycled stores, which are generally more expensive and less profitable than new ones**. . .

106.    As of the publication of the March 1984 article, there were 137 Black McDonald's operators nationwide, with 267 restaurants, totaling approximately two (2) stores per Black operator, as compared to the average of five (5) stores per McDonald's White operator.  *Id.*

107.    Today, McDonald's has dwindled down to a similarly low number of Black franchisees, following false promises of parity and a reverse course back to discrimination.

**(iii)    *McDonald's Admits Racial Steering and Need for Parity***

108.    In the late 1990s, McDonald's leadership admitted that McDonald's excluded Black franchisees from franchise opportunities afforded to White franchisees.

109.    Specifically, through Executive Vice President, Thomas S. Dentice, McDonald's admitted, "**[T]he company has placed many Black Franchisees in restaurants that have not allowed them to achieve the same level of economic success as their peers**."  A true and correct copy of the April 18, 1996, Dentice Letter to NBMOA Chairman, Reggie Webb, is attached as **Exhibit "C"** hereto, with excerpts quoted below (emphasis added).



- A full course press will be applied to fix all of the existing under performing locations that are owned by African American Franchisees-----second chances for all African American Franchisees will be the rule, not the exception for the rest of 1996 and beyond, if necessary, until we get the current problems fixed.

- The company in concert with the Black Franchisees, will create and implement a strategy designed to achieve parity for African American franchisees. It will be aggressive, focused, have a short period to reach its objectives, be measurable and have the endorsement and full backing of the TMT.

- There will be rewards for success and sanctions for failure in achieving plan targets and goals.

- The company will meet with the NBMOA on a regular basis to review progress..

- The strategic plan will be announced and implemented by July 1, 1996 and achieve meaningful results by year end.

- We will not try to reach consensus on what the "right decision" is to fix financial and franchising problems. That authority will rest in the hands of a few individuals.

- This process will be viewed for what it is; achieving parity for our Black Franchisees, not reaching a comfortable financial or franchising solution for the company.

- The company will also work in concert with the NBMOA to develop a comprehensive strategy for African Americans that includes purchasing and marketing.

Reggie, I know that we can achieve our common purpose. We may disagree at times on the what's and how's as we move forward, but I know that we do not and will not disagree on what we want to accomplish-----Parity.

Sincerely yours,

This process will be viewed for what it is; achieving parity for our Black Franchisees, not reaching a comfortable financial or franchising solution for the company.
***
We may disagree at times on the what's and how's as we move forward, but I know that we do not and will not disagree on what we want to accomplish-----Parity.

110. Yet, parity was never truly achieved. McDonald's spent the next decade instituting aspirational and temporary measures and promising Black franchisees, including Plaintiffs, that it was working to achieve parity between Black and White McDonald's franchisees. Plaintiffs relied on these representations and had no reason to believe McDonald's was discriminating against them.

111. On November 14, 2002, NBMOA leadership addressed McDonald's past discriminatory practices in a letter from NBMOA Chairman and CEO, Larry C. Tripplett, to NBMOA

24

Membership, which described its negotiations with McDonald's Leadership "to ensure that Parity is

met and maintained." *See* Nov. 14, 2002 Tripplett Letter, **Exhibit "D"** hereto, with excerpts below.



First, let me remind you of what you already know. **We are "Free People."** We have the right to expect not to be discriminated against by anyone. Discrimination is illegal in this Country. We make significant contributions to the McDonald's System every day. In some cases, these contributions are made under very difficult dangerous environmental circumstances. We do so proudly and professionally as we all desire the American Dream of successful Business Ownership. We deserve and will demand nothing less than equal treatment. **We must continue to stand United and Strong**. We have nothing to fear.

As you are aware, the NBMOA Executive Committee is in earnest negotiations with the Leadership of McDonald's Corporation to ensure that Parity is met and maintained. We believe that each and every African American Franchisee should receive real assurances that when Parity is met, the discriminatory practices of the past will not reoccur.

112.    In 2006, after a decade of fighting for parity, Don Thompson became the first Black

President of the Western Division of McDonald's and went on to serve as the first Black President

and CEO of McDonald's from 2012 to 2015.

>            **(iv)     *Change in McDonald's Leadership in 2015:  Reverse Course for Black
>                     Franchisees***

113.    In 2015, Easterbrook replaced Thompson as McDonald's President and CEO, and

hand-picked Chris Kempczinski, McDonald's current CEO and then President of McDonald's USA.

25

114. Under Easterbrook and Kempczinski's leadership, McDonald's instituted discriminatory policies including, but not limited to, rejecting advertising budget modifications to target Black consumers, denying Black franchisees opportunities for growth, confining Black franchisees to inner-city or urban areas with higher costs, denying Black franchisees' requests for rent relief, and implementing initiatives such as the Bigger Bolder Vision 2020 ("BBV2020") modernization plan that negatively and disproportionately impacted Black franchisees, including Plaintiffs, in order to force them out the McDonald's franchise system.

115. These discriminatory practices and policies led to the cash flow gap between Black franchisees in comparison to White franchisees tripling from 2010 to 2019, and a mass exodus of more than half of McDonald's Black franchisees from the McDonald's franchise system.

116. On January 7, 2020, two Black McDonald's senior executives, Victoria Guster-Hines and Domineca Neal, filed suit against McDonald's for intentional racial discrimination,  bringing to light this renewed pattern and practice of covert and systemic discrimination against Black franchisees post-parity. *Guster-Hines v. McDonald's USA LLC*, No. 20-00117, Compl. [D.E. 1] (N.D. Ill. Jan. 1, 2020).

117. The Guster-Hines Complaint revealed inside information at the corporate level for the first time, alleging McDonald's deliberately divested opportunities from Black franchisees, implemented business plans with a discriminatory impact on Black franchisees, made exceptions for White Next Generation candidates it did not make for Black candidates, graded Black Consumer Market stores "differently, in a negative way," and overall abandoned its commitment to racial equality on a company-wide basis:  "McDonald's continuing pattern and practice of intentional race discrimination [] should outrage everyone, especially those who grew up going to McDonald's and believing the 'Golden Arches' were swell."  *Id*., at ¶¶ 1, 65, 75.

118.    The same pervasive racial discrimination, disparate treatment, and substantial wealth gap for Black franchisees continues today under the leadership of Christopher Kempczinski.

**(v)    *McDonald's Leadership is Once Again on Notice of Ongoing Disparate Treatment of Black Franchisees; Continues Making False Promises***

119.    On March 12, 2019, Tripplett, as Chairman and CEO of the NBMOA, notified McDonald's USA Division Presidents, Charlie Strong and Mario Barbosa, of McDonald's discriminatory actions, in a letter which raised "serious concerns regarding the status of African American Owners within McDonald's Corporation." A copy of the March 12, 2019 Tripplett Letter to McDonald's is attached as **Exhibit "E"** hereto. Specifically, Tripplett advised McDonald's leadership that "**the trajectory of the treatment of African American Owners is moving backwards**. Through no fault of our own we lag behind the general market in all measures. This is reflected in the loss of sales to African American consumers. **We believe that the loss of sales is closely correlated to how African Americans are treated within the Company**." *Id.*, at p. 1 (emphasis added).

120.    Tripplett called for "urgent progress now," given, "[t]he current state of affairs for African American Owners [which] can only be described as hostile." *Id.*, at p. 3. The letter ended with a strong call for action: "**[W]e need change now**." *Id.* (emphasis added).

121.    On November 4, 2019, following Easterbrook's firing, Tripplett provided an "Informational Update" to NBMOA Members, a copy of which is attached as **Exhibit "F"** hereto. Tripplett advised NBMOA members that McDonald's current CEO, Kempczinski, and Joe Erlinger, President of McDonald's USA, called him directly to assure him as follows: "[Kempczinski] expressed his plans to continue to work on our cash flow gaps as he and Steve Easterbrook agreed to do at our convention in Houston," and "[Erlinger] expressed his desire to work with the NBMOA in

27

achieving our initiatives." *Id.*, at p. 1. "We are cautiously optimistic," Tripplett advised NBMOA members. *Id.*

122.    Despite McDonald's empty promises and assurances to the NBMOA, intended to induce Black franchisees like Plaintiffs to operate its substandard stores, McDonald's knowingly continued institutional, systemic, and covert racial discrimination against its Black franchisees.

### C.    "Big Mac Attack" on Black Owner/Operators: McDonald's Intentional and Covert Racial Discrimination

### (i)    *Take it or Leave it: Steering to High-Cost and Low-Volume Locations*

123.    When Plaintiffs sought entrance into the McDonalds's franchise system, McDonald's systematically steered Plaintiffs to stores in Black neighborhoods. These neighborhoods were the tough areas, often filled with high-crime, patrons with little to no means to purchase significant meal tickets, leading to low-volume cash sales and high operating costs in the form of higher insurance rates, security costs, and employee turnover.

124.    McDonald's offered White franchisees packages with no restraints, on better terms, and in better locations than Plaintiffs.

125.    McDonald's induced Plaintiffs into purchasing these substandard restaurants by, among other things, rushing Plaintiffs, and requiring same-day inspections. McDonald's told Plaintiffs that it could take months, if not years, to be offered another restaurant if they turned down a site. McDonald's made Plaintiffs believe that these substandard locations were their only way in.

126.    For example, during Plaintiff Dominique's Operator Approval meeting, McDonald's representatives told him they had a restaurant that they felt would be a "good fit" based on his background in law enforcement. McDonald's told Mr. Dominique that they needed an answer "ASAP" and asked him to fly down to Atlanta, Georgia that same day to inspect the location.

127.    At the time, the restaurant was owned by another Black franchisee, Plaintiff Van Jakes. The restaurant was a non-traditional (no drive-through) site in Downtown Atlanta in a high-crime area and with a significant homeless population.  As Mr. Dominique later learned, McDonald's then Vice-President and General Manager, Debbie Stroud, forced Mr. Jakes out of this restaurant and was now pushing it on to Mr. Dominique as part of McDonald's fraudulent scheme and pattern of discrimination, continuing the same perpetual cycle of giving bad restaurants in bad neighborhoods to Blacks.

128.    Based on McDonald's misrepresentations and omissions regarding the availability of stores, their locations, and future growth opportunities, Plaintiffs believed that if they did not take the store(s) McDonald's offered them, their chances of entering McDonald's franchise system would be extremely limited.  Plaintiffs relied on McDonald's representations because they believed that they had equal access to locations within the McDonald's franchise as Whites.

129.    Unbeknownst to Plaintiffs, McDonald's offered Black franchisees historically underperforming restaurants that White franchisees did not want to purchase.  Conversely, and upon information and belief, White franchisees were routinely given preferred locations and were able to buy and sell restaurants without restriction, allowing them to prosper.

130.    Through this process, McDonald's covertly excluded Plaintiffs from the opportunity to purchase restaurants in the open market and deprived Plaintiffs of the ability to achieve the same level of economic success as White franchisees.

131.    Plaintiffs took the bad to get the good, as McDonald's intentionally misled them by, among other things:  (i) providing Plaintiffs with financial representations that McDonald's knew did not—and could not—accurately reflect the net revenues of the locations it steered Plaintiffs to; (ii) assurances that these restaurants would be profitable if Plaintiffs made significant initial investments

29

in rebuilds and/or renovations, encouraging debt as part of a fraudulent scheme to force Plaintiffs into debt, bankruptcy, and/or economic duress, and more easily cycle them out of the system; and (iii) assurances that any losses would be offset by growth opportunities to better locations, which was the key to any successful McDonald's franchise model.

132.    Even after Plaintiffs entered the system through these substandard locations, McDonald's continued to deny Plaintiffs the opportunity to own and operate franchises in more profitable locations, unless these more profitable locations were packaged with low-volume, high-cost locations.

133.    For example, after Plaintiff Mason increased sales in his initial restaurants located within Walmart stores in the Raleigh/Durham Region with the expectation that he would be given an opportunity to purchase a traditional store, McDonald's again offered Mr. Mason six (6) additional Walmart restaurants.  McDonald's told him that there were no traditional stores available in the market for him to purchase, which was not true.

134.    Marty Ranft, a former QSC VP of the McDonald's Raleigh/Durham Region, had an inventory of McDonald's restaurants located within Walmart stores that White franchisees in the Region did not want to purchase because these restaurants were historically underperforming stores due to low sales volume and located in substandard locations.  McDonald's, by and through Mr. Ranft, steered Plaintiff Mason to an initial 4-store package, take-it-or-leave-it deal, that only included Walmart restaurants in the Virginia market located in substandard locations.

135.    For no reason other than Mr. Mason's race, McDonald's then intentionally limited Plaintiff Mason's ability to grow and expand his franchise organization into traditional stores.  Upon information and belief, Mr. Ranft was known by McDonald's to have made derogatory and racist comments about Black McDonald's employees and franchisees.  For example, and upon further

information and belief, in 2005, Mr. Ranft told McDonald's senior executive, Vicki Guster-Hines, and another Black executive, that "90%" of what the black franchisees had to say about their experiences at McDonald's was a "goddamn lie," and, "You are a [N-word] like all the rest – you just believe you are better cause you are a smart one." *Guster-Hines v. McDonald's USA LLC*, No. 20-00117, Compl. [D.E. 1,], at ¶ 59 (N.D. Ill. Jan. 7, 2020).

136.    What is more, Plaintiffs had to risk their own safety in these high-crime areas, often contending with drug dealers selling controlled substances inside and outside the restaurant, vagrants hassling customers, multiple incidents of fights, and even a murder in the parking lot of Plaintiff Crawfords' restaurant.

137.    Plaintiffs often had to carry licensed firearms for their personal security.  These dangerous environments made it difficult for Plaintiffs to attract and retain experienced managers and employees.

**(ii)    *McDonald's Requires Plaintiffs to Make Significant Initial Investments: Rebuilds and Renovations***

138.    Despite placing Plaintiffs in locations McDonald's knew could not succeed under its own franchise model, McDonald's required Plaintiffs to invest in rebuilds and/or renovations within a short time, offering initial short-term lower rent, but then rapidly escalating for the remaining franchise term, setting Plaintiffs up for financial failure.

139.    McDonald's knew or should have known that the rebuilds and/or renovations it required would not provide increased sales to Plaintiffs' locations sufficient to offset Plaintiffs' upfront losses.

140.    Plaintiffs paid for the costs associated with any rebuilds, renovations, and major remodels, often seeking outside financing, and driving them into debt.

141. In certain instances where McDonald's contributed to the rebuild and/or renovation costs, McDonald's charged Plaintiffs escalating rent it knew Plaintiffs could not afford.

142. Upon information and belief, White-owner/operators were not immediately required to rebuild and McDonald's placed White owner/operators on a voluntary reinvestment program without the same time restrictions.

143. McDonald's required Plaintiff Jakes, for example, to make substantial and numerous reinvestments in his Panola Road, Georgia restaurant. During the twenty-two (22) years he owned and operated Panola Road, McDonald's required him to rebuild or reinvest in the store three (3) times. By contrast, a White owner/operator, Patrick Dennis, was allowed to operate a much older restaurant just a few miles down the road from him in Peachtree City, Georgia for years without being required to rebuild (e.g., changing green roof to red roof and other modernizations).

144. Similarly, after purchasing the ten (10) stores, Plaintiff Brown was told he had only six (6) months to bring the stores to National Restaurant Brand Standards, even though the stores had remained in the same condition for more than five (5) years prior to his ownership.

145. Even McDonald's own McOpCo stores were kept in disrepair for years until McDonald's turned around and immediately required Plaintiffs to reinvest in significant rebuilds and/or renovations as a condition of purchase.

146. When McDonald's forced Plaintiffs out and offered stores to White owner/operators, McDonald's did not require White owner/operators to immediately reinvest and/or remodel by a certain date. Upon information and belief, certain restaurants Plaintiffs sold to White owner/operators years ago are in the same condition Plaintiffs left them.

147. On the other hand, in certain cases where McDonald's offered Plaintiffs' stores to Black owner/operators, McDonald's required immediate reinvestment and/or remodels, continuing

the same perpetual cycle of giving bad restaurants in bad neighborhoods to Black owner/operators and setting them up for financial failure to then force them out and start the cycle again.

148.     McDonald's rebuild and renovation requirements forced Plaintiffs to sink their own funds into locations McDonald's knew would not provide any return on investment, benefitting only McDonald's as the owner of the real estate, while driving Plaintiffs into significant debt.

**(iii)     *McDonald's Arbitrarily Denies Plaintiffs Opportunities for Growth***

149.     The economics of owning McDonald's franchises is to own more than one location so that overhead costs can be absorbed by the multiple locations and yield a profit to the franchise owners.

150.     McDonald's knew that to grow a profitable franchise organization in its franchise system, Plaintiffs needed restaurants with higher sales volume and cash flow to offset the low-volume, high-cost stores it offered them.

151.     Yet, McDonald's refused reasonable proposals from Plaintiffs to expand within the McDonald's system by opening McDonald's restaurants at sites Plaintiffs were ready, willing, and qualified to operate, offering these profitable locations to White franchisees instead.

152.     For no reason other than Plaintiffs' race, McDonald's systematically rejected Plaintiffs' sites and/or failed to provide Plaintiffs with any meaningful assistance to locate better restaurants in better neighborhoods.

153.     Plaintiffs would wait years before McDonald's made an offer for another store, only to find out they were offering another "hood" restaurant, meaning it was a low-volume store in an economically distressed community with a high crime rate.  These substandard restaurants were consistently offered to Black owner/operators over White owner-operators.

154. In certain instances where Plaintiffs were given the opportunity to purchase a profitable store, it was at a significantly higher premium, with oppressive conditions attached, such as an agreement to purchase other substandard locations as part of a "packaged deal."

155. Despite McDonald's representations and continued assurances to Plaintiffs that it would assist in growth opportunities, McDonald's continued to intentionally deprive Plaintiffs of any meaningful assistance to find other viable expansion locations over the course of their franchise relationship.

156. Indeed, McDonald's did the opposite and went as far as to saturate the market and encroach upon Plaintiffs' locations by opening McDonald's stores just miles apart.

157. While McDonald's offered impact funds to offset new store competition to White operators up front before the new, competing restaurant became operational, Plaintiffs were made to "wait and see," until the actual impact could be assessed. This forced Plaintiffs to continue to operate at a loss, sometimes for more than a year, while they waited for the full impact of the competing stores to be realized and assessed.

(iv) *McDonald's False Promise of "Rent Relief" and Misleading Financial Assistance*

158. Despite Plaintiffs' significant investments and hard work over decades in the McDonald's franchise system, when Plaintiffs requested financial assistance to reduce the rent, McDonald's either denied their requests or rent was temporarily reduced and then escalated causing further financial harm.

159. McDonald's knew when it escalated Plaintiffs' rents that Plaintiffs would not be able to pay their rent over the long term, yet McDonald's refused to provide Plaintiffs with permanent rent relief, even though McDonald's offered this relief to White franchisees.

34

160. Through the FDD, McDonald's provided Plaintiffs with a table of total acquisition and development costs, along with Fixed Percentage Rent rates, explaining how McDonald's sets and controls these costs and rent rates as follows:

> The percentages used in computing monthly payments based on Gross Sales are **determined by McDonald's management** in consideration of the rights being granted by the Franchise Agreement, **the drawing power of the McDonald's restaurant**, the value of the McDonald's System as a whole and **McDonald's interests in obtaining a profit in light of competitive conditions**. All payments made by you to McDonald's constitute a single financial arrangement between you and McDonald's which, taken as a whole and without regard to any designation or description, reflect the value of the rights being made available to you by McDonald's and the services being rendered by McDonald's during the franchise term. The percentages may vary among franchises depending upon when the franchise was sold as well as other factors. In unusual circumstances that involve special costs, the fees paid by you may be higher than those outlined in this Item 6.

(*See* FDD, Ex. B, at Item 6) (emphasis added).

161. After placing Plaintiffs in restaurants with no "drawing power," guided by McDonald's own "interests in obtaining a profit," McDonald's denied Plaintiffs any legitimate financial assistance, including, but not limited to, repeated requests for permanent rent reductions, financial restructuring, and paying for security not required by White owned and operated restaurants.

162. For example, after McDonald's steered Plaintiff Sims to a one of the most dangerous areas of Atlanta, plagued by drugs and prostitution, Mr. Sims asked McDonald's to pay for an armed security guard and provide a permanent rent reduction. McDonald's refused. When Mr. Sims declined to renew his agreement for this initial, substandard store, McDonald's began to impose escalated inspections of his other restaurants and he suddenly began to have bad business reviews. Finally, McDonald's targeted Mr. Sims under the pretext of BBV2020 in order to require unreasonable renovations and find him in breach for failing to comply. Like all Plaintiffs named herein, McDonald's kept Mr. Sims on the hook throughout his franchise term through false promises

35

and minimal relief efforts, as it drove him further and further into debt, isolating him at every step of the process to then make it easier to force him out once he was no longer profitable to McDonald's.

(v) *Targeted and Unreasonable Inspections and Grading*

163. Once Plaintiffs were in dire financial situations and/or refused to continue operations in crime-ridden neighborhoods with low-volume sales, McDonald's began targeted, rigorous, and unreasonable inspections and harsh grading that White franchisees were not subjected to, generating negative business reviews of Plaintiffs' restaurants.

164. The number of inspections grew exponentially, with close to ten (10) inspections in a single quarter in certain instances, and the inspections began to take place late at night or at odd hours.

165. Whereas Plaintiffs generally had positive business reviews prior to experiencing financial hardship and/or rejecting McDonald's offer to continue to operate in substandard locations, that immediately shifted as McDonald's began grading Plaintiffs more harshly in business reviews in a manner that disproportionately impacted Black franchisees as compared to White franchisees.

166. McDonald's knew and leveraged the fact that Plaintiffs' eligibility for growth and renewal, or "rewrite," of their franchise term depended on business reviews and passing inspections.

167. By instituting harsher grading standards and through unreasonable inspections, McDonald's negatively impacted Plaintiffs' performance ratings as pretext for McDonald's denial of growth and/or rewrite opportunities.

(vi) *No Choice But to Sell: McDonald's Forced Exit Scheme*

168. Under the oppressive terms of McDonald's rewrite process, McDonald's has absolute and sole discretion with respect to whether a franchisee may or may not be offered a new term franchise, or "rewrite." *See* McDonald's U.S. Rewrite (New Term) Policy ("McDonald's Rewrite Policy"), Exhibit L to the FDD, which is subject to change "in McDonald's sole discretion."

169.     Pursuant to McDonald's Rewrite Policy, three (3) years prior to the franchise term expiring, the rewrite process begins.  (FDD, Ex. B, at Exhibit L).  McDonald's controls the rewrite o process:  Only McDonald's Rewrite Committee has the authority to offer or decline to offer a new term franchise, the Rewrite Committee's recommendations are submitted by the Vice President of the Field Office of the Rewrite Committee, compromised of members of McDonald's U.S. management.  *Id*.  The decision of the Rewrite Committee is final.  *Id*.

170.     When McDonald's concludes that it will not offer a new term franchise, McDonald's will extend an "alternative offer, which will give the Owner/Operator the opportunity to sell the restaurant business to a **qualified buyer** prior to the expiration of the current franchise.  Subject to the terms stated in the alternative offer, which include a release, McDonald's will commit to offer a new term franchise to the **qualified buyer**."  *Id*. (emphasis added).

171.     Plaintiffs with interested buyers were blocked by McDonald's, who had final approval in "qualifying" buyers.  McDonald's rejected Plaintiffs' potential buyers without any legitimate business justification.  For example, when Plaintiff Christine Crawford presented a list of operators interested in purchasing her restaurants, the general manager of the Atlanta Region, Greg Watson, told Ms. Crawford that she could only offer them to operators who were, "a part of the class picture of the region's future."  Similarly, in an email from McDonald's Atlanta Region Vice President, Valarie Williams, McDonald's told Ms. Crawford, "The QSC VP will provide names of potential buyers that are supported by the region for you to negotiate the sale of your restaurants."

172.     Because McDonald's controlled the exit process, there was no way for Plaintiffs to gauge what their restaurants could have sold for in an open market.

173.     McDonald's systematically dealt with Plaintiffs on an individual basis to cover up their discriminatory practices and fraudulent scheme from Black franchisees.

174. McDonald's led Plaintiffs to believe at all times material hereto that they had no choice but to sell and that their financial losses were caused by Plaintiffs' individual deficiencies as a "bad operators" or operational deficiencies within Plaintiffs' network of stores.

175. With the looming threat of further financial penalties, and no process for disputing qualification denials of buyers in the rewrite process McDonald's controlled, Plaintiffs could not afford to wait for another "qualified buyer," and were forced to sell their stores at a loss.

176. As a result of McDonald's discriminatory practices, unfair retaliation, bad faith breach of contract, and fraud alleged herein, Plaintiffs have suffered substantial damages in amounts that will be proven at trial, including, but not limited to, lost profits, lost value of the franchise(s), lost capital contributions, lost investments, lost revenue, lost business opportunities, attorneys' fees, costs, and any and all unnecessary out-of-pocket expenses.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF 42 U.S.C. § 1981
**(As to Plaintiffs, Christine Crawford, Delores Crawford, Juneth N. Daniel, Yves Dominique, Van Jakes, Ralph King, Keith Manning, Kenneth Manning, Dawn Mussenden, Laetitia Johnson, Carrie Salone, Floyd Sims, Larry Brown, John Mason, Ronnie Thornton, Lisa Gunter, Mitchell McGuire, Lois McGuire, Hayes Ferrell, Yvonne Knox, Arthur Scott, Errol Service, Melvin Jones, George Gipson, Michael Simon, Victor Bruce, David White, John Tillman, Allen Stafford, Kurt Holloway, Kent Jones, Wise Finley, and Lewis Anderson, against McDonald's)**

177. Plaintiffs, Christine Crawford, Delores Crawford, Juneth N. Daniel, Yves Dominique, Van Jakes, Ralph King, Keith Manning, Kenneth Manning, Dawn Mussenden, Laetitia Johnson, Carrie Salone, Floyd Sims, Larry Brown, John Mason, Ronnie Thornton, Lisa Gunter, f/k/a Lisa McKenzie, Mitchell McGuire, Lois McGuire, Hayes Ferrell, Yvonne Knox, Arthur Scott, Errol Service, Melvin Jones, George Gipson, Michael Simon, Victor Bruce, David White, John Tillman, Allen Stafford, Kurt Holloway, Kent Jones, Wise Finely, and Lewis Anderson, adopt, reallege, and

incorporate the allegations of paragraphs 1 through 176 of this Complaint as though fully set forth herein.

178.    Plaintiffs are members of a protected class due to their race as Black citizens who have the same right to make and enforce contracts as White citizens pursuant to 42 U.S.C. § 1981.

179.    The Franchise Agreements between Plaintiffs and McDonald's are "contracts" within the meaning of Section 1981, providing that Black citizens have the same right to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the [franchise] relationship" as White citizens.  42 U.S.C. § 1981(b).

180.    McDonald's violated Section 1981 by denying Plaintiffs the same franchise opportunities made available to White franchisees.

181.    McDonald's treated Plaintiffs differently from other similarly-situated franchisees in their region and nationwide because they are Black, by, including, but not limited to:

   a.    Restricting Plaintiffs to older, recycled restaurants, in poor-performing and dangerous locations with high operating costs and low-volume sales;

   b.    Requiring Plaintiffs to invest in rebuilds and/or renovations within short timeframes not required of White franchisees;

   c.    Excluding Plaintiffs from the same growth opportunities offered to White franchisees;

   d.    Failing to provide any legitimate business reasons for repeated denials of franchise opportunities to Plaintiffs over many years;

   e.    Denying Plaintiffs meaningful support to allow them to overcome financial hardships, while White franchisees were routinely provided such assistance, including, but not limited to, permanent rent relief and impact funding;

   l.    Depriving Plaintiffs of the same legacy opportunities offered to White franchisees through McDonald's Next Gen program;

   m.    Retaliation against Plaintiffs for rejecting offers to continue operations in crime-ridden neighborhoods with low-volume sales, including through

39

targeted, increased, and unreasonable inspections;

n.    Disparate treatment with respect to inspections and grading of Plaintiffs' restaurants as part of a scheme to generate bad business reviews to force Plaintiffs out of the McDonald's system because of their race; and/or

o.    Placing Plaintiffs in untenable positions of economic duress, denying them eligibility for growth and renewal of their agreements, and arbitrarily denying final approval of their buyers, so that Plaintiffs had no choice but to sell their entire franchise organization at a loss or walk away from the business after decades investing in and cultivating their businesses.

182.    By the conduct described above, Defendants intentionally and willfully deprived Plaintiffs of the same rights enjoyed by White citizens to be free from racial discrimination in the right to enter into contracts and the right to enjoy all of the privileges and benefits of established contractual relationships in violation of 42 U.S.C. § 1981.

183.    As a direct and proximate result of McDonald's conduct, Plaintiffs collectively lost over two-hundred (200) stores with compensatory damages averaging between four million dollars ($4,000,000.00) and five million dollars ($5,000,000.00) per store.

184.    As a direct and proximate result of McDonald's violations of Section 1981, Plaintiffs, Christine Crawford, Delores Crawford, Juneth N. Daniel, Yves Dominique, Van Jakes, Ralph King, Keith Manning, Kenneth Manning, Dawn Mussenden, Laetitia Johnson, Carrie Salone, Floyd Sims, Larry Brown, John Mason, Ronnie Thornton, Lisa Gunter, f/k/a Lisa McKenzie, Mitchell McGuire, Lois McGuire, Hayes Ferrell, Yvonne Knox, Arthur Scott, Errol Service, Melvin Jones, George Gipson, Michael Simon, Victor Bruce, David White, John Tillman, Allen Stafford, Kurt Holloway, Kent Jones, Wise Finely, and Lewis Anderson, suffered and continue to suffer damages in an amount in excess of the jurisdictional limit, including, without limitation: special or consequential damages in the form of lost profits and opportunities; damages for the intangible injury that results from the denial of civil rights under the law; emotional and physical suffering and distress, humiliation,

damage to professional reputations and future business prospects; punitive damages in an amount sufficient to deter Defendants' similar wrongful conduct in the future; and an award of attorneys' fees, expert fees, and costs.

WHEREFORE, Plaintiffs, Christine Crawford, Delores Crawford, Juneth N. Daniel, Yves Dominique, Van Jakes, Ralph King, Keith Manning, Kenneth Manning, Dawn Mussenden, Laetitia Johnson, Carrie Salone, Floyd Sims, Larry Brown, John Mason, Ronnie Thornton, Lisa Gunter, f/k/a Lisa McKenzie, Mitchell McGuire, Lois McGuire, Hayes Ferrell, Yvonne Knox, Arthur Scott, Errol Service, Melvin Jones, George Gipson, Michael Simon, Victor Bruce, David White, John Tillman, Allen Stafford, Kurt Holloway, Kent Jones, Wise Finely, and Lewis Anderson, respectfully request that the Court enter judgment against Defendants awarding Plaintiffs (a) actual damages, (b) special or consequential damages in the forms described above, (c) fees and costs of this action, and (d) such other and further relief as the Court deems proper.

### COUNT II
### BAD FAITH BREACH OF CONTRACT
**(As to All Plaintiffs Against Defendants)**

185. Plaintiffs adopt, reallege and incorporate the allegations of paragraphs 1 through 176 of this Complaint as though fully set forth herein.

186. Plaintiffs entered into Franchise Agreements to own and operate McDonald's domestic franchised restaurants, on the entry dates, and in the locations specified for each Plaintiff specified in paragraphs 26 through 73.

187. Pursuant to Section 3 of the Franchise Agreement, "General Services of McDonald's," McDonald's agreed to, "**make available to Franchisee all additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes generally**

**available, from time to time, to all its franchisees** operating McDonald's restaurants." (Franchise Agreement, Ex. A, at ¶ 3) (emphasis added).

188.   McDonald's further agreed to a reasonableness standard with respect its inspection and rebuild rights pursuant to Section 12, "Compliance with Entire System," as follows:

> McDonald's shall have the right to inspect the Restaurant at all **reasonable** times to ensure that Franchisee's operation thereof is in compliance with the standards and policies of the McDonald's System.
>
> Franchisee shall comply with the entire McDonald's System, including, but not limited to, the following: (c) Keep the Restaurant constructed and equipped in accordance with the building blueprints and equipment layout plans that are standard in the McDonald's System or as such blueprints and plans may be **reasonably** changed from time to time by McDonald's.

(*Id*., at ¶ 12) (emphasis added).

189.   McDonald's breached <u>Section 3</u> of the Franchise Agreement by, *inter alia*:

    a.   Excluding Plaintiffs from growth opportunities made available to White franchisees without any legitimate business reason;

    b.   Denying Plaintiffs the same level of meaningful financial assistance offered to White franchisees, including, but not limited to, permanent rent adjustments and impact funding;

    c.   Excluding Plaintiffs from participation in the Next Gen legacy program;

    d.   Disproportionately imposing rebuild and/or renovation requirements on Plaintiffs that were not imposed on White franchisees; and/or

    e.   Failing to approve reasonable requests for financial assistance and/or restructuring plans.

190.   McDonald's breached <u>Section 12</u> of the Franchise Agreement by *inter alia*:

    a.   Demanding unnecessary and unreasonable rebuilds and/or renovations of Plaintiffs' restaurants in locations that McDonald's knew would not provide any return on investment; and/or

    b.   Increased, harassing, and targeted inspections of Plaintiffs' restaurants.

191.    Beyond the written terms of the Franchise Agreement, McDonald's owed a duty of good faith and fair dealing to Plaintiffs in its performance under the Franchise Agreement.

192.    In its performance of the Franchise Agreement, McDonald's violated its duty of good faith and fair dealing by, *inter alia*:

a.    Engaging in unreasonable and targeted inspections of Plaintiffs' restaurants;

b.    Applying harsher grading standards to Plaintiffs' restaurants in order to generate bad business reviews;

c.    Denying Plaintiffs meaningful financial assistance, including, rent relief and impact money for building new stores within their trade area;

d.    Imposing excessive costs and investments and modifications, including those required under the BBV2020 plan, and then arbitrarily reneging on the "unprecedented investment" promised by McDonald's through its partnering program;

e.    Placing Plaintiffs in positions of economic duress and asking Plaintiffs to sign one-sided release agreements at every step of the franchise relationship; and/or

f.    Forcing Plaintiffs to sell their franchises at a loss after failing to approve reasonable requests for financial assistance and/or restructuring plans, that could have resolved any outstanding obligations and debt on one store in the organization and allow Plaintiffs to remain in the system.

193.    As a direct and proximate result of McDonald's conduct, Plaintiffs collectively lost over two-hundred (200) stores with compensatory damages averaging between four million dollars ($4,000,000.00) and five million dollars ($5,000,000.00) per store.

194.    As a direct, proximate, and foreseeable result of McDonald's breach of contract and bad faith, Plaintiffs have incurred substantial damages in amounts that will be proven at trial, including, without limitation, reasonable compensation for the time and effort expended in planning and preparing their franchise business, lost profits, and out-of-pocket expenses they incurred in pursuing the franchise business, in an amount in excess of the jurisdictional limit, and any applicable prejudgment and post-judgment interest.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants, awarding Plaintiffs (a) actual damages, (b) special or consequential damages in the forms described above, and (c) such other and further relief as the Court deems proper.

**COUNT III**
**FRAUDULENT INDUCEMENT AND FRAUDULENT OMISSION**
**(As to All Plaintiffs Against Defendants)**

195.    Plaintiffs adopt, reallege and incorporate the allegations of paragraphs 1 through 176 of this Complaint as though fully set forth herein.

196.    As fully set forth above, McDonald's made misrepresentations of material fact and/or failed to disclose material information, including, but not limited to:

a.    Representing that the substandard locations it offered Plaintiffs were the only available sites and that other sites were extremely limited;

b.    Representing to Plaintiffs that the financial performance of Plaintiffs' restaurant locations would be in line with the national average of domestic traditional McDonald's restaurants opened at least one (1) year prior;

c.    Failing to disclose that McDonald's would require Plaintiffs to rebuild and/or remodel their restaurants, with little or no impact on sales, on short timelines, and without permanent rent relief;

d.    Failing to disclose that McDonald's would offer growth opportunities to higher-volume, lower cost locations to White franchisees over Black franchisees;

e.    Representing that Plaintiffs would be given equal opportunity for renewal upon expiration of their franchise terms;

f.    Failing to disclose that Plaintiffs' restaurants would be subject to unreasonable and targeted inspections when Plaintiffs experience financial difficulty;

g.    Failing to disclose that Plaintiffs' restaurants would be subject to harsher grading than similarly situated franchisees to generate bad business reviews when Plaintiffs experience financial difficulty; and/or

h.    Failing to disclose that McDonald's had no intention of qualifying Plaintiffs' ready and willing buyers at the point of exit.

197. McDonald's knew or should have known that these representations were false.

198. McDonald's intended that these statements and material omissions would induce Plaintiffs to accept substandard locations, invest in significant renovations and/or rebuilds, accept unequal terms as part of temporary financial assistance, continue to accept substandard stores as a condition to own and operate profitable stores, accept McDonald's rewrite denial and sell their stores.

199. Plaintiffs did not know, have reason to know, nor could have discovered, through the exercise of reasonable diligence, the falsity of the foregoing misrepresentations and/or omissions when made.

200. As the result of Defendants' actions, Plaintiffs were unaware, and could not know or have learned through reasonable diligence, that entering the McDonald's franchise system would deprive them of franchise opportunities offered to White franchisees and that the deprivation of those contractual rights were a direct and proximate result of Defendants' acts and omissions.

201. Plaintiffs reasonably and justifiably relied upon McDonald's misrepresentations and made financial decisions to their detriment.

202. As a direct and proximate result of McDonald's conduct, Plaintiffs collectively lost over two-hundred (200) stores with compensatory damages averaging between four million dollars ($4,000,000.00) and five million dollars ($5,000,000.00) per store.

203. As a direct, proximate, and foreseeable result of McDonald's fraudulent misrepresentations and concealment, Plaintiffs have incurred substantial damages in amounts that will be proven at trial, including without limitation, lost profits and other damages in excess of the jurisdictional limit.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants awarding Plaintiffs (a) actual damages, (b) special or consequential damages in the forms described above, and (c) such other and further relief as the Court deems proper.

## COUNT IV
## PUNITIVE DAMAGES
### (As to All Plaintiffs Against Defendants)

204.     Plaintiffs adopt, reallege, and incorporate each and every allegation in paragraphs 1 through 176 of the Complaint as if fully restated herein.

205.     McDonald's engaged in willful, wanton, malicious, and or/reckless conduct that injured Plaintiffs in disregard of their protected rights.

206.     McDonald's willful, wanton, malicious, and/or reckless conduct includes, but is not limited to, its racially discriminatory practices and fraudulent conduct that resulted in substantial and irreparable damages sustained by Plaintiffs.

207.     McDonald's has demonstrated an outrageous conscious disregard for Plaintiffs' rights with implied malice, warranting the imposition of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants and request the following relief from the Court:

a.     Declaration that the acts and practices complained of herein are violations of 42 U.S.C. § 1981;

b.     Direct Defendants to make Plaintiffs whole for all earnings and benefits they would have received but for Defendant's discriminatory treatment;

c.     General, compensatory, and consequential damages in amounts to be proven at trial, including, without limitation:

(1)     damages in in excess of the jurisdictional limit;

46

(2)     lost business opportunities because of McDonald's unjustifiable refusal to offer such opportunities to Plaintiffs;

(3)     excessive and unreasonable costs and expenses due to substandard franchise location;

(4)     insufficient sales volume due to substandard franchise location;

(5)     loss of profits because of excessive expenses and insufficient sales volume due to substandard franchise location;

(6)     loss of franchise value because of inability to extinguish debt and meet operating expenses due to substandard franchise location;

(7)     loss of franchises due to discriminatory conduct; and

(8)     additional damages for emotional and physical suffering and distress, humiliation, damage to professional reputations, and to future busines prospects.

d.     an award of punitive damages in an amount sufficient to deter Defendant's similar wrongful conduct in the future;

e.     an order for an award of attorney's fees, expert fees, and costs, as provided by law;

f.     an award of pre-judgment and post-judgment interest as provided by law; and

g.     an order for all such other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues so triable as a matter of right.


DATED this 31st day of August, 2020.          Respectfully submitted,

**THE FERRARO LAW FIRM, P.A.**
*Attorneys for Plaintiffs*

*/s/ James L. Ferraro*
James L. Ferraro, Esq.
Florida Bar No.: 381659
jlf@ferrarolaw.com
Mamie C. Joeveer, Esq.
Florida Bar No.: 79045

mcj@ferrarolaw.com
Janpaul Portal, Esq.
Florida Bar No.: 0567264
jpp@ferrarolaw.com
Natalia Salas, Esq.
Florida Bar No.:  44895
nms@ferrarolaw.com
Brickell World Plaza
600 Brickell Avenue, 38th Floor
Miami, Florida 33131
Telephone: (305) 375-0111
Facsimile: (305) 379-6222

and

William R. Fahey, Esq.
Illinois Bar No.: 3127912
bfahey@cooneyconway.com
Cooney & Conway
120 N. LaSalle Street, 30th Floor
Chicago, IL 60602
Telephone: (312) 236-6166

*Designated as Local Counsel*
*Pursuant to Local Rule 83.15*