# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

CHRISTINE CRAWFORD, DELORES
CRAWFORD, JUNETH N. DANIEL, YVES
DOMINIQUE, VAN JAKES, RALPH KING, KEITH
MANNING, KENNETH MANNING, DAWN
MUSSENDEN, LAETITIA JOHNSON, CARRIE
SALONE, FLOYD SIMS, LARRY BROWN, JOHN
MASON, RONNIE THORNTON, LISA GUNTER,
F/K/A LISA MCKENZIE, MITCHELL MCGUIRE,
LOIS MCGUIRE, HAYES FERRELL, YVONNE
KNOX, ARTHUR SCOTT, ERROL SERVICE,
MELVIN JONES, GEORGE GIPSON, MICHAEL
SIMON, VICTOR BRUCE, DAVID WHITE,
BARBARA WHITE, JOHN TILLMAN, ALLEN
STAFFORD, KERISTIN HOLLOWAY, GLORIA
HOLLOWAY, GEORGE JONES, JANE JONES,
WISE FINLEY, LEWIS ANDERSON, SCOTT
MILLER, DWIGHT MILLER, FAYE HOBLEY,
PAUL HOSKINS, MICHELE HOSKINS, AL HARRIS,
KRISTEN HARRIS, NORMAN H. WILLIAMS,
WILLIAM (PETE) WASHINGTON, BENNY CLARK,
ELEANOR CLARK, HAROLD LEWIS, JEREMY
LEWIS, PHILIP DOUGLAS, LAWRENCE HOLLAND,
WILLIAM RASUL, LEROY WALKER, JR., JEFFERY
ROGERS, JOSEPH MBANEFO, ANNIS
ALSTON-STALEY, HARRY STALEY, GORDON
THORNTON, DWAYNE RICHARD JOHNSON,
SERGE TANCREDE, KAREN TANCREDE, ERROL
THYBULLE, JEREMIAH SIMMONS, DARRYL
UMPHRIES, JACQUELINE GEORGE, ANTHONY
GEORGE, WESLEY HALL, GLENDA CLAYPOOL,
AS PERSONAL REPRESENTATIVE OF THE ESTATE
SHERMAN CLAYPOOL, KENNETH NELSON,
BERNARD SAFFOLD, LANCE WILLIAMS,
JACQUELINE WYNN, ROBERT (BOB) BONNER,
GARY ROAN, JOYCE MANCE-ROAN, DOUGLAS
HOLLIS, AND GLENNA HOLLIS,

                Plaintiffs,

v.

McDONALD'S USA, LLC, a Delaware
limited liability company, and
McDONALD'S CORPORATION, a
Delaware corporation,
                Defendants.

Case No.: 1:20-cv-05132

Hon. Judge Steven C. Seeger

Jury Trial Demanded

## AMENDED COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

JURISDICTION AND VENUE ........................................................................... 8

THE PARTIES ...................................................................................................... 9

   A. Plaintiffs ...................................................................................................... 9

   B. Defendants ................................................................................................. 21

COMMON FACTUAL ALLEGATIONS ......................................................... 22

   A. The McDonald's Franchise Model:  Unequal Bargaining Power, The Franchise
      Agreement, and Misleading Franchise Disclosure Documents .................... 22

         (i)      *The Franchise Agreement* ........................................................ 23

         (ii)     *The Cost to Operate a McDonald's Franchise* ......................... 28

         (iii)    *A Financial Suicide Mission: The Cost to Operate a Black McDonald's
                   Franchise* .............................................................................. 29

   B. McDonald's History of Discrimination Against Black Franchisees ............ 29

         (i)      *Boycott in Cleveland 1969* ...................................................... 30

         (ii)     *Trouble Under the Golden Arches:  Black Franchisee Sues McDonald's
                   for Racial Steering* ................................................................. 31

         (iii)    *McDonald's Admits Racial Steering and Need for Parity* ........ 33

         (iv)    *Change in McDonald's Leadership in 2015:  Reverse Course for Black
                   Franchisees* ........................................................................... 36

         (v)     *McDonald's Leadership is Once Again on Notice of Ongoing Disparate
                   Treatment of Black Franchisees; Continues Making False Promises* ....... 37

**C. "Big Mac Attack" on Black Owner/Operators:**
**McDonald's Intentional and Covert Racial Discrimination** ........................................38

(i)    *Take it or Leave it:*
*Steering to High-Cost and Low-Volume Locations* .................................38

(ii)    *McDonald's Requires Plaintiffs to Make Significant Initial Investments*
*in Substandard Locations: Unreasonable Rebuilds and Renovations* ....41

(iii)    *McDonald's Arbitrarily Denies Plaintiffs Opportunities for Growth* ......44

(iv)    *McDonald's False Promise of "Rent Relief" and Misleading Financial*
*Assistance* ...............................................................46

(v)    *Targeted and Unreasonable Inspections and Grading* ..........................47

(vi)    *No Choice But to Sell:  McDonald's Forced Exit Scheme* ......................48

**CAUSES OF ACTION** ..............................................................50

Count I – Violation of 42 U.S.C. § 1981 .........................................50

Count II – Breach of Contract ...................................................54

Count III – Fraudulent Omission .................................................59

**PRAYER FOR RELIEF** ............................................................61

**DEMAND FOR JURY TRIAL** .....................................................62

**AMENDED COMPLAINT**

Plaintiffs, Christine Crawford, Delores Crawford, Juneth N. Daniel, Yves Dominique, Van Jakes, Ralph King, Keith Manning, Kenneth Manning, Dawn Mussenden, Laetitia Johnson, Carrie Salone, Floyd Sims, Larry Brown, John Mason, Ronnie Thornton, Lisa Gunter, f/k/a Lisa McKenzie, Mitchell McGuire, Lois McGuire, Hayes Ferrell, Yvonne Knox, Arthur Scott, Errol Service, Melvin Jones, George Gipson, Michael Simon, Victor Bruce, David White, Barbara White, John Tillman, Allen Stafford, Keristin Holloway, Gloria Holloway, George Jones, Jane Jones, Wise Finley, Lewis Anderson, Scott Miller, Dwight Miller, Faye Hobley, Paul Hoskins, Michele Hoskins, Al Harris, Kristen Harris, Norman H. Williams, William (Pete) Washington, Benny Clark, Eleanor Clark, Harold Lewis, Jeremy Lewis, Philip Douglas, Lawrence Holland, William Rasul, LeRoy Walker, Jr., Jeffery Rogers, Joseph Mbanefo, Annis Alston-Staley, Harry Staley, Gordon Thornton, Dwayne Richard Johnson, Serge Tancrede, Karen Tancrede, Errol Thybulle, Jeremiah Simmons, Darryl Umphries, Jacqueline George, Anthony George, Wesley Hall, Glenda Claypool, as Personal Representative of the Estate of Sherman Claypool, Kenneth Nelson, Bernard Saffold, Lance Williams, Jacqueline Wynn, Robert (Bob) Bonner, Gary Roan, Joyce Mance-Roan, Douglas Hollis, and Glenna Hollis (collectively, "Plaintiffs"), hereby bring this action against Defendants, McDonald's USA LLC ("McDonald's USA"), a Delaware limited liability company, and McDonald's Corporation, a Delaware corporation ("McDonald's Corporation," together with McDonald's USA, "McDonald's" or "Defendants"), and allege as follows:

**INTRODUCTION**

1. Plaintiffs are Black, former McDonald's franchisees, who bought into McDonald's public commitment to the Black communities it serves only to be misled and denied equal opportunity to economic success by McDonald's systematic and covert racial discrimination.

2.      Plaintiffs entered the McDonald's franchise system with the expectation that it would open the door to opportunities to develop thriving businesses to pass on to their children.

3.      Plaintiffs were more than McDonald's franchisees; they were employers and pillars in their communities.  In many cases, they became parental figures providing the safety and security often lacking in the depressed, crime-ridden neighborhoods that McDonald's steered them to.

4.      For more than 50 years, McDonald's has branded itself as a socially conscious company, committed to strengthening Black entrepreneurship, and embracing racial opportunity as a critical component of its corporate culture.

5.      On June 16, 2020, McDonald's Chief Executive Officer, Christopher Kempczinski, appeared on CNBC's "Mad Money with Jim Cramer" and stated that, "*McDonald's has created more millionaires within the Black community than probably any other corporation on the planet*."

6.      In response to the murder of George Floyd and the Black Lives Matter movement, McDonald's proclaimed, "*We do not tolerate inequity, injustice, or racism*."  McDonald's advertisements read, "They were all one of us.  We see them in our customers.  We see them in our crew members.  *We see them in our franchisees*.  And this is why the entire McDonald's family grieves.  It's why we stand for them and any other victims of systematic oppression and violence."

7.      As recently as McDonald Corporation's Verified Complaint against its former CEO, Stephen J. Easterbrook, McDonald's continues to falsely represent a corporate commitment to equality:  "Today, [McDonald's] continues its efforts to cultivate a safe, nondiscriminatory, and respectful workplace, including most recently through a renewed values statement that makes clear McDonald's commitment to operating its business with integrity and *creating equal opportunities*."  *McDonald's Corporation v. Easterbrook*, Case Id. 2020-0658, Verified Compl. [D.E. 1], at ¶ 34 (Del. Ch. Aug. 10, 2020) (emphasis added).

8.      These statements are patently **false** and highlight the dichotomy between McDonald's corporate ethos as a recruiter and developer of Black entrepreneurs and its record on race: McDonald's has a decades-long history of racial discrimination against its own Black franchisees.

9.      McDonald's proclaims a commitment to racial equality, profits from its Black customers, yet places Black franchisees in locations that are destined to fail, with low-volume sales and high operating costs, leading to consistent profit shortfalls or losses, impeding Black franchisees' efforts to grow as they acquire other stores, necessary for success under McDonald's own franchise model, to force Black franchisees out, repeating this pattern of misconduct over and over again.

10.     McDonald's racial discrimination has resulted in an increasing cash flow gap between McDonald's Black franchisees as compared to White ones.  This cash flow gap **more than tripled** from 2010 to 2019, per National Black McDonald's Operators Association ("NBMOA") data.

11.     Plaintiffs' average annual sales of $2 million was **more than $700,000 under** McDonald's national average of $2.7 million between 2011 and 2016, and $2.9 million in 2019.

12.     As a result, the historic high of approximately 400 Black McDonald's franchisees in 1998 has been **more than cut in half**.  Today, there are less than 200 Black franchisees.  *See* Figure 1 below, based on NBMOA and McDonald's data.

13.     At the same time, from 1998 to date, the total number of McDonald's franchised restaurants **more than doubled**.  *See* Figure 2 below, based on data from McDonald's Corporation.

14.     These differences are statistically significant and are the result of Defendants' racial bias and barriers within the McDonald's franchise system, effectuated by Defendants through systematic and covert racial discrimination targeted against Black franchisees.

3

**Exodus of Black Franchisees 1998 – 2020**

| END OF YEAR | BLACK FRANCHISEES |
|---|---|
| 1998 | 377 |
| 1999 | 368 |
| 2000 | 350 |
| 2001 | 347 |
| 2002 | 333 |
| 2003 | 319 |
| 2004 | 320 |
| 2005 | 313 |
| 2006 | 305 |
| 2007 | 304 |
| 2008 | 304 |
| 2009 | 294 |
| 2010 | 285 |
| 2011 | 283 |
| 2012 | 276 |
| 2013 | 270 |
| 2014 | 261 |
| 2015 | 255 |
| 2016 | 236 |
| 2017 | 222 |
| 2018 | 207 |
| 2019 | 194 |
| 2020 | 186 |

Figure 1: Number of Black McDonald's Franchisees

**Total Number of Franchised McDonald's Restaurants 1998 – 2020**

| YEAR | TOTAL FRANCHISES |
|---|---|
| 1998 | 15,086 |
| 1999 | 15,949 |
| 2000 | 16,795 |
| 2001 | 17,395 |
| 2002 | 17,864 |
| 2003 | 18,132 |
| 2004 | 18,248 |
| 2005 | 18,334 |
| 2006 | 22,880 |
| 2007 | 24,471 |
| 2008 | 25,465 |
| 2009 | 26,216 |
| 2010 | 26,338 |
| 2011 | 27,075 |
| 2012 | 27,882 |
| 2013 | 28,691 |
| 2014 | 29,544 |
| 2015 | 30,081 |
| 2016 | 31,230 |
| 2017 | 34,108 |
| 2018 | 35,085 |
| 2019 | 36,059 |
| 2020 | 38,999 |

Figure 2: Number of McDonald's Franchised Restaurants

4

15.     McDonald's definition of success is a one-way street:  as long as McDonald's is paid its rent, service fees, related vendor expenses, and renovation loans with McDonald's approved banks, the franchisee is a "success" by McDonald's standards, regardless of the fact that the individual franchisee has not earned **a single dollar** of profit for him or herself.

16.     On the other hand, an individual franchisee's definition of success is entirely different: on average, a successful McDonald's franchisee makes $400,000 to $500,000 of profit per year, whereas Black McDonald's franchisees were put in locations that had no chance of generating profits for Black franchisees that even come close to that level of success.

17.     Knowing that Black franchisees historically had very limited access to the McDonald's system and would take what they could get, McDonald's systematically kept Black franchisees in underperforming locations with low revenues and high expenses where White franchisees refused to own and operate restaurants.  By steering and restricting Black franchisees growth beyond predominantly Black neighborhoods because of their race, McDonald's increased its own success at the expense of Black franchisees who had little to no success individually.

18.     Black franchisees go in and out of locations with consistent profit shortfalls, on land and buildings owned by McDonald's, operated by Black franchisees to better target Black consumers, with improvements paid for by Black franchisees, maximizing McDonald's profits, while White franchisees are offered newer, safer, and more profitable locations.

19.     But for their race, Black franchisees, and more specifically, the Plaintiffs, would have been given the opportunity to successfully operate newer, safer, and more profitable restaurants like White McDonald's franchisees.

20.     McDonald's knowingly discriminated against Plaintiffs, Black franchisees, a protected class under federal law (42 U.S.C. §1981), who were parties to franchise agreements with McDonald's, by, including, but not limited to:

    a.     Steering Plaintiffs to, and restricting growth beyond, substandard locations with low-volume sales and higher operating costs, such as higher security costs due to crime, higher insurance rates, and higher employee turnover, because of their race;

    b.     Excluding Plaintiffs from the purchase of restaurants in the open market throughout their franchise terms because of their race;

    c.     Providing Plaintiffs with misleading financial information to induce them to purchase McDonald's least desirable franchises and fraudulently concealing information to restrict Plaintiffs' growth into more profitable locations;

    d.     Requiring Plaintiffs to invest in rebuilds and/or renovations within short time frames not required of White franchisees in locations McDonald's knew would fail to generate an adequate return on Plaintiffs' individual investments;

    e.     Excluding Plaintiffs from the same growth opportunities to higher-volume, lower-cost stores offered to White franchisees;

    f.     Failing to provide any legitimate business reasons for repeated denials of franchise opportunities to Plaintiffs over many years;

    g.     Denying Plaintiffs meaningful support to allow them to overcome financial hardships, while White franchisees were routinely provided such assistance, including, but not limited to, permanent rent relief and impact funding;

    h.     Depriving Plaintiffs of the same legacy opportunities offered to White franchisees through McDonald's Next Generation ("Next Gen") program;

    i.     Retaliation against Plaintiffs for rejecting offers to continue operations in crime-ridden neighborhoods with low-volume sales, including through targeted, increased, and unreasonable inspections;

    j.     Unreasonable and unequal inspections and grading of Plaintiffs' restaurants to generate bad business reviews as pretext to force Plaintiffs out of the McDonald's system because of their race; and/or

k.    Placing Plaintiffs in untenable positions of economic duress, denying them eligibility for growth and renewal of their agreements, and arbitrarily denying final approval of their buyers, so that Plaintiffs had no choice but to exit on McDonald's terms, at a loss.

21.    Through these series of repeated and interrelated events, McDonald's intentionally and covertly deprived Plaintiffs of the same rights enjoyed by White franchisees to the creation, performance, enjoyment, and all benefits of their contractual relationships with Defendants.

22.    McDonald's fraudulently claimed to have remedied their discriminatory practices in the 1990s, through a campaign of misinformation, non-binding parity deals, and empty promises.

23.    As of 1998, and thereafter, Plaintiffs were led to believe that McDonald's history of discrimination was in the past. Plaintiffs all operated under the assumption of parity and fair dealing by McDonald's. Through McDonald's control of information as the franchisor, and public commitment to racial equality, Plaintiffs were unaware, and could not know or have learned through due diligence, that McDonald's would deprive them of franchise opportunities offered to White franchisees.

24.    After 1998, during the period of "parity," when Plaintiffs encountered operational difficulties, they were systematically isolated and led to believe that they were "bad operators" and individually responsible for the excessive operational expenses, insufficient sales volume, lost profits, lost business opportunities, and damage to their professional reputations.

25.    McDonald's discriminatory and fraudulent practices were not apparent to Plaintiffs when committed, and only became apparent when viewed in light of the later acts establishing a pattern of systematic and covert racial discrimination targeted against Black franchisees, which became public through the January 7, 2020, filing of a racial discrimination lawsuit by Black McDonald's senior executives, Victoria Guster-Hines and Domineca Neal. *Guster-Hines v. McDonald's USA LLC*, No. 20-00117, Compl. [D.E. 1] (N.D. Ill. Jan. 1, 2020).

7

26.     Through the Guster-Hines and Neal Complaint, Plaintiffs discovered inside corporate information **for the first time** that revealed that their franchise terminations by McDonald's were part of a renewed practice of covert and systemic discrimination against Black franchisees post-parity at the executive level.

27.     Plaintiffs learned that they were not in fact "bad operators," who mismanaged their restaurants, as McDonald's led them to believe, but rather that McDonald's own executives recognized that the company deliberately divested opportunities from Black franchisees, implemented business plans with a discriminatory impact on Black franchisees, made exceptions for White Next Generation candidates it did not make for Black candidates, graded Black Consumer Market stores "differently, in a negative way," and overall abandoned its commitment to racial equality on a company-wide basis:  "McDonald's continuing pattern and practice of intentional race discrimination [] should outrage everyone, especially those who grew up going to McDonald's and believing the 'Golden Arches' were swell."  (Compl., at ¶¶ 1, 65, 75).

28.     After the public filing, Plaintiffs began to exchange information and engage in discussions with other former McDonald's franchisees after years of intentional isolation by McDonald's only to realize that they each suffered the same series of ongoing denials of franchise opportunities by McDonald's, post-parity, despite operating in different domestic locations and backgrounds, because they have one thing in common:  they are Black.

## JURISDICTION AND VENUE

29.     This is an action based on McDonald's denial of Plaintiffs' right to equality in their contracts in violation of Section 1981 of the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981 (Count I), breach of contract (Count II), and fraudulent inducement and omission (Count III).

8

30.    This Court has subject matter jurisdiction over Plaintiffs' 42 U.S.C. § 1981 claims pursuant to 28 U.S.C. §§ 1331, 1332, 1343(a)(3), and 42 U.S.C. § 1988.

31.    This Court has subject matter jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because they are so related to Plaintiffs' federal question claims that they form part of the same case or controversy.

32.    Plaintiffs' claims are properly joined under the permissive joinder provisions of Rule 20, Fed. R. Civ. P., as their claims arise out of the same series of transactions or occurrences and raise common questions of law or fact.

33.    This Court has personal jurisdiction over Defendants because McDonald's Corporation is headquartered in this District and McDonald's USA maintains its principal place of business in Chicago, Illinois.

34.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants reside in this District, where its principal place of business is located, and a substantial part of the events giving rise to Plaintiffs' claims occurred in Chicago, Illinois, which is within this District.

## **THE PARTIES**

### A.    **Plaintiffs**

35.    Plaintiffs are members of a federally-protected class who owned and operated McDonald's restaurant(s).

36.    Plaintiff Christine Crawford and her mother, Delores Crawford, are South Carolina residents and former McDonald's Atlanta Region franchise owner/operators.  Delores Crawford became a McDonald's franchisee in 1988, while her daughter, Cristine Crawford, became one in 2005.  The Crawfords were forced out in 2018.  As a result of McDonald's continuing misconduct alleged herein, the Crawfords owned and lost seven (7) stores. They are Black.

37.     Plaintiff Juneth N. Daniel is a Florida resident and a former Alabama Region McDonald's franchise owner/operator who became a franchisee in 2008 and was forced out in 2018. As a result of McDonald's continuing misconduct alleged herein, Daniel owned and lost four (4) stores.  She is Black.

38.     Plaintiff Yves Dominique is a Georgia resident and a former Atlanta Region McDonald's franchise owner/operator who became a franchisee in 2008 and was forced out in 2017. As a result of McDonald's continuing misconduct alleged herein, Dominique owned and lost six (6) stores.  He is Black.

39.     Plaintiff Van Jakes is a Georgia resident and a former Atlanta Region McDonald's franchise owner/operator who became a franchisee in 1992 and was forced out in 2016 As a result of McDonald's continuing misconduct alleged herein, Jakes owned and lost five (5) stores.  He is Black.

40.     Plaintiff Ralph King is a Missouri resident and a former Missouri Region McDonald's franchise owner/operator who became a franchisee in 1983 and was forced out in 2019.  As a result of McDonald's continuing misconduct alleged herein, King owned and lost thirteen (13) stores.  He is Black.

41.     Plaintiff Keith Manning is a North Carolina resident and a former North Carolina Region McDonald's franchise owner/operator who became a franchisee in 1992 and was forced out in 2017.  As a result of McDonald's continuing misconduct alleged herein, Keith Manning owned and lost ten (10) stores.  He is Black.

42.     Plaintiff Kenneth Manning is a Georgia resident and a former Alabama and Atlanta Region McDonald's franchise owner/operator who became a franchisee in 2001 and was forced out in 2017.  As a result of McDonald's continuing misconduct alleged herein, Kenneth Manning owned and lost seventeen (17) stores.  He is Black.

10

43.     Plaintiff Dawn Mussenden is a Georgia resident and a former New York and Atlanta Region McDonald's franchise owner/operator who became a franchisee in 1990 and was forced out in 2017.  As a result of McDonald's continuing misconduct alleged herein, Mussenden owned and lost five (5) stores.  She is Black.

44.     Plaintiff Laetitia Johnson is a Georgia resident and former Atlanta Region McDonald's franchise owner/operator who became a franchisee in 1995 and was forced out in 2018.  As a result of McDonald's continuing misconduct alleged herein, Johnson owned and lost four (4) stores.  She is Black.

45.     Plaintiff Carrie Salone is a Georgia resident and a former Atlanta Region McDonald's franchise owner/operator who became a franchisee in 2003 and was forced out in 2016.  Between 2010 and 2016, Salone owned and lost two (2) stores.  She is Black.

46.     Plaintiff Floyd Sims is a Georgia resident and a former Atlanta Region McDonald's franchise owner/operator who became a franchisee in 2000 and was forced out in 2018.  As a result of McDonald's continuing misconduct alleged herein, Sims owned and lost seven (7) stores.  He is Black.

47.     Plaintiff Larry Brown is an Iowa resident and a former Iowa Region McDonald's franchise owner/operator who became a franchisee in 2000 and was forced out in 2017.  As a result of McDonald's continuing misconduct alleged herein, Brown owned and lost ten (10) stores.  He is Black.

48.     Plaintiff John Mason is a North Carolina resident and a Virginia and North Carolina Region McDonald's franchise owner/operator who became a franchisee in 2004 and was forced out in 2018.  As a result of McDonald's continuing misconduct alleged herein, Mason owned and lost four (4) stores.  He is Black.

49.     Plaintiff Ronnie Thornton is a North Carolina resident and a former Raleigh/Durham Region McDonald's franchise owner/operator who became a franchisee in 1998 and was forced out in 2017.  As a result of McDonald's continuing misconduct alleged herein, Thornton owned and lost five (5) stores.  He is Black.

50.     Plaintiff Lisa Gunter, f/k/a Lisa McKenzie, is a North Carolina resident and a former Raleigh/Durham Region McDonald's franchise owner/operator who became a franchisee in 2007 and was forced to out in 2018.  As a result of McDonald's continuing misconduct alleged herein, Gunter owned and lost two (2) stores.  She is Black.

51.     Plaintiff Mitchell McGuire and his wife, Lois McGuire, are New Jersey residents and former New York Metro Region McDonald's franchise owner/operators who became franchisees in 2000 and were forced out in 2016.  As a result of McDonald's continuing misconduct alleged herein, the McGuires owned and lost one (1) store.  They are Black.

52.     Plaintiff Hayes Ferrell is a Georgia resident and a former Atlanta Region McDonald's franchise owner/operator who became a franchisee in 1989 and was forced out in 2016.  As a result of McDonald's continuing misconduct alleged herein, Ferrell owned and lost one (1) store.  He is Black.

53.     Plaintiff Yvonne Knox is a Michigan resident and a former Detroit Region McDonald's franchise owner/operator who became a franchisee in 1981 and was forced out in 2016. As a result of McDonald's continuing misconduct alleged herein, Knox owned and lost one (1) store. She is Black.

54.     Plaintiff Arthur Scott is a Michigan resident and a former Detroit Region McDonald's franchise owner/operator who became a franchisee in 1994 and was forced out in 2017.  As a result

of McDonald's continuing misconduct alleged herein, Scott owned and lost eight (8) stores. He is Black.

55.     Plaintiff Errol Service is a Michigan resident and a former Detroit Region McDonald's franchise owner/operator who became a franchisee in 1994 and was forced out in 2020. As a result of McDonald's continuing misconduct alleged herein, Service owned and lost seventeen (17) stores. He is Black.

56.     Plaintiff Melvin Jones is a Florida resident and a former Detroit Region McDonald's franchise owner/operator who became a franchisee in 1999 and was forced out in 2018. As a result of McDonald's continuing misconduct alleged herein, Jones owned and lost three (3) stores. He is Black.

57.     Plaintiff George Gipson is a Missouri resident and a former St. Louis Region McDonald's franchise owner/operator who became a franchisee in 1994 and was forced out in 2017. As a result of McDonald's continuing misconduct alleged herein, Gipson owned and lost three (3) stores. He is Black.

58.     Plaintiff Michael Simon is a New Jersey resident and a former Raleigh Region McDonald's franchise owner/operator who became a franchisee in 2013 and was forced out in 2017. As a result of McDonald's continuing misconduct alleged herein, Simon owned and lost three (3) stores. He is Black.

59.     Plaintiff Victor Bruce is an Indiana resident and a former Indianapolis Region McDonald's franchise owner/operator who became a franchisee in 1994 and was forced out in 2016. As a result of McDonald's continuing misconduct alleged herein, Bruce owned and lost three (3) stores. He is Black.

60.     Plaintiff David White and his wife, Barbara White, are Indiana residents and former Indianapolis Region McDonald's franchise owner/operators who became franchisees in 1999 and were forced out in 2018.  As a result of McDonald's continuing misconduct alleged herein, the Whites owned and lost five (5) stores.  They are Black.

61.     Plaintiff John Tillman is a Texas resident and a former Houston Region McDonald's franchise owner/operator who became a franchisee in 1990 and was forced out in 2019.  As a result of McDonald's continuing misconduct alleged herein, Tillman owned and lost fourteen (14) stores. He is Black.

62.     Plaintiff Allen Stafford is a Georgia resident and a former Atlanta Region McDonald's franchise owner/operator who became a franchisee in 1992 and was forced out in 2017.  As a result of McDonald's continuing misconduct alleged herein, Stafford owned and lost five (5) stores.  He is Black.

63.     Plaintiff Keristin Holloway and his wife, Gloria Holloway, are Texas residents and former Houston Region McDonald's franchise owner/operators who became franchisees in 1997 and were forced out in 2017.  As a result of McDonald's continuing misconduct alleged herein, the Holloways owned and lost two (2) stores.  They are Black.

64.     Plaintiff George Jones and his wife, Jane Jones, are Tennessee residents and former Nashville Region McDonald's franchise owner/operators who became franchisees in 1981 and were forced out in 2019.  As a result of McDonald's continuing misconduct alleged herein, the Jones owned and lost four (4) stores.  They are Black.

65.     Plaintiff Wise Finley is a Michigan resident and a former Detroit Region McDonald's franchise owner/operator who became a franchisee in 1987 and was forced out in 2016.  As a result

14

of McDonald's continuing misconduct alleged herein, Finley owned and lost three (3) stores. He is Black.

66.     Plaintiff Lewis Anderson is a Florida resident and a former Great Southern Region McDonald's franchise owner/operator who became a franchisee in 2002 and was forced out in 2016. As a result of McDonald's continuing misconduct alleged herein, Anderson owned and lost four (4) stores. He is Black.

67.     Plaintiff Dwight Miller and his son, Scott Miller, are Florida and Illinois residents, respectively, and former Chicago Region McDonald's franchise owner/operators. Dwight Miller became a franchisee in 1997, while Scott Miller became one in 2011, and they jointly operated their McDonald's franchises on or after 2014. The Millers were forced out in 2019. As a result of McDonald's continuing misconduct alleged herein, the Millers owned and lost twelve (12) stores. They are Black.

68.     Plaintiff Faye Hobley is a Nebraska resident and a former region Minneapolis Region McDonald's franchise owner/operator who became a franchisee in 1982 and was forced out in 2018. As a result of McDonald's continuing misconduct alleged herein, Hobley owned and lost three (3) stores. She is Black.

69.     Plaintiff Paul Hoskins and his wife, Michele Hoskins, are Texas residents and former Houston Region McDonald's franchise owner/operators who became franchisees in 2004 and were forced out in 2018. As a result of McDonald's continuing misconduct alleged herein, the Hoskins owned and lost five (5) stores. They are Black.

70.     Plaintiff Al Harris and his daughter, Kristen Harris, are Virginia residents and former Richmond Region McDonald's owner/operators. Al Harris became a franchisee in 1997, while Kristen became a franchisee in 2012. The Harrises were forced out in 2019. As a result of

15

McDonald's continuing misconduct alleged herein, Al Harris owned and lost seven (7) stores and Kristen Harris owned and lost one (1) store. They are Black.

71.    Plaintiff Norman H. Williams is a Virginia resident and a former Richmond Region McDonald's owner/operator who became a franchisee in 1994 and was forced out in 2018. As a result of McDonald's continuing misconduct alleged herein, Williams owned and lost one (1) store. He is Black.

72.    Plaintiff William (Pete) Washington is a Virginia resident and a former Richmond Region McDonald's owner/operator who became a franchisee in 1998 and was forced out in 2016. As a result of McDonald's continuing misconduct alleged herein, Washington owned and lost two (2) stores. He is Black.

73.    Plaintiff Benny Clark and his wife, Eleanor Clark, are South Carolina residents and former Columbia Region McDonald's owner/operators who became franchisees in 1999 and were forced out in 2019. As a result of McDonald's continuing misconduct alleged herein, the Clarks owned and lost four (4) stores. They are Black.

74.    Plaintiff Harold Lewis and his son, Jeremy Lewis, are Nevada residents and former Las Vegas Region McDonald's franchise owner/operators. Harold Lewis became a franchisee in 1987, while Jeremy Lewis became a franchisee in 2010. The Lewises were forced out in 2015. As a result of McDonald's continuing misconduct alleged herein, Harold Lewis owned and lost nine (9) stores and Jeremy Lewis owned and lost one (1) store. They are Black.

75.    Plaintiff Philip Douglas is an Illinois resident and a former Chicago Region McDonald's franchise owner/operator who became a franchisee in 1997 and was forced out in 2014. As a result of McDonald's continuing misconduct alleged herein, Douglas owned and lost three (3) stores. He is Black.

16

76.     Plaintiff Lawrence Holland is a Georgia resident and a former Atlanta Region McDonald's franchise owner/operator who became a franchisee in 2003 and was forced out in 2013. As a result of McDonald's continuing misconduct alleged herein, Holland owned and lost two (2) stores. He is Black.

77.     Plaintiff William Rasul is a Georgia resident and a former Atlanta Region McDonald's franchise owner/operator who became a franchisee in 1999 and was forced out in 2010. As a result of McDonald's continuing misconduct alleged herein, Rasul owned and lost three (3) stores. He is Black.

78.     Plaintiff LeRoy Walker, Jr. is a Mississippi resident and a former Mississippi Region McDonald's franchise owner/operator who became a franchisee in 1984 and was forced out in 2015. As a result of McDonald's continuing misconduct alleged herein, Walker owned and lost one (1) store due to McDonald's misconduct. He is Black.

79.     Plaintiff Jeffery Rogers is a Florida resident and a former Jacksonville Region McDonald's franchise owner/operator who became a franchisee in 2005 and was forced out in 2011. As a result of McDonald's continuing misconduct alleged herein, Rogers owned and lost one (1) store. He is Black.

80.     Plaintiff Joseph Mbanefo is a New York resident and a former New York Region McDonald's franchise owner/operator who became a franchisee 1996 and was forced out in 2012. As a result of McDonald's continuing misconduct alleged herein, Mbanefo owned and lost four (4) stores. He is Black.

81.     Plaintiff Annis Alston-Staley and her husband, Harry Staley, are South Carolina residents and former New Jersey Region McDonald's franchise owner/operators who became

franchisees in 1995 and were forced out in 2015. As a result of McDonald's continuing misconduct alleged herein, the Staleys owned and lost six (6) stores. They are Black.

82. Plaintiff Gordon Thornton is a North Carolina resident and a former Raleigh/Durham Region McDonald's franchise owner/operator who became a franchisee in 1993 and was forced out in 2012. As a result of McDonald's continuing misconduct alleged herein, Thornton owned and lost four (4) stores. He is Black.

83. Plaintiff Dwayne Richard Johnson is a Pennsylvania resident and a former Philadelphia Region McDonald's franchise owner/operator who became a franchisee in 1993 and was forced out in 2012. As a result of McDonald's continuing misconduct alleged herein, Johnson owned and lost one (1) store. He is Black.

84. Plaintiff Serge Tancrede and his wife, Karen Tancrede, are Texas residents and former Philadelphia Region McDonald's franchise owner/operators who became franchisees in 2004 and were forced out in 2011. As a result of McDonald's continuing misconduct alleged herein, the Tancredes owned and lost one (1) store. They are Black.

85. Plaintiff Errol Thybulle is a New York resident and a former New York Region McDonald's franchise owner/operator who became a franchisee in 1990 and was forced out in 2011. As a result of McDonald's continuing misconduct alleged herein, Thybulle owned and lost two (2) stores. He is Black.

86. Plaintiff Jeremiah Simmons is a New York resident and a former New York Region McDonald's franchise owner/operator who became a franchisee in 1998 and was forced out in 2010. As a result of McDonald's continuing misconduct alleged herein, Simmons owned and lost one (1) store. He is Black.

87.     Plaintiff Darryl Umphries is an Oklahoma resident and a former Oklahoma City Region McDonald's franchise owner/operator who became a franchisee in 2004 and was forced out in 2014.  As a result of McDonald's continuing misconduct alleged herein, Umphries owned and lost two (2) stores.  He is Black.

88.     Plaintiff Jacqueline George and her husband, Anthony George, are Florida residents and former Columbus, Ohio Region McDonald's franchise owner/operators who became franchisees in 1990 and were forced out in 2012.  As a result of McDonald's continuing misconduct alleged herein, the Georges owned and lost three (3) stores.  They are Black.

89.     Plaintiff Wesley Hall is a Florida resident and a former Alabama Region McDonald's franchise owner/operator who became a franchisee in 2005 and was forced out in 2010.  As a result of McDonald's continuing misconduct alleged herein, Hall owned and lost two (2) stores.  He is Black.

90.     Plaintiff Glenda Claypool, a Texas resident, brings this action, on behalf of, and pending appointment as Personal Representative of the Estate of her late husband, Sherman Claypool, a former Milwaukee Region McDonald's franchise owner/operator who became a franchisee in 1971 and was forced out in 2014.  As a result of McDonald's continuing misconduct alleged herein, Claypool owned and lost five (5) stores.  He was Black.

91.     Plaintiff Kenneth Nelson is a Missouri resident and a former St. Louis Region McDonald's franchise owner/operator who became a franchisee in 1992 and was forced out in 2012.  As a result of McDonald's continuing misconduct alleged herein, Nelson owned and lost five (5) stores.  He is Black.

92.     Plaintiff Bernard Saffold is a Wisconsin resident and a former Milwaukee Region McDonald's franchise owner/operator who became a franchisee in 1999 and was forced out in 2010.

19

As a result of McDonald's continuing misconduct alleged herein, Saffold owned and lost one (1) store. He is Black.

93. Plaintiff Lance Williams is an Alabama resident and a former Atlanta Region McDonald's franchise owner/operator who became a franchisee in 2001 and was forced out in 2013. As a result of McDonald's continuing misconduct alleged herein, Williams owned and lost two (2) stores. He is Black.

94. Plaintiff Jacqueline Wynn is a Georgia resident and a former Alabama and Atlanta Region McDonald's owner/operator who became a franchisee in 1994 and was forced out in 2011. As a result of McDonald's continuing misconduct alleged herein, Wynn owned and lost one (1) store. She is Black.

95. Plaintiff Robert (Bob) Bonner is an Illinois resident and a former St. Louis Region McDonald's owner/operator who because a franchisee in 1990 and was forced out in 2013. As a result of McDonald's continuing misconduct alleged herein, Bonner owned and lost four (4) stores. He is Black.

96. Plaintiff Gary Roan and his wife, Joyce Mance-Roan, are Ohio residents and former Dayton Region McDonald's owner/operators who became franchisees in 1990 and were forced out in 2014. As a result of McDonald's continuing misconduct alleged herein, the Roans owned and lost four (4) stores. They are Black.

97. Plaintiff Douglas Hollis and his wife, Glenna Hollis, are Florida residents and former Orlando Region McDonald's owner/operators who became franchisees in 1998 and were forced out in 2013. As a result of McDonald's continuing misconduct alleged herein, the Hollises owned and lost five (5) stores. They are Black.

20

98.     As a result of Defendants' racial discrimination, breach of contract, and fraud alleged herein, each of the individual Plaintiffs named above have been subjected to the same pattern and practice of discrimination and suffered substantial damages in the forms described below and amounts that will be proven at trial.

99.     At all times material, McDonald's led Plaintiffs to believe that they wanted all franchisees to succeed, were committed to racial equality, and, as such, any losses they suffered were because they were "bad operators" and/or "mismanaged" their organizations.

100.    As a result of Defendants' affirmative misrepresentations and omissions, systematic isolation of Plaintiffs throughout their franchise terms, and control of vital information bearing on Plaintiffs' claims, Plaintiffs were unaware, and could not have reasonably known or have learned through the exercise of due diligence, the true nature and extent of McDonald's systematic and covert racial discrimination.

101.    By agreement with Defendants, who were previously provided by Plaintiffs earlier this year with a draft complaint, as of June 8, 2020 all viable statutes of limitation applicable to Plaintiffs' claims were tolled.

**B.      <u>Defendants</u>**

102.    Defendant McDonald's USA is a Delaware limited liability corporation with its principal place of business located at 110 North Carpenter Street, Chicago, Illinois. McDonald's USA is a wholly-owned subsidiary of McDonald's Corporation and the franchisor of the McDonald's franchise system, which develops, operates, franchises, and services a system of fast-food restaurants in the United States.

103.    Defendant McDonald's Corporation is a publicly traded Delaware corporation with its principal place of business located at One McDonald's Plaza, Oak Brook, Illinois. McDonald's

Corporation is the sole member of McDonald's USA, and is the worldwide franchisor of the McDonald's franchise system.

## COMMON FACTUAL ALLEGATIONS

104. McDonald's offered Plaintiffs what, at first, appeared to be a once-in-a-lifetime opportunity to invest in and become a part of America's best-known international corporation.

105. Yet, by covertly restricting and steering Plaintiffs to older and underperforming store locations because of their race, misleading financial representations and omissions, exclusion from growth opportunities, unequal and unreasonable renovation and rebuild requirements, and application of harsher and unreasonable grading and inspection standards, McDonald's intentionally impeded Plaintiffs' ability to succeed and grow within the franchise they dedicated their lives to.

A. **The McDonald's Franchise Model: Unequal Bargaining Power, The Franchise Agreement, and Misleading Franchise Disclosure Documents**

106. McDonald's is a heavily franchised business model. As of May 1, 2020, approximately 95% of all U.S. restaurants are franchised to independent franchisees and about 5% are franchised to company-owned McDonald's ("McOpCo") restaurants.

107. By franchising nearly 100% of its restaurants, McDonald's has grown to become one of the largest commercial real estate owners in the world: McDonald's owns and controls approximately 55% of the land and 80% of the buildings for restaurants in its consolidated markets. On the other hand, Plaintiffs, as former franchisees, never owned any land or buildings in consolidated markets.

108. In 2019, revenues for McDonald's Corporation totaled $21.1 billion, returning approximately $8.6 billion to shareholders through a combination of shares repurchased and dividends paid at year-end 2019. McDonald's revenues consist of rents, royalties, and initial franchise fees. Franchisees' sales are not recorded as revenues of McDonald's Corporation.

22

109.    Under this business model, McDonald's obtains new capital as well as enormous profits from its franchisees, with little to no investment of its own.  By using franchisees to acquire land and to build restaurants, McDonald's creates captive tenants out of its franchisees.

110.    As captive tenants, Plaintiffs were charged unreasonably high rent and service fees over long lease terms.

(i)    *The Franchise Agreement*

111.    The decision to offer any franchise opportunity is within McDonald's sole discretion from the point of initial entry into the McDonald's franchise system and throughout the franchise relationship.

112.    According to "Your Path to Becoming a McDonald's Franchisee," prospective franchisees can only enter the Franchisee Training Program if they meet the following requirements:

   a.  Ability to invest a minimum of $500,000 in non-borrowed personal funds;

   b.  Divestiture of all existing business interests;

   c.  Commitment to an extensive training program that can range from 12-18 months, with a minimum of 20 hours per week; and

   d.  Relocation based on availability of restaurants.

*See* McDonald's "Your Path to becoming a McDonald's franchisee," at p. 23, https://www.mcdonalds.com/content/dam/usa/nfl/documents/franchising/Your_Path_to_Becoming_a_McDonalds_Franchisee.pdf.

113.    McDonald's will **<u>not</u>** work with applicants "who desire a specific restaurant location or limited geographic area."  *See* McDonald's Franchising FAQ, https://www.mcdonalds.com/us/en-us/about-us/franchising/franchising-faq.html.

114.    McDonald's requires every franchisee to sign its standard Franchise Agreement in order to operate one or more, new or existing, McDonald's restaurants located on real estate owned

or leased by McDonald's, and leased to the franchisee through an Operator's Lease, incorporated as Exhibit A to the Franchise Agreement (the "Lease"), for a twenty (20) year term. Franchisees have absolutely no right or option to renew after the initial 20-year Lease term. Instead, in McDonald's sole discretion, McDonald's offers franchisees of its choice the opportunity to rewrite their Lease three (3) years prior to expiration of the 20-year term. This puts enormous pressure on franchisees, which McDonald's used as leverage to extract unreasonable conditions from Plaintiffs throughout their franchise terms. True and correct copies of McDonald's USA's standard Franchise Agreement (Traditional), A-1, and an exemplar of Plaintiff Dominique's Franchise Agreement, A-2, are attached as **Composite Exhibit "A"** (together with the Lease and Franchise Disclosure Document, collectively referred to as the "Franchise Agreement").[1]

115.    Under the Franchise Agreement, McDonald's owns or leases the franchised premises, so that the franchisee is always the tenant. Franchisees are granted the right to operate a restaurant using the McDonald's system through a license and, in most cases, the use of a restaurant facility, through the Lease, which is coterminous with the Franchise Agreement. Failure to renew therefore includes eviction and loss of the franchisee's business.

116.    Franchisees pay initial fees upon the opening of a new restaurant or grant of a new franchise, as well as continuing rent and royalties to McDonald's based upon a percent of sales with minimum rent payments. This structure enables McDonald's to generate significant and predictable levels of cash flow.

117.    Franchisees are responsible for all related occupancy costs, which include property taxes, maintenance, structural repairs, and acquiring and maintaining insurance coverage upon taking

---

[1] McDonald's has possession of Plaintiffs' individual Franchise Agreements. According to McDonald's Annual Report, McDonald's Corporation is the franchisor of any Franchise Agreement entered into (and not later amended or superseded) prior to approximately 2005, and McDonald's USA is the franchisor of any Franchise Agreement entered into since approximately 2005.

possession of the restaurant, which name McDonald's as an additional insured. (Franchise Agreement, Ex. A, at ¶¶ 12 & 17, and Lease, at Sections 2.06, 2.08, 4.02, 4.03, and 6.05).

118.    McDonald's also requires franchisees to rebuild, renovate, and/or make major remodels at franchisees' sole cost and expense. (Lease, at Section 2.06). McDonald's owns the real estate with all improvements paid for by the franchisees.

119.    Through the Franchise Agreement, McDonald's agrees in relevant part:

> General Services of McDonald's. McDonald's shall advise and consult with Franchisee periodically in connection with the operation of the Restaurant and also, upon Franchisee's request, at other reasonable times. . .McDonald's shall also make available to Franchisee **all** additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes generally available, from time to time, **to all its franchisees** operating McDonald's restaurants.

(Franchise Agreement, Ex. A, at ¶ 3) (emphasis added).

120.    Pursuant to Section 12, titled "Compliance with Entire System," McDonald's and Plaintiffs further agreed to a reasonableness standard with respect to inspections and renovations as follows:

> McDonald's shall have the right to inspect the Restaurant at all **reasonable** times to ensure that Franchisee's operation thereof is in compliance with the standards and policies of the McDonald's System.

> Franchisee shall comply with the entire McDonald's System, including, but not limited to, the following: (c) Keep the Restaurant constructed and equipped in accordance with the building blueprints and equipment layout plans that are standard in the McDonald's System or as such blueprints and plans may be **reasonably** changed from time to time by McDonald's.

(*Id*., at ¶ 12) (emphasis added).

121.    Through McDonald's Franchise Disclosure Document ("FDD"), incorporated by reference into the Franchise Agreement and an exemplar copy of which is attached as **Exhibit "B"**

hereto,[2] McDonald's provides "prospective franchisees"[3] with "Financial Performance Representations," that include *pro forma* statements with the national average sales of domestic traditional McDonald's restaurants opened at least one (1) year prior. For example, the most recent 2020 FDD attached hereto provides, in pertinent part, as follows:

**All Domestic Traditional Restaurants**

Of the approximately 12,032 domestic traditional McDonald's restaurants opened at least 1 year as of December 31, 2019, approximately 79% had annual sales volumes in excess of $2,300,000; approximately 70% had annual sales volumes in excess of $2,500,000; and approximately 60% had annual sales volumes in excess of $2,700,000. The average annual sales volume of domestic traditional McDonald's restaurants open at least 1 year as of December 31, 2019, was $3,009,000 during 2019. The highest and lowest annual sales volume in 2019 for these domestic traditional McDonald's restaurants was $12,654,000 and $654,000, respectively. The median annual sales volume of domestic traditional McDonald's restaurants open at least 1 year as of December 31, 2019, was **$2,910,000 during 2019**.

**Traditional Franchised Restaurants**

Of the approximately 11,435 domestic traditional franchised McDonald's restaurants opened at least 1 year as of December 31, 2019, approximately 78% had annual sales volumes in excess of $2,300,000; approximately 68% had annual sales volumes in excess of $2,500,000; and approximately 58% had annual sales volumes in excess of $2,700,000. The average annual sales volume of domestic traditional franchised McDonald's restaurants open at least 1 year as of December 31, 2019, was $2,970,000 during 2019. The highest and lowest annual sales volume in 2019 for these domestic traditional McDonald's restaurants was $12,654,000 and $654,000, respectively. The median annual sales volume of domestic traditional franchised

---

[2] By way of example, attached is the most recent version of McDonald's FDD, issued May 1, 2020. McDonald's issues its FDD annually and provides all prospective franchisees with the FDD prior to joining the McDonald's franchise system. McDonald's has possession of the individual disclosure documents it provided to Plaintiffs.

[3] A "prospective franchisee" is defined by the Franchise Rule as "any person (including any agent, representative, or employee) who approaches or is approached by a franchise seller to discuss the possible establishment of a franchise relationship." 16 C.F.R. Part 436. McDonald's therefore provides financial disclosure not only upon entry, but also throughout the franchise term for any additional purchases of a franchise and/or in connection with a sale of a franchise.

McDonald's restaurants open at least 1 year as of December 31, 2019, was **$2,867,000 during 2019**.

***Traditional Company Owned Restaurants***

Of the approximately 597 domestic traditional McOpCo restaurants opened at least 1 year as of December 31, 2019, approximately 99% had annual sales volumes in excess of $2,300,000; approximately 98% had annual sales volumes in excess of $2,500,000; and approximately 95% had annual sales volumes in excess of $2,700,000. The average annual sales volume of domestic traditional McOpCo restaurants open at least 1 year as of December 31, 2019, was $3,758,000 during 2019. The highest and lowest annual sales volume in 2019 for these domestic traditional McOpCo restaurants was $8,182,000 and $2,047,000, respectively. The median annual sales volume of domestic traditional McOpCo restaurants open at least 1 year as of December 31, 2019, was **$3,629,000 during 2019**.

(FDD, Ex. B, at Item 19) (emphasis added).

122. At all times material hereto, Plaintiffs' average annual sales were **more than $700,000 under** McDonald's disclosed national averages of $2.7 million between 2011 and 2016, and $2.9 million in 2019.

123. McDonald's dictates uniformity of the operational structure and revenue expectations of all its franchisees' stores, even though they are cognizant that Black-owned and operated McDonald's franchises generate significantly lower revenue and assume higher operational costs than the national average due to the low-income and high-cost locations it steers its Black franchisees to.

124. McDonald's knew or should have known that these differential revenue and operating costs of Black-operated franchises as compared to White-operated franchises are not random or due to poor management. These differences are statistically significant and are the result of the historical racial bias and barriers built into the McDonald's franchise system.

125. Acquisition of a McDonald's franchise under these conditions was nothing short of a "financial suicide mission."

**(ii)** *The Cost to Operate a McDonald's Franchise*

126.    To purchase a McDonald's franchise, McDonald's requires an initial down payment of 40% of the total cost for a new restaurant, or 25% of the total cost for an existing restaurant. McDonald's website, Buying a Franchise, available at https://www.mcdonalds.com/us/en-us/about-us/franchising/acquiring-franchising.html.  Generally, McDonald's requires a minimum of $500,000 of non-borrowed personal resources.  *See* n. 4.  The balance of the purchase price may be financed for no more than seven (7) years.  *Id.*

127.    Pursuant to McDonald's 2020 FDD, McDonald's estimates a franchisee's Estimated Initial Investment to be between $1,314,500 to $2,306,500, which do not include ongoing percentage rate or service fees.

128.    Franchisees pay McDonald's the following ongoing fees:

      a.    **Service fee**:  A monthly fee based upon the restaurant's sales performance (as of this filing date, a Service Fee of 4.0% of Gross Sales); and

      b.    **Rent**:  A monthly base rent and pass thru rent, if applicable, plus percentage rent in amounts calculated as a percentage of monthly Gross Sales, and that may include rent escalations, including, but not limited to, fixed-rent escalations, escalations based on an inflation index, and fair-value adjustments, with terms ranging from annually to every five (5) years.

(Franchise Agreement, Ex. A, at ¶¶ 8–9; FDD, Ex. B, at Items 5–7, and Ex. A, at pp. 11–12).

129.    Gross Sales include all revenues from sales, excluding sales or use tax, and are calculated based on the preceding month, and are defined in Paragraph 7 of the Franchise Agreement, in pertinent part, as "all revenues from sales of the Franchisee based upon all business conducted upon or from the Restaurant, …"  Gross Sales are used to determine McDonald's service fee and monthly rents, which are a percentage thereof.

130.    Gross sales at McDonald's restaurants are almost exclusively based on location.

(iii)    *A Financial Suicide Mission:  The Cost to Operate a Black McDonald's Franchise*

131.    Unequal bargaining power characterizes the relationship between franchisees and McDonald's and this bargaining disparity is even more palpable for Black applicants and operators like Plaintiffs.

132.    This unequal bargaining position made it easy for McDonald's to award Black franchisees entering the system the oldest stores, in need of the most reinvestment, in tough and depressed areas, that had been routinely rejected by White franchisees, many of which McDonald's wanted to close, but needed someone to operate until McDonald's could sell its real estate.

133.    McDonald's offered Plaintiffs locations with higher operating costs, such as security, insurance, and employee training and turnover, and which required substantial renovations and rebuilds, as compared to White-owned franchises.

134.    McDonald's discriminatory practices led to low cash flow and decreased equity for Black owner/operators, forcing Black owner/operators, including Plaintiffs, into significant debt and, in many cases, bankruptcy.

135.    According to documents from the NBMOA, this cash flow gap between Black and White McDonald's franchisees **more than tripled** between 2010 and 2019.

136.    For McDonald's, it was a win-win strategy to collect high rent and fees for substandard stores, built upon a history of discrimination it successfully executed for decades.

B.    **McDonald's History of Discrimination Against Black Franchisees**

137.    The McDonald's franchise system was established in 1955, but Black franchisees were denied entry until 1968, following the assassination of Dr. Martin Luther King Jr.

138.    In the wake of civil unrest and heighted racial tension in the United States, McDonald's implemented "zebra" partnerships between silent, White investors and Black operators

in order to expand its real estate footprint into predominantly Black areas where White franchisees could not safely operate.

139.    On December 21, 1968, Herman Petty opened his first restaurant in the inner-city of Chicago, becoming the first Black Owner/Operator of a McDonald's franchise.

(i)    *Boycott in Cleveland 1969*

140.    A boycott of McDonald's in 1969 made headlines in Ohio and led to the first Black franchisees in the McDonald's system opening stores in depressed areas of Cleveland.

141.    In a January 25, 1970, article regarding the first Black owned and operated McDonald's franchise, the New York Times reported: "Spokesman for Negro groups, who banded together to form Operation Black Unity have been demanding black ownership of four existing McDonald's units … **All are in predominantly Negro areas**." *Cleveland Negro Wins a Franchise*, N.Y. Times, Jan. 25, 1970, *available at* https://www.nytimes.com/1970/01/25/archives/cleveland-negro-wins-a-franchise-9month-controversy-over-restaurant.html (emphasis added).

142.    In 1972, the National Black McDonald's Operators Association, also known as the NBMOA, was founded to help promote growth in the industry by Black owner/operators.

143.    During hearings held on April 7 and 8, 1976, before the United States Senate Committee on Commerce regarding the Fairness in Franchising Act, Donald R. Conley, President of the McDonald's Operator's Association, testified that McDonald's primary tool used to force franchisees to sell prior to expiration of their agreements is their power over renewal of franchise agreements, entirely within McDonald's control and discretion, allowing them to discriminate against franchisees.  *See* U.S. Senate, Hearing of the Committee on Commerce, S. 2335 (1996), at pp. 381–397.

30

144.    Mr. Conley testified that McDonald's inhibits franchisees' expansion, while encroaching on their territories, with new McDonald's restaurants that cut sales volume, thereby depressing the resale value of the franchise at franchisee's loss and McDonald's gain.  *Id*.  He explained that because McDonald's franchise agreement has a restrictive covenant that prevents the franchisee from owning any business other than his own McDonald's operation, the franchisee is locked into the McDonald's store as his only business such that cutting the sales volume or profitability of that one business by siphoning off sales to additional units is a process employed by McDonald's to devalue the business interest and drive the franchisee out of business.  *Id*.

145.    In the same hearing, Vice President of McDonald's Corporation is cited in an excerpt from the company's in-house publication, "Insight," as stating that pursuant to McDonald's renewal policy, being a good operator, having high sales volume, and/or being favorably regarding by customers does not entitle a franchisee to renewal.  *Id*. at 382.  According to McDonald's, renewal can be denied for other completely subjective evaluations "at the whim of management."  *Id*. at 387.

146.    Unfortunately, McDonald's reinstituted these same discriminatory business practices that existed in the 1960s, 1970s, and 1980s, after the monumental announcement of "parity" in the 1990s.

    **(ii)**    ***Trouble Under the Golden Arches:  Black Franchisee Sues McDonald's for Racial Steering***

147.    By the 1980s, Black franchisees were operating in the McDonald's franchise system, but McDonald's did not treat Black franchisees as equals to White franchisees.

148.    In 1983, Charles Griffis, a Black McDonald's owner/operator in the Los Angeles market, filed a race discrimination countersuit against McDonald's, alleging, among other things, that McDonald's systematically excluded Black franchisees from buying stores in White neighborhoods.

149.    In a March 12, 1984, New York Times article, Griffis detailed his experience:

**My stores are in hellholes**, he said. They get robbed once or twice a month, and I pay $20,000 a month in security services they don't pay in good neighborhoods. We had a murder in one and we still get the windows smashed and the bathrooms vandalized. **I've upgraded my stores a lot and I don't see why I shouldn't have a shot at a store in a good neighborhood**.

Tamar Lewin, *McDonald's is Battling with Black Franchisee*, N.Y. Times, March 12, 1984,

*available at* https://www.nytimes.com/1984/03/12/business/mcdonald-s-is-battling-with-black-

franchisee.html; *see also* excerpt of the article below (emphasis added).

150.    In response to McDonald's racial practices, and Griffis' situation, the New York

chapter of the NBMOA also wrote to McDonald's New York Regional Vice President at the time to

advise that, "**black McDonald's owner-operators are primarily confined to ghetto areas and not**

**allowed to expand as fast as their white counterparts**." *Id*. (emphasis added).

## *MCDONALD'S IS BATTLING WITH BLACK FRANCHISEE*



"Charles Griffis came to California in 1977 when he heard he might be able to buy a McDonald's franchise in Santa Barbara… It turns out, though, that the store was in Los Angeles on Santa Barbara Street, right in the middle of the ghetto… It was an old store in real bad shape."

". . .[Rev. Jesse] Jackson wrote McDonald's on behalf of his Operation PUSH to complain that blacks felt they were 'being subjected to a double standard' in that they were **confined to inner-city areas with high maintenance and security costs, and were usually offered only recycled stores, which are generally more expensive and less profitable than new ones**. . .

151. As of the publication of the March 1984 article, there were 137 Black McDonald's operators nationwide, with 267 restaurants, totaling approximately two (2) stores per Black operator, as compared to the average of five (5) stores per McDonald's White operator. *Id.*

152. Today, McDonald's has dwindled down to a similarly low number of Black franchisees, following false promises of parity and a reverse course back to discrimination.

**(iii)** *McDonald's Admits Racial Steering and Need for Parity*

153. In the late 1990s, McDonald's leadership admitted that McDonald's excluded Black franchisees from franchise opportunities afforded to White franchisees.

154. Specifically, through Executive Vice President, Thomas S. Dentice, McDonald's admitted, "**[T]he company has placed many Black Franchisees in restaurants that have not allowed them to achieve the same level of economic success as their peers.**"  A true and correct copy of the April 18, 1996, Dentice Letter to NBMOA Chairman, Reggie Webb, is attached as **Exhibit "C"** hereto, with excerpts quoted below (emphasis added).



I am also highly frustrated that Black Franchisees have been part of the McDonald's system for almost thirty years and as a group have not achieved the same level of success as other franchisees that have the same tenure. . . . **[F]or business reasons we thought were valid at the time, the company has placed many Black Franchisees in restaurants that have not allowed them to achieve the same level of economic success as their peers**.

I am personally tired of this lack of progress by my company.  I am tired of being the person that has to listen to your calls for help and not seeing progress.  I am tired of making excuse[s] for myself and others and I am tired of working my tail off to achieve our mutual goals and being considered the enemy.

- A full course press will be applied to fix all of the existing under performing locations that are owned by African American Franchisees-----second chances for all African American Franchisees will be the rule, not the exception for the rest of 1996 and beyond, if necessary, until we get the current problems fixed.

- The company in concert with the Black Franchisees, will create and implement a strategy designed to achieve parity for African American franchisees. It will be aggressive, focused, have a short period to reach its objectives, be measurable and have the endorsement and full backing of the TMT.

- There will be rewards for success and sanctions for failure in achieving plan targets and goals.

- The company will meet with the NBMOA on a regular basis to review progress.

- The strategic plan will be announced and implemented by July 1, 1996 and achieve meaningful results by year end.

- We will not try to reach consensus on what the "right decision" is to fix financial and franchising problems. That authority will rest in the hands of a few individuals.

- This process will be viewed for what it is; achieving parity for our Black Franchisees, not reaching a comfortable financial or franchising solution for the company.

- The company will also work in concert with the NBMOA to develop a comprehensive strategy for African Americans that includes purchasing and marketing.

Reggie, I know that we can achieve our common purpose. We may disagree at times on the what's and how's as we move forward, but I know that we do not and will not disagree on what we want to accomplish-----Parity.

Sincerely yours,

> This process will be viewed for what it is; achieving parity for our Black Franchisees, not reaching a comfortable financial or franchising solution for the company.
> ***
> We may disagree at times on the what's and how's as we move forward, but I know that we do not and will not disagree on what we want to accomplish-----Parity.

155. Yet, parity was never truly achieved. McDonald's spent the next decade instituting aspirational and temporary measures and promising Black franchisees, including Plaintiffs, that it was working to achieve parity between Black and White McDonald's franchisees.

156. Plaintiffs relied on these representations and had no reason to believe McDonald's was discriminating against them.

34

157. On November 14, 2002, NBMOA leadership addressed McDonald's past discriminatory practices in a letter from NBMOA Chairman and CEO, Larry C. Tripplett, to NBMOA Membership, which described its negotiations with McDonald's Leadership "to ensure that Parity is met and maintained." *See* Nov. 14, 2002 Tripplett Letter, **Exhibit "D"** hereto, with excerpts below.



First, let me remind you of what you already know. **We are "Free People."** We have the right to expect not to be discriminated against by anyone. Discrimination is illegal in this Country. We make significant contributions to the McDonald's System every day. In some cases, these contributions are made under very difficult dangerous environmental circumstances. We do so proudly and professionally as we all desire the American Dream of successful Business Ownership. We deserve and will demand nothing less than equal treatment. **We must continue to stand United and Strong**. We have nothing to fear.

As you are aware, the NBMOA Executive Committee is in earnest negotiations with the Leadership of McDonald's Corporation to ensure that Parity is met and maintained. We believe that each and every African American Franchisee should receive real assurances that when Parity is met, the discriminatory practices of the past will not reoccur.

158. In 2006, after a decade of fighting for parity, Don Thompson became the first Black President of the Western Division of McDonald's and went on to serve as the first Black President and CEO of McDonald's from 2012 to 2015.

**(iv)** *Change in McDonald's Leadership in 2015: Reverse Course for Black Franchisees*

159.    In 2015, Easterbrook replaced Thompson as McDonald's President and CEO, and hand-picked Chris Kempczinski, McDonald's current CEO and then President of McDonald's USA.

160.    Under Easterbrook and Kempczinski's leadership, McDonald's instituted discriminatory policies including, but not limited to, rejecting advertising budget modifications to target Black consumers, denying Black franchisees opportunities for growth, confining Black franchisees to inner-city or urban areas with higher costs, denying Black franchisees' requests for rent relief, and implementing initiatives such as the Bigger Bolder Vision 2020 ("BBV2020") modernization plan that negatively and disproportionately impacted Black franchisees, including Plaintiffs, in order to force them out the McDonald's franchise system.

161.    These discriminatory practices and policies led to the cash flow gap between Black franchisees in comparison to White franchisees **tripling** from 2010 to 2019, and a mass exodus of **more than half** of McDonald's Black franchisees from the McDonald's franchise system, which is disproportionate to the loss of White franchisees during the same time, according to NBMOA data.

162.    Because McDonald's controls all data and messaging to its franchisees, including from the NBMOA, Plaintiffs continued to believe at all times material, including without limitation during their franchise terms, that they were operating under the parity agreement and that McDonald's corporate practices were supportive of racial diversity and equal opportunities.

163.    It was not until the January 7, 2020, Guster-Hines and Neal Complaint against McDonald's for intentional racial discrimination that Plaintiffs learned of McDonald's renewed pattern and practice of covert and systemic discrimination against Black franchisees post-parity at the corporate level. *Guster-Hines v. McDonald's USA LLC*, No. 20-00117, Compl. [D.E. 1] (N.D. Ill. Jan. 1, 2020).

36

164.     The same pervasive racial discrimination, disparate treatment, and substantial wealth gap for Black franchisees continues today under the leadership of Christopher Kempczinski.

**(v)     *McDonald's Leadership is Once Again on Notice of Ongoing Disparate Treatment of Black Franchisees; Continues Making False Promises***

165.     On March 12, 2019, Tripplett, as Chairman and CEO of the NBMOA, notified McDonald's USA Division Presidents, Charlie Strong and Mario Barbosa, of McDonald's discriminatory actions, in a letter which raised "serious concerns regarding the status of African American Owners within McDonald's Corporation." A copy of the March 12, 2019 Tripplett Letter to McDonald's is attached as **Exhibit "E"** hereto. Specifically, Tripplett advised McDonald's leadership that "**the trajectory of the treatment of African American Owners is moving backwards**. Through no fault of our own we lag behind the general market in all measures. This is reflected in the loss of sales to African American consumers. **We believe that the loss of sales is closely correlated to how African Americans are treated within the Company**." *Id*., at p. 1 (emphasis added).

166.     Tripplett called for "urgent progress now," given, "[t]he current state of affairs for African American Owners [which] can only be described as hostile." *Id.*, at p. 3. The letter ended with a strong call for action: "**[W]e need change now**." *Id*. (emphasis added).

167.     On November 4, 2019, following Easterbrook's firing, Tripplett provided an "Informational Update" to NBMOA Members, a copy of which is attached as **Exhibit "F"** hereto. Tripplett advised NBMOA members that McDonald's current CEO, Kempczinski, and Joe Erlinger, President of McDonald's USA, called him directly to assure him as follows: "[Kempczinski] expressed his plans to continue to work on our cash flow gaps as he and Steve Easterbrook agreed to do at our convention in Houston," and "[Erlinger] expressed his desire to work with the NBMOA in

achieving our initiatives." *Id.*, at p. 1. "We are cautiously optimistic," Tripplett advised NBMOA members. *Id*.

168.    Despite McDonald's empty promises and assurances to the NBMOA, intended to induce Black franchisees like Plaintiffs to operate its substandard stores, McDonald's knowingly continued institutional, systemic, and covert racial discrimination against its Black franchisees.

### C.    "Big Mac Attack" on Black Owner/Operators: McDonald's Intentional and Covert Racial Discrimination

#### (i)    *Take it or Leave it:  Steering to High-Cost and Low-Volume Locations*

169.    When Plaintiffs sought entrance into the McDonalds's franchise system, and throughout their franchise terms, McDonald's systematically steered Plaintiffs to stores in Black neighborhoods and restricted their growth to more profitable locations given to White franchisees. These neighborhoods were the tough areas, often filled with high-crime, patrons with little to no means to purchase significant meal tickets, leading to low-volume cash sales and high operating costs in the form of higher insurance rates, security costs, and employee turnover.

170.    McDonald's offered White franchisees packages with no restraints, on better terms, and in better locations than Plaintiffs.

171.    McDonald's induced Plaintiffs into purchasing these substandard restaurants by, among other things, rushing Plaintiffs, and requiring same-day inspections.  McDonald's told Plaintiffs that it could take months, if not years, to be offered another restaurant if they turned down a site.  McDonald's made Plaintiffs believe that these substandard locations were their only way in.

172.    For example, during Plaintiff Dominique's Operator Approval meeting, McDonald's representatives told him they had a restaurant that they felt would be a "good fit" based on his background in law enforcement.  McDonald's told Mr. Dominique that they needed an answer "ASAP" and asked him to fly down to Atlanta, Georgia that same day to inspect the location.

38

173.    At the time, the restaurant was owned by another Black franchisee, Plaintiff Van Jakes. The restaurant was a non-traditional (no drive-through) site in Downtown Atlanta in a high-crime area and with a significant homeless population.  As Mr. Dominique later learned, McDonald's then Vice-President and General Manager, Debbie Stroud, forced Mr. Jakes out of this restaurant and was now pushing it on to Mr. Dominique as part of McDonald's fraudulent scheme and pattern of discrimination, continuing the same perpetual cycle of giving bad restaurants in bad neighborhoods to Black franchisees.

174.    Based on McDonald's misrepresentations and omissions regarding the availability of stores, their locations, and future growth opportunities, Plaintiffs believed that if they did not take the store(s) McDonald's offered them, their chances of entering McDonald's franchise system would be extremely limited.  Plaintiffs relied on McDonald's representations because they believed that they had equal access to locations within the McDonald's franchise as Whites.

175.    Unbeknownst to Plaintiffs, McDonald's offered Black franchisees historically underperforming restaurants that White franchisees did not want to purchase and continued to deny them access to profitable locations throughout their franchise terms.   Conversely, and upon information and belief, White franchisees were routinely given preferred locations and were able to buy and sell restaurants without restriction, allowing them to prosper.

176.    Through this process, McDonald's covertly excluded Plaintiffs from the opportunity to purchase restaurants in the open market and deprived Plaintiffs of the ability to achieve the same level of economic success as White franchisees.

177.    What is more, Plaintiffs had to risk their own safety in these high-crime areas, often contending with drug dealers selling controlled substances inside and outside the restaurant, vagrants hassling customers, multiple incidents of fights, and even a murder in the parking lot of the

Crawfords' restaurant. Plaintiffs were solely responsible for paying for required additional security costs, including armed guards.

178. Plaintiffs often had to carry licensed firearms for their personal security. These dangerous environments made it difficult for Plaintiffs to attract and retain experienced managers and employees.

179. Knowing that Black franchisees historically had very limited access to the McDonald's system, McDonald's intentionally misled Plaintiffs by, among other things: (i) providing Plaintiffs with financial representations that McDonald's knew did not—and could not—accurately reflect the net revenues of the locations it steered Plaintiffs to; (ii) assurances that these restaurants would be profitable if Plaintiffs made significant initial investments in rebuilds and/or renovations, encouraging debt as part of a fraudulent scheme to force Plaintiffs into debt, bankruptcy, and/or economic duress, and more easily cycle them out of the system; and (iii) assurances that any losses would be offset by growth opportunities to better locations, which was the key to any successful McDonald's franchise model.

180. Even after Plaintiffs entered the system through these substandard locations, McDonald's continued to deny Plaintiffs the opportunity to own and operate franchises in more profitable locations, unless these more profitable locations were packaged with low-volume, high-cost locations.

181. For example, when McDonald's offered Plaintiff Mason entry into the McDonald's system through restaurants within Walmart stores in the Raleigh/Durham Region, where White franchisees did not want to purchase because they were historically underperforming, McDonald's assured Mr. Mason that he would have opportunities for growth if he increased sales. Yet, even after Mr. Mason increased sales in his initial Walmart locations, with the expectation that he would be

given an opportunity to purchase a traditional store, McDonald's continued to offer Mr. Mason additional Walmart locations and refused to approve him for any traditional stores, falsely telling him that none were available, while instead approving them for sale to White franchisees.

182.    Unbeknownst to Mr. Mason, Marty Ranft, a former QSC VP of the McDonald's Raleigh/Durham Region, was known by McDonald's to have made derogatory and racist comments about Black McDonald's employees and franchisees. According to senior executives, Guster-Hines and Neal, as revealed through their January 2020 public filing, Mr. Ranft told McDonald's senior executive, Vicki Guster-Hines, and another Black executive, that "90%" of what the black franchisees had to say about their experiences at McDonald's was a "goddamn lie," and, "You are a [N-word] like all the rest – you just believe you are better cause you are a smart one." *Guster-Hines v. McDonald's USA LLC*, No. 20-00117, Compl. [D.E. 1,], at ¶ 59 (N.D. Ill. Jan. 7, 2020).

183.    For no reason other than Mr. Mason's race, and in the same way it did to all Plaintiffs named herein, McDonald's intentionally concealed this information and limited Mr. Mason's ability to grow and expand his franchise organization throughout his franchise term.

### (ii)    *McDonald's Requires Plaintiffs to Make Significant Initial Investments in Substandard Locations: Unreasonable Rebuilds and Renovations*

184.    Despite placing Plaintiffs in locations McDonald's knew would not generate an adequate return on Plaintiffs' individual reinvestment due to low-volume sales and high expenses, McDonald's required Plaintiffs to pay for improvements to McDonald's real estate in the form of excessive and unnecessary rebuilds and/or renovations within a short time, offering initial short-term lower rent, but then rapidly escalating for the remaining franchise term, setting Plaintiffs up for financial failure.

41

185.    McDonald's knew or should have known that the rebuilds and/or renovations it required would not provide increased sales to Plaintiffs' locations sufficient to offset Plaintiffs' upfront losses.

186.    Plaintiffs paid for the costs associated with any rebuilds, renovations, and major remodels, often seeking outside financing, and driving them into debt.

187.    In certain instances where McDonald's contributed to the rebuild and/or renovation costs, McDonald's charged Plaintiffs escalating rent it knew Plaintiffs could not afford.

188.    In comparison, McDonald's offered White owner/operators newer restaurants that did not require significant reinvestment and/or locations with higher volume-sales that McDonald's knew would generate an adequate return on investment and would offset renovation and/or rebuild costs. McDonald's also placed White owner/operators on a voluntary reinvestment program without the same time restrictions placed on Black franchisees.  As representative examples of specific instances of such unequal treatment with respect to reinvestment requirements,

      a.  **Plaintiff Van Jakes**:  McDonald's required Plaintiff Jakes to reinvest in his Panola Road, Georgia, McDonald's restaurant three (3) times over the course of his franchise term when, by contrast, McDonald's did not require a White owner/operator, Patrick Dennis, in the same Region to make any reinvestments to his restaurant located just a few miles down the road in Peachtree City, Georgia.  These changes included modernizations that McDonald's told Mr. Jakes were nationally mandated, such as changing a green roof to red.

      b.  **Plaintiff Yvonne Knox**:  Plaintiff Knox struggled with one low-volume McDonald's restaurant for nearly four decades located in a depressed, crime-ridden area of Detroit, Michigan.  In 2013, a McDonald's Field Consultant told

42

Ms. Knox that she had to reimage her store a second time. Ms. Knox complied, relying on McDonald's assurances that the reinvestment would increase sales, so that she could finally sell her store and buy a profitable McDonald's franchise. After the reimaging, McDonald's told Ms. Knox that she could not buy outside of her Region, even though White operators routinely owned and operated outside of their initial Regions. Through this process, and throughout her franchise term, McDonald's restricted Ms. Knox's ability to grow beyond the predominantly Black neighborhood it offered her initially, benefiting from the improvements she paid for, and perpetuating the same cycle at the end of her term by telling her that she could only sell to another Black owner/operator.

c.  **Plaintiff Larry Brown**:  After Plaintiff Brown sought to purchase ten (10) McDonald's restaurants that McDonald's Vice President, Walt Maney, had reserved for McDonald's Corporation executives, Sue Immick and Dave Roberts, who were leaving the company and wanted to become McDonald's owner/operators, Plaintiff Brown faced retaliation in the form of unreasonable renovation requirements. McDonald's initially told Mr. Brown that three (3) restaurants required rebuilds, but later required him to bring all ten (10) restaurants in compliance with National Restaurant Brand Standards within six (6) months, even though these restaurants had been in the same condition for over five (5) years under different ownership.

189.  When McDonald's forced Plaintiffs out and offered stores to White owner/operators, McDonald's did not require White owner/operators to immediately reinvest and/or remodel by a

certain date.  Moreover, certain restaurants Plaintiffs sold to White owner/operators years ago are in the same condition Plaintiffs left them.

190.    On the other hand, in certain cases where McDonald's offered Plaintiffs' stores to Black owner/operators, McDonald's required immediate reinvestment and/or remodels, continuing the same perpetual cycle of giving bad restaurants in bad neighborhoods to Black owner/operators and setting them up for financial failure to then force them out and start the cycle again.

191.    Even McDonald's-owned McOpCo stores were kept in disrepair for years until McDonald's turned around and immediately required Plaintiffs to reinvest in significant rebuilds and/or renovations as a condition of purchase.

192.    McDonald's rebuild and renovation requirements forced Plaintiffs to sink their own funds into locations McDonald's knew would not provide any return on investment, benefitting only McDonald's as the owner of the real estate, while driving Plaintiffs into significant debt.

(iii)    *McDonald's Arbitrarily Denies Plaintiffs Opportunities for Growth*

193.    The economics of owning McDonald's franchises is to own more than one location so that overhead costs can be absorbed by the multiple locations and yield a profit to the franchise owners.

194.    McDonald's knew that to grow a profitable franchise organization in its franchise system, Plaintiffs needed restaurants with higher sales volume and cash flow to offset the low-volume, high-cost stores it offered them.

195.    Yet, McDonald's refused reasonable proposals from Plaintiffs to expand within the McDonald's system by opening McDonald's restaurants at sites Plaintiffs were ready, willing, and qualified to operate, offering these profitable locations to White franchisees instead.

196.    For no reason other than Plaintiffs' race, McDonald's systematically rejected Plaintiffs' sites and/or failed to provide Plaintiffs with any meaningful assistance to locate better restaurants in better neighborhoods.

197.    Plaintiffs would wait years before McDonald's made an offer for another store, only to find out they were offering another "hood" restaurant, meaning it was a low-volume store in an economically distressed community with a high crime rate.  These substandard restaurants were consistently offered to Black owner/operators over White owner-operators.

198.    In certain instances where Plaintiffs were given the opportunity to purchase a profitable store, it was at a significantly higher premium, with oppressive conditions attached, such as an agreement to purchase other substandard locations as part of a "packaged deal."

199.    Despite McDonald's representations and continued assurances to Plaintiffs that it would assist in growth opportunities, McDonald's continued to intentionally deprive Plaintiffs of any meaningful assistance to find other viable expansion locations over the course of their franchise relationship.

200.    Indeed, McDonald's did the opposite and went as far as to saturate the market and encroach upon Plaintiffs' locations by opening McDonald's stores just miles apart.

201.    While McDonald's offered impact funds to offset new store competition to White operators up front before the new, competing restaurant became operational, Plaintiffs were made to "wait and see," until the actual impact could be assessed.

202.    This forced Plaintiffs to continue to operate at a loss, sometimes for more than a year, while they waited for the full impact of the competing stores to be realized and assessed.

### (iv)    McDonald's False Promise of "Rent Relief" and Misleading Financial Assistance

203.    Despite Plaintiffs' significant investments and hard work over decades in the McDonald's franchise system, when Plaintiffs requested financial assistance to reduce the rent, McDonald's either denied their requests or rent was temporarily reduced and then escalated causing further financial harm.

204.    McDonald's knew when it escalated Plaintiffs' rents that Plaintiffs would not be able to pay their rent over the long term, yet McDonald's refused to provide Plaintiffs with permanent rent relief, even though McDonald's offered this relief to White franchisees.

205.    Through the FDD, McDonald's provided Plaintiffs with a table of total acquisition and development costs, along with Fixed Percentage Rent rates, explaining how McDonald's sets and controls these costs and rent rates as follows:

> The percentages used in computing monthly payments based on Gross Sales are **determined by McDonald's management** in consideration of the rights being granted by the Franchise Agreement, **the drawing power of the McDonald's restaurant**, the value of the McDonald's System as a whole and **McDonald's interests in obtaining a profit in light of competitive conditions**.    All payments made by you to McDonald's constitute a single financial arrangement between you and McDonald's which, taken as a whole and without regard to any designation or description, reflect the value of the rights being made available to you by McDonald's and the services being rendered by McDonald's during the franchise term.    The percentages may vary among franchises depending upon when the franchise was sold as well as other factors.    In unusual circumstances that involve special costs, the fees paid by you may be higher than those outlined in this Item 6.

(*See* FDD, Ex. B, at Item 6) (emphasis added).

206.    After placing Plaintiffs in restaurants with no "drawing power," guided by McDonald's own "interests in obtaining a profit," McDonald's denied Plaintiffs any legitimate

financial assistance, including, but not limited to, repeated requests for permanent rent reductions, financial restructuring, and paying for security not required by White owned and operated restaurants.

207.    McDonald's kept Plaintiffs on the hook throughout his franchise terms through false promises and minimal relief efforts, as they drove Plaintiffs further and further into debt, isolating them at every step of the process to then make it easier to force each Plaintiff out once they are no longer profitable to McDonald's.

(v)    ***Targeted and Unreasonable Inspections and Grading***

208.    Once Plaintiffs were in dire financial situations and/or refused to continue operations in crime-ridden neighborhoods with low-volume sales, McDonald's began targeted, rigorous, and unreasonable inspections and harsh grading that White franchisees were not subjected to, generating negative business reviews of Plaintiffs' restaurants.

209.    The number of inspections grew exponentially, with close to ten (10) inspections in a single quarter in certain instances, and the inspections began to take place late at night or at odd hours.

210.    Whereas Plaintiffs generally had positive business reviews prior to experiencing financial hardship and/or rejecting McDonald's offer to continue to operate in substandard locations, that immediately shifted as McDonald's began grading Plaintiffs more harshly in business reviews in a manner that disproportionately impacted Black franchisees as compared to White franchisees.

211.    McDonald's knew and leveraged the fact that Plaintiffs' eligibility for growth and renewal, or "rewrite," of their franchise term depended on business reviews and passing inspections.

212.    By instituting harsher grading standards and through unreasonable inspections, McDonald's negatively impacted Plaintiffs' performance ratings as pretext for McDonald's denial of growth and/or rewrite opportunities.

47

**(vi)** *No Choice But to Sell:  McDonald's Forced Exit Scheme*

213.    Under the oppressive terms of McDonald's rewrite process, McDonald's has absolute and **<u>sole</u>** discretion with respect to whether a franchisee may or may not be offered a new term franchise, or "rewrite."  *See* McDonald's U.S. Rewrite (New Term) Policy, Exhibit L to the FDD, which is subject to change "in McDonald's sole discretion."

214.    Pursuant to McDonald's Rewrite Policy, three (3) years prior to the franchise term expiring, the rewrite process begins.  (FDD, Ex. B, at Exhibit L).  McDonald's controls the rewrite process:  Only McDonald's Rewrite Committee has the authority to offer or decline to offer a new term franchise, the Rewrite Committee's recommendations are submitted by the Vice President of the Field Office of the Rewrite Committee, compromised of members of McDonald's U.S. management.  *Id*.  The decision of the Rewrite Committee is final.  *Id*.

215.    When McDonald's concludes that it will not offer a new term franchise, McDonald's will extend an "alternative offer, which will give the Owner/Operator the opportunity to sell the restaurant business to a **<u>qualified buyer</u>** prior to the expiration of the current franchise.  Subject to the terms stated in the alternative offer, which include a release, McDonald's will commit to offer a new term franchise to the **<u>qualified buyer</u>**."  *Id*. (emphasis added).

216.    Plaintiffs with interested buyers were blocked by McDonald's, who had final approval in "qualifying" buyers.  McDonald's rejected Plaintiffs' potential buyers without any legitimate business justification.  For example,

        a.    **Plaintiff Christine Crawford**:  When Plaintiff Christine Crawford presented McDonald's with a list of operators interested in purchasing her restaurants, then General Manager of the Atlanta Region, Greg Watson, told Ms. Crawford that she could only offer them to operators who were, "a part of the class picture of the

region's future." Similarly, in an email from McDonald's Atlanta Region Vice President, Valarie Williams, McDonald's told Ms. Crawford, "The QSC VP will provide names of potential buyers that are supported by the region for you to negotiate the sale of your restaurants."

**b. Plaintiff Jeremiah Simmons**: After McDonald's USA Senior Vice President and Chief Restaurant Officer, Mason Smoot, told Plaintiff Simmons to invest in a McCafé despite his low-volume sales or leave the system, Mr. Simmons began looking for potential buyers. Mr. Simmons had an offer from another McDonald's owner/operator and agreed on a selling price. The buyer withdrew the offer, however, shortly after speaking to Mr. Smoot. McDonald's subsequently approved another McDonald's owner/operator's offer to the purchase Mr. Simmons' franchise for $400,000 **less than** his original offer.

217. Because McDonald's controlled the exit process, there was no way for Plaintiffs to gauge what their restaurants could have sold for in an open market.

218. McDonald's systematically dealt with Plaintiffs on an individual basis to cover up their discriminatory practices and fraudulent scheme from Black franchisees.

219. McDonald's led Plaintiffs to believe at all times material hereto that they had no choice but to sell and that their financial losses were caused by Plaintiffs' individual deficiencies as a "bad operators" or operational deficiencies within Plaintiffs' network of stores.

220. With the looming threat of further financial penalties, and no process for disputing qualification denials of buyers in the rewrite process McDonald's controlled, Plaintiffs could not afford to wait for another "qualified buyer," and were forced to sell their stores at a loss.

221.     As a result of McDonald's discriminatory practices, unfair retaliation, breach of contract, and fraud alleged herein, Plaintiffs have suffered substantial damages in amounts that will be proven at trial, including, but not limited to, lost profits, lost value of the franchise(s), lost capital contributions, lost investments, lost revenue, lost business opportunities, attorneys' fees, costs, and any and all unnecessary out-of-pocket expenses.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF 42 U.S.C. § 1981
**(As to Plaintiffs, Christine Crawford, Delores Crawford, Juneth N. Daniel, Yves Dominique, Van Jakes, Ralph King, Keith Manning, Kenneth Manning, Dawn Mussenden, Laetitia Johnson, Carrie Salone, Floyd Sims, Larry Brown, John Mason, Ronnie Thornton, Lisa Gunter, f/k/a Lisa McKenzie, Mitchell McGuire, Lois McGuire, Hayes Ferrell, Yvonne Knox, Arthur Scott, Errol Service, Melvin Jones, George Gipson, Michael Simon, Victor Bruce, David White, Barbara White, John Tillman, Allen Stafford, Keristin Holloway, Gloria Holloway, George Jones, Jane Jones, Wise Finley, Lewis Anderson, Scott Miller, Dwight Miller, Faye Hobley, Paul Hoskins, Michele Hoskins, Al Harris, Kristen Harris, Norman H. Williams, William (Pete) Washington, Benny Clark, and Eleanor Clark, Against Defendants)**

222.     Plaintiffs, Christine Crawford, Delores Crawford, Juneth N. Daniel, Yves Dominique, Van Jakes, Ralph King, Keith Manning, Kenneth Manning, Dawn Mussenden, Laetitia Johnson, Carrie Salone, Floyd Sims, Larry Brown, John Mason, Ronnie Thornton, Lisa Gunter, f/k/a Lisa McKenzie, Mitchell McGuire, Lois McGuire, Hayes Ferrell, Yvonne Knox, Arthur Scott, Errol Service, Melvin Jones, George Gipson, Michael Simon, Victor Bruce, David White, Barbara White, John Tillman, Allen Stafford, Keristin Holloway, Gloria Holloway, George Jones, Jane Jones, Wise Finley, Lewis Anderson, Scott Miller, Dwight Miller, Faye Hobley, Paul Hoskins, Michele Hoskins, Al Harris, Kristen Harris, Norman H. Williams, William (Pete) Washington, Benny Clark, and Eleanor Clark (collectively, the "1981 Plaintiffs"), adopt, reallege, and incorporate the allegations of paragraphs 1 through 221 of this Amended Complaint as though fully set forth herein.

50

223. The 1981 Plaintiffs are members of a protected class due to their race as Black citizens who have the same right to make and enforce contracts as White citizens pursuant to 42 U.S.C. § 1981.

224. The Franchise Agreements between the 1981 Plaintiffs and McDonald's are "contracts" within the meaning of Section 1981, as amended, providing that Black citizens have the same right to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the [franchise] relationship" as White citizens. 42 U.S.C. § 1981(b).

225. McDonald's violated 42 U.S.C. § 1981 by denying the 1981 Plaintiffs the same franchise opportunities made available to White franchisees.

226. McDonald's treated the 1981 Plaintiffs differently from other similarly-situated franchisees in their region and nationwide because they are Black, by, including, but not limited to:

    a.    Restricting the 1981 Plaintiffs to older, recycled restaurants, in poor-performing and dangerous locations with high operating costs and low-volume sales;

    b.    Requiring the 1981 Plaintiffs to invest in rebuilds and/or renovations within short timeframes not required of White franchisees;

    c.    Excluding 1981 Plaintiffs from the same growth opportunities offered to White franchisees;

    d.    Failing to provide any legitimate business reasons for repeated denials of franchise opportunities to 1981 Plaintiffs over many years;

    e.    Denying 1981 Plaintiffs meaningful support to allow them to overcome financial hardships, while White franchisees were routinely provided such assistance, including, but not limited to, permanent rent relief and impact funding;

    f.    Depriving 1981 Plaintiffs of the same legacy opportunities offered to White franchisees through McDonald's Next Gen program;

g.   Retaliation against the 1981 Plaintiffs for rejecting offers to continue operations in crime-ridden neighborhoods with low-volume sales, including through targeted, increased, and unreasonable inspections;

h.   Disparate treatment with respect to inspections and grading of the 1981 Plaintiffs' restaurants as part of a scheme to generate bad business reviews to force Plaintiffs out of the McDonald's system because of their race; and/or

i.   Placing the 1981 Plaintiffs in untenable positions of economic duress, denying them eligibility for growth and renewal of their agreements, and arbitrarily denying final approval of their buyers, so that the 1981 Plaintiffs had no choice but to sell their entire franchise organization at a loss or walk away from the business after decades investing in and cultivating their businesses.

227.   By the conduct described above, Defendants intentionally and willfully deprived 1981 Plaintiffs of the same rights enjoyed by White citizens to be free from racial discrimination in the right to enter into contracts and the right to enjoy all of the privileges and benefits of established contractual relationships in violation of 42 U.S.C. § 1981.

228.   As a direct and proximate result of McDonald's conduct, 1981 Plaintiffs collectively lost close to three-hundred (300) stores with compensatory damages averaging between four million dollars ($4,000,000.00) and five million dollars ($5,000,000.00) per store.

229.   McDonald's engaged in willful, wanton, malicious, and or/reckless conduct that injured 1981 Plaintiffs in disregard of their protected rights, thereby entitling them to punitive damages.

230.   McDonald's willful, wanton, malicious, and/or reckless conduct includes, but is not limited to, its racially discriminatory practices and fraudulent conduct that resulted in substantial and irreparable damages sustained by the1981 Plaintiffs.

231.   Defendants fraudulently concealed their discriminatory practices through the conduct described above, including systematic isolation of the 1981 Plaintiffs and controlling the information

they received, designed to prevent the 1981 Plaintiffs discovery of McDonald's ongoing discriminatory practices post-parity.

232. At all times material, Defendants had actual knowledge of the wrongfulness of their conduct and the high probability that injury and/or damage to the 1981 Plaintiffs would result, and despite that knowledge, willfully, wantonly, and recklessly pursued their course of conduct.

233. Defendants actively and knowingly participated in such conduct, and/or their officers, directors, or managers knowingly condoned, ratified or consented to such conduct.

234. Defendants' conduct is so gross and flagrant as to show a reckless disregard or a conscious wanton, reckless indifference to consequences or a grossly careless disregard for the life, safety, and/or rights of 1981 Plaintiffs.

235. McDonald's has demonstrated an outrageous conscious disregard for 1981 Plaintiffs' rights with implied malice, warranting the imposition of punitive damages.

236. But for 1981 Plaintiffs' race and McDonald's discriminatory denial of equal franchise opportunities, and as a direct and proximate result of McDonald's practice of ongoing discrimination during each 1981 Plaintiffs' franchise term, the 1981 Plaintiffs suffered and continue to suffer damages in an amount in excess of the jurisdictional limit, including, without limitation: special or consequential damages in the form of lost profits and opportunities; damages for the intangible injury that results from the denial of civil rights under the law; emotional and physical suffering and distress, humiliation, damage to professional reputations and future business prospects; punitive damages in an amount sufficient to deter Defendants' similar wrongful conduct in the future; and an award of attorneys' fees, expert fees, and costs.

WHEREFORE, Plaintiffs, Christine Crawford, Delores Crawford, Juneth N. Daniel, Yves Dominique, Van Jakes, Ralph King, Keith Manning, Kenneth Manning, Dawn Mussenden, Laetitia

Johnson, Carrie Salone, Floyd Sims, Larry Brown, John Mason, Ronnie Thornton, Lisa Gunter, f/k/a

Lisa McKenzie, Mitchell McGuire, Lois McGuire, Hayes Ferrell, Yvonne Knox, Arthur Scott, Errol

Service, Melvin Jones, George Gipson, Michael Simon, Victor Bruce, David White, Barbara White,

John Tillman, Allen Stafford, Keristin Holloway, Gloria Holloway, George Jones, Jane Jones, Wise

Finley, Lewis Anderson, Scott Miller, Dwight Miller, Faye Hobley, Paul Hoskins, Michele Hoskins,

Al Harris, Kristen Harris, Norman H. Williams, William (Pete) Washington, Benny Clark, and

Eleanor Clark, respectfully request that the Court enter judgment against Defendants awarding 1981

Plaintiffs (a) actual damages, (b) special or consequential damages in the forms described above, (c)

fees and costs of this action, and (d) such other and further relief as the Court deems proper.

## COUNT II
## BREACH OF CONTRACT

**(As to Plaintiffs, Christine Crawford, Delores Crawford, Juneth N. Daniel, Van Jakes, Ralph King, Keith Manning, Kenneth Manning, Dawn Mussenden, Carrie Salone, Floyd Sims, John Mason, Ronnie Thornton, Lisa Gunter, f/k/a Lisa McKenzie, Mitchell McGuire, Lois McGuire, Hayes Ferrell, Yvonne Knox, Arthur Scott, Errol Service, Melvin Jones, George Gipson, Michael Simon, Victor Bruce, David White, Barbara White, John Tillman, Allen Stafford, Keristin Holloway, Gloria Holloway, George Jones, Jane Jones, Wise Finley, Lewis Anderson, Scott Miller, Dwight Miller, Faye Hobley, Paul Hoskins, Michele Hoskins, Al Harris, Kristen Harris, Norman H. Williams, William (Pete) Washington, Benny Clark, Eleanor Clark, Harold Lewis, Jeremy Lewis, Philip Douglas, Lawrence Holland, William Rasul, LeRoy Walker, Jr., Jeffery Rogers, Joseph Mbanefo, Annis Alston-Staley, Harry Staley, Gordon Thornton, Dwayne Richard Johnson, Serge Tancrede, Karen Tancrede, Errol Thybulle, Jeremiah Simmons, Darryl Umphries, Jacqueline George, Anthony George, Wesley Hall, Glenda Claypool, as Personal Representative of the Estate of Sherman Claypool, Kenneth Nelson, Bernard Saffold, Lance Williams, Jacqueline Wynn, Robert (Bob) Bonner, Gary Roan, Joyce Mance-Roan, Douglas Hollis, and Glenna Hollis, Against Defendants)**

237. Plaintiffs, Christine Crawford, Delores Crawford, Juneth N. Daniel, Van Jakes, Ralph

King, Keith Manning, Kenneth Manning, Dawn Mussenden, Carrie Salone, Floyd Sims, John Mason,

Ronnie Thornton, Lisa Gunter, f/k/a Lisa McKenzie, Mitchell McGuire, Lois McGuire, Hayes

Ferrell, Yvonne Knox, Arthur Scott, Errol Service, Melvin Jones, George Gipson, Michael Simon,

Victor Bruce, David White, Barbara White, John Tillman, Allen Stafford, Keristin Holloway, Gloria

Holloway, George Jones, Jane Jones, Wise Finley, Lewis Anderson, Scott Miller, Dwight Miller, Faye Hobley, Paul Hoskins, Michele Hoskins, Al Harris, Kristen Harris, Norman H. Williams, William (Pete) Washington, Benny Clark, Eleanor Clark, Harold Lewis, Jeremy Lewis, Philip Douglas, Lawrence Holland, William Rasul, LeRoy Walker, Jr., Jeffery Rogers, Joseph Mbanefo, Annis Alston-Staley, Harry Staley, Gordon Thornton, Dwayne Richard Johnson, Serge Tancrede, Karen Tancrede, Errol Thybulle, Jeremiah Simmons, Darryl Umphries, Jacqueline George, Anthony George, Wesley Hall, Glenda Claypool, as Personal Representative of the Estate of Sherman Claypool, Kenneth Nelson, Bernard Saffold, Lance Williams, Jacqueline Wynn, Robert (Bob) Bonner, Gary Roan, Joyce Mance-Roan, Douglas Hollis, and Glenna Hollis (collectively, the "Breach of Contract Plaintiffs"), adopt, reallege and incorporate the allegations of paragraphs 1 through 221 of this Amended Complaint as though fully set forth herein.

238. The Breach of Contract Plaintiffs entered into Franchise Agreements to own and operate McDonald's domestic franchised restaurants, on the entry dates, and in the locations specified above.

239. The Breach of Contract Plaintiffs substantially performed all material terms of the Franchise Agreements by, among other things, operating their restaurants in compliance with the standards prescribed by the McDonald's System, making timely payments of undisputed amounts due to McDonald's and suppliers, unless excused, complying with non-compete provisions, and allowing McDonald's to inspect their restaurants at reasonable times.

240. Pursuant to Section 3 of the Franchise Agreement, "General Services of McDonald's," McDonald's agreed to, "make available to Franchisee all additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes generally available,

from time to time, **to all its franchisees** operating McDonald's restaurants." (Franchise Agreement, Ex. A, at ¶ 3) (emphasis added).

241.   McDonald's breached <u>Section 3</u> of the Franchise Agreement by, *inter alia*:

    a.   Excluding the Breach of Contract Plaintiffs from the right to grow their organizations to profitable locations offered to other franchisees;

    b.   Excluding the Breach of Contract Plaintiffs from participation in the Next Gen legacy program offered to other franchisees;

    c.   Disproportionately imposing rebuild and/or renovation requirements on the Breach of Contract Plaintiffs that were not imposed on other franchisees; and/or

    d.   Failing to approve the Breach of Contract Plaintiffs' reasonable requests for financial assistance and/or restructuring plans that were offered to other franchisees, including, but not limited to, permanent rent adjustments and impact funding.

242.   McDonald's further agreed to a reasonableness standard with respect inspections and renovation/rebuild requirements pursuant to Section 12, "Compliance with Entire System:"

> McDonald's shall have the right to inspect the Restaurant at all **reasonable** times to ensure that Franchisee's operation thereof is in compliance with the standards and policies of the McDonald's System.

> Franchisee shall comply with the entire McDonald's System, including, but not limited to, the following: (c) Keep the Restaurant constructed and equipped in accordance with the building blueprints and equipment layout plans that are standard in the McDonald's System or as such blueprints and plans may be **reasonably** changed from time to time by McDonald's.

(*Id*., at ¶ 12) (emphasis added). Article 7 of the Operator's Lease, incorporated as Exhibit A into the Franchise Agreement, similarly requires any inspections to be "during **reasonable** business hours." (Operator's Lease, at § 7.01) (emphasis added).

243.   McDonald's breached <u>Section 12</u> of the Franchise Agreement by *inter alia*:

    a.   Imposing high-cost rebuilds and/or renovations of the Breach of Contract Plaintiffs' restaurants in locations that McDonald's knew would not provide

an adequate return on investment and in short time frames not required of other franchisees; and/or

b.    Increased, harassing, and targeted inspections of the Breach of Contract Plaintiffs' restaurants, including outside of regular business hours.

244.    McDonald's also owed a duty of good faith and fair dealing to the Breach of Contract Plaintiffs in its performance under the Franchise Agreement.

245.    In its performance of the Franchise Agreement, McDonald's violated its duty of good faith and fair dealing by, *inter alia*:

a.    Engaging in unreasonable and targeted inspections of Breach of Contract Plaintiffs' restaurants as pretext for denying them growth and rewrite;

b.    Applying harsher grading standards to the Breach of Contract Plaintiffs' restaurants in order to generate bad business reviews;

c.    Denying Plaintiffs meaningful financial assistance, including, rent relief and impact money for building new stores within their trade area;

d.    Imposing excessive costs and investments and modifications, including those required under the BBV2020 plan, and then arbitrarily reneging on the "unprecedented investment" promised by McDonald's through its partnering program;

e.    Placing the Breach of Contract Plaintiffs in positions of economic duress and asking Plaintiffs to sign one-sided release agreements at every step of the franchise relationship; and/or

f.    Forcing the Breach of Contract Plaintiffs to sell their franchises at a loss after failing to approve reasonable requests for financial assistance and/or restructuring plans, that could have resolved any outstanding obligations and debt on one store in the organization and allowed the Breach of Contract Plaintiffs to remain in the system.

246.    As a direct and proximate result of McDonald's conduct, Breach of Contract Plaintiffs collectively lost close to three-hundred (300) stores with compensatory damages averaging between four million dollars ($4,000,000.00) and five million dollars ($5,000,000.00) per store.

247. As a direct, proximate, and foreseeable result of McDonald's breach of contract and bad faith, the Breach of Contract Plaintiffs have incurred substantial damages in amounts that will be proven at trial, including, without limitation, reasonable compensation for the time and effort expended in planning and preparing their franchise business, lost profits, and out-of-pocket expenses they incurred in pursuing the franchise business, in an amount in excess of the jurisdictional limit, and any applicable prejudgment and post-judgment interest.

WHEREFORE, Plaintiffs, Christine Crawford, Delores Crawford, Juneth N. Daniel, Van Jakes, Ralph King, Keith Manning, Kenneth Manning, Dawn Mussenden, Carrie Salone, Floyd Sims, John Mason, Ronnie Thornton, Lisa Gunter, f/k/a Lisa McKenzie, Mitchell McGuire, Lois McGuire, Hayes Ferrell, Yvonne Knox, Arthur Scott, Errol Service, Melvin Jones, George Gipson, Michael Simon, Victor Bruce, David White, Barbara White, John Tillman, Allen Stafford, Keristin Holloway, Gloria Holloway, George Jones, Jane Jones, Wise Finley, Lewis Anderson, Scott Miller, Dwight Miller, Faye Hobley, Paul Hoskins, Michele Hoskins, Al Harris, Kristen Harris, Norman H. Williams, William (Pete) Washington, Benny Clark, Eleanor Clark, Harold Lewis, Jeremy Lewis, Philip Douglas, Lawrence Holland, William Rasul, LeRoy Walker, Jr., Jeffery Rogers, Joseph Mbanefo, Annis Alston-Staley, Harry Staley, Gordon Thornton, Dwayne Richard Johnson, Serge Tancrede, Karen Tancrede, Errol Thybulle, Jeremiah Simmons, Darryl Umphries, Jacqueline George, Anthony George, Wesley Hall, Glenda Claypool, as Personal Representative of the Estate of Sherman Claypool, Kenneth Nelson, Bernard Saffold, Lance Williams, Jacqueline Wynn, Robert (Bob) Bonner, Gary Roan, Joyce Mance-Roan, Douglas Hollis, and Glenna Hollis, respectfully request that the Court enter judgment against Defendants, awarding Breach of Contract Plaintiffs (a) actual damages, (b) special or consequential damages in the forms described above, and (c) such other and further relief as the Court deems proper.

**COUNT III**
**FRAUDULENT OMISSION**

**(As to Plaintiffs, Christine Crawford, Delores Crawford, Juneth N. Daniel, Yves Dominique, Van Jakes, Ralph King, Keith Manning, Kenneth Manning, Dawn Mussenden, Laetitia Johnson, Carrie Salone, Floyd Sims, Larry Brown, John Mason, Ronnie Thornton, Lisa Gunter, f/k/a Lisa McKenzie, Mitchell McGuire, Lois McGuire, Hayes Ferrell, Yvonne Knox, Arthur Scott, Errol Service, Melvin Jones, George Gipson, Michael Simon, Victor Bruce, David White, Barbara White, John Tillman, Allen Stafford, Keristin Holloway, Gloria Holloway, George Jones, Jane Jones, Wise Finley, Lewis Anderson, Scott Miller, Dwight Miller, Faye Hobley, Paul Hoskins, Michele Hoskins, Al Harris, Kristen Harris, Norman H. Williams, William (Pete) Washington, Benny Clark, Eleanor Clark, Harold Lewis, Jeremy Lewis, LeRoy Walker, Jr., Annis Alston-Staley, and Harry Staley, Against Defendants)**

248.     Plaintiffs, Christine Crawford, Delores Crawford, Juneth N. Daniel, Yves Dominique, Van Jakes, Ralph King, Keith Manning, Kenneth Manning, Dawn Mussenden, Laetitia Johnson, Carrie Salone, Floyd Sims, Larry Brown, John Mason, Ronnie Thornton, Lisa Gunter, f/k/a Lisa McKenzie, Mitchell McGuire, Lois McGuire, Hayes Ferrell, Yvonne Knox, Arthur Scott, Errol Service, Melvin Jones, George Gipson, Michael Simon, Victor Bruce, David White, Barbara White, John Tillman, Allen Stafford, Keristin Holloway, Gloria Holloway, George Jones, Jane Jones, Wise Finley, Lewis Anderson, Scott Miller, Dwight Miller, Faye Hobley, Paul Hoskins, Michele Hoskins, Al Harris, Kristen Harris, Norman H. Williams, William (Pete) Washington, Benny Clark, Eleanor Clark, Harold Lewis, Jeremy Lewis, LeRoy Walker, Jr., Annis Alston-Staley, and Harry Staley (collectively, the "Fraud Plaintiffs"), adopt, reallege and incorporate the allegations of paragraphs 1 through 221 of this Amended Complaint as though fully set forth herein.

249.     As fully set forth above, Defendants failed to disclose material information to the Fraudulent Omission Plaintiffs throughout their franchise terms, including, but not limited to:

      a.     Failing to disclose that the substandard locations it offered to the Fraud Plaintiffs were not the only available sites and that other profitable locations were being offered to White franchisees;

59

b.  Failing to disclose that the financial performance of the Fraud Plaintiffs' restaurant locations would be in line with the national average of domestic traditional McDonald's restaurants opened at least one (1) year prior;

c.  Failing to disclose that McDonald's would require Plaintiffs to rebuild and/or remodel their restaurants, with little or no impact on sales, on short timelines, and without permanent rent relief;

d.  Failing to disclose that McDonald's would offer growth opportunities to higher-volume, lower cost locations to White franchisees over Black franchisees;

e.  Failing to disclose the information that McDonald's used to determine the Fraud Plaintiffs' renewal upon expiration of their franchise terms;

f.  Failing to disclose that McDonald's would begin harassing inspections of the Fraud Plaintiffs' restaurants if the Fraud Plaintiffs experience financial difficulty;

g.  Failing to disclose that the Fraud Plaintiffs' restaurants would be subject to harsher grading than similarly situated franchisees to generate bad business reviews when the Fraud Plaintiffs experience financial difficulty; and/or

h.  Failing to disclose that McDonald's had no intention of qualifying the Fraud Plaintiffs' ready and willing buyers at the point of exit.

250.  McDonald's intended that these material omissions would induce the Fraud Plaintiffs to accept substandard locations, invest in significant renovations and/or rebuilds, accept unequal terms as part of temporary financial assistance, continue to accept substandard stores as a condition to own and operate profitable stores, accept McDonald's rewrite denial and sell their stores.

251.  McDonald's fraudulently concealed this systemic practice and controlled all of the information provided to franchisees such that the Fraud Plaintiffs did not know, have reason to know, nor could have discovered, through the exercise of reasonable diligence, the foregoing omissions.

252.  The Fraud Plaintiffs reasonably and justifiably relied upon McDonald's as the franchisor and made financial decisions to their detriment.

253.    As a direct and proximate result of McDonald's conduct, Plaintiffs collectively lost close to three-hundred (300) stores with compensatory damages averaging between four million dollars ($4,000,000.00) and five million dollars ($5,000,000.00) per store.

254.    As a direct, proximate, and foreseeable result of McDonald's fraudulent misrepresentations and concealment, Plaintiffs have incurred substantial damages in amounts that will be proven at trial, including without limitation, lost profits and other damages in excess of the jurisdictional limit.

WHEREFORE, Plaintiffs , Christine Crawford, Delores Crawford, Juneth N. Daniel, Yves Dominique, Van Jakes, Ralph King, Keith Manning, Kenneth Manning, Dawn Mussenden, Laetitia Johnson, Carrie Salone, Floyd Sims, Larry Brown, John Mason, Ronnie Thornton, Lisa Gunter, f/k/a Lisa McKenzie, Mitchell McGuire, Lois McGuire, Hayes Ferrell, Yvonne Knox, Arthur Scott, Errol Service, Melvin Jones, George Gipson, Michael Simon, Victor Bruce, David White, Barbara White, John Tillman, Allen Stafford, Keristin Holloway, Gloria Holloway, George Jones, Jane Jones, Wise Finley, Lewis Anderson, Scott Miller, Dwight Miller, Faye Hobley, Paul Hoskins, Michele Hoskins, Al Harris, Kristen Harris, Norman H. Williams, William (Pete) Washington, Benny Clark, Eleanor Clark, Harold Lewis, Jeremy Lewis, LeRoy Walker, Jr., Annis Alston-Staley, and Harry Staley, respectfully request that the Court enter judgment against Defendants awarding Plaintiffs (a) actual damages, (b) special or consequential damages in the forms described above, and (c) such other and further relief as the Court deems proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants and request the following relief from the Court:

a.    Declaration that the acts and practices complained of herein are violations of 42 U.S.C. § 1981;

b.      Direct Defendants to make Plaintiffs whole for all earnings and benefits they would have received but for Defendants' discriminatory treatment;

c.      General, compensatory, and consequential damages in amounts to be proven at trial, including, without limitation:

         (1)      damages in in excess of the jurisdictional limit;

         (2)      lost business opportunities because of McDonald's unjustifiable refusal to offer such opportunities to Plaintiffs;

         (3)      excessive and unreasonable costs and expenses due to substandard franchise location;

         (4)      insufficient sales volume due to substandard franchise location;

         (5)      loss of profits because of excessive expenses and insufficient sales volume due to substandard franchise location;

         (6)      loss of franchise value because of inability to extinguish debt and meet operating expenses due to substandard franchise location;

         (7)      loss of franchises due to discriminatory conduct; and

         (8)      additional damages for emotional and physical suffering and distress, humiliation, damage to professional reputations, and to future busines prospects.

d.      an award of punitive damages in an amount sufficient to deter Defendant's similar wrongful conduct in the future;

e.      an order for an award of attorney's fees, expert fees, and costs, as provided by law;

f.      an award of pre-judgment and post-judgment interest as provided by law; and

g.      an order for all such other relief the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all issues so triable as a matter of right.

DATED this 16th day of November, 2020.     Respectfully submitted,

**THE FERRARO LAW FIRM, P.A.**
*Attorneys for Plaintiffs*

*/s/ James L. Ferraro*
James L. Ferraro, Esq.
Florida Bar No.: 381659
jlf@ferrarolaw.com
Mamie C. Joeveer, Esq.
Florida Bar No.: 79045
mcj@ferrarolaw.com
Janpaul Portal, Esq.
Florida Bar No.: 0567264
jpp@ferrarolaw.com
Natalia Salas, Esq.
Florida Bar No.:  44895
nms@ferrarolaw.com
Brickell World Plaza
600 Brickell Avenue, 38th Floor
Miami, Florida 33131
Telephone: (305) 375-0111
Facsimile: (305) 379-6222

and

William R. Fahey, Esq.
Illinois Bar No.: 3127912
bfahey@cooneyconway.com
Cooney & Conway, PC
120 N. LaSalle Street, 30th Floor
Chicago, IL 60602
Telephone: (312) 236-6166

*Designated as Local Counsel*
*Pursuant to Local Rule 83.15*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 16, 2020, I electronically filed the foregoing document with the Clerk for the United States District Court, Northern District of Illinois. The electronic case filing system (CM/ECF) will send a Notice of Electronic Filing (NEF) to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

By: */s/ James L. Ferraro*
James L. Ferraro, Esq.