**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KENNETH MANNING, CHRISTINE CRAWFORD, KEITH MANNING, DELORES CRAWFORD, VAN JAKES, ANNIS ALSTON-STALEY, HARRY STALEY, ROBERT BONNER, LARRY BROWN, BENNY CLARK, ELEANOR CLARK, GLENDA CLAYPOOL, JUNETH DANIEL, YVES DOMINIQUE, WISE FINLEY, JACQUELINE GEORGE, ANTHONY GEORGE, WESLEY HALL, AL HARRIS, KRISTEN HARRIS, LAWRENCE HOLLAND, DOUGLAS HOLLIS, GLENNA HOLLIS, LAETITTIA JOHNSON, HAROLD LEWIS, JEREMY LEWIS, JOSEPH MBANEFO, SCOTT MILLER, DWIGHT MILLER DAWN MUSSENDEN, WILLIAM RASUL, DWAYNE RICHARD JOHNSON, JEFFERY ROGERS, CARRIE SALONE, JEREMIAH SIMMONS, FLOYD SIMS, ALLEN STAFFORD, RONNIE THORNTON, ERROL THYBULLE, NORMAN WILLIAMS, LANCE WILLIAMS, JACQUELINE WYNN, MITHCELL MCGUIRE, LOIS MCGUIRE, GORDON THORNTON, SERGE TANCREDE, KAREN TANCREDE, AND WILLIAM (PETE) WASHINGTON,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>McDONALD'S USA, LLC, a Delaware limited liability company, and McDONALD'S CORPORATION, a Delaware corporation<br><br>*Defendants*. | Case No.: 1:20-cv-05132<br><br>Hon. Judge Steven C. Seeger<br><br><br>**JURY TRIAL DEMANDED** |

## SECOND AMENDED COMPLAINT

NOW COME Plaintiffs KENNETH MANNING, KEITH MANNING, DELORES CRAWFORD, CHRISTINE CRAWFORD, VAN JAKES, ANNIS ALSTON-STALEY, HARRY STALEY, ROBERT BONNER, LARRY BROWN, BENNY CLARK, ELEANOR CLARK, GLENDA CLAYPOOL, JUNETH DANIEL, YVES DOMINIQUE, WISE FINLEY, JACQUELINE GEORGE, ANTHONY GEORGE, WESLEY HALL, AL HARRIS, KRISTEN HARRIS, LAWRENCE HOLLAND, DOUGLAS HOLLIS, GLENNA HOLLIS, LAETITTIA JOHNSON, HAROLD LEWIS, JEREMY LEWIS, JOSEPH MBANEFO, SCOTT MILLER, DWIGHT MILLER DAWN MUSSENDEN, WILLIAM RASUL, DWAYNE RICHARD JOHNSON, JEFFERY ROGERS, CARRIE SALONE, JEREMIAH SIMMONS, FLOYD SIMS, ALLEN STAFFORD, RONNIE THORNTON, ERROL THYBULLE, NORMAN WILLIAMS, LANCE WILLIAMS, JACQUELINE WYNN, MITHCELL MCGUIRE, LOIS MCGUIRE, GORDON THORNTON, SERGE TANCREDE, KAREN TANCREDE, and WILLIAM (PETE) WASHINGTON, by their attorneys LOEVY & LOEVY, and complaining of Defendants MCDONALD'S CORPORATION and MCDONALD'S USA, LLC, state as follows:

### INTRODUCTION

1.      This case arises from McDonald's systematic racial discrimination against its Black franchisees.

2.      Plaintiffs are all Black, former McDonald's franchisees who were forced out of the McDonald's system due to McDonald's systematic racial discrimination.

3.      Plaintiffs put their hearts and souls into their dreams of owning and operating McDonald's stores and building generational wealth for their families.

4.      In return, McDonald's directed that Plaintiffs, solely because they were Black, could only franchise and operate stores that were in predominantly Black neighborhoods. These

stores had lower sales and profits than McDonald's stores in white neighborhoods. McDonald's refused to allow Plaintiffs to become franchisees in white neighborhoods.

5.     In addition, once Plaintiffs were part of the McDonald's system, McDonald's continued to discriminate against them based on their race and breached McDonald's agreements with Plaintiffs. For instance, McDonald's refused to offer Plaintiffs the same support that McDonald's offered white franchisees, and McDonald's subjected Plaintiffs to harassing treatment that it never directed at white franchisees.

6.     Finally, when it came time to sell their franchises, McDonald's continued to discriminate against Plaintiffs because of their race and breach McDonald's agreements with Plaintiffs. For example, McDonald's refused to allow Plaintiffs to sell to their preferred Black buyers, and it instead forced Plaintiffs to sell at lower prices to white buyers that McDonald's had hand-picked.

7.     McDonald's pitched the prospect of becoming a franchisee to Black owners, including Plaintiffs, as a once-in-a-lifetime opportunity to become business owners, to acquire generational wealth, and to become leaders in their local communities. Like much of what McDonald's has sold in the United States, it sold Plaintiffs and other Black franchisees what it advertised was a part of the American dream. But it was a false promise. In reality, McDonald's trapped Black franchisees in a cycle of financial duress driven by racism.

8.     In particular, McDonald's executives and managers began by forcing Plaintiffs into substandard, low-profit stores in predominantly Black communities with high crime rates. McDonald's executives intentionally placed Black franchisees in these stores based on the racist belief that customer sales would increase—and that McDonald's bottom line would therefore

improve—if stores were operated by individuals who had the same skin color as the rest of the community.

9.     McDonald's race discrimination against Black franchisees did not end with their initial placement in substandard, dangerous locations. Plaintiffs' experiences also reveal a stunning pattern of race discrimination by McDonald's from the beginning to the end of their relationships with McDonald's.

10.     Once placed in these substandard locations, Black franchisees were forced to pay significantly higher operating costs than their white counterparts due to security costs, higher insurance rates, and higher employee turnover. Yet, when confronted with the economic harms it had caused, McDonald's refused to provide Black franchisees with any of the needed financial assistance, including rent relief. Meanwhile, McDonald's routinely provided such assistance, including rent relief, to white owner/operators, who did not face nearly as serious operating challenges.

11.     Moreover, when Black franchisees approached McDonald's about purchase opportunities in affluent white communities—stores that could have given them the financial cash flow to help pay costs at their lower-profit locations—McDonald's uniformly denied them those opportunities because they were Black.

12.     McDonald's also held Plaintiffs to higher operating standards solely because of their race. Regional staff consistently demanded that Plaintiffs complete unnecessary and costly renovations or remodels on their stores. McDonald's offered Plaintiffs no breathing room when it came to completing renovations, often shortly after Plaintiffs' purchase of a store, whereas white franchisees were routinely granted a generous time frame to complete remodels upon purchase.

13.     When McDonald's identified a Black franchisee it wanted to force out of the system, McDonald's relied on a well-honed practice to do so: ramping up unannounced inspections at all times of the day and night to find infractions McDonald's could use to justify a poor business review.  In turn, McDonald's drew upon these poor business reviews to deem franchisees ineligible for expansion or deny renewal of their leases. In contrast, when McDonald's wanted to keep a white franchisee in the system, McDonald's provided extensive advanced notice of their planned inspections, and helped prepare white franchisees for a successful inspection.

14.     When Black franchisees protested this racist treatment, requested financial assistance, or when McDonald's simply wanted to cast them off in favor of a white owner/operator, McDonald's employed the "inspection" tactic to force them out of the system.

15.     McDonald's racially discriminatory business practices were compounded by additional overt displays of racism by McDonald's, up and down the chain of command. The routine racist indignities that Black franchisees, including Plaintiffs, suffered included but were not limited to McDonald's executives' racist comments, McDonald's regional staff's non-response to hate crimes committed at Plaintiffs' stores, and McDonald's rejection of Plaintiffs' efforts to have their family members join the McDonald's system through the Next Generation program.

16.     Moreover, in 2017, McDonald's CEO Steve Easterbrook announced his "Bigger Bolder Vision 2020" program, which was introduced as a plan to modernize McDonald's locations across the country. But the Bigger Bolder Vision plan was also a racially discriminatory plan to force Black franchisees out of the McDonald's system. It worked by favoring franchisees with multiple locations as well as franchisees with newer stores, who could

more easily afford to cover the cost of expensive renovations. Black franchisees, including Plaintiffs, largely did not fall into either of these camps. McDonald's executives knew that Black franchisees were unable to engage in the Bigger Bolder Vision program, but they did not care. Instead, McDonald's regional managers forced Black franchisees to engage in the Bigger Bolder Vision program—an impossible task—and, when they could not, McDonald's deployed increased inspections to force Black franchisees out of the system.

17.     The Bigger Bolder Vision program was a turning point for many Black franchisees, including Plaintiffs, who were forced by McDonald's discriminatory actions to decide between risking financial ruin or leaving the businesses they had poured years of their lives into. But the intentional racial discrimination left them no choice: one-third of Black franchisees left McDonald's during Easterbrook's tenure, ending in 2019, and roughly half of Black franchisees exited by 2020.

18.     McDonald's intentional race discrimination continued even once Plaintiffs were forced to leave—it extended to interfering in Plaintiffs' sales of their stores at the end of their relationships with McDonald's. Rather than approving prospective buyers who were interested in purchasing Plaintiffs' stores, McDonald's withheld its consent to those sales without justification and in breach of their franchise agreements. Behind the scenes, McDonald's had hand-picked particular buyers to take over Plaintiffs' stores, who typically bought the stores for less than they were worth. In particular, where Plaintiffs had turned around economically depressed locations, McDonald's selected new white owner/operators to purchase the stores, and it prohibited Plaintiffs from negotiating with other prospective buyers.

19.     McDonald's intentional discrimination against Plaintiffs based solely on the fact that they were Black directly caused them extreme harm. Among other things, McDonald's

discriminatory and illegal actions devastated Plaintiffs' livelihoods, deprived them of valuable opportunities, and ruined their physical and emotional health. Without McDonald's intentional race discrimination against Plaintiffs, they would never have suffered this harm.

20.     Plaintiffs now seek to recover for the harm McDonald's caused and to redress the race discrimination and other tortious conduct they suffered at the hands of McDonald's. On behalf of 48 Plaintiffs, this complaint discusses McDonald's intentional race discrimination and other illegal activities, and the direct effect that McDonald's misconduct had on each of the Plaintiffs.

21.     As one Plaintiff put it, "When we [Black franchisees] first got started, we always knew we were behind. We had to run faster to catch up. The only problem is we didn't understand that we weren't running the same race."

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, §1332, and § 1367.

23.     This Court has personal jurisdiction over Defendants McDonald's USA, LLC and McDonald's Corporation because each of their principal places of business is in the State of Illinois and because they have the requisite minimum contacts with the State necessary to constitutionally permit the Court to exercise jurisdiction.

24.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim have occurred and are occurring in the Northern District of Illinois, and Defendants transacted affairs and conducted activity that gave rise to the claim of relief in this District. Further, both Defendants' principal place of business is in this District.

25.     Plaintiffs' claims are properly joined under Federal Rule of Civil Procedure 20.

## PARTIES

26.     Plaintiffs Annis Alston-Staley and her husband, Harry Staley, are South Carolina residents. They are Black.

27.     Plaintiff Larry Brown is a Kansas resident. He is Black.

28.     Plaintiffs Benny Clark and his wife, Eleanor Clark, are South Carolina residents. They are Black.

29.     Plaintiff Glenda Claypool is a Texas resident who is acting on behalf of, pending appointment as Personal Representative of the estate of her late husband, Sherman Claypool. Mr. Claypool was Black.

30.     Plaintiffs Christine Crawford and her mother, Delores Crawford, are South Carolina residents. They are Black.

31.     Plaintiff Juneth Daniel is a Florida resident. She is Black.

32.     Plaintiff Yves Dominique is a Georgia resident. He is Black.

33.     Plaintiff Wise Finley is a Michigan resident. He is Black.

34.     Plaintiffs Jacqueline George and her husband, Anthony George, are Florida residents.

35.     Plaintiff Wesley Hall is a Florida resident. He is Black.

36.     Plaintiffs Al Harris and his daughter, Kristen Harris, are Virginia residents. They are Black.

37.     Plaintiff Lawrence Holland is a Georgia resident. He is Black.

38.     Plaintiffs Douglas Hollis and his wife, Glenna Hollis, are Florida residents. They are Black.

8

39.     Plaintiff Van Jakes is a Georgia resident. He is Black.

40.     Plaintiff Laetitia Johnson is a Georgia resident. She is Black.

41.     Plaintiff Harold Lewis and his son, Jeremy Lewis, are Nevada residents. They are Black.

42.     Plaintiff Kenneth Manning is a Georgia resident. He is Black.

43.     Plaintiff Keith Manning is a North Carolina resident. He is Black.

44.     Plaintiff Joseph Mbanefo is a New York resident. He is Black.

45.     Plaintiff Dwight Miller is a Florida resident and his son, Plaintiff Scott Miller, is an Illinois resident. They are Black.

46.     Plaintiff Dawn Mussenden is a Georgia resident. She is Black.

47.     Plaintiff William Rasul is a Georgia resident. He is Black.

48.     Plaintiff Dwayne Richard Johnson is a Pennsylvania resident. He is Black.

49.     Plaintiff Jeffery Rogers is a Florida resident. He is Black.

50.     Plaintiff Carrie Salone is a Georgia resident. She is Black.

51.     Plaintiff Jeremiah Simmons is a New York resident. He is Black.

52.     Plaintiff Floyd Sims is a Georgia resident. He is Black.

53.     Plaintiff Allen Stafford is a Georgia resident. He is Black.

54.     Plaintiff Ronnie Thornton is a North Carolina resident. He is Black.

55.     Plaintiff Errol Thybulle is a New York resident. He is Black.

56.     Plaintiff Norman Williams is a Virginia resident. He is Black.

57.     Plaintiff Lance Williams is an Alabama resident. He is Black.

58.     Plaintiff Jacqueline Wynn is a Georgia resident. She is Black.

59.     Plaintiffs Mitchell McGuire and his wife, Lois McGuire, are New Jersey residents. They are Black.

60.     Plaintiff Gordon Thornton is a North Carolina resident. He is Black.

61.     Plaintiff Serge Tancrede and his wife, Karen Tancrede, are Texas residents. They are Black.

62.     Plaintiff William (Pete) Washington is a Virginia resident. He is Black.

63.     Plaintiff Robert Bonner is an Illinois resident. He is Black.

64.     Defendant McDonald's Corporation is incorporated in Delaware and maintains its principal place of business in Illinois. Defendant McDonald's USA, LLC, the franchisor for McDonald's in the United States, is a wholly owned subsidiary of McDonald's Corporation that is similarly incorporated in Delaware and operates its principal place of business in Illinois. For ease of reference, both defendants are referred to collectively as "McDonald's" throughout the complaint.

## FACTUAL ALLEGATIONS

### Franchise Structure

65.     McDonald's business model depends on its franchisees. Out of McDonald's 38,000 locations around the globe, approximately 93% are operated by franchisees. McDonald's retains control of the remaining locations through its wholly owned subsidiary, McDonald's Operations Co. ("McOpCo"). McDonald's earns roughly 69% of its $21-23 billion in annual revenue from the rents and fees it charges its franchisees.

66.     As the franchisor, McDonald's develops and oversees McDonald's restaurants, including a specific menu of food items. McDonald's owns or leases the land on which the restaurants are located. Franchisees, also known as owner/operators, are granted the right to

operate a specific McDonald's restaurant and sell McDonald's products in exchange for fees and an agreement to pay rent.

67.     For a traditional restaurant, a franchisee will oversee a restaurant at a dedicated McDonald's location with a full menu. The typical franchise term for this type of restaurant is set at 20 years.

68.     McDonald's also franchises "satellite restaurants" that are located at non-dedicated McDonald's sites, such as in a shopping center or hospital, and sell a limited menu of food items.

69.     McDonald's offers a third type of lease—a BFL or "Business Franchise Lease," in which McDonald's leases the restaurant and its business facilities for a shorter period of time.

70.     McDonald's offered BFLs to many Black operators as a method of recruiting persons of color into the system.

71.     Each franchisee is part of a regionally based "co-op," made up of other franchisees in the same TV market area. Co-ops hold regular meetings as often as once a month.

72.     Additionally, McDonald's offers the Next Generation Training Program to allow qualified family members of current franchisees an expedited path to becoming an owner/operator.

73.     What McDonald's pitches as a tremendous growth opportunity to prospective franchisees is more akin to a feudal system, in which McDonald's provides the land and reaps the rewards of its franchisees' labor. This power imbalance is captured in McDonald's standard franchise agreement, which it executes with each of its franchisees.

74.     The Agreement, which is attached as Exhibit A, stipulates that franchisees must meet a stringent set of requirements and pay a variety of fees to McDonald's. Fees include rent

based on a percentage of the location's gross sales, collective advertising costs, a monthly service fee subject to gross sales, and royalties.

75.     Franchisees bear the costs of operations. These operational costs include insurance, maintenance, and equipment, like kitchen fixtures and lighting, all of which must satisfy standards that McDonald's sets. All franchisees must comply with all of McDonald's requirements for quality, service, and cleanliness, as well as any new or existing procedures McDonald's imposes, though McDonald's enforces unevenly depending on the race of the franchisee.

76.     Even though the Agreement is favorable to McDonald's, McDonald's retains obligations to its franchisees. Under the Agreement, McDonald's pledges to "make available to Franchisee all additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes *generally* available, from time to time, to all its franchisees operating McDonald's restaurants." (Franchise Agreement ¶ 3) (emphasis added).

77.     Additionally, McDonald's reserves the right to inspect a franchisee's restaurant but only at "*reasonable* times to ensure that [the] Franchisee's operation" complies with McDonald's standards and policies. Franchisees may be required to renovate their stores in compliance with McDonald's standard building plans, including when those plans are "*reasonably* changed from time to time by McDonald's." (Franchise Agreement ¶ 12) (emphasis added).

78.     Given that the typical lease term is set at 20 years, McDonald's begins discussions about whether to renew a franchisee's lease at least three years prior to the lease's expiration.

79.     If a franchisee wishes to extend his or her lease or expand to additional locations, the franchisee and McDonald's engage in discussions about potential extensions or expansions.

80.     Expansion and ownership of multiple stores is key to a franchisee's success at McDonald's. Owning multiple stores gives a franchisee breathing room if one store dips in sales or requires a costly renovation.

81.     In the past, McDonald's applied a 40-mile standard for expansion, meaning that operators were encouraged to not to expand beyond a 40-mile radius from their stores' location. More recently, McDonald's has relaxed that standard and allowed operators to purchase stores beyond the 40-mile radius, though it has done so only with white franchisees.

82.     If a franchisee decides to sell a location, he or she must first receive McDonald's written consent. The franchisee must provide McDonald's at least 20 days' notice of their intention to sell, along with the name and address of the prospective buyer, and the terms and conditions of the agreement. McDonald's reserves the right of first refusal, meaning that it has the first option to purchase the restaurant.

83.     In evaluating whether to provide consent for a sale, McDonald's may consider the prospective purchaser's "work experience and aptitude; financial background; character; ability to personally devote time and best efforts to managing the Restaurant; residence in the locality of the Restaurant; equity interest in the Restaurant; conflicting interests; and such other criteria and conditions as McDonald's shall then apply." Franchise Agreement § 15(d). However, "[s]uch consent shall not be arbitrarily withheld." *Id*.

84.     Significantly, McDonald's does not employ an "open market" system for selling its stores. To purchase a store, a franchisee must either receive an offer from McDonald's for a particular location or a franchisee must hear about the store being put up for sale from the seller or through the grapevine. As a result, Black franchisees were limited to purchasing restaurants

McDonald's offered them—low-volume stores in dangerous locations—or to purchasing from other Black operators, who helped them access opportunities that were not accessible.

85. Even when Black franchisees have been able to position themselves to invest in rebuilds or renovations to their restaurants, McDonald's does not provide equitable opportunities and treatment, but instead continues its pattern of discriminating against Black franchisees.

86. McDonald's maintains an internal set of national standards setting out the required equipment, layout, and physical condition that each of its restaurants must maintain, called the National Restaurants Building and Equipment Standards (NRBES). McDonald's has a practice of providing new franchisees with what is referred to as an NRBES letter, which describes all of the renovations and upgrades (referred to as "reinvestments") required to bring the restaurant into compliance with the NRBES.

87. The NRBES letter sent to each franchisee states that, as a condition of purchase, franchisees must complete all the necessary reinvestments within a specific time frame from purchase. Depending on the age and condition of the restaurant, the expected cost to complete all of these "reinvestments" could run into the hundreds of thousands of dollars. Because McDonald's forced Black franchisees to older, less profitable, lower quality restaurant locations, Black franchisees faced disproportionately higher initial "reinvestment" costs than white franchisees.

88. McDonald's told Black franchisees that the NRBES were consistently and uniformly applied to all franchisees. McDonald's evaluated franchisees' compliance with the NRBES in the business process to measure future opportunities for relocations, rebuilds, and rewrites (renewals of a lease). But unbeknownst to Plaintiffs, and contrary to the claimed consistent and uniform application, McDonald's had a practice of requiring Black franchisees to

complete their reinvestments and bring their restaurants into compliance with the NRBES within much shorter time frames than white franchisees, and with much less flexibility and leeway.

89.     McDonald's employs a hierarchical system to oversee its franchisees. During Plaintiffs' tenures, the President of McDonald's USA managed overall operations for the corporation's 14,000 restaurants across the country. Below the President, the Presidents of the East and West Divisions oversaw all restaurants in the eastern and western areas of the country, respectively. Within each of those two divisions, the General Manager or Regional Manager supervised franchisees within a particular region, as well as managed real estate and development strategy. The "Vice President and Regional Manager," along with the Vice President of Quality, Service, and Cleanliness ("QSCVP"), was responsible for all franchising decisions within a given region, including setting up the franchisee with a particular location and determining whether a franchisee was eligible for growth and rewrite. Field Service Managers or Representatives managed and developed strategy for a sub-set of franchisees and reported to the QSCVP.  Finally, Business Consultants conducted graded visits and inspections, reporting back to the Field Service Manager, who in turn reported to the Director of Operations.

90.     At each stage of the franchising process, from selecting a franchise location to setting rental prices to approving the sale of a store and more, McDonald's employees intentionally discriminated against Black franchisees.

### A History of Racial Discrimination Against Black Franchisees

91.     McDonald's has a long history of discriminating against Black franchisees.

92.     Upon its founding in 1955, McDonald's installed its restaurants only in white neighborhoods and barred Black individuals from becoming franchisees.

93.     However, following white flight from urban areas in the late 1960s and 1970s and Martin Luther King's assassination in 1968, McDonald's began recruiting Black owner/operators

to take over stores in cities. McDonald's approved only "zebra" or "salt and pepper" partnerships, in which Black franchisees partnered with a white owner/operator to purchase a location.

94.     In 1972, McDonald's first Black owner/operator, Herman Petty, helped found the National Black McDonald's Operators Association (NBMOA) to advocate for Black franchisees.

95.     In 1982, McDonald's sued Charles Griffis, a Black owner/operator, for breach of contract after he bought two Popeyes franchise locations—a McDonald's competitor. Griffis countersued McDonald's for intentionally placing him in "ghetto" locations and restricting him from purchasing stores in suburban areas. McDonald's settled with Griffis for $4.7 million.

96.     That same year, McDonald's began facing public allegations against McDonald's for its practice of "redlining" Black owner/operators by forcing them into agreements to operate older, lower-volume restaurants in need of costly renovations in Black neighborhoods.

97.     Jesse Jackson's civil rights organization, PUSH, protested McDonald's practice of systematically placing Black franchisees in less desirable and higher-debt restaurants. The NAACP in Chicago and Los Angeles echoed those protests and organized boycotts of the restaurant chain.

98.     In 1996, McDonald's Executive Vice President Tom Dentice conceded in a letter that "for business reasons we thought were valid at the time, the company has placed many Black Franchisees in restaurants that have not allowed them to achieve the same level of economic success as their peers." (Ex. B). McDonald's admitted that by discriminating against Black franchisees based on their race, it thought it would make more money.

99.     This is not the only evidence that McDonald's knew that it was discriminating against Black franchisees on the basis of their race for McDonald's own financial benefit. In

1996, McDonald's CEO Ed Rensi agreed to implement a program that McDonald's said was intended to establish equity between Black and white franchisees. As part of the program, McDonald's pledged to sell more profitable restaurants to Black franchisees and to offer them temporary rent relief. But McDonald's never followed through on these pledges to rectify the discrimination it knew it was perpetuating. Instead, McDonald's leadership disbanded the program in 2001, unbeknownst to Plaintiffs.

100.    If McDonald's had made any progress to establish equity, it was wiped out when Steve Easterbrook and Chris Kempczinski took the reins as CEO and President of McDonald's USA, respectively, in 2015. Upon assuming the role of CEO, Easterbrook said that the number of Black owner/operators at McDonald's did not matter. This set the stage for the company to eliminate its nascent equity initiatives.

**McDonald's Continuing Practice of Discrimination Against Plaintiffs**

101.    Beginning in 2017, Easterbrook and Kempczinski unveiled the "Bigger Bolder Vision 2020" program with the goal of modernizing 80% of current McDonald's restaurants. The Program would require costly renovations for older restaurants, estimated at as much as $750,000 per store.

102.    McDonald's knew that the program would eliminate Black owner/operators from the McDonald's system. That impact was revealed by an impact study conducted by the Boston Consulting Group prior to the program's implementation. Easterbrook and Kempczinski were aware of the results of the impact study and the disproportionate effect Bigger Bolder Vision 2020 would have on Black owner/operators, but they relentlessly pushed it anyway because they wanted to force Black owner/operators to exit the McDonald's system.

103.    Under Easterbrook's and Kempczinski's racially discriminatory tenure as CEO and USA President of McDonald's, respectively, approximately a third of Black owner/operators

17

were forced out of the McDonald's system—a much higher percentage than non-Black operators who left during this time. This exodus of Black franchisees coincided with Easterbrook's decisions to deprioritize Black employees and consumers, including Easterbrook's purge of Black McDonald's employees from positions in senior leadership, an intentional decision to direct advertising budgets away from Black consumers, and the resulting decrease in sales to Black consumers.

104. In July 2018, McDonald's USA demoted Senior Executives Vicki Guster-Hines and Domineca Neal, both Black women. Both had relayed or spoken out about Black franchisees being subjected to discriminatory practices, like unfair grading visits. Their demotions were part of McDonald's purge of 43 Black senior executives during Easterbrook's tenure, composing 85% of McDonald's Black employees who were at Executive Director level and above. Guster-Hines and Neal sued McDonald's for discrimination in January 2020.

105. The Guster-Hines and Neal complaint revealed inside corporate information to Plaintiffs for the first time, including evidence that McDonald's had been systematically and intentionally discriminating against Plaintiffs on the basis of their race. Prior to these revelations, McDonald's had caused Plaintiffs to believe that McDonald's was treating Black owners/operators the same as white owners/operators.

106. Compounding the problem, given McDonald's control of information as the franchisor, and given its supposed public commitment to racial equality, Plaintiffs were unaware, and they could not know or have learned through due diligence, that McDonald's was depriving them of franchise opportunities offered to white franchisees and was otherwise discriminating against them on the basis of their race.

107.     In reality, by 2019, the annual cashflow gap between Black and non-Black franchisees increased to $65,706, up more than $45,000 from 2010.

108.     Owner-operator Larry Tripplett filed a letter on behalf of the NBMOA to McDonald's East and West Zone Division Presidents, stating that "the trajectory of the treatment of Black Owners is moving backwards. Through no fault of our own we lag behind the general market in all measures." (Ex. C). He noted that "[t]he current state of affairs for Black Owners can only be described as hostile" and identified permanent rent reduction as one necessary step, among others. (Ex. C).

109.     By 2020, roughly half of Black franchisees had been forced out of the McDonald's system, as compared to only 10% of white owner/operators in the same timeframe. Despite Easterbrook's firing in 2020, Black franchisees' circumstances have not improved under now-CEO Chris Kempczinski.

110.     Plaintiffs were victims of race discrimination in all aspects of their experiences as franchisees, from acquiring their first store to being forced out of the system.

111.     Taken together, Plaintiffs' factual allegations paint a powerful and detailed picture of McDonald's intentional racial discrimination against Black franchisees, including Plaintiffs, and the economic harm that Plaintiffs suffered as a direct result of and solely because of that intentional discrimination.

112.     McDonald's intentional race discrimination against Plaintiffs followed a tried-and-true pattern. To begin, McDonald's QSCVPs made a racist decision to put Plaintiffs in charge of older, low-volume locations in high-crime areas that were in need of repair. McDonald's placed franchisees in Black communities that reflected Plaintiffs' race because McDonald's thought Black owners should be limited to Black communities because of the color

19

of their skin. In addition, McDonald's thought that it would benefit McDonald's bottom line to put Black franchisees in Black communities. As a result, Black franchisees were placed in Black neighborhoods and could not purchase stores in suburban, white neighborhoods.

113.    Conversely, white franchisees were rarely, if ever, placed in stores that served Black consumers.

114.    Plaintiffs all became franchisees believing that they would have equal access to McDonald's portfolio, not to just restaurants, but to profitable restaurants. But for being Black, McDonald's would have granted Plaintiffs that access.

115.    McDonald's discrimination in franchise acquisition did not end there. When a white owner/operator struggled to turn a profit at a store, McDonald's cast the store off to a Black operator, rather than running it as a company-owned store.

116.    Once placed in these franchise locations, Plaintiffs faced a series of security and operational issues—challenges that McDonald's knew about and failed to disclose prior to purchase. Many of Plaintiffs' stores were robbed; individuals were killed in these stores or their parking lots; and one Plaintiff was violently assaulted on the way home from work. Plaintiffs' employees feared coming into work. Their stores were constantly in need of repair, as individuals would destroy or graffiti the property.

117.    As a result, Plaintiffs were forced to spend much more money than their white counterparts on security and maintenance measures, including security guards, video cameras, bulletproof windows, and repairs. McDonald's knew that Plaintiffs were forced to spend much more money on these measures.

118.    Plaintiffs also used "security costs" as shorthand for the myriad other costs and profit losses that came with McDonald's redlining them into low-income neighborhoods. The

location McDonald's placed a franchisee dictated the store's profit margins. Owner/operators in low-income neighborhoods were forced to decrease standard prices of food and drink items to sell them, and the customer base in low-income neighborhoods was more likely to buy lower-price items, like a double cheeseburger, as opposed to prices with a higher mark-up, like a drink or fries.

119.    Even though white and Black owner/operators had the same products, branding, and experience, white operators were able to charge higher prices and sell far more profitable items, whereas Black owner/operators, including Plaintiffs, had to sell less profitable products for lower prices, solely because of their race. To analogize, McDonald's allowed white owner/operators to sell their items at Saks Fifth-Avenue prices and forced Black owner/operators to sell the same items at Walmart prices because of the company's racial discrimination.

120.    Again, McDonald's discriminated against Black franchisees by deciding to never subsidize these costs for Black franchisees. McDonald's could have offset the additional costs that Black owner/operators faced by granting rent relief, meaning that it would have charged a lower percentage for rent, but McDonald's did not offer this relief to Black franchisees. At the same time, this practice was commonplace for white operators, as McDonald's often granted them rent relief when they suffered a dip in sales. But McDonald's either refused to grant rent relief to Plaintiffs or granted them a negligible amount, especially as compared to their white counterparts, because of their race.

121.    In spite of McDonald's stacking the odds against them, Plaintiffs attempted to overcome these financial hurdles by purchasing more franchise locations and growing their businesses. But once again, McDonald's intentional race discrimination prevented their success.

McDonald's routinely blocked Black owner/operators from purchasing white franchisees' locations by refusing to sign off on those deals.

122.    As a result, McDonald's stuck Black owner/operators in a cycle they could not escape from—placing them in low-income, high-crime areas, forcing them to pay unforeseen security and operational costs, and prohibiting them from purchasing stores in affluent areas that could have helped alleviate the financial burden.

123.    McDonald's standard operating procedure of discriminating against Black franchisees was thrown into starker relief with the implementation of Bigger Bolder Vision 2020. Despite knowing that the modernization program would have a disproportionate effect on Black owner/operators, McDonald's pushed ahead with the program anyway.

124.    McDonald's also relied on a well-honed practice of forcing Black owner/operators out of the system, which it applied only to Black owner/operators: ramping up unannounced inspections on their stores at all times of the day or night at far greater frequency and with much greater inconvenience than inspections of white franchisees' stores. By increasing inspections, McDonald's had a better chance of finding faults at a Black franchisee's store that they could use to justify deeming them ineligible for expansion or refusing to renew their lease. Often, inspections became so incessant and unbearable that Plaintiffs felt they had no choice but to exit the system. At other times, the cost of maintenance and security became so high that without McDonald's support, Plaintiffs were forced to sell off their stores. Again, McDonald's treated Black franchisees, including Plaintiffs, this way solely because of the color of their skin.

125.    Even in the sale of their stores, Plaintiffs were not free from McDonald's discrimination and its economic consequences. Rather than allowing Plaintiffs to sell to the highest bidder, as McDonald's did for white franchisees, McDonald's again discriminated

against Plaintiffs based on their race and breached the franchise agreement by arbitrarily withholding consent to prevent Plaintiffs' sales. In doing so, McDonald's was able to place the white owner/operators it had hand-picked into the stores Plaintiffs had turned around from economically depressed to profitable.

126.    Were it not for Plaintiffs' race, McDonald's would not have intentionally placed them in undesirable locations; it would not have denied them financial assistance in operating and maintaining those locations; it would not have denied them the opportunity to expand; it would not have subjected them to incessant unannounced inspections to the point they were forced out of the system; and it would not have interfered with the sale of their stores to the buyers of their choice. But for Plaintiffs' race and McDonald's intentional race discrimination, Plaintiffs would have had a chance of succeeding as franchisees.

127.    McDonald's intentional discrimination is evident in the number of Black franchisees in its system as well. From 1998 to 2020, the number of Black franchisees fell from 377 to 186. Meanwhile, the number of total McDonald's stores doubled from 15,086 to 38,999. Stores owned by Black franchisees only earn about two-thirds of the average McDonald's store.

128.    While the facts alleged above amply demonstrate McDonald's intentional discrimination against Black franchisees, including Plaintiffs, the Plaintiffs' individual experiences that follow amplify that McDonald's purposely treated them worse because they were Black and that McDonald's intentional discrimination caused them massive harm.

**Kenneth Manning**

129.    Kenneth Manning owned and operated twenty stores throughout Alabama, Georgia, and North Carolina during his tenure at McDonald's. He is Black.

130.    In total, Manning spent 41 years working for McDonald's and worked in a variety

of roles, including as a store manager and Director of Operations, before pursuing a career as an owner/operator.

131.    Manning was well-recognized as a leader in the McDonald's community during his four-decade long career. He received the NBMOA's Mentor Award, McDonald's East Division Second Vice President Award for assisting the entire East Division in achieving results, the NBMOA's Service Award, the Atlanta Region's Profit Excellence Award, and the Atlanta Region Climb the Mountain Award.

132.    Manning was also a leadership operator serving on the Store Technology Board, chaired the East Division Real & Profit team, served on the NLC Food team, served on the East Division Leadership Council, served on the Lot & Light Pole Task Force, served as Triad Co-op Vice President and President, served as the East Division NBMOA Second Vice President, served as the Raleigh Region NBMOA Chapter President, and served on the Atlanta Region NBMOA.

133.    In 1991, Manning applied to be an owner/operator but was denied because of McDonald's racial discrimination. Specifically, McDonald's discriminated against prospective Black franchisees by limiting their opportunities to enter the system. McDonald's informed him that they had no stores available for purchase. Instead, they proposed that he supervise a white owner's restaurants and help him grow from one to five stores.

134.    In March 2001, Vice President of Operations Marty Ranft and Regional Manager Karen King approached Manning about purchasing two stores in North Carolina. They told him on a Thursday that the two stores were available and gave him until Monday to decide whether to buy them. Manning decided to accept the offer and purchase them.

135. In 2004, Ranft approached him again about purchasing a third store from Plaintiff Ronnie Thornton, with the stipulation that he needed to rebuild it within 18 months. Manning bought the store and spent more than a million dollars rebuilding it, ultimately making it the most profitable store in the Eastern Division.

136. In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores in Black neighborhoods, McDonald's placed Manning in such underperforming stores solely because of his race. In 2009, Vice President of Operations for the Atlanta Region Debbie Stroud offered Manning ten company stores in the Atlanta region, which were collectively underperforming by $11 million. Manning turned down the deal given the amount of money the stores were losing.

137. However, Stroud continued to push these stores on Manning and told him explicitly that McDonald's wanted to place a Black operator in the region. McDonald's had approached several Black operators about purchasing this location and completing a rebuild there.

138. Stroud sweetened the deal by proposing that if Manning purchased the ten Atlanta stores, she would allow him to buy five more stores in Montgomery, Alabama, which would substantially grow his business. Manning accepted the offer and purchased the ten Atlanta stores and five stores in the Montgomery area. In doing so, he became the second largest operator in McDonald's Eastern Division.

139. McDonald's also discriminated against Manning in his ability to freely sell his stores, solely because of his race. In July or August 2009, Vice President of Franchising Jeff Wilfong called Manning to talk about the 15-store deal. Plaintiff Manning informed Wilfong that

he would be selling his North Carolina stores to his brother, Keith, to which Jeff responded, "I don't know if I'm gonna approve that deal."

140.     Marty Ranft, who was now General Manager of the region, went back and forth for months with Manning about why he was unwilling to approve the deal. Eventually, he approved the deal, but only for Ken to sell two of his three North Carolina stores to his brother.

141.     McDonald's did not want to transfer the North Carolina stores to Keith because Keith was not making as much money at the time (Keith owned several stores at the time) and Kenneth's stores would increase his financial holdings. McDonald's denied the transfer solely because of Keith's race, as it did not want to grow familial Black wealth.

142.     McDonald's discrimination against Manning as a Black owner/operator continued. At an NBMOA conference in Detroit in 2007, Wilfong commented in front of a group of Black owner/operators: "Hey, I was wondering why there was no more fried chicken in Detroit." Wilfong received no reprimand or consequences from McDonald's for making such a blatantly racist remark.

143.     Later on, Plaintiff Gordon Thornton called Manning and relayed that he had told Wilfong he was racist because he had offered a store to a Latina woman without mentioning to any Black operators that it was for sale. Two weeks later, Wilfong met with Manning and told him, "I've been labeled a racist, talk to me and let me know if I'm being a racist." Manning told him, "The way you will not be perceived as a racist is to do right by Black people and people of color."

144.     Again, McDonald's did not reprimand Wilfong for this discriminatory and inappropriate behavior. Instead, it continued to allow his career to flourish at the company.

145.    In June 2010, McDonald's Franchise Legal Counsel John Richardson sent a letter blocking Manning from buying profitable stores back in the future from his brother, though that had not originally been part of the franchise agreement or contingency in the deal. White owner/operators routinely sell and buy back stores from family members.

146.    In addition, McDonald's subjected Manning to an exigent rebuild schedule that it did not require of white owner/operators. In the first year alone after he purchased the Atlanta and Montgomery stores, Manning completed three rebuilds of the Atlanta region stores—an unheard-of number of rebuilds in that time frame—for $5 million on top of the $16 million he had paid for the stores. McDonald's had not required any white owner/operator in the region to complete as many rebuilds in such a short period of time.

147.    Regarding one of the three stores, Stroud and McDonald's Development Director Vivian Valdivia had requested that Ken complete the rebuild within the first year, though he was originally informed he would have four years to do it. They noted that a company-owned McDonald's location was being built down the road and implied that they would offer the new store to Ken if he completed the rebuild within the year, which he did. Several months later, McDonald's demanded that Manning rebuild one of the other Atlanta stores because of its leaking roof, which Manning did.

148.    In October 2011, Vice President of Franchising and Operations Darren Hall offered another underperforming store in the area to Manning ("Centerville"). Hall was so insistent that Manning purchase Centerville that he called Manning every night until the night of the sale to ensure that Manning would purchase it.

149.    In January 2012, Hall informed Manning that McDonald's was selling the store down the road—originally promised to him—to Jerry Murphy, a white owner/operator based

more than forty miles away. Manning had attended meetings with the construction manager for that store in anticipation of taking it on. Hall stated that they were not offering him the store because he was not eligible for expansion. Manning knew this explanation was not true, given that Hall had insisted he buy the Centerville location a mere three months ago—a point that he raised with Hall. Were it not for Manning's race, McDonald's would not have reneged on its promise to sell him the company-owned store and sold it to a white operator it had hand-picked.

150.    Hall immediately retaliated against Manning for speaking up about his unfair treatment. Following his conversation with Hall, McDonald's deployed its tactic of forcing Black operators out of the system by increasing their inspections of Manning's stores. Two field service managers visited the store for a few days to conduct an inspection. In the two and a half years prior, Manning had never had McDonald's employees conduct an inspection of his store.

151.    Three months later, Chief Franchising Officer John Kujawa approached Manning at a meeting and stated, "I hear you're making a lot of trouble down there in the Atlanta region." Manning told Kujawa about Hall's excuse for not selling the company-owned store to him and stated that it was unfair that the store had been promised to him and then retracted. Manning also raised the issue of McDonald's employing two different standards for the stores it offered to franchisees and the stores franchisees sought out themselves. Kujawa commented that he hoped McDonald's was not ramping up graded visits on Manning's stores because Manning had complained about his unfair treatment to Hall. Manning informed him that they were.

152.    In approximately summer 2012, McDonald's Business Consultant Myra Overbay informed Manning's store manager Tammy Horn that McDonald's was going to force Manning out. In response, Manning sent a formal complaint about Overbay to Hall.

153.     McDonald's subjected Overbay to an HR investigation, but she remained as Manning's consultant, though McDonald's advised her not to speak to Manning. However, she ignored this dictate and yelled at Manning one day outside of a meeting. Like Wilfong, Overbay received no consequences for her inappropriate behavior and continued to work as a business consultant at McDonald's. This served as further evidence that McDonald's employed two different standards for Black franchisees and white employees—punishing Black employees who spoke out and allowing white employees to act inappropriately without consequence.

154.     In the fall of 2013, at a meeting, Atlanta QSCVP Darren Hall asked Manning to sell all of his stores and refrain from buying any new stores until Hall had identified particular locations for purchase. Manning responded that Hall must want him out of the system because he only had to wait a year for Manning to no longer be eligible to buy again.

155.     The retaliation continued. Manning attempted to negotiate deals on his own, but Hall blocked all of them. Specifically, the stores Manning wanted to buy were sold to other owner/operators.

156.     In December 2013, Manning was able to buy a store from his good friend, Mark Mines, in Forest Park, Georgia. The store was low-volume and Manning was able to pay cash for it since McDonald's had cut off his financing with Chase Bank.

157.     In early 2014, Field Service Manager Ken Jenkins inadvertently sent out an email instructing his business consultants to ramp up grading and noting that "the most powerful weapon you have is the pen." Manning filed a formal complaint to Darren Hall.

158.     In retaliation for Manning's complaint, inspections of Manning's stores became increasingly onerous from then on. Beginning in the summer of 2014, Business Consultant Wassuf Hajbeh and Field Service Manager Tom Dodd began another series of stringent

inspections. One inspection took place on Christmas Eve. At one point, Hall relayed to Manning that Hall's staff said Manning was "too New York-ish," which Manning understood to mean that he was too Black.

159. During Manning's last operator review in summer of 2016, QSCVP Valerie Williams met with Manning to discuss selling his last store and leaving the system. Williams wanted Manning to say that he was retiring so that it would not look bad on his record, meaning that McDonald's would otherwise note that he was fired or kicked out of the system. Worn down from losing everything he had worked his entire life to build, Manning agreed.

160. On her way to the meeting, Williams was over an hour late, so Dodd and Manning called her on speakerphone. Williams said that she was lost and Manning asked if she was heading to his house. Williams responded that she supposed she was at Manning's house because she was in front of a nice housing development. When she arrived at the correct address, she told them, "Hey, Ken, you have a nice house." Dodd and Wassuf, as well as Manning, were shocked at Williams' racist comment.

161. Later on, Dodd apologized to Manning for how he had been treated and admitted that he did not feel good doing the Region's dirty work.

162. As a result of the constant racial harassment, Manning tried to sell his stores in 2017. He began negotiations with Ed Gerena, who wanted to buy all 16 stores. However, McDonald's blocked the sale to Gerena and in doing so, prohibited Manning from selling the stores for what they were worth. Manning also refinanced his heavy debt load, only to have it blocked by Atlanta Regional Finance Director David Knies.

163. Facing the pressure to sell, Manning was forced to accept lower offers from the buyers McDonald's had put forward, all of whom were white. Indeed, Williams pressured him,

telling Manning that if he did not sell his restaurant to John Hurt at the low-ball price they had presented, she would get McDonald's attorney to terminate his franchise agreement. Manning immediately called General Manager and Vice President Greg Watson to file a complaint and request that Williams be instructed not to threaten him. This interference in the sale of his stores further demonstrated McDonald's racial discrimination, as it forced Manning out of the system at a loss, in favor of its preferred white owner/operators.

164.    McDonald's granted the white owner/operators concessions to incentivize the sale of Manning's restaurants, including allowing them to wait longer to complete rebuilds on the stores than they had for Manning. But for Manning's race, McDonald's would not have stamped out his successful business as one of the largest owner/operators in the Eastern Division and forced him to sell his stores for less than they were worth.

**Keith Manning**

165.    Keith Manning owned and operated eleven McDonald's stores in the North Carolina region. He is Black.

166.    Manning began working at McDonald's in 1977 as a cashier. Between 1977 and 1991, he worked in variety of roles at McDonald's, including as a Swing Manager, First Assistant to the General Manger, General Manager, Supervisor, and Director of Operations.

167.    Manning became an owner/operator on or around September 16, 1992, when he purchased his first franchise location in Far Rockaway Queens, New York.

168.    In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores in Black neighborhoods, McDonald's placed Manning in such stores, particularly in Far Rockaway Queens and Brooklyn, with low-volume sales and higher operating costs due to crime, higher insurance rates, and higher employee turnover, solely because of his race.  As a result, Manning faced a host of security issues at his restaurants,

including two shootings at one of his restaurants where two young girls were grazed by a bullet, and another individual was shot. Manning subsequently lost his customer base. As a result, he was forced to sell his restaurants in New York and move to North Carolina.

169.    In 2000, McDonald's again placed Manning into predominantly Black neighborhoods, in Durham, to substandard locations with low-volume sales and higher operating costs due to crime, higher insurance rates, and higher employee turnover, solely because of his race. Marty Ranft, then Director of Operations in the Durham Region, explained to Manning that McDonald's was looking for someone to operate restaurants in the "hood." McDonald's even sent representatives to New York to verify that his stores were located in "inner-city" neighborhoods similar to the Durham restaurant location.

170.    Around 2010, Manning was excluded from the same rent opportunities provided to white franchisees. Manning contacted then-General Manager Marty Ranft because he had not been provided with any rent figures in the commitment letter for the lease extension to one of his stores. Ranft informed Manning that he needed to sign the commitment letter, and that he should not be concerned about McDonald's increasing rent. Manning relied on that information in deciding to sign the commitment letter.

171.    After Manning had signed, Ranft informed Manning that the rent was nearly doubling, from approximately 8.5 to 14.25%. Manning and other concerned operators met with East Division President Karen King, who admitted that it was unfair, but McDonald's was raising the rent regardless because Manning could afford the burden. Manning also learned that Andrea Endrusick, a white operator, was receiving a rewrite at the same time, but McDonald's was not forcing her to pay the excessively high rent increase being imposed on Manning.

172.     Manning was excluded from the purchase of restaurants in the open market throughout his franchise terms solely because of his race. For example, around 2012, Manning communicated to Marty Ranft that he wanted to purchase a restaurant in a neighborhood, which did not have a predominantly Black customer base. Ranft told Manning that he was better suited to operate among Black customers.

173.     McDonald's denied Manning financial assistance in the form of rent relief, routinely offered to white owner/operators, solely because he was Black. For instance, in 2015, Manning was operating a store adjacent to a brand-new Walmart. The Vice President & QSCVP, Yolanda Cook, had presented Manning with an opportunity for a restaurant near a Walmart, with 20-year projections of sales and profits. The Walmart store, however, closed approximately three years after opening due, in large part, to high crime. Manning then made a reasonable request that McDonald's reduce his excessively high rent of 16 percent to offset the reduction in sales, especially in light of Walmart's closing due to high crime in the area. Vice President General Manager Debbie Stroud informed Manning that McDonald's could not reduce his rent and she provided no legitimate business justification for why he could not receive the requested financial assistance. Were it not for Manning's race, he would have been provided the permanent rent relief routinely provided to white franchisees.

174.     McDonald's provided Manning with misleading financial information and concealed information to restrict his growth into more profitable locations. For example, in 2014, McDonald's asked Manning to rebuild a store in Durham. After the store opened, the Finance Manager in the Raleigh region, Kyle Sykes, informed Manning that he would also be responsible for the past through rent of the restaurant. This information was never provided to Manning until

the rebuild was completed. As a result, this lowered the value of the restaurant because it induced less cash flow, and Manning was forced to sell the store in 2017.

175.     Around 2017, McDonald's instructed Manning to adopt the new Bigger Bolder Vision plan. That plan required him to renovate four of his stores within three years. McDonald's pressured Manning to complete renovations sooner. Vice President General Manager Debbie Stroud and Vice President & QSCVP Tim Fisher met with Manning on a Sunday afternoon and gave an ultimatum—either complete renovations a year sooner, or sell his stores. McDonald's enforced its renovation standards more stringently on Manning, as compared to white owner/operators, solely because of his race and in violation of the franchising agreement.

176.     Manning had no choice but to exit on McDonald's terms, at a loss.

177.     As a result, Manning was forced to sell all nine stores in 2017 for a total of $2.8 million, destroying a nearly 30-year process of creating generational wealth and ownership for Manning and his family.

178.     But for Manning's race, McDonald's would not have engaged in the continuing misconduct alleged herein.

**Delores and Christine Crawford**

179.     Delores Crawford and her daughter, Christine Crawford, are former McDonald's owner/operators in the Augusta, Georgia, region, who owned nine stores during their tenure with McDonald's. They are Black.

180.     Following her franchisee training in 1988, Delores expressed interest in purchasing stores in Aiken, South Carolina, where her family was based. Instead, the Franchising Officer and QSCVP proposed a store in Beaufort, South Carolina.

181.     After Delores had accepted the Beaufort store, but before she moved, McDonald's started selling company-owned stores in the Aiken-Augusta area. However, McDonald's would not allow Delores to give up the Beaufort store in exchange for purchasing stores in her hometown. Instead, McDonald's offered those restaurants to Tommy and Pam Powers—white owner/operators based much farther away in Barnwell, South Carolina. As a result, Delores purchased the store in Beaufort, South Carolina, and spent her first two and a half years as a franchisee living away from her family.

182.     In February 1990, McDonald's offered to buy her Beaufort restaurant in exchange for the purchase of two if its company-owned restaurants, one in North Augusta, South Carolina, and the other in Augusta, Georgia.

183.     In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores in Black neighborhoods, in 1995, McDonald's offered Delores the "Regency" store in Augusta, Georgia. McDonald's informed her that Marvin Whaley, the former white owner/operator, did not have the comfort level to run a restaurant in the neighborhood. The Regency store was located in a predominantly Black, low-income area with security issues. Delores agreed to purchase the store.

184.     In 1999, Delores purchased another store in Augusta, Georgia, that had been built in the Children's Medical Center.

185.     Meanwhile, Christine entered McDonald's Next Generation program in 2003 and was approved in 2005 to become an owner/operator.

186.     In 2012, the Crawfords purchased a second store in North Augusta and the year after, in 2013, bought another store in Augusta, Georgia (the "Jimmie Dyess" location).

187.     During their careers as owner/operators, the Crawfords established themselves as leaders in both McDonald's and their local community. Delores was recognized as Female Entrepreneur of the Year and Minority Business of the Year in her community. Within McDonald's, she was a founding member of the Women Operators Network ("W.O.N."), served on the NBMOA Board, served as a Board Member for global Ronald McDonald House Charities, and served as co-op treasurer. Christine was elected co-op President twice, elected Vice Chair of the East Division Leadership Council (out of 4,000 restaurants represented), and served on several national leadership teams, including menu innovation and experience of the future. Christine planned several Next Generation Leadership trainings for the NBMOA and W.O.N., and received the 2007 Spirit Award, among other honors.

188.     Throughout their tenure, the Crawfords faced serious security issues at their stores. At the Regency location, an individual was murdered in the parking lot, and there was at least one armed robbery and an instance in which customers kicked in and broke a window. The Crawfords employed an off-duty sheriff to guard the location on weekend evenings. At the North Augusta location, an individual attempted an armed burglary. At the Med Center location, there was at least one robbery and a suicide in the parking lot. The Crawfords were forced to spend much more on security to safeguard their stores.

189.     In addition to spending more on security, to remain eligible for growth by passing business reviews, the Crawfords had to fund extraordinary labor costs. They paid more on labor than the top 25% of McDonald's restaurants.

190.     At a co-op meeting, Jerry Baine, a white owner/operator, bragged that he spent only 13-14% of sales on labor costs. Franchise Manager Bill Pegg acknowledged that this was unacceptable, but still allowed Baine's operations to grow.

191.    Almost immediately after purchasing the Jimmie Dyess store in 2012, the Crawfords began facing financial issues at the location, as it was underperforming by $700,000 per year. The Crawfords requested rent relief and McDonald's awarded them only $20,000 in relief, far less relief than McDonald's provides to its white franchisees. McDonald's denied the Crawfords financial assistance in the form of meaningful rent relief, routinely offered to white owner/operators, solely because they were Black.

192.    Additionally, the Crawfords shared their concerns about a new McDonald's location opening up near Jimmie Dyess, known as the Grovetown location.

193.    McDonald's has a dedicated "impact fund" that it uses to mitigate the financial impact a new restaurant has on another location's sales. But rather than pulling from the impact fund to assist the Crawfords, who had recently renovated the Jimmie Dyess location as part of the "Create Your Own Taste Test" program, McDonald's awarded the location to Jerry Baine's daughter as a retirement gift to him.

194.    But for the Crawfords' race, they would have been offered financial assistance from the impact fund or been offered to purchase the restaurant, like Jerry Baine's daughter.

195.    The Crawfords voiced their concerns about McDonald's lack of support to then-CEO Don Thompson and Mike Andres, who both retired shortly thereafter. In her December 2014 e-mail to Thompson, Christine detailed the financial issues with Jimmie Dyess, and McDonald's lack of response, and noted that "[t]he most unfortunate part is that this is not an atypical situation."

196.    Ultimately, the Crawfords realized that they could not financially maintain their restaurants. In a meeting with the region and their accountants, the Crawfords realized that they had lost $600,000 on the Jimmie Dyess restaurant, while McDonald's had made $900,000 during

the same time period off of the restaurant's rent. To continue operations, they were borrowing against Delores's and her husband's retirement funds. In October 2017, they put their restaurants up for sale.

197.     Christine sent Franchising Officer Valerie Williams a list of potential buyers she wanted to speak to, including Jim Booth. Williams replied that the QSCVP would provide names of potential buyers who were supported by the region, meaning that they had been hand-picked by McDonald's.

198.     Christine also sent the list of potential buyers to General Manager of the Atlanta region Greg Watson. Watson told Christine that she would only be able to sell her restaurants only to "buyers that are included in the class picture of the future of the region," whom McDonald's would identify and bring to the Crawfords.

199.     After a deal did not go forward with one potential buyer, Christine asked Watson about offering the restaurants to Jim Booth. Watson instructed her to meet with David Cravens first.

200.     The Crawfords ended up selling their restaurants for $5.1 million in 2018 to David Cravens, a white owner/operator McDonald's had hand-picked. The Crawfords would have been able to sell their restaurants for a significantly higher amount if McDonald's had not interfered with their efforts to sell to the buyer of their choice. This interference in the sale further demonstrated McDonald's racial discrimination, as it forced the Crawfords out of the system at a loss, in favor of its preferred white owner/operator.

### Van Jakes

201.     Van Jakes owned and operated five McDonald's stores in the Atlanta region. He is Black.

202.    Jakes was formerly the President of the Atlanta Black McDonald's Owner
Operator Association, served on the Executive Board of the Greater Atlanta McDonald's Owner
Operator Association, and was President of the African American Consumer Market Target
Marketing Subcommittee.

203.    Jakes is also a former professional football player in the National Football
League, where he played for notable teams like the Kansas City Chiefs, New Orleans Saints, and
Green Bay Packers. He played cornerback, but "never took a hit as hard as the ones McDonald's
put on me during my 24 years as an operator."

204.    Jakes retired from football and yearned to be an entrepreneur. Around 1994, he
became an owner/operator in Atlanta. In keeping with McDonald's discriminatory practice of
intentionally placing Black franchisees into substandard stores in Black neighborhoods,
McDonald's forced Jake to purchase four stores with a "take-it-or-leave-it" attitude. All of the
stores were in economically distressed, high-crime areas with a predominantly Black customer
base. All needed major rebuilds or renovations. All required security to protect employees,
customers and property. Jakes was never offered a store in a white neighborhood and was only
offered these stores solely because of his race.

205.    McDonald's enforced its renovation standards more stringently on Jakes, as
compared to white owner/operators, solely because of his race and in violation of the franchising
agreement. McDonald's required Jakes to reinvest in his Panola Road, Georgia, restaurant three
times over the course of his franchise term. By contrast, McDonald's did not require a white
owner/operator, Patrick Dennis, in the same region to make any reinvestments to his restaurant
located just a few miles down the road in Peachtree City, Georgia. These changes included
modernizations that McDonald's told Jakes were nationally mandated, such as changing the

green roof to a red roof. McDonald's would not have required such trivial and constant renovations by Jakes but for his race.

206.    McDonald's also required Jakes to invest in restaurants within short time frames, not required of white franchisees, in locations McDonald's knew would fail to generate an adequate return on the owner's individual investment. Jakes purchased two stores in Stone Mountain from a white owner/operator who had not been complying with company standards. Yet, when Jakes purchased the store, McDonald's told him he could not grow other stores until he complied with conditions the company had not demanded of the white owner/operators.

207.    As a result, around 2014, Jakes informed McDonald's regional staff, including Vice President of Franchising and Operations Darren Hall and General Manager Sharlene Smith, that he intended to sell the stores because the previous owner left them in such terrible condition. Jakes wanted to purchase a new store being built. Rather than approving Jakes's decision, McDonald's demanded that he continue rebuilding the two dilapidated stores and awarded the newly built store to a white owner/operator.

208.    Jakes had also communicated to county officials that he sought to purchase the store. But because McDonald's would not give Black owners/operators like Jakes the opportunity to purchase the new store, county board officials refused to approve the new store's development. As a result, Darren Hall and Sharlene Smith informed Jakes that he was not to talk to county officials.

209.    Jakes's efforts for equality were not received well by McDonald's regional staff. In retaliation, McDonald's deployed its tactic of forcing Black operators out of the system by increasing their inspections of Jakes's stores to give him bad business reviews. These reviews, in turn, were used as pretext to force him out of the McDonald's system. Inspectors would regularly

40

arrive unannounced late on Friday nights with a goal of documenting the smallest infraction. McDonald's Vice President of Operations for the Atlanta Region Debbie Stroud would specifically visit Jakes's stores herself to find infractions and force him out of the business—a tactic she employed with other Black owner/operators she wanted to push out of business.

210.    One inspector suggested to Jakes that he, as a mere three-store operator, should just give up, sell, and get out of business. Were it not for Jakes's race, he would not have been subjected to unequal inspections that were not directed at white operators. White franchisees in the region, such as Keith Sirockman, were allowed to dictate the circumstances for inspections, including negotiating the date and time.

211.    Jakes also served as President of the Purchasing Committee for McDonald's. In that capacity, he learned that McDonald's would allow white operators to become vendors, including advertising vendors, while denying that same opportunity to Black operators. Around 2015, Jakes sought to become a vendor to distribute disposable gloves within restaurants. Jakes provided McDonald's with samples, submitted a bid, and waited patiently for approval. Although he was approved by a local purchasing committee in Atlanta, McDonald's denied Jakes the opportunity without any legitimate business justification. But for his race, Jakes would have been allowed to become a vendor.

212.    As McDonald's continued to prevent Jakes from expanding his business, he was forced out of the system and lost five stores in 2016.

213.    Were it not for Jakes's race, McDonald's would not have engaged in the continuing misconduct alleged herein, which destroyed a nearly 20-year process of creating generational wealth and ownership for Jakes and his family.

**Annis Alston-Staley and Harry Staley**

214.    Annis Alston-Staley and her husband, Harry Staley, owned and operated ten

41

McDonald's stores in the New Jersey region. They are Black.

215. Prior to becoming a franchisee in 1995, Annis worked for twenty years at McDonald's corporate division, including as a Regional Manager and Senior Vice President for five years.

216. In that role, Annis sat in on corporate meetings in which McDonald's would name problematic owner/operators that they wanted to force out of the system. The majority of owners they identified as problematic were Black.

217. She witnessed how McDonald's forced Black operators out of the system by conducting frequent, unannounced inspections, blaming the operators for cash flow issues, and by unfairly rating Black operators' performance. In doing so, they were able to justify their decision not to rewrite Black operators' stores. Additionally, she observed how McDonald's offered stores that were difficult to run to Black operators.

218. McDonald's denied the couple opportunities to purchase franchises in their desired location solely because they were Black. When Annis and Harry decided to purchase a store as franchisees in 1995, she asked to be placed in Raleigh. McDonald's typically honors senior management's location choice when they transition to becoming owner/operators. However, the Regional Manager rejected her request. The Regional Manager offered her stores at the North Carolina shore, which were notoriously difficult to run, given the highly seasonal nature of the customer base.

219. Annis and Harry refused to take on those locations and opted to purchase stores in Middlesex and Pompton Plains, New Jersey, in 1995, at the direction of McDonald's Zone Manager, who had been Annis's prior supervisor. The couple then purchased two more locations in Union and Vauxhall, NJ. Regional Manager Mason Smoot and President of the East Zone Division incentivized the couple to purchase the Vauxhall store, located on the turnpike, by

promising them that McDonald's would make certain improvements to the store and projected that sales would increase to $3.5 million as a result. McDonald's never followed through on that promise and never made the improvements.

220.    McDonald's set a high rent for the Vauxhall location, charging the Staleys 15% of gross sales per year, compared to the typical rate of 6-10% per year. Additionally, the location never met McDonald's projected sales of $3.5 million per year. McDonald's typically set high rents like this on low-volume stores that it knew would not fulfill their projected sales.

221.    The Staleys accepted McDonald's proposal to take on a newly built store in Somerville, New Jersey. Like the Vauxhall store before it, McDonald's managers provided inaccurate sales records and projections for the store's revenue to encourage the couple to purchase the store. In reality, the Somerville store was substandard, low-volume, and located in a flood plain. McDonald's also did not disclose to the Staleys prior to their purchase that the location had strict noise ordinances in place, which hampered sales, nor did it disclose the flood plain, which they knew about.

222.    Both Harry's son and nephew entered the Next Generation program and qualified to become store managers. However, they could not obtain a review for approval to become franchisees because their assigned consultant would not put them forward. In the end, neither Harry's son nor nephew ended up receiving the review needed to qualify as a prospective franchisee.

223.    Annis and Harry decided to sell their remaining stores because the cost of staying in business had become too high, as a direct result of McDonald's unreasonable demands that they rebuild and renovate their stores.

224.     Were it not for the Staleys' race, McDonald's would have allowed them to purchase stores in Raleigh, would have charged them less rent, and would have disclosed to them that the restaurant in Somerville would make less money because of the applicable noise ordinance.

### Robert Bonner

225.     Robert Bonner is a former owner and operator of six stores in Illinois and the St. Louis region. He is Black.

226.     Bonner received recognition for his leadership in the local communities where he operated, including investing nearly $1 million into community programs.

227.     Bonner first became an owner/operator in 1990 when he purchased a store in East St. Louis, a predominantly Black neighborhood. The store had historically low-volume sales and higher operating costs, such as higher security costs due to crime, higher insurance rates, and higher employee turnover. McDonald's did not support Bonner's purchase of the store and denied him meaningful support to improve the business location, while locations with white customer bases were routinely provided such assistance.

228.     McDonald's considered Bonner to be too independent and influential as a Black operator and sought to keep a close watch on him.  Regional staff communicated to Bonner that he was simply a "glorified manager" for the company and nothing more.

229.     McDonald's deployed its tactic of forcing Black operators out of the system by increasing their inspections of Bonner's stores. Regional staff began increasing the scope of their inspections and would regularly arrive unannounced with a goal of documenting the smallest infractions. Were it not for Bonner's race, he would not have been subjected to a campaign of unannounced, stringent inspections.

230.    Around 2013, McDonald's sought to increase the pressure on Bonner and informed him that they were adding new requirements, one of which would be investing in a full remodel of his store for a McCafé, which is a café-style chain owned by McDonald's. Regional staff informed Bonner that the investment was obligatory and that he would need to take out a sizeable loan.  Despite McDonald's claim that these investments were mandatory, McDonald's did not require white franchisees to make investments in similar locations to Bonner's where the investment was unlikely to generate an adequate return. McDonald's also took a starkly different approach when one of its nationally-imposed strategies did not work—Bonner knew that McDonald's allowed Black operators to flounder and ultimately to fail, while McDonald's helped white operators remain afloat through measures like rent relief.

231.    McDonald's also denied Bonner the same growth opportunities to higher-volume, lower-cost stores that it offered to white franchisees. On multiple occasions between 2005 and 2013, McDonald's prevented Bonner from both selling his stores and purchasing new locations. For example, Bonner had a deal with Steve Short to sell his stores for approximately $800,000. However, Regional Manager Robert Sanders communicated to Short that he planned to buy Bonner's store for much less and stated, "I'll be damned if I let a Black operator be much richer than me."  As a result, Bonner had to sell the store for less approximately 25% less than the deal he had lined up, and as a result was unable to complete a planned deal to purchase seven stores in the Oklahoma region.  Bonner also sought to purchase a store in the Atlanta region. Sanders contacted the Regional Manager in Atlanta and encouraged him not to sell to Bonner. Were it not for Bonner's race, McDonald's management would not have interfered with his sales and prevented his success as a franchisee.

232.    As a result of McDonald's efforts to prevent Bonner from expanding and its desire to push a successful Black operator out of the system, Bonner was forced to sell his stores in 2013.

233.    But for Bonner's race, McDonald's would not have engaged in the continuing misconduct alleged herein, which destroyed a nearly 23-year process of creating generational wealth and ownership for Bonner and his family.

**Larry Brown**

234.    Larry Brown is a former owner and operator of 10 stores in the Iowa region.  He is Black.

235.    Brown first became a McDonald's franchise owner/operator in 2000.

236.    In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores, between 2000 and 2017, McDonald's placed Brown in stores with low-volume sales and higher operating costs, solely because of his race.

237.    To force him into these locations, McDonald's provided Brown with false financial information to induce him to purchase McDonald's least desirable franchises, and made false statements about the availability of other franchise locations to restrict his growth into more profitable locations. Around 2013, McDonald's informed Brown that it wanted to build a new store in between his two stores.  Regional staff provided him with an ultimatum that if he did not purchase the store, McDonald's would sell it to another owner.  McDonald's provided false financial information and made revenue projections that McDonald's knew were not realistic, and which turned out to be nearly $1 million more than the actual revenue, all in an effort to induce Brown to purchase this store, which he did.

238.     Around 2015, McDonald's denied Brown financial support to allow him to overcome the hardships he faced because of McDonald's false statements about the financial viability of these stores. McDonald's denied Brown financial assistance in the form of rent relief, routinely offered to white owner/operators, solely because he was Black.

239.     McDonald's attempted to place Brown into a location where the city planned to construct a highway bypass. McDonald's intentionally concealed this information from Brown, who learned about the bypass just before he entered into the contract for the restaurant.

240.     In another instance, Brown sought to purchase another restaurant and McDonald's yet again concealed information about a planned bypass.  Brown finally learned about the bypass and road construction planned from the zoning department.  At a follow-up meeting on the deal, Brown confronted McDonald's regional staff, including General Manager Kim Corral and Vice President Kevin Lyon, who provided Brown with no legitimate business reason as to why they had concealed the construction. Instead, McDonald's retaliated against Brown for rejecting a store and sought to prevent him from acquiring a new store.

241.     But for Brown's race, McDonald's would not have provided him with false financial information to induce him to purchase McDonald's least desirable locations, or retaliated against him for opposing their mistreatment of him.

242.     McDonald's intentionally denied Brown purchase opportunities because of his race.  Around 2012, Brown negotiated with a franchise owner in Iowa and agreed to purchase ten new restaurants.  The agreement was presented to McDonald's for final approval. McDonald's Vice President Walt Maney informed Brown that he was reserving the restaurants for purchase by McDonald's Corporation Executives Sue Immick and Dave Roberts, both of

47

whom were white. But for Brown's race, McDonald's would not have interfered with his business deal.

243. McDonald's enforced its renovation standards more stringently on Brown, as compared to white owner/operators, solely because of his race and in violation of the franchising agreement. McDonald's gave Brown six months to complete the renovations on one of his stores, while the previous white owner/operator, Steve Nelson, was allowed to operate the store for years without making such renovations.

244. When Brown complained about McDonald's lack of support, McDonald's deployed its tactic of forcing Black operators out of the system by increasing their inspections of Brown's stores. Regional staff began conducting unreasonable and unequal inspections of Plaintiffs' restaurants to generate bad business reviews in retaliation for Brown's complaints. They used these reviews, in turn, as pretext to force Brown out of the McDonald's system because of his race. Inspectors would regularly arrive unannounced, late at night at Brown's stores with the goal of documenting the smallest infraction. But for Brown's race, he would not have been subjected to unequal inspections that were not directed at white operators.

245. McDonald's intentionally placed Brown in an untenable economic position, so that Brown had no choice but to exit on McDonald's terms, at a loss. In 2017, McDonald's instructed a white owner/operator, David Roberts, to "low ball" Brown by offering less for his stores than they were worth. This interference in the sale further demonstrated McDonald's racial discrimination, as it forced Brown out of the system at a loss, in favor of its preferred white owner/operator.

246. After the sale was complete, McDonald's provided Roberts with the assistance that it had never offered Brown.

**Benny and Eleanor Clark**

247.     Benny Clark and his wife, Eleanor Clark, are former McDonald's franchise

owners and operators of four stores in the Columbia, South Carolina, region. They are Black.

248.     The Clarks first became McDonald's franchise owner/operators in 1999 in

Columbia, South Carolina.

249.     In keeping with McDonald's discriminatory practice of intentionally placing

Black franchisees into substandard stores in Black neighborhoods, between 1999 and 2019,

McDonald's placed the Clarks into substandard locations with low-volume sales and higher

operating costs due to crime, higher insurance rates, and higher employee turnover, solely

because of their race. The Clarks sought more profitable locations, but McDonald's denied them

the opportunity to purchase these restaurants because of their race.

250.     McDonald's deployed its tactic of forcing Black operators out of the system by

increasing their inspections of the Clarks' stores to generate bad business reviews. The Clarks

received poorer reviews than white owner/operators like Sandy Webb, whose restaurants were in

similar or worse condition. Were it not for the Clarks' race, they would not have been subjected

to unequal inspections that were not directed at white operators.

251.     Around 2019, McDonald's informed the Clarks that they were no longer

interested in supporting small operators with only a few restaurants, as a result of Bigger Bolder

Vision 2020. The Clarks appealed to the national headquarters, particularly given that white

owner/operators were allowed to continue operations for either a few restaurants or a single

restaurant.  Yet, McDonald's never provided the Clarks with any financial relief to remain in

business.

252.    McDonald's placed the Clarks in an untenable position of economic duress, so that the Clarks had no choice but to exit on McDonald's terms, at a loss. The Clarks were forced to sell their stores in 2019.

**Glenda Claypool**

253.    Glenda Claypool brings this action, on behalf of, and pending appointment as Personal Representative of the Estate of her late husband, Sherman Claypool, a former McDonald's franchise owner and operator of five stores in the Milwaukee region. He was Black.

254.    Claypool first became a McDonald's franchise owner/operator in 1971. He was one of the founding members of the NBMOA and attended the first convention for the organization in May 1972.  In May 2022, the Illinois House of Representatives passed a resolution acknowledging Claypool, among the other founding members, for laying the foundation for "African American entrepreneurs in the United States today."

255.    Unfortunately, Claypool was treated differently based on his race within the McDonald's Corporation. In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores in Black neighborhoods, McDonald's placed Claypool in stores with low-volume sales and higher operating costs due to crime, higher insurance rates, and higher employee turnover, solely because of his race. Claypool faced a series of security issues at his stores: his employees were frequently robbed and in one incident, one man was shot.  Field Consultant Diane Hatterson told Claypool that white regional staff were uncomfortable coming to Black neighborhoods.

256.    Despite being pigeonholed into Black communities, Claypool was not provided the social and cultural support McDonald's provided to owner/operators in white communities.

For example, Claypool created a program where he would take the restaurant sales from Juneteenth and give scholarships to underserved Black youth in the community.

257.    When regional staff learned about the Claypool's program, Field Consultant Diane Hatterson and other regional staff informed him that they could not have a scholarship for Black youth, regardless of the holiday commemorating the emancipation of enslaved Black people. Were it not for Claypool's race, he would never have been prevented from creating community programs for his Black customer base.

258.    Despite being relegated to substandard locations, McDonald's denied Claypool meaningful support to allow him to overcome the financial hardships it created, while white franchisees were routinely provided such assistance. Around 2014, a reckless driver drove into the store, which suspended Claypool's operations for weeks. In addition, a truck fell into a sinkhole in front of Claypool's store, which prevented customers from entering the store or accessing the drive-through for about eight months. Claypool sought financial assistance from McDonald's because of these incidents but was denied. By contrast, McDonald's provided financial aid to white owner/operators in the area, like Steve Killian.

259.    McDonald's also deployed its tactic of forcing Black operators out of the system by increasing their inspections of Claypool's stores to generate bad business reviews. Inspectors would regularly arrive unannounced late on Friday nights with the goal of documenting the smallest infraction at Claypool's store. Around 2012, Field Consultant Alejandra Herrera would arrive at unreasonable hours to inspect Claypool's store, including on the night of a snowstorm. On other occasions, McDonald's would send inspectors to spend more than an hour analyzing every salad dressing in the restaurant. But for Claypool's race, he would not have been subjected to these unreasonable and unequal inspections that were not directed at white operators.

260.     McDonald's required Claypool to invest in a remodel within a short timeframe, not required of white franchisees, in locations McDonald's knew would fail to generate an adequate return on Claypool's individual investments.

261.     In 2014, McDonald's informed Claypool that he needed to remodel immediately, or they would not renew his lease. Because of the time crunch and financial hardship, Claypool was forced to sell his store to a white owner/operator, Jeff Sterns. Strikingly, McDonald's did not require Sterns to remodel immediately. Instead, it provided him financial support and gave him at least seven years to remodel the store. This differential standard for remodeling further demonstrated McDonald's racial discrimination, as it denied Claypool an extension to remodel but offered that same extension to a white owner/operator.

### Juneth Daniel

262.     Juneth Daniel owned and operated four McDonald's stores in the Alabama region. She is Black.

263.     In 1998, Juneth Daniel started working at McDonald's as a shift manager on weekends and during summer break between college semesters. In 2000, she graduated college, became a full-time manager, and attended Hamburger University.

264.     From there, Daniel worked her way up the ranks, receiving multiple promotions in the process. Between 2006 and 2008, Daniel applied and was approved to become a McDonald's franchise owner/operator after interviewing with McDonald's East Division Franchising Officer Marion Foran and East Division Franchising Manager Toni Nightlinger.

265.     In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores in Black neighborhoods, QSCVP Debbie Stroud directed Daniel to visit franchise store opportunities, all in Black neighborhoods, all with low

sales, and all requiring renovations. Stroud would not have directed Daniel to these various locations but for her race.

266.    In February 2008, McDonald's presented Daniel with a new store location in Montgomery, Alabama ("Eastchase"). The rent was 15.5% and projected to bring in $2.6 million in sales. Daniel was not aware at the time that no seasoned operators in the co-op were interested in purchasing the Eastchase store given its high rent. During negotiations, no one from McDonald's ever informed Daniel of the possibility that another franchise location might be built near the Eastchase Store within a few years.

267.    Daniel entered into a BFL with McDonald's. Part of the agreement was that Daniel would purchase a store in Union Springs, Alabama ("Union Springs")—a location that no other operator wanted because of its location, low sales, and investment requirements. McDonald's ran it as a company-owed store prior to Daniel's purchase and had not completed reinvestments on the store. Additionally, the Union Springs store was located in a low-income, predominantly Black, rural town and hiring for the store was very difficult.

268.    The Eastchase store's sales never reached the $2.6 million in sales McDonald's had projected. As a result, she financially struggled to acquire the Union Springs Store. Nevertheless, in September 2009, Daniel purchased the Union Springs restaurant, which was also located in a predominantly Black, low-income area.

269.    Daniel requested rent relief for the Eastchase store because it was not meeting sales projections, which McDonald's only partially granted and granted only for one year. McDonald's denied Daniel financial assistance in the form of meaningful rent relief, which was routinely offered to white owner/operators, solely because she was Black.

270.     Over the next few years, Daniel struggled to turn Eastchase, Selma, and Union Springs into profitable franchises. Union Springs struggled to bring in revenue because of the profitability of Selma, and the two stores operated under a blended rent system. Eastchase carried high rent and costs, while Selma carried extra costs in terms of security and the renovations required upon purchase. Meanwhile, the Union Springs store required early renovations and extra costs in terms of security, including an armored car service, as well as maintenance and repairs.

271.     In May 2010, Daniel acquired two more locations in Selma, one of which was located in a Walmart ("Walmart Store"). Both these stores were located in high-crime, low-volume areas, and no other franchisees were interested in operating them.

272.     Because this was the only opportunity to grow as a franchisee that McDonald's offered to Daniel, she took on the stores. McDonald's enforced its renovation standards more stringently on Daniel, as compared to white owner/operators, solely because of her race and in violation of the franchising agreement. For example, as part of the agreement between McDonald's and Daniel, she had to renovate the lobby in the Selma location within six months of purchasing the store.

273.     However, Daniel had to request an extension from General Manager of the Atlanta Region Harry Coaxum for the remodel because she could not afford to renovate the lobby due to Eastchase's and Union Spring's low sales. Coaxum denied Daniel's request, telling her that she bought the stores under the requirement to renovate. This was the despite the fact that on transition, the Selma store had no managers, high theft, high crime, no employees, and was located in a poverty-stricken area. Daniel was forced to live in a local hotel for days at a

time when she took the store over in order to improve operations, while at the same time managing operations for her other locations that were located an hour to an hour and a half away.

274. Even though McDonald's inaccurately projected much higher sales for the Eastchase store, McDonald's never adjusted the price or lowered the rent on the store. The location never reached McDonald's projection of $2.6 million per year.

275. In or around 2014, Daniel met with Vice President and General Manager Sharlene Smith and Finance Manager Tanya Squire to discuss her stores and potentially receiving financial assistance from McDonald's. During this meeting, Smith and Squire scolded Daniel for leasing office space for her business. Because Daniel operated locations in three different counties, she needed the office space to store equipment, hold meetings, and conduct day-to-day business operations. Despite this and the fact that many of her white counterparts had office space, Smith and Squire told her it was an unnecessary expense. Rather than aiding Daniel, McDonald's, via Smith and Squire, blamed her for the economic harm McDonald's had caused through inaccurate projections because of her race.

276. In or around 2015, McDonald's corporate management asked Daniel about her opinion on whether Technology Consultant Bob Coneen should be promoted to Business Consultant. Daniel gave her honest assessment that Coneen had poor interactions with her staff, including swearing and yelling at one of her managers, and belittling Daniel in their interactions. Despite her complaints, McDonald's promoted him to Business Consultant.

277. In or around 2015, Daniel began negotiations with Plaintiff Kenneth Manning to purchase his Taylor Road store and sell her Selma location. Now-General Manager Darren Hall killed the deal, without providing any explanation, and allowed the location to be sold to Ronald

Hay, a white owner/operator. But for Daniel's race, Hall would have allowed the sale to go through.

278.     In or around 2016, Daniel complained to QSCVP Valerie Williams about continuing racist harassment at her Eastchase location. The store had been vandalized with the "N-word" as well as drawings of male genitalia. Local adolescents would go through the drive-through and say the "N-word" into the speaker because they knew the location was Black-owned. Williams provided no response or acknowledgment of these racist hate crimes Daniel was forced to endure.

279.     In or around 2016, McDonald's built a new location (the "Love Travel Stop") approximately fifteen minutes away from the Eastchase store. General Manager Darren Hall and QSCVP Sharlene Smith never offered Daniel the chance to bid or consider purchasing the location. Were it not for Daniel's race, Hall and Smith would have considered her for this store that impacted her Eastchase location.

280.     In 2015 and 2016, Daniel worked to reset and improve her business as a McDonald's franchisee but was prevented from doing so because of McDonald's further discrimination. Daniel reached out to now-Vice President and General Manager for the Raleigh Region Debbie Stroud and the NBMOA in an attempt to change regions.

281.     Word of Daniel's attempt to change regions traveled back to the Atlanta Regional Office. Then-QSCVP Valerie Williams stepped in and interfered with Daniel's requests, ensuring that she would not be able to change regions or succeed as a franchisee. Williams sent business consultants to grade Daniel's restaurants at unannounced and unreasonable times, including late at night.

282.     Daniel complained to Ombudsman Bill Lowery about Williams's behavior and her belief that Williams was retaliating against her for seeking out other McDonald's managers to attempt to switch regions. In doing so, Daniel was challenging McDonald's practice of keeping Black operators stuck in undesirable franchise locations.

283.     In 2016, Daniel and her team attended a co-op training at a local restaurant owned by the Hays—white owner/operators. She noted that there was a large commercial fan at the front of the drive-through at this location, which was a clear food safety violation for McDonald's and the City. However, the Hays had not been penalized for it. By contrast, Daniel was poorly graded or forced to repair the most minute defect, such as having a tile with a small stain on it or a slot not working on a food storage cabinet. But for her race, Daniel would not have been required to make such trivial repairs or risk receiving poor reviews for the most minor of defects.

284.     In 2016, during a meeting with the NBMOA that Daniel attended, McDonald's presented their plan for the future of franchisees. They informed the group that their overarching plan was to weed out small operators because only operators with five or more traditional locations would be able to satisfy the plan's terms. McDonald's knew at the time that this plan would force Black franchisees out of the system.

285.     In or around 2017, Daniel was forced to hire security for her Union Springs location—an added cost that her white counterparts did not have to pay—after the KKK threatened to commit violence at the store because it was Black-owned. Again, Daniel notified Williams about the hate crime and requested to transfer locations. Again, Williams did nothing and continued to set Daniel up to fail.

286.     In 2017, in retaliation for Daniel's complaints, Williams informed Daniel at her annual business review that she was ineligible for growth or rewrite.

287.     In 2017, Daniel attended another McDonald's meeting in which they presented the Bigger Bolder Vision 2020 plan. The meeting was a turning point for her, given McDonald's statement that it would be difficult to afford the new investments if you were a small operator.

288.     In or around 2017, Daniel started exploring selling her stores. Williams sent her the names of two local operators—Buddy Rogers and Gerry Murphy. Williams told her that if Daniel could sell her restaurants, she would find a deal for her in central Atlanta. The locations Williams offered were located in the highest-crime areas of Atlanta, including one location owned by Plaintiff Floyd Sims that McDonald's knew was going to close eventually.

289.     In or around 2017, Daniel traveled to North Carolina, at the border of Virginia, to explore purchasing promising locations from an NBMOA operator in the Raleigh Region. Williams killed any potential deal, informing Daniel that she could not look at other locations without Williams' consent. It was common practice among Daniel's white counterparts to look at or negotiate with operators in other regions to continue to grow, reorganize, or relocate their restaurants. White owner/operators including Gerry Murphy and Ronald Hay had purchased from operators in other counties. However, Williams denied Daniel the opportunity to grow outside of her region solely because of her race.

290.     In 2016 and 2017, Daniel faced a high-risk pregnancy and could not stand or walk for long periods of time. Although McDonald's was aware of her medical condition, the business consultants continued to conduct inspections and graded visits early in the morning and late at night without warning. McDonald's was deploying their tactic of forcing Black operators out of the system by increasing their inspections of Daniel's stores.

291.   Following her Cesarean delivery, Daniel needed to take time off to recover. Even so, right after she gave birth, Operations Manager Robert Smith began calling her frequently to ask when she would return to work.

292.   Under Williams's instructions, McDonald's attempted to force Daniel on the Bigger Bolder Vision 2020 schedule, despite the fact that she could not oversee such a large project when she had not yet recovered and could not be physically present in the stores.

293.   When Daniel returned to the store full time in 2018, Williams continued to pressure her to execute the Bigger Bolder Vision 2020 plan. Daniel realized soon thereafter that she could not financially meet the demands of Bigger Bolder Vision 2020, given the loss of sales at her Union Springs store due to the restructured marketing in the Montgomery/Dothan co-op.

294.   McDonald's enforced the Bigger Bolder Vision 2020 plan more stringently on Black owner/operators than on white owner/operators, as Daniel experienced. But for her race, she would not have been pressured to strictly follow the Bigger Bolder Vision schedule during a period of medical recovery.

295.   In or around 2018, Daniel emailed General Manager Greg Watson regarding a food safety visit Business Consultant Robert Smith completed that Daniel believed was unfair. Smith did not give her supervisor time to correct the issues, as he did for white franchisees.

296.   In 2018, Daniel sold her stores for virtually nothing to Gerry Murphy—the only owner/operator McDonald's presented to her as a potential buyer.

**Yves Dominique**

297.   Yves Dominique owned and operated six McDonald's stores in the Atlanta region during his time at McDonald's. He is Black.

298.   Prior to becoming a McDonald's franchise, Dominique had worked as an Assistant Manager under Plaintiff Keith Manning when he was 15 years old. Though Dominique

59

worked as a police officer in New York for 20 years, he kept in touch with Manning, who was by then a franchisee.

299.    Dominique entered McDonald's Advocate Program to facilitate his pathway to becoming an owner/operator, though the Advocate Program provides no guarantees of approval.

300.    In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores in Black neighborhoods, in approximately 2008, Franchise Manager Paul Carpenter approached Dominique about an opportunity to purchase a store in Atlanta, located in one of the highest-crime and most challenging areas of the city. Dominique believed that he would not have been chosen for that location were it not for being Black. However, because he had few opportunities to purchase other franchise locations, Dominique accepted the offer.

301.    The Atlanta store was in poor condition. For example, the ceiling tiles were loose because of how badly the store was infested with rats. Even so, Dominique poured himself into the store to remodel it and make it a success. Throughout his tenure at McDonald's, Dominique passed every business review and was always recommended for growth.

302.    As Dominique sought to expand, he began negotiations with a white owner/operator who was selling a store in Midtown Atlanta. Despite engaging in serious negotiations for the store, the deal fell through after McDonald's informed him McDonald's would not support the sale. McDonald's did not provide a reason. McDonald's provided the same response when Dominique negotiated a deal to buy a store on Northside Drive, also owned by a white operator named John Tomasse. Again, McDonald's informed Domonique that they would not approve the deal. McDonald's withheld its consent because it did not want to transfer white-owned, profitable stores to Black owner/operators.

303.    In 2012, Dominique purchased an additional four stores in the region. Immediately thereafter, McDonald's raised the rent on the stores to 13.68% of gross sales, though they did not raise the rent on any other operator in his region.

304.    In 2014, McDonald's demanded that Dominique undertake a remodel on one of his stores, which compounded the debt he had from purchasing the new locations.

305.    Though Dominique's stores were located in a low-income urban area, Dominique's hard work had made them profitable. Dominique wanted to sell his stores to a Black owner/operator named Mark Mines, but McDonald's did not approve and arbitrarily withheld its consent in breach of the franchise agreement. Instead, McDonald's directed him to Jessica Dean, a white/owner operator, ensuring that these profitable locations would not go to a Black franchisee. This interference in the sale further demonstrated McDonald's racial discrimination, as it forced Dominique out of the system at a loss, in favor of its preferred white owner/operator.

306.    McDonald's then informed Dominique that he could not be a single-store owner/operator, despite the fact that McDonald's permitted many white owner/operators to own only one store, including a franchisee in Mount Zion named Ray Justice and another franchisee, Kip Mecer. Instead, McDonald's wanted to force Dominique out of the system solely because of his race and used the one-store standard as a pretext to do so. As a result, Dominique was forced to sell his last store in 2017.

**Wise Finley**

307.    Wise Finley first became a McDonald's franchise owner/operator in downtown Detroit, Michigan in 1987. He is Black.

308.    In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores in Black neighborhoods, McDonald's placed Finley

into such a location for his first restaurant, which was located at Griswold and State Street in downtown Detroit and had no drive-through. At the time Finley acquired this store, there was a significant homeless population that sought shelter in the restaurant.

309.    Despite the store's challenges, Finley ran the store for two years, during which time he managed to increase its sales by 30%.

310.    After his first year operating the restaurant, McDonald's Field Consultant Errol Serbes instructed Finley to remodel the store's lobby. Former McDonald's Director of Field Operations Pat Isaac also communicated with Finley about the specifics of the renovation, including that McDonald's would pay for the remodel upfront, and he could reimburse McDonald's when he exercised the BFL.

311.    In fact, Finley ended up paying more than $100,000 for the remodel.

312.    In 1989, Finley became the President of the Detroit Chapter of the Black McDonald's Operator's Association and a board member of the NBMOA. That same year, Finley was ready to exercise his BFL, but when he tried to do so, McDonald's informed him that it was going to sell the restaurant to another owner/operator. McDonald's directed Finley to acquire other franchise locations in Michigan. McDonald's denied Finley's request to exercise his BFL in retaliation for his involvement with the Detroit BOA and in an effort to push him out of the city.

313.    Finley began operating three stores in Michigan: (1) Ypsilanti, (2) Maynard Street in Ann Arbor, and (3) South University in Ann Arbor. Neither Ann Arbor location had a drive-through. He operated these franchise stores from 1989 into 1994, making approximately $200,000 in annual profits.

314.    Then, in 1994, Ted Lyons, McDonald's Regional Manager at the time, offered Finley the opportunity to purchase a six-store package in Chattanooga, Tennessee. Specifically, Lyons proposed that if Finley sold his three stores in Michigan and relocated to Chattanooga, Finley would start off operating two franchise stores, and then over the course of the following two years would acquire four additional stores.

315.    Finley, looking to expand his career as a McDonald's franchisee, accepted Lyons's offer. One of the two Chattanooga stores he acquired immediately was located on Shallowford Road and the other located on Fourth Street.

316.    In 1995, Finley was operating the two stores in Chattanooga when McDonald's opened a new location about one mile from the Shallowford Store. This impacted Finley's store's sales by 32%.

317.    In situations where a new store is built near an existing location, McDonald's routinely provides financial assistance—usually in the form of monetary compensation—to franchisees for the negative impact that the new location is predicted to have on the franchisee's sales. Despite this, McDonald's never gave Finley the opportunity to bid for the new store location, nor did they offer financial assistance or impact funds to Finley. McDonald's denied financial assistance—which it routinely gave to white operators who were impacted by a store opening—to Finley solely because he was Black.

318.    Later that year, three white men entered the Shallowford Store and carved "KKK" on two tables in the restaurant. These men also set fire to a waste basket in the bathroom.

319.    When Finley reported the racist vandalism to Lyons (via phone), Lyons responded to the effect of, "It is what it is." Neither McDonald's nor Lyons took this racist incident seriously nor offered any support or resources to Finley.

320.     After that incident, Finley met with Lyons and told him he wanted to return to Detroit. Lyons told Finley if he left Tennessee and those two stores, he could not continue as a McDonald's franchisee and would be exiled from the system. As a counteroffer, Lyons proposed buying the franchise stores from Finley for $300,000 and in return, allowing Finley to leave the system.

321.     In 1996, Finley met with Noel Kaplan, Herbert Williams, and Ted Lyons about his desire to return to Michigan and operate restaurants there. Kaplan and Williams offered to purchase the Chattanooga stores for $500,000, which would enable Finley to relocate anywhere.

322.     After that meeting, Lyons asked Finley to run the stores until McDonald's could find another buyer, which Finley agreed to do for approximately three to four months. Lyons was unable to find another franchise operator to take over the Chattanooga locations, so McDonald's bought back the stores from Finley. Within one year of Finley leaving Chattanooga, both restaurants closed and were no longer operational.

323.     When Finley returned to Detroit area in 2000, he purchased a franchise store located on Ford Road in Dearborn, Michigan. At the time of purchase, the store's sales were approximately $1.3 million.

324.     Dearborn has one of the largest Muslim communities in Michigan. Because of the demographics, McDonald's asked Finley to be one of the two franchise stores to test Halal products, and Finley agreed.

325.     In 2001, Finley launched the Halal product line out of the Ford Road Store. By 2012, Finley had nearly tripled the sales at this store, largely due to the Halal products.

326.     In 2003, Finley remodeled the Ford Road Store, which included adding a double drive-through. The remodel cost him over $300,000.

327. In 2007, Finley purchased another franchise store, the Grand River Store.

328. In 2013, Terry Reese, Regional Vice President at the time, called Finley and asked him what the Halal products were generating in sales. Finley informed Reese that the Halal products were generating at least a million dollars at his store. Without explanation, Reese told Finley that McDonald's was considering pulling the Halal products from the store. Shortly after that conversation, Reese resigned.

329. Subsequently, Poncho Gonzalez, who replaced Terry Reese as Regional Vice President, contacted Finley and told him that they were removing the Halal products from his store. Finley met with Gonzalez about this decision and informed him that it would affect his sales by $1.1 million. Despite the success of the Halal products and the impact it would have on Finley's sales, Gonzalez and McDonald's moved forward with pulling Halal products from the Ford Road Store's menu.

330. As a result of this decision, Finley asked McDonald's for a rent reduction for the Ford Road Store, but Gonzalez only agreed to partially reduce Finley's rent payment.

331. Finley ended up selling the store to an Indian operator, and later learned that Gonzalez had given the new operator the full amount of rent relief that Finley had previously requested. This confirmed that McDonald's would have granted Finley the rent relief requested were it not for his race.

332. In 2016, Finley was forced to sell his stores because of loss of sales. McDonald's paid him $1.9 million for both stores.

**Jacqueline and Anthony George**

333. Jacqueline George and her husband, Anthony George, are former owners and operators of six McDonald's franchise locations in Pennsylvania and Ohio. They are Black.

65

334.    Jacqueline and Anthony George operated McDonald's franchise stores for 21 years. The Georges purchased their first McDonald's franchise location in 1990 in North Huntingdon, Pennsylvania, with the assistance of Marion Foran, a McDonald's executive. Two years later, the Georges purchased a second franchise location in East Liberty, Pennsylvania.

335.    In 1997, the Georges sold their two Pennsylvania franchise locations, and purchased three locations in Ohio as part of a package under the direction of former McDonald's executive Jan Fields. In 2002, the Georges acquired the final franchise location they would operate, in The Plains, Ohio. The Georges' Ohio franchise stores were located in rural, low-income areas.

336.    In or around 2005, major road construction began near one of the Georges' franchise locations at East State Street. This road construction lasted approximately eight months and caused a substantial decline in the store's sales; an estimated $500,000 loss in sales volume.

337.    As a result of the disruption to their restaurant, the Georges requested rent relief from then-General Manager Monica Boyles and Vice President of Quality, Service, and Cleanliness Mason Smoot. Boyles and Smoot denied the Georges' request without offering further explanation. McDonald's denied the Georges financial assistance in the form of rent relief, routinely offered to white owner/operators, solely because they were Black.

338.    In 2012, the Georges were forced to sell their franchise locations to another franchisee, Chris Celic.

### Wesley Hall

339.    In 2005, Wesley Hall, owned and operated two stores in the Alabama region. He is Black.

340.    In 2005, Hall applied to become a McDonald's franchise operator through the online registration process. Subsequently, McDonald's called Hall and offered him two locations

to operate in Selma, Alabama. Hall then inquired about franchise stores in Florida, and McDonald's told him that he could either accept their offer and operate the stores in Alabama or be passed over for any other franchise locations.

341.    To make the deal more appealing, McDonald's told Hall that one of the Selma stores was projected to bring in $600,000 in yearly sales. Hall relied on that projection in agreeing to purchase the store. In reality, the store only brought in approximately $200,000 in annual sales.

342.    In September 2005, Hall accepted McDonald's proposal regarding the two Selma stores and began operating the restaurants.

343.    Pursuant to his Franchise Agreement, Hall was to operate the restaurants from 6:00 am to 12:00 am seven days a week. Additionally, McDonald's required Hall to agree to rental payments of 15%.

344.    In or around 2008, McDonald's Business Consultant Willie Jackson forced Hall to start operating his stores 24 hours a day, seven days a week. This schedule change caused Hall's operational expenses, including labor, maintenance, utilities, and food, to significantly increase.

345.    Hall quickly realized that operating 24 hours a day every day of the week was unsustainable, so he proposed that he stay open 24 hours on Fridays and Saturdays and return to the previous work schedule for the remaining weekdays. McDonald's rejected Hall's proposal.

346.    McDonald's did not mandate that similarly situated white franchise operators keep their stores open 24 hours a day. Were it not for Hall being Black, McDonald's would not have imposed the 24-hour requirement on him.

347.    McDonald's denied Hall financial assistance in the form of rent relief, routinely offered to white owner/operators, solely because he was Black. On multiple occasions, Hall requested that McDonald's reduce his rental payments from 15% to 10% of gross sales. McDonald's rejected this request out of racial discrimination.

348.    Both Selma stores were located in high crime areas. Hall was robbed and his staff were assaulted on multiple occasions. Moreover, people would frequently steal food from Hall's stores so regularly that he ended up installing padlocks on his store's refrigerators.

349.    One Friday night, a woman wielding a machete assaulted a customer, and Hall had to intervene to stop her from seriously injuring anyone. As a result, Hall's insurance payments were higher than other franchise operators in the region.

350.    Hall was ultimately forced to hire security officers for the safety and security of his staff and stores. Additionally, Hall had to deal with high employee turnover because of the operating hours and frequent criminal activity in the area.

351.    McDonald's knew, or should have known, that Hall's stores were not financially viable as a result of the security and coinciding operational costs because they examined the stores' financial records every thirty days.

352.    For white operators who faced similar situations in their stores as Hall, McDonald's routinely reduced their rent to 5% or 6%. McDonald's denied that same relief to Hall, despite its practice of granting it, solely because he was Black.

353.    When Hall sought out franchise opportunities in Tampa, Florida, McDonald's summoned him to a meeting and chastised him for inquiring about these other stores.

354.    McDonald's deployed its tactic of forcing Black operators out of the system by increasing their inspections of Hall's stores. In or around 2007 to 2010, Hall was subjected to

increasingly rigorous and frequent inspections at both of his Selma stores. These inspections were more frequent and inconvenient than those imposed on white franchisees.

355.     With no financial support from McDonald's, eventually, Hall was forced to leave the McDonald's franchise system in 2010.

### Al and Kristen Harris

356.     Al Harris and his daughter, Kristen Harris, owned and operated twelve McDonald's stores in the Tidewater and Richmond regions of Virginia during their tenure at McDonald's. They are Black.

357.     Al worked for 37 years in the McDonald's system—21 years as an owner and 16 prior to that as an employee. In that capacity, he held several leadership positions, including ten years as President of the Virginia Black McDonald's Owners Association ("BMOA") and ten years on the Regional Owners Executive Board. He was awarded the Regional Leadership Award four years in a row.

358.     Kristen, who spent 15 years in the McDonald's system and 11 years as an approved owner, also held a host of leadership positions. She served as the Virginia BMOA Secretary for two years, served as the Regional Women's Operator Network Vice President for one year, spent four years as a Regional People Team member, served for three years as the co-op People Team Lead, and served for two years on the Regional Next Generation leadership team. Kristen was awarded the Virginia BMOA Leadership award twice and the Regional Street Fighter award.

359.     Prior to becoming a franchisee, Al worked for 16 years in McDonald's corporate office in a variety of roles, including in marketing, product development, operations, and as a minority ombudsman.

360.     In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores in Black neighborhoods, McDonald's proposed this type of store to Al and denied him the opportunity to purchase a store in an affluent white neighborhood solely because of his race. In 1997, Al approached Debra Koenig, the East Coast Zone Division Manager, about becoming a franchisee and purchasing stores in Asheville, North Carolina. Koenig, a white woman, told Al, "You know they will never let you purchase those stores. You're black."

361.     Al understood this to mean that McDonald's would not let him purchase these stores because they were high-volume locations in an affluent white area—the type of area McDonald's would not place Black owner/operators. McDonald's sold the Asheville store he had requested to a white owner/operator, Don Raznik.

362.     Koenig sent Al purchase options in the inner city of New Orleans, a dangerous area of Dallas, Texas, and finally, a low-income area of Virginia Beach.

363.     The proposed Virginia Beach store was located in a high crime area of town. In addition to that store, McDonald's proposed that Al buy a new store it had built on Birdneck Road in Virginia Beach that had been open for six months and was underperforming.

364.     Al told then-Regional Manager Louie Mele that he did not want to purchase the Birdneck location because of its low sales, operational issues, and location in a high-crime area. Mele responded that the two restaurants were a package deal and that it was both of them or nothing.

365.     Several white operators were purchasing restaurants in the region around the same time, and McDonald's offered them opportunities to purchase much more attractive restaurants.

70

But for being Black, McDonald's would have also offered Al similarly desirable franchise opportunities from the outset.

366.    In 2000, McDonald's offered Al the opportunity to purchase five stores in the Richmond, Virginia area in exchange for selling three of his Virginia Beach restaurants. McDonald's Regional Manager Steve Plotkin instructed Al that he would need to sell them to specific parties. Specifically, the First Colonial Road and Birdneck locations had to be sold to Paul Smith, a white owner/operator, and the Chimney Hill location needed to be sold to McOpCo. These forced sales reduced the price Al received for the restaurants because he could not negotiate offers with other potential buyers. By contrast, white owner/operators in the region, including Hugh Far and Leon Dickey, were allowed to pursue offers with buyers of their choosing. But for his race, Al would have been allowed to seek out other buyers for these restaurants and sell them for their full value.

367.    One of the Richmond stores—"Crater Road"—was a low-volume store with operational issues, located in a dangerous part of town. Al communicated to Plotkin that he did not want to purchase this location for these reasons. Plotkin ignored Al and stated that the five stores needed to be purchased as a package. Additionally, Crater Road's current operator's son, Tom Bishop (a white owner/operator) was allowed to purchase better locations nearby, rather than being forced to purchase Crater Road. Indeed, McDonald's intentionally directed Al to the Crater Road location and forced him to buy it solely because of his race.

368.    McDonald's enforced its renovation standards more stringently on Al, as compared to white owner/operators, solely because of his race and in violation of the franchising agreement. After purchasing the stores, McDonald's informed Al that he needed to remodel or

relocate the Crater Road store to a location that would cost 4% more in rent. McDonald's had not forced the last owner/operator of Crater Road, who was white, to remodel or relocate.

369.     The Harrises dealt with numerous security issues during their tenure at McDonald's. Five of their stores were robbed multiple times between 1998 and 2017. In February 2005, an individual was killed in one of their store's lobbies. They incurred extra security costs because they offered policemen in uniform free meals to deter crime. They also faced staffing issues as employees were too scared to come into work.

370.     In January 2012, McDonald's informed Al that they were building a new store 1.5 miles from his South Hill location. When Al expressed his concerns about the impact the new store would have on South Hill's sales, McDonald's reassured him that it would only reduce sales by 10%. They encouraged Kristen, who had completed the Next Generation training program in April 2009, to purchase the store.

371.     Area Real Estate Manager Bill Savage conducted a survey of the potential impact of the new store, which projected it to be double what McDonald's had estimated. The Harrises accordingly requested impact relief but were granted only $25,000, roughly a fifth of what other white owner/operators had been granted in similar circumstances.

372.     One such white owner/operator, Sue Derlack, told Al that when she had informed McDonald's that the impact of a new store was going to be much higher for her location than McDonald's had predicted, they had cut her a check for substantially more impact funding than what Al had received. That was not the case for the Harrises solely because of their race.

373.     As a result, Kristen felt forced to purchase the store so that they could avoid another owner/operator eating into Al's sales.

374.     When Al's South Hill store was being rebuilt and up for rewrite in 2018, the Harrises asked Field Operations Officer Barbara Calloway if Kristen could purchase the store at that time. Calloway denied their request.

375.     By contrast, the Harrises knew of several other white Next Generation operators had been able to sell stores to their children, including Frank Harmon and Paul Smith.

376.     At their operator review on April 24, 2015, Al and Kristen asked QSCVP Doug Jubic about expanding to Raleigh as it was the only area with opportunities for growth at the time. Jubic told them that they could not grow into a different region, although several white owner/operations had been allowed to purchase stores in different co-ops and regions.

377.     When Bigger Bolder Vision was launched in 2020, the guidelines for passing graded company visits became more stringent.

378.     The Harrises' Business Consultant Julie Mariotti accidentally sent a text to Kristen intended for someone else. Mariotti wrote of the Harrises: "They don't care about customer. They only care about faking it to pass visits."

379.     McDonald's discriminated against Kristen because of her race in their non-response to this situation, as demonstrated by their proactive response to a white operator. Kristen wrote to Mariotti's Regional Supervisor Helen Greco and told her she found the text disrespectful and unfounded based on their 95% customer complaint recovery rate. She expressed her concerns that Mariotti was not evaluating their stores from a fair and unbiased standpoint. Kristen requested that they be assigned a new consultant, but Greco denied her request.

380.     By contrast, another white operator, Dave Traub, had similar issues with Mariotti, requested a new consultant, and McDonald's assigned a different business consultant. This

divergence demonstrates that McDonald's employed two different standards for Black and white franchisees, granting white franchisee's requests and allowing them to succeed.

381.    Prior to being forced out of the McDonald's system in 2019, the Harrises were outperforming their co-op in sales, guest count, customer complaint responses, and customer recovery. Despite their success, when they were one visit away from passing the number of visits to be deemed eligible for rewrite, McDonald's failed them on a company graded visit ("CEV"), based on a company guideline over which McDonald's had complete discretion.

382.    Although only two of their four stores were up for rewrite, the Harrises could not find an operator who willing to purchase the two stores alone without the other two stores included in the package. The Harrises were therefore forced to sell their two remaining stores as well, which they had only finished renovating and reopening four months prior and had no desire to sell.

383.    The Harrises were forced to sell their remaining stores in 2019. Al barely broke even on his investment after 40 years in the McDonald's system. But for their race, the Harrises would have passed their company graded visit and remained in the McDonald's system.

**Lawrence Holland**

384.    Plaintiff Lawrence Holland is a former owner and operator of two McDonald's franchise locations in Jackson, Georgia. Holland is Black.

385.    Holland's brother owned and operated a McDonald's franchise in Boulder, Colorado. Holland initially worked at his brother's franchise so that he could qualify to apply to be a franchisee. In 2003, he purchased a standalone McDonald's store in Jackson, Georgia ("Jackson").

386.     In 2005, Holland attempted to purchase a new hybrid McDonald's store located at a truck stop ("Truck Stop") in the same area from Franchising Manager Bruce Freeman.

387.     Originally, his application was denied due to his finances. However, an hour after his application was denied, he was offered a two-year BFL to purchase the location. The BFL would lock Holland into a seven-year obligation. Additionally, the BFL would increase the location's rent by an additional 4% (18% overall) until Holland exercised his option on the loan. These loans are difficult to repay unless the franchisee has a second or third store that is turning a profit. Even though McDonald's knew of Holland's financial situation ahead of this purchase, Holland was allowed to move forward with the purchase using the BFL.

388.     McDonald's denied Holland financial assistance in the form of rent relief, routinely offered to white owner/operators, solely because he was Black. Holland asked McDonald's several times to lower the rent at the Truck Stop location because of its tight profit margins. McDonald's denied every request. By contrast, Holland knew of a white franchisee whose rent was lowered from 12% to 9% because of tight profit margins.

389.     At one point during his time as a franchisee for the Truck Stop location, another location on the same freeway became available for purchase. Regional Manager Debbie Stroud denied Holland's request to purchase it.

390.     At one of his business reviews, Holland saw that the Field Consultant had written positive comments. However, after the Field Consultant reviewed those comments with Stroud, the Field Consultant changed the comments and gave Holland a negative review.

391.     After Holland was given a bad business review at the Jackson location, Stroud told him he could sell the store now or wait for McDonald's to "take it." It became clear that Stroud wanted to force Holland out of the McDonald's system.

392. At his last annual business review for the Jackson location, McDonald's corporate informed him that he would not be granted a new 20-year lease for the location. McDonald's justified this decision because Holland did not have two pieces of equipment needed for a new McCafé. Holland had already installed this equipment at the Truck Stop location. He had already ordered these pieces for the Jackson location and was waiting for the shipment to be delivered. He showed the Operations Manager a receipt for the purchase. There was no reason to believe it would not be installed shortly after arrival. Despite that, McDonald's would not grant him the lease and used the equipment as a pretext to deny Holland's rewrite.

393. Holland's last annual business review was cancelled without his knowledge. He was not contacted by phone or email about the cancellation. The review was then rescheduled to the date after the required due date for the McCafé equipment installation. McDonald's knew Holland would not have the equipment installed by that date. As a result, Holland failed the business review, could not obtain a new lease, and was forced to sell the Jackson location in 2011.

394. If his review had been conducted as scheduled, there would not have been an issue with the equipment not being installed. He could have discussed the issue with corporate and expedited the installation.

395. Holland ultimately sold the Truck Stop location. He had struggled to make a profit at the location and McDonald's had demanded that he remodel the lobby, although the store was new when he purchased it.

396. After Holland sold his franchises, several key pieces of information came to his attention. First, none of the three white franchise owner/operators near the Truck Stop location wanted to purchase the store due to its high rent. Other stores in the area had 9–12% rents, while

the Truck Stop location had a 14% rent. As mentioned, Holland's BFL increased his rent to 18% for this location.

397.     Second, Freeman informed him that the original sale was going to be a two-store package for both the Jackson and Truck Stop locations. The Truck Stop location could not financially operate as a standalone store, and the Jackson location was known as a "problem" store because it was an older facility with faulty equipment. This location was so problematic that nearby McDonald's franchise owner/operators wanted nothing to do with the store.

398.     Third, the previous white owner/operator of the Jackson location had experienced similar issues for years with no repercussions from McDonald's corporate. The white owner was not forced to make repairs, even when anticipating a sale to Holland. Unlike the white owner/operator and solely because of his race, Holland was pushed out of the system because McDonald's saddled him with a problem store.

399.     But for his race, McDonald's would have disclosed this information prior to his purchases, rather than putting Holland at a disadvantage and compromising his opportunity to be a successful owner/operator.

**Glenna and Douglas Hollis**

400.     Plaintiffs Glenna Hollis and her husband, Douglas Hollis, are former owner/operators of six McDonald's franchise locations in and around Orlando, Florida. The Hollises are Black.

401.     In 1988, Douglas Hollis began working at McDonald's restaurants in New York's Westchester and Rockland Counties as a registered applicant—a pathway to becoming a franchisee for individuals without previous McDonald's experience. Hollis has a bachelors and Master of Business Administration in Finance. Prior to entering the registered applicant program, he had 17 years of corporate experience at IBM and Xerox Corporations. At the same time,

Glenna Hollis began working at McDonald's restaurants to learn the business alongside her husband.

402.     From 1988 to 1996, Douglas owned and operated a McDonald's franchise at 1201 North Broad Street in Philadelphia, Pennsylvania ("Broad Street"). He purchased this location using a BFL.

403.     In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores in Black neighborhoods, McDonald's placed Douglas into such a location for his first store. The Broad Street location was the only purchase offer Douglas received after successfully completing the registered applicant program. It was an underperforming store with low sales in an area of North Philadelphia that had one of the highest crime rates in the city. The store was constantly under siege by drug and gang activity. The Broad Street location had been unsuccessfully recycled three to four times before Douglas purchased the location. All prior owners were Black or persons of color who had filed for bankruptcy and exited McDonald's system. The location had high operating costs, high employee turnover, and additional 24/7-armed security costs for the location.

404.     At this time, white owner/operators were placed in affluent communities in and around Philadelphia, while Black owners and operators were placed in lower-income, higher-crime areas. But for Douglas being Black, McDonald's would not have directed him to this store.

405.     Executives were not happy with Douglas's decision to hire security, even though it was needed. McDonald's also subjected the Broad Street store to incessant field consultant inspections. Those consultants consistently gave bad reviews because of location-specific issues, like security, that were beyond Douglas's control.

406.    McDonald's misled Douglas in several ways prior to his purchase of this location. McDonald's misrepresented why prior owners and operators had failed at this location. McDonald's attributed their failures to incompetence and subpar operations, rather than the general consensus that the location had more significant operational challenges than any other metro Philadelphia location.

407.    McDonald's also promised Douglas that it would provide additional support if he purchased this location. Instead, Douglas was subjected to unannounced visits from corporate late at night and on weekends, as well as undeservedly poor reviews. He felt he was held to higher standards than white franchisees, despite operating in a more challenging environment.

408.    Despite these issues, Douglas was able to increase sales from $900,000 to $1.1 million at the location and eventually exercised his BFL option to purchase the restaurant. Even with his successes under difficult circumstances, he was never offered any expansion opportunities in the Philadelphia region.

409.    Douglas sold this location back to McDonald's in 1996 at a loss. Douglas decided to take the loss to leave the location and area, hoping for better opportunities.

410.    From 1996 to 2001, Douglas owned and operated four franchise locations in and around Portland, Oregon. He relocated from Philadelphia, Pennsylvania to Portland, Oregon with the sole assistance of a Black McDonald's Senior Level Executive Vice President and Zone Manager.

411.    The Hollises attempted to purchase more corporate stores in this area, but their applications were denied. These stores were later sold to white owner/operators. But for their race, McDonald's would have provided them with the opportunity to buy company-owed stores.

412.    Ultimately, the Hollises sold these franchise locations and relocated to Orlando, Florida.

**Laetitia Johnson**

413.    Plaintiff Laetitia Johnson formerly owned and operated four McDonald's stores in the Atlanta Region.

414.    In 1995, Johnson entered a BFL with McDonald's to purchase her first franchise store in Greenville, South Carolina ("Greenville").

415.    In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores in Black neighborhoods, McDonald's placed Johnson in such a location with her Greenville store, which was located in an economically depressed neighborhood. The store did not reach the required production levels, so Johnson sold it to a McDonald's field consultant.

416.    Subsequently, Johnson acquired another BFL store in Spartanburg, South Carolina, which was also in a low-income and rural area. Johnson only owned and operated this store for a short time.

417.    Between 2003 and 2006, Johnson acquired two more franchise locations—Kings Tree and Lake City. Johnson purchased these locations from a white owner/operator. In or around 2015, Johnson acquired four additional franchise stores that McDonald's was operating at the time, one of which was located off the Jimmy Carter Highway ("Jimmy Carter").

418.    The Jimmy Carter Store suffered severe financial setbacks when an infrastructure construction project began on the highway.

419.    Additionally, Johnson faced security concerns at all of her stores, including an armed robbery at the Kings Tree location.  As a result, Johnson hired a security company to guard all four of her stores.

420.    Johnson applied to refinance her loan with her bank, Wells Fargo. If secured, Johnson would have paid $36,000 less per month than she was currently paying. Wells Fargo was prepared to grant Johnson's request to refinance the loan. However, McDonald's refused to approve the refinancing, without explanation.

421.    Johnson attended a co-op meeting where McDonald's held a vote on the implementation of the Dollar Menu. Several franchisees, including Johnson, voted against the dollar menu.

422.    When Sharlene Smith, a McDonald's General Manager, learned of her vote, she said to Johnson, "You'll regret this."

423.    When Johnson wanted to retire, her son sought to purchase these four stores.

424.    McDonald's interfered with Johnson's son's purchase of these four stores by making false statements about the finances of these operations to her son and refusing to approve any deal involving her son.

425.    Specifically, QSCVP Valerie Williams and Sharlene Smith refused to allow Johnson to sell the four stores to her son and pressured her to sell to white operators. But for Johnson's race, McDonald's would not have interfered in the sale of her restaurants to her son.

426.    Eventually, in 2018, Johnson was forced to sell her stores to a white buyer for half the price she originally paid. This interference in the sale further demonstrated McDonald's racial discrimination, as it forced Johnson out of the system at a loss, in favor of its preferred white owner/operator.

**Harold and Jeremy Lewis**

427.    Harold Lewis and his son, Jeremy Lewis, are former owners and operators of twenty McDonald's franchise locations in the San Diego and Las Vegas regions. They are Black.

428.     Harold Lewis purchased his first McDonald's franchise location in San Diego, California in 1987.  He would eventually become recognized for his leadership by both McDonald's and his local community. McDonald's recognized Harold with the distinguished "Ronald Award," which honors operators for outstanding service to the community. Harold is also a recipient of the McDonald's "Outstanding Store Award."

429.     When Harold Lewis purchased his first McDonald's franchise location in 1987, McDonald's was blatantly forcing Black franchisees into predominantly Black communities. It was at that time that Charles Griffis filed a race discrimination countersuit, asserting that Black individuals were systematically kept from buying store in white neighborhoods.

430.     In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores in Black neighborhoods, when Harold sought to purchase his first store, the Regional Vice President informed him that he was being offered a restaurant in a "rough area," referring to a predominantly Black community in the southern part of San Diego. McDonald's knew that these locations had low-volume sales and higher operating costs, such as higher security costs due to crime.

431.     Harold became one of only two Black operators in the San Diego region. Between 1987 and 2015, McDonald's would continue to direct Harold to predominantly Black communities that the company considered to be rough areas. McDonald's placed Harold in six such stores in Las Vegas when he decided to relocate and sell his San Diego stores in or around 2007.

432.     Harold sought to expand his business to more profitable locations but learned that McDonald's sought to deprive him of economic opportunities solely because of his race. For example, he learned that McDonald's was attempting to sell a profitable store that was

approximately six blocks from his store to a white owner/operator. McDonald's had not provided Harold notice or a fair opportunity to purchase the store that would impact his store's pricing and customer base.

433.    When Harold immediately complained to McDonald's about the sale of the new store, General Manager Cody Teets and QSCVP Bill Garrett informed him that McDonald's had already completed a Letter of Interest with the white operator, and intended to move forward with the deal.  Harold then complained to McDonald's corporate executives, including McDonald's President Jan Fields, that this would be another example of McDonald's following discriminatory expansion policies when it pertained to Black operators. Eventually, McDonald's stopped pursuing the deal.

434.    As a result, Cody Teets and other McDonald's staff retaliated against Harold. They attempted to prevent Harold from receiving McDonald's 365 Black Award and blocked Harold and Jeremy from growing their business. For example, Jeremy had purchased a McDonald's store in Las Vegas around 2013. He had worked in his father's McDonald's stores since approximately 1996 to learn the business, including working closely with store managers, shift managers, and field service consultants to ensure they met their goals and targets to drive profits. Jeremy completed the Next Generation Program and was approved as an owner/operator. Nevertheless, Cody Teets and other McDonald's executives prevented Jeremy from expanding to additional stores in retaliation for Harold's complaint about race discrimination. Jeremy sought to purchase another location that would impact his current store, but McDonald's sold it to a white operator instead.

435.    Around 2014, Cody Teets and other McDonald's executives also sought to prevent Harold from expanding his business after he completed his annual business review.

Harold sought to purchase two new stores in his area, but Teets alleged that Harold was not eligible for expansion based on "financial reasons." Harold later learned that there were no justifiable financial reasons for not expanding his business, and he was deemed expandable again six months later. However, the damage had already been done. During this time, Harold lost out on the opportunity to purchase the two stores.

436.    Teets and other McDonald's staff also provided Harold with misleading financial information about the impact a competing store would have on his restaurant.  Harold learned that Teets was attempting to sell two available restaurants near Harold's stores: one store was being sold to a white operator from another region. Harold told Cody there would be significant impact on his stores, but Teets assured Harold that the company projected less than a 7% loss of sales in his locations.  As a result of McDonald's misleading financial information, Harold's business lost approximately 30% of sales and revenue.

437.    In 2015, Teets and other McDonald's staff conspired to force Harold and Jeremy out of business.  As a result of the impact on his business from McDonald's misleading financial information, Harold sought to sell his impacted stores and to purchase a profitable store. McDonald's informed Harold that a deal was viable if Jeremy sold his store to Harold. The two followed McDonald's guidance and Jeremy sold his store.

438.    After Jeremy sold his store, Teets and other regional staff altered the terms of the deal to prevent Harold from acquiring a loan to purchase the store. McDonald's increased the store's price by approximately $300,000 at the eleventh hour of negotiations and never approved the bank loan.

439.    To remedy the situation, Harold attempted to sell Jeremy back one of the stores. Jeremy sought to purchase the store, but McDonald's staff informed him that he could not apply.

McDonald's asserted that since Harold was leaving the business, Jeremy did not have enough experience and could not be a solo owner/operator, even though Jeremy had been involved in the business for nearly 20 years. White operators, including Tom Ault, were allowed to exit and sell their business to their children. McDonald's failed to provide any legitimate business reasons for the denial of Jeremy's franchise opportunity, or why similarly situated white operators were treated differently.

440.    Ultimately, by 2015, Harold and Jeremy had owned and lost nine stores and Jeremy had owned and lost one store.  But for Harold and Jeremy's race, McDonald's would not have prevented the purchase and sale of stores, which destroyed a nearly 30-year process of creating generational wealth and ownership for themselves and their family.

### Joseph Mbanefo

441.    Joseph Mbanefo is a New York resident who owned and operated five stores in Brooklyn, New York. He is Black.

442.    Mbanefo had an extensive career in budgeting and finance. After receiving a master's degree in public finance, he had several leadership positions, including Budget Analyst for the City of New York's Department of Finance, Budget Director for the City of New York's Department of Juvenile Justice, and Acting Assistant Commissioner of Finance for the Department of Juvenile Justice.

443.    In 1996, Mbanefo asked to purchase a McDonald's location in Long Island, where he lived. McDonald's refused without providing an explanation.

444.    In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores, McDonald's offered Mbanefo such a store in a high-crime area of Brooklyn on Pitkin Avenue, as well as a satellite store four blocks away on Belmont Avenue. Regional Manager Paul Facella told Mbanefo that McDonald's wanted to

place him in this neighborhood. Mbanefo understood this to mean that McDonald's was placing him in this location because he was Black and would not have placed a white owner/operator there.

445.    Mbanefo faced serious security concerns at the Belmont Avenue and Pitkin Avenue locations, as well as another location he acquired on Rutland Road. Individuals would routinely jump over the counter, attack his staff, take money from the cash registers, and flee. Mbanefo initially hired security officers but they were unable to control the situation. As a result, he hired private security officers with attack dogs to protect himself and his staff. He closed the store at 5–6 PM every evening because customers were afraid to enter the store after dark.

446.    Though Mbanefo showed the security videos from his stores to his assigned Business Consultant and told Facella that he did not want to die in his store, they did not respond.

447.    For years, Mbanefo asked Facella and QSCVP Bill Lowery to close the Belmont Avenue and Rutland Avenue stores, given the security concerns, but McDonald's refused to do so. Regional Manager Art Alamo and Lowery told him that if they closed the store, Mbanefo would not receive another store in the New York region.

448.    Lowery and McDonald's continued to hinder Mbanefo's growth prospects, telling him he would never be able to grow his franchise in the New York region. Still, Mbanefo was eager to expand, even if it meant purchasing stores in a different region. Lowery and Alamo proposed two locations in Philadelphia.

449.    Mbanefo visited the stores in Philadelphia and was horrified to find that they were located in a high-crime, unsafe neighborhood. He refused to take them on. A fellow franchisee named Al Chambers, a Black man Mbanefo had trained with, ended up purchasing the

Philadelphia stores and was shot and killed at work. Chambers died in the hospital when Mbanefo when to visit him, and Mbanefo was tasked with informing his wife and children of his death. McDonald's refused to close the store, even for Chambers' funeral, and the event haunts Mbanefo to this day.

450.     But for Mbanefo being Black, McDonald's would never have directed him to this location, as further proven by whom they selected as the store's buyer.

451.     Soon thereafter, McDonald's demanded that Mbanefo renovate his Pitkin Avenue location because it was old and in poor condition. The renovation cost $2 million. When he agreed to renovate, Mbanefo asked to renew his 20-year lease on the Pitkin Avenue store, which was typically granted to franchisees who conducted significant remodels. Director of Operations Mary Steidel refused without offering a reason.

452.     Following the renovation, sales at the Pitkin Avenue store skyrocketed. With the increase in revenue, Regional Manager Steve Kerley started pressuring Mbanefo to sell the store.

453.     When he refused to sell, McDonald's deployed its tactic of forcing Black operators out of the system by increasing their inspections of Mbanefo's stores. Kerley and Business Consultant Lori Prymak began harassing Mbanefo with unannounced inspections of the Pitkin Avenue store, starting as early as 7 am. Kerley and Prymak would arrive at the store in white sneakers and would point at the marks on their shoes after inspecting his store. During one inspection, upon seeing a photo of The Beatles in the store lobby, Kerley asked Mbanefo how he ended up working for McDonald's if he did not know anything about The Beatles' music, implying that Mbanefo did not have the same knowledge or cultural experience as someone who was white.

454. Mbanefo is not aware of any white owner/operators who were subject to the same kind of unannounced, early morning inspections. McDonald's would not have subjected him to such demanding inspections or pressured him to sell a successful store if he were a white owner/operator.

455. Aware of Mbanefo's continuing desire to expand, Director of Operators Mary Steidel, Field Service Manager John Stantonastasso, and Business Consultant Ken Pilar approached him about purchasing three stores from Rick Yandoli, a white owner/operator who had filed for bankruptcy.

456. Mbanefo, Yandoli, and McDonald's negotiated a deal for Mbanefo to purchase the three stores for $3.6 million around 2010. At that time, Mbanefo was not eligible for growth but McDonald's told him not to worry about it. Within a few weeks, they informed Mbanefo that they would conduct another inspection and gave him a passing business review, which made him eligible to grow and buy the Yandoli stores. The most profitable store was instead sold to Paul Handel, a white operator. Were it not for Mbanefo's race, he would have been allowed to purchase the most profitable store as part of the package.

457. Three weeks before the deal was finalized, Senior Vice President and Chief Restaurant Officer Mason Smoot called Mbanefo to inform him that the most profitable of the three stores was being pulled from the deal. Ultimately, Mbanefo purchased the other two stores for $2.6 million.

458. Linda Brinkman, McDonald's accountant, referred Mbanefo to John Sharkey, another accountant affiliated with McDonald's, who convinced him the stores were worth $2.6 million.

459.     Brinkman coordinated the loan for the two stores with Lake Forest Bank. Sharkey

prepared the paperwork and Sandy McCraren arranged the loan for which Mbanefo would pay

$53,000 per month. They promised that Mbanefo would receive a 20-year loan on the stores as

soon as they received it from the landlord.

460.     Around 2010, to check Sharkey's calculations, Mbanefo hired a new accountant,

Jennifer Lepore, who analyzed the loan and found that he was overpaying by about $15,000-

$20,000 per month for the Yandoli stores. When Lepore and Mbanefo approached Brinkmann,

Smoot, Kerley, and Brinkman about this inconsistency, they refused to listen to him. Lake Forest

Bank ultimately admitted that it was attempting to charge him the wrong amount for the loan.

461.     In turn, Mbanefo requested that his overpayment be returned to him, and that they

adjust his future payment schedule. McDonald's refused to provide Mbanefo with adequate

financial relief for their own failures. Instead, McDonald's merely provided Mbanefo with an

additional loan to create more unnecessary debt for him.

462.     Since McDonald's refused to provide Mbanefo with adequate relief, McDonald's

sent Mbanefo a notice to take over his store immediately. As a result, Mbanefo was forced to file

bankruptcy.

463.     In 2012, McDonald's subjected Mbanefo's Conkland Avenue location to a

surprise audit without providing a reason. An auditor inspected his records for two days and

found nothing. He passed the audit with flying colors.

464.     That same year, McDonald's forced Mbanefo out of the system. He received an

offer to purchase all four stores for $6.3 million and $5.1 million from Jacques Lawrence and

Bruce Corley, respectively. In breach of the Franchising Agreement, McDonald's refused to

approve the offers without providing a reason.

465.    Eventually, in December 2012, Mbanefo sold his four stores back to McDonald's at a loss, for $2.3 million. But for Mbanefo's race, McDonald's would not have interfered with the sale of his stores to particular sellers that resulted in a multi-million dollar loss. Additionally, after ignoring Mbanefo's years-long pleas to close the Rutland Road and Belmont Avenue stores, McDonald's shut the store down only after it had bought it back from him.

466.    As a result of the stress he experienced during his time at McDonald's, Mbanefo suffered a series of health issues, including developing blood pressure, diabetes, and suffering a stroke. While he experienced these health conditions during his tenure at McDonald's, Marty Balls insisted she wanted to visit Mbanefo while he was sick but Mbanefo refused and opted to meet with her at a nearby Marriott hotel. Balls insisted Mbanefo bring all of his medications to make sure he was not lying about his illnesses, which Mbanefo did.

### Lois and Mitchell McGuire

467.    Plaintiffs Lois and Mitchell McGuire are former owner/operators of four McDonald's franchise locations in Newark and Jersey City, New Jersey. Mitchell was a retired Newark police officer when he began his second career with McDonald's. They are Black.

468.    In 2000, McDonald's offered the McGuires their first location in Newark, New Jersey. In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores, the restaurant was a low-volume store located in a high-crime neighborhood and required 24/7 security, which the McGuires had to pay out-of-pocket. Security alone cost them $100 per day.

469.    The McGuires were hesitant about the location, but they felt it was their only option to get into the McDonald's system. They ultimately decided to purchase the store. Had the McGuires not been Black, McDonald's would not have offered them this location.

470.    Despite the many obstacles the location presented, the McGuires were able to increase sales. Even so, those sales did not offset the security costs. The McGuires asked their Regional Manager several times if McDonald's could provide financial assistance or a rent reduction. The McDonald's Regional Manager refused to provide the financial assistance, which McDonald's routinely provided to similarly situated white franchisees, solely because they were Black.

471.    After purchasing the first location, the McGuires asked McDonald's about additional franchise opportunities. Again, McDonald's offered them another location in Newark that required heavy security. But for their race, McDonald's would have offered the McGuires other locations with greater revenue and lower costs. The McGuires purchased this location.

472.    McDonald's enforced its renovation standards more stringently on the McGuires, as compared to white owner/operators, solely because of their race and in violation of the franchising agreement. After operating this second location for about a year, McDonald's told the McGuires that the restaurant needed extensive remodeling. McDonald's never informed the McGuires during purchase negotiations that these remodels would be required to operate the store. The McGuires could not afford those renovations.

473.    Because the McGuires could not afford the renovations, they were forced to sell their two restaurants. McDonald's would not allow them to participate in the sale of the restaurant and instead presented the McGuires with its own pre-selected buyer.

474.    In 2007, McDonald's offered the McGuires two locations in Jersey City, Jersey. McDonald's did not disclose that these locations, like those in Newark, required extensive remodeling and heavy security paid for out-of-pocket. McDonald's did not allow the McGuires to purchase restaurants on the open market. The McGuires could only purchase from or sell to

91

persons that McDonald's presented to them. With no other options, they decided to purchase these locations.

475. In 2007, the McGuires took full control of the Jersey City location on Mallory Avenue. After they took over, one of the location's managers informed them that the former owner/operator had switched all the equipment with old or broken equipment from another location he had owned. The managers had informed McDonald's. Both the managers and the McGuires informed the company that all their equipment was old or needed to be replaced, but the company did not address these issues.

476. After owning the Mallory Avenue location for a year, McDonald's informed the McGuires that they would need to completely remodel the restaurant. The McGuires could not afford the remodel. Like their Newark locations, they were forced to sell the Mallory Avenue location.

477. In 2007, the McGuires purchased a McDonald's franchise located in a strip mall on Grand Street. This location also required significant security paid for out-of-pocket. They entered this contract under the impression that McDonald's would cover some of the security costs. Their contract covered "cam charges" paid to McDonald's, which were supposed to pay in part for a patrol car in their parking lot. These charges significantly influenced their decision to buy this location.

478. McDonald's never provided that patrol car despite the McGuires' payments. They had to once again pay out-of-pocket for 24/7 security after already paying their contractual "cam charges." In effect, they had to pay for security twice.

479.     On May 21, 2011, the Grand Street location burned down in a fire. Under the terms of their franchise contract, the McGuires could not find their own contractor to complete the rebuild. Instead, they had to rely on McDonald's to complete the rebuild.

480.     For the year that the store was closed for the rebuild, the McGuires had to pay rent, service fees, and cam charges. McGuire wrote a letter to the company's CFO, citing unfairness, but the company did not meaningfully respond. The McGuires had to continue paying these fees.

481.     The McGuires' insurance refused to continue to pay the McGuires' rent and service fees, as well as other expenses while the restaurant was closed, because they believed the contractor McDonald's hired was taking too long to complete the rebuild. McDonald's excused the delay by claiming that the construction manager was ill, and the McGuires had to wait for him to recover before the reconstruction could continue. The McGuires asked for a replacement construction manager, but McDonald's refused solely because of their race. This contrasted with other white owner/operators discussed, who McDonald's offered financial assistance to due to more minor operational challenges, like traffic issues or road closures.

482.     As a result, the McGuires were forced to take out a home equity loan to make up for the lack of insurance payments.

483.     The McGuires were forced to sell this location to cover their losses. Additionally, McDonald's took the balance of the owed rent and service fees from their closing settlement when they sold the restaurant.

484.     During their time as owner/operators, Mitchell served as the President of the Black McDonald's Operators of America. He had several meetings in his role with company executives seeking to advance racial equity in restaurant sales by addressing systemic problems

Black operators faced. McDonald's retaliated against the McGuires for this advocacy by offering them restaurants with high operating costs.

**Scott and Dwight Miller**

485.     Scott Miller and his father, Dwight Miller, are former owners and operators of eight McDonald's franchise locations in Champaign, Illinois. They are Black.

486.     Dwight Miller purchased his first McDonald's franchise location in St. Charles, Missouri 1997. When McDonald's implemented its parity program in 2000, Dwight sold the St. Charles store and purchased seven McDonald's stores in Champaign, Illinois.

487.     In September 2011, McDonald's approved Scott to become a franchisee through the Next Generation program. Three months later, in December 2011, Scott purchased one of the stores from his father.

488.      During their tenure as owner/operators in Champaign, the Millers were the only Black McDonald's franchisees in central and downstate Illinois.

489.     Between 2008 to 2017, Dwight and Scott Miller were recognized for their leadership by both McDonald's and their local community. Fellow McDonald's franchisees elected Dwight to be Chair of the Regional Leadership Team, a position he served in for four years, and Representative for the National Leadership Committee. In 2012, Parkland College awarded Dwight its Entrepreneur of the Year award. In 2014, Central Illinois Business Magazine recognized Scott as its 40 Under 40 "Man of the Year."

490.     In 2017, three years before five of their stores' leases would expire, Scott and Dwight began talks with then-Vice President of Operations Alvaro Bonta, their Field Service Manager Cindy Armstrong, and their Regional Controller about rewriting the leases for their stores. Scott also asked about purchasing four of the stores from his father, which Bonta and Armstrong verbally approved.

491. On February 21, 2018, the Millers met with the new Vice President of Operations Chioke Elmore for what was supposed to be an introductory informational meeting.

492. Instead, Elmore informed them that Scott could not purchase Dwight's four stores and that they would not be rewriting their five stores when the leases expired in 2020. Elmore justified this decision by telling the Millers that their stores' sales were below the average of TV market sales, meaning the sales of other stores within the same media or television market. Millers had never heard of McDonald's using TV market sales as a metric of a store's performance before.

493. Dwight attempted to explain that their sales were cyclical and could depend on how well the University of Illinois football team was doing, given that their games drove more business into the town. Additionally, the store was above the regional average in almost every category that McDonald's considers during reviews. Elmore did not want to hear it.

494. On April 8, 2019, the Millers wrote a letter to McDonald's Rewrite Committee, appealing Elmore's decision not to rewrite the lease on their five stores. They cited the fact that in their experience, McDonald's always gave a specific reason for deciding not to rewrite the store that related to the restaurant, plus an opportunity to correct the problem. They concluded: "We are assuming that McDonald's is holding everyone to the same standard."

495. On May 7, 2018, Elmore, Armstrong, and new Field Service Manager Brian Temple conducted a business review of the Millers' stores and gave them a failing grade. This was the first time the Millers had not passed a business review.

496. Elmore, Armstrong, and Temple looked for reasons to mark down the Millers on sections of the review. For example, they failed them on the "People" portion of the review for not having Hamburger University-certified managers. When the Millers produced their

managers' Hamburger University certifications, Elmore said that those certifications were not in their system, though that was not a requirement. Temple called the Millers afterwards and apologized for how Elmore had spoken to them during the review.

497.    As a result of failing their business review, the Millers were no longer eligible for expansion and Scott was no longer eligible to purchase his father's stores.

498.    On May 15, 2018, Elmore called the Millers to inform them that the Rewrite Committee had denied their rewrite appeal.

499.    In spring 2018, the Millers decided to put their restaurants up for sale. Elmore provided them with a list of three potential buyers, including Brad Davis.

500.    The Millers searched for other potential buyers who were eligible for expansion in their region. They began working on a deal and drew up a contract with one such owner/operator, Blake Linders, to purchase their stores for $15.5 million. Linders, who is white, informed McDonald's that he was planning on buying the Millers' stores.

501.    However, in October 2018, Linders withdrew from the deal. McDonald's told him he was not able to purchase the stores because his sales were below the TV market sales in the region. Management also made a comment about Linders's children potentially not being accepted into the Next Generation program and his own stores not being rewritten if he purchased the Millers' stores.

502.    Facing the 2020 deadline to sell their stores, the Millers were boxed into a corner to sell them to Elmore's pick, Brad Davis—a white owner/operator—for $12.25 million. Thirty-three months after the Millers sold their stores to Davis, Davis sold them to Blake Linders for $24 million.

503.    McDonald's denied the Millers' rewrite request because they were below TV market sales, but allowed Linders, a white owner/operator whose sales were also below the TV market, to purchase more stores. Store sales below the TV market were never a reason to deny rewrite. But for the Millers' race, McDonald's would not have denied their rewrite request nor Scott's purchase of his father's store on the pretextual basis of the TV market metric. If McDonald's had not discriminated against them, the Millers would have continued to operate successful businesses.

504.    McDonald's denied the Millers' deal with Linders but later allowed a white owner/operator, Davis, to sell the same stores to Linders for twice their purchase price. This interference in the sale further demonstrated McDonald's racial discrimination, as it forced the Millers out of the system at a loss, in favor of its preferred white owner/operator. But for the Millers' race, McDonald's would not have interfered with their sale to Linders and caused them to lose $11.75 million on the sale.

**Dawn Mussenden**

505.    Dawn Mussenden owned and operated five McDonald's stores in the New York and Atlanta regions. She is Black.

506.    Before working at McDonald's, Mussenden had a well-paying job in financial management and was the leader of her finance group. Given her husband's entrepreneurial ambitions, she decided to change her career path and trained with her husband at Hamburger University to become a franchisee.

507.    As Mussenden and her husband prepared to buy their first restaurant in the New York region, her husband told the Regional Manager that he was not interested in buying a store in the outer boroughs of New York City, given his concern for their safety.

508. The Regional Manager eventually offered them a restaurant that would be built on Central Islip on Long Island. Mussenden and her husband would be the first Black owners on Long Island, a fact they took pride in. However, in keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores, the Central Islip store was a low-volume and unprofitable location.

509. However, Mussenden became concerned when she attended a Long Island operator's meeting and learned that all the white operators had turned the restaurant down. They warned her that it was a bad deal, even though the Regional Manager told Mussenden that the restaurant's sales would reach $2 million. As the white operators had forewarned, sales never came close to that figure. Solely because they were Black, the Regional Manager pigeonholed Mussenden and her husband into a store that no white operator wanted to take on.

510. The restaurant was located in a high-crime area of Central Islip, and several robberies occurred at the store, as well as regular drug use. Mussenden and her husband needed to hire security to ensure the store's safety, but could not afford to pay security guards every night. Mussenden asked McDonald's for financial assistance to help cover security costs, but McDonald's refused. Tragically, one night when security was not at the store, one of her favorite employees was killed in a robbery.

511. Other white operators told Mussenden that McDonald's had paid for their stores' security when asked. But for Mussenden being Black, McDonald's would have helped offset her security costs.

512. McDonald's later offered Mussenden and her husband a store in a mall on Long Island. Mussenden faced issues with this location as well because the mall charged rent based on the store's square footage, not based on gross sales, as was McDonald's typical practice.

513.    She and her husband asked McDonald's to negotiate with the mall, but they never did. Because of the high costs, they were eventually forced to sell the restaurant for virtually nothing to another operator. That operator, in turn, faced so many challenges with the restaurant that he left shortly thereafter.

514.    McDonald's made promises to the couple about providing other opportunities for expansion to them, but never followed through. For example, the Regional Manager told them he planned to offer them a restaurant on Sunrise Highway—an opportunity the couple was excited about. However, McDonald's ended up selling that restaurant to a white operator.

515.    A few years later, McDonald's offered the couple a three-restaurant deal. One store was located in a dangerous neighborhood. The couple begged McDonald's to exclude that store from the deal.

516.    The restaurants McDonald's offered to the couple followed the same pattern: low volume, high rent, and high operation costs. When better opportunities came along, Mussenden and her husband saw them go to white operators. McDonald's pegged the couple for undesirable franchise opportunities and denied them more appealing ones solely because of their race.

517.    When Dawn and her husband got divorced, they divided their three remaining restaurants. Mussenden took one restaurant ("Roosevelt"), which she worked tirelessly to improve. She brought sales up to $2.7 million and won awards as a result, including a corporate trip to the Bahamas.

518.    Despite her success at Roosevelt, when she inquired about buying more restaurants, specifically McOpCo restaurants in her area, McDonald's told her none were for sale. However, a white operator, who already owned 12 to 13 other restaurants, was able to purchase one of the McOpCo stores for his son in the NextGen program. Had Mussenden been

white, McDonald's would have offered her expansion opportunities in her area, given her demonstrated record of success.

519.    Given McDonald's refusal to provide her with expansion opportunities, Mussenden decided to seek them out for herself. Mussenden heard about an operator in Brooklyn who was going into bankruptcy and selling his store, and she asked the Regional Manager whether she could purchase it. The regional manager hemmed and hawed, saying he would look into it, and that the decision was ultimately that of McDonald's corporate headquarters. Mussenden was never offered the store.

520.    This followed a pattern Mussenden had observed and personally experienced: McDonald's franchisees received the best restaurants if they were white and the worst restaurants if they were Black.

521.    Eventually, Mussenden purchased two other stores from a friend who was retiring in Atlanta. On paper the stores looked promising, but Mussenden did not know when she purchased them that a new development was being built near the stores that would include several competitors' restaurants.

522.    Mussenden approached the Regional Manager to ask for assistance due to the unexpected competition in the area. After several meetings, McDonald's would only agree to a very small amount of assistance, which was not nearly sufficient to make up for the loss of sales due to the development.

523.    McDonald's regularly provided much greater assistance to white owners-operators. Mussenden was personally informed by white owner-operators that they paid only 4% rent and received substantial assistance from McDonald's. Mussenden would have received such financial assistance and support but for being Black.

100

524.     Eventually, the QSCVP Valerie Williams came to her store and told her that with "all the things coming down the pike" with the Bigger Bolder Vision 2020 plan, she did not believe Mussenden was in a financial position to keep the store and should sell it. Williams' comment aligned with McDonald's corporate executives' awareness that Bigger Bolder Vision 2020 would decimate Black franchisees' operations and their decision to force Black owner/operators to comply with the modernization program anyway.

525.     After that meeting, McDonald's deployed its tactic of forcing Black operators out of the system by increasing their inspections of Mussenden's stores. Mussenden was subject to constant, unannounced store inspections. The business consultants conducting the visits were condescending towards her and her employees.

526.     During the worst visit, a business consultant opened a meat cabinet, screamed that the meat was expired, and slammed the contents of a meat container on a prep counter, causing the meat to fly everywhere. Mussenden's employees were traumatized, and Mussenden cried in her car after the inspection.

527.     Ultimately, Mussenden decided to sell her stores. When Mussenden was in the process of selling them, she spoke to a white operator and mentioned that her rent was 12%. The white operator told her he had never paid rent that high. McDonald's charged Mussenden an objectively higher amount of rent solely because she was Black.

**William Rasul**

528.     William Rasul owned and operated three McDonald's stores in the Atlanta region. He is Black.

529.    He would eventually become recognized for his leadership by both McDonald's and their local community.  Rasul served on the board of directors for the Old National Merchants Association, and was named businessman of the year in the City of College Park.

530.    Rasul began working at McDonald's in 1979 as a maintenance man.  Eventually, he became an Operations Manager, overseeing approximately 25 restaurants.

531.    After working for McDonald's for 20 years, Rasul purchased his first store as a franchisee in 1999.  In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores in Black neighborhoods, between 1999 and 2010, McDonald's placed Rasul into such stores, with low-volume sales and higher operating costs due to crime, higher insurance rates, and higher employee turnover, solely because of his race.  For example, Rasul regularly had to purchase bulletproof windows. Insurance companies required him to replace his security guards with certified law enforcement officers. McDonald's never provided an opportunity or considered Rasul for a store in a neighborhood that was not predominantly Black.

532.    McDonald's denied Rasul financial assistance in the form of rent relief, routinely offered to white owner/operators in the region like Doug Taper and Stanford Delky, solely because he was Black. For instance, McDonald's relegated Rasul to another store in a substandard location, specifically a store in Riverdale that was non-compliant with the American Disabilities Act and required a complete remodeling.  McDonald's then required Rasul to remodel the store within a short timeframe not required of white franchisees. Rasul asked Vice President of Operations for the Atlanta Region Debbie Stroud and David Neese for financial assistance, including a loan to repair and remodel the store, but they denied his request.

533.     McDonald's deployed its tactic of forcing Black operators out of the system by increasing their inspections of Rasul's stores to generate bad business reviews. In turn, they relied on the poor business reviews as a pretext to force him out of the McDonald's system. Inspectors would regularly arrive unannounced with a goal of documenting the smallest infraction. Stroud would deputize regional staff and inspectors to conduct these visits. At one point, Stroud went so far as to accuse Rasul of using drugs. But for Rasul's race, he would never have been subjected to these unreasonable inspections and accusations.

534.     As a result of McDonald's continuing misconduct alleged herein, Rasul was forced to sell his stores in 2010 and file for bankruptcy.

### Dwayne Richard Johnson

535.     Dwayne Richard Johnson is a former owner/operator of two McDonald's franchise locations in Philadelphia, Pennsylvania. He is Black.

536.     Johnson began learning about operating McDonald's franchises at age 17 though working at his uncle's, Bob Wright, restaurants in Philadelphia. Johnson started off completing various maintenance jobs. As the years progressed, his uncle gave him more responsibilities. Johnson developed a passion for McDonald's and dreamt of becoming a franchise owner.

537.     After college, he moved to Boston to work full-time with Dow Chemical. In 1985, he left to follow his dream of becoming an operator. Johnson began running operations as a manager and supervisor at his uncle's restaurants.

538.     Johnson first witnessed McDonald's discrimination again Black operators when sales at one of his uncle's restaurants began to dip. In response, McDonald's began to subject the restaurant to incessant inspections. Johnson and his uncle told the company that the sales dip was due to a fence that had been built in the area, which impeded access to the restaurant. However, McDonald's honed in on operations, old equipment, and his uncle's inability to upgrade the

equipment, and built a case against his uncle as an operator. His uncle was forced to sell the restaurant.

539.    Johnson was a well-regarded manager who had won management awards. As a result, the company offered him jobs as a manager for other restaurants. He made it known to the company that his goal was to become an operator.

540.    In 1991, he received a call that a Black operator was selling his restaurant in North Philadelphia. Since Johnson did not have the capital to buy it on his own, McDonald's offered to place him on a fast-track program where he would function as an owner but receive a salary from the company. In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores, McDonald's placed Johnson into such a store in North Philadelphia.

541.    During the sales process, Johnson noticed that the Black operator of the Philadelphia restaurant seemed to have been pushed out and forced to sell in a similar way to his uncle. He also knew the store was in a difficult neighborhood and would be challenging to maintain. Even so, he was thrilled to become an operator and was unsure if he'd receive another opportunity.

542.    By 1993, Johnson took over the restaurant as a traditional owner. Though it was a challenging store, he ran it well and increased sales.

543.    In 2000, McDonald's offered him the opportunity to buy a second restaurant. This West Philadelphia restaurant was similar to his first—a two-story restaurant in a rough neighborhood. The restaurant was in poor condition and needed a lot of work. Johnson had not been offered a second store in his seven years as an operator, so he accepted the restaurant

despite its challenges. However, McDonald's would not have offered Johnson this location were it not for his race.

544.     Around 2005, McDonald's deployed its tactic of forcing Black operators out of the system by increasing their inspections of Johnson's stores. Johnson started to receive more frequent inspections in both locations. The business consultants told him that each location needed repairs and remodels. Johnson ended up spending $300,000 to remodel his first restaurant.

545.     Since Johnson did not have the funds to remodel the second location, McDonald's arranged a buyer for Johnson to sell the restaurant to. Regional Manager Harry Coaxum told Johnson that he would get a better restaurant in exchange for selling. That never happened.

546.     Johnson started preparing to seek approval for rewrite on the first location. He met with an accountant to make sure the restaurant's numbers were where they needed to be. Johnson met with his accountant, the Regional Manager and Cedri Jones, the Regional Vice President. During that meeting, Jones verbally promised to rewrite his restaurant.

547.     When the time came to actually renew the lease, Johnson was denied rewrite. Jones denied ever promising the rewrite to him. McDonald's told Johnson they were denying him the rewrite based on not meeting the financial ratios required and certain operational issues. However, to make this argument, they needed to pull Johnson's financial ratios from 8 years back. In terms of operations, Johnson had done the remodels and reinvestments required of him. McDonald's reasons for denying the rewrite were pretextual, as it sought to push out a Black owner/operator who had turned around difficult stores, solely because of his race.

548.     Having worked for the company since he was 17 years old and given everything to it, Johnson was devastated for his career at McDonald's to end in this way.

**Jeffery Rogers**

549. Jeffery Rogers owned and operated McDonald's stores in the Jacksonville region of Florida. He is Black.

550. In August 2005, after completing his franchisee training, Rogers purchased a stand-alone McDonald's store and a McDonald's store within a Walmart as part of a package deal in Jacksonville, Florida. In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores, McDonald's placed Rogers into such a store, located in a high-crime area in Jacksonville.

551. Rogers' purchase of the stores was brokered by Jim McCabe, the QSCVP for the region in May 2005, who had personally pitched the sale as "the perfect two store deal" to Rogers and his wife. The stores were located on the north side of Jacksonville, a predominantly Black, low-income, and high-crime area.

552. McCabe told him that the restaurant would be an excellent fit for him and his wife based on the area's demographics. McCabe said that the neighborhood would benefit greatly from having two professional Black role models running the store with the promise of growth, because the north side was expanding.

553. Rogers understood this to mean that he and his wife fit the profile for dealing with a "difficult" demographic and area because they were Black. Indeed, but for their race, McDonald's would not have directed them to that restaurant.

554. McCabe underscored that point by informing Rogers that regional leadership— General Manager Charlie Roberson, Director of Field Services Walt Maney, and Franchising Director Marion Foran—wanted to keep a Black operator in these stores.

555. McCabe passed along Ken Meeks' phone number, then the current owner/operator, and instructed Rogers to talk to him about his interest in buying the stores.

Meeks told Rogers that regional leadership had instructed him only to speak to Rogers and no other prospective buyers.

556.    During his first walk-through of the restaurant, Rogers became concerned about maintenance issues including the ISP register system, the grills, and the HVAC. During closing, Rogers complained about those issues and was reassured by Field Service Manager Marcia Keeney and Field Service Consultant Scott Mason that they were acceptable and met McDonald's standards. Rogers relied on those statements in his decision to purchase the restaurant.

557.    In reality, they were all expensive reinvestment issues. Six months later, Mason informed Rogers that he needed to replace these items to pass his annual business review.

558.    McDonald's enforced its renovation standards more stringently on Rogers, as compared to white owner/operators, solely because of his race and in violation of the franchising agreement. When Rogers questioned why he needed to replace them as he had recently been told they were acceptable, Mason simply stated that they needed to close the deal with Meeks before the end of the month and it was now Rogers' responsibility to replace these items. In total, those renovations cost Rogers $100,000.

559.    Additionally, following the sale, a former employee informed Rogers that the restaurant had been temporarily closed for five days in March 2005, due to a major rat and roach infestation problem, as well as other food safety concerns. McCabe had not disclosed this information during the sale.

560.    Despite the obstacles, Rogers passed his business reviews and became eligible for growth. But the franchising team continued to present him only stores located in high-crime, low-income, Black communities around the country. Between 2004 – 2005, McDonald's

approached Rogers about purchasing stores in "inner-city" areas of Atlanta, West Philadelphia, Columbia, SC, Selma, AL, Charlotte, NC, and Baltimore, MD.

561.     None of the white registered applicants Rogers knew from franchisee training were offered stores in the African American Consumer Market. Neither would Rogers have been offered such stores but for his race.

562.     During his business review in 2007 or 2008, Finance Director Allison Peck stated that maybe Rogers was not cut out to be a businessman and should reconsider going back into law enforcement.

563.     Rogers was caught off guard and insulted by her comment, which he believed to be racially motivated. He asked his white counterparts at the co-op meeting if they had received similar comments and they said they had not.

564.     After Rogers spoke to Field Service Manager Marcia Keeney about the lack of assistance he had received from Roberson and McCabe, Roberson deployed McDonald's tactic of forcing Black operators out of the system by increasing inspections of Rogers' stores. The corporation created an environment where, despite Rogers' best efforts, they would not allow him to achieve success.

565.     Rogers spoke to his white counterparts at co-op meetings, including Dave Mullins, Tom LeSanti, Joe King, and Awilda Duffy, who said they were not receiving such frequent inspections. McDonald's had pegged him as an owner/operator they wanted to force out of the system.

566.     As a result of the stress of operations, Rogers suffered three heart attacks between 2007 and 2010. The unannounced inspections continued unabated even while he was in the hospital.

567.    When Rogers complained to Field Service Consultant Julie Woodruff about the relentless inspections, she began crying and told him, "It's not me, I'm only following orders and this is above my pay grade," effectively conceding that McDonald's had placed a target on Rogers' back.

568.    In 2007 or 2008, McCabe requested that Rogers and his wife meet with him and Regional Director of Field Service Bonnie Wiess at the Worldwide Convention in Orlando. McCabe offered Rogers and his wife two stores in another high-crime area in Jacksonville and again insisted that the neighborhood would benefit from the presence of two upstanding Black role models.

569.    When Rogers refused to take on the stores, Roberson called him and threatened to end his career.

570.     In winter 2009, Rogers requested a loan from Chase to complete required reinvestments for his store.

571.    In December 2009, Chase banker Dajuana Cohen emailed Rogers and let him know that she was waiting on an exception from the regional McDonald's office to approve the loan. Cohen asked him who he had "piss[ed] off" at the regional office and told him that she had been instructed by Finance Director Allison Peck and Roberson to deny his loan application, although his financials were in good shape.

572.    Rogers consulted with his white counterparts at a co-op meeting, including Awilda Duffy, Kathy Schurman, Dave Mullins, Tom Lisante, Mark Boozer, Jim Van Laere, and Joe King, to see if they had ever experienced or heard of anything like the McDonald's regional office withholding a loan approval. They had not. Indeed, Peck and Roberson were retaliating against Rogers for refusing to purchase stores in a high-crime, predominantly Black area.

573. On February 25, 2010, Linda Rogers, in McDonald's finance department, emailed Rogers and stated that his financials were acceptable and that he had exceeded the company's minimum target for cash flow.

574. But a week later, on March 6, 2010, Jay Mages informed Rogers that would be conducting an internal audit of the store, without further explanation. Rogers understood the audit to be further retaliation on McDonald's part.

575. On December 3, 2010, Field Service Director Harry Thomas threatened to place Rogers on a performance improvement plan during his business review. Immediately following the review, Rogers went into cardiac arrest and was shuttled into surgery.

576. While he was in recovery and his wife took over running the store, Field Service Manager Carolyn Shivers and Field Service Consultant Julie Woodruff continued conducting excessive, unannounced grading visits.

577. On December 23, 2010, Shivers and Woodruff conducted an unannounced grading visit while Rogers was still on leave. Rogers asked why they were conducting a visit on a busy holiday weekend while he was home recovering from a heart attack. He attempted to call their supervisor, Director of Field Services Harry Thomas, but he would not pick up the phone.

578. Ultimately, Rogers' doctor urged him to sell the store due to the stress it was putting on his health and his risk of a fatal heart attack. Despite receiving multiple offers for his store, in 2011, Charlie Roberson blocked those offers, thereby breaching the Franchise Agreement's stipulation that McDonald's could not arbitrarily withhold consent to a sale. Instead, Roberson sent Rogers a buyer he would approve.

579. In a final retaliatory act in February 2011, at Roberson's direction, Franchising Manager Carl Patula sent Rogers an NRBES M&R repair list, and required inflated

reinvestments in order to reduce sales profits. McDonald's used this well-known pattern and practice against operators forced out of the system.

580.     Rogers sold the store on May 1, 2011, after which the excessive field service visits stopped immediately.

### Carrie Salone

581.     Carrie Salone owned and operated two McDonald's stores in Atlanta, Georgia. She is Black.

582.     Prior to entering the McDonald's system as an owner/operator, Salone was a Public Health Director at the Center for Disease Control for 25 years. She received her Master's Degree in public health from Morehouse School of Medicine.

583.     As a McDonald's owner/operator, Salone was a pillar of her community and was frequently recognized for her leadership. She served on the Ronald McDonald House Board, served as the Vice Chair of the Atlanta Region Supply Chain, and as the McDonald National Gospel Chair. During her tenure, her restaurant won "Crew Person of the Year" award.

584.     In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores in Black neighborhoods, McDonald's directed Salone to such stores to purchase. In 2003, Salone worked with Franchising Manager Darryl Clarke to purchase her first store as a franchisee. Clarke proposed the Buckhead location in Atlanta—the only option presented to her.

585.     In 2006, Salone purchased another store from Lou Matti, a white owner/operator, in Decatur, Georgia, at the recommendation of Vice President of Operations for the Atlanta Region Debbie Stroud. Salone learned after the sale that it was a low-volume store that needed serious repairs and new equipment. During her discussion with Matti, he informed Salone that McDonald's had paid for most of his expenses during the time he owned the restaurant because it

was a low-volume, older store. However, McDonald's did not provide this same support to Salone solely because of her race.

586.    Following the sale, McDonald's awarded Matti a higher volume store in an affluent commercial district.

587.    Salone repeatedly approached Stroud, General Manager Sharlene Smith, and Vice President and General Manager Harry Coaxum to expand into more profitable locations and offset the costs of her lower-volume stores. She proposed locations including Alpharetta, Cobb, Dunwoody, and Gwinnett, where the owner/operators of McDonald's stores were predominantly white. All three denied her requests.

588.    By contrast, white operators, including J.M. Owens, Frank and Pat Phalen, Tim Phalen, Keith Sirockman, and Jim Abetti, who experienced sales decreases as a result of traffic issues or road closures were awarded additional restaurants to offset the financial burden. Due to racial discrimination, McDonald's blocked Salone from addressing the economic harm it had caused her by placing her in a low-volume store.

589.    On November 8, 2008, Salone sent an email to Regional Vice President Harry Coaxum, complaining about the unfair grading of her restaurants as well as Stroud's behavior and tone in their meetings. Coaxum requested that she summarize Stroud's inappropriate behavior in an email. He indicated that other BMOA operators had voiced numerous complaints about Stroud including her language, approach, and unannounced visits, as compared to white operators.

590.    Salone related that Stroud had told her she would not rewrite her restaurant. In response, Coaxum stated, "I am working with her on this issue as it relates to [her] treatment to Black operators." Salone also included in her email to Coaxum that two white operators—Ray

Justice and Keith Sirockman—had expressed that Stroud did not approach them in this manner, nor did they receive unannounced graded visits without notice. They stated that they would have kicked Stroud out of their restaurants if she had approached them in that manner. As a result, Coaxum was on notice of Stroud's racial discrimination against Salone.

591.    On January 9, 2009, Salone met with Stroud to request financial assistance for the Buckhead location as increasing real estate taxes were making operational costs higher. Salone was aware that Lou Matti and Keith Muller, both white owner/operators in the area, had been granted financial assistance.

592.    Rather than approving financial assistance, Stroud recommended to Salone that she sell both restaurants in order to purchase stores in more affluent areas. Again, because of her race, Salone was denied financial assistance that Stroud had approved for white owner/operators.

593.    Salone could not afford to sell both restaurants, given that she would need to forgo income and wait until McDonald's approached her with another available restaurant. She told Stroud that as a single parent of young children, she could not afford to sit out and wait for new restaurant opportunities that might not come. She therefore refused Stroud's proposal and requested to keep both stores and receive other opportunities to buy additional stores.

594.    In response, Stroud sent her a recap of their discussion and indicated that the situation would only get worse. Stroud and her staff began conducting graded visits of Salone's restaurants at late hours on weekdays and weekends. Stroud's Field Consultant Willie Jackson told Salone that he did not want to be in her restaurants at these off times, but that Stroud had instructed him to do so. He also indicated that other white operators in the region, like Keith Muller, Keith Sirockman, and Jim Abetti, were not being subjected to such visits.

595. In August of 2009, Salone was forced to sell the Buckhead store because the cost of maintaining it had become too high.

596. During her tenure as a franchisee, Salone expressed her concerns about her growth as compared to white operators to the NBMOA and her state representative. In turn, the NBMOA met with McDonald's leadership on several occasions and complained about their lack of support for Salone.

597. On November 16, 2015, Georgia State Representative Billy Mitchell wrote a letter to McDonald's, applauding Salone's extraordinary business leadership in her community and how she had helped build the McDonald's brand. He noted that he was aware of McDonald's unfair treatment of Salone as a Black, single-store operator, as compared to white operators, and expressed his disdain for McDonald's attempt to force her out of the system. Mitchell later recognized Salone at the state capitol for her leadership as a Black owner/operator in her community.

598. In retaliation for her complaints of discriminatory treatment to the NBMOA and to her state representative, between February and June 2016, McDonald's deployed its tactic of forcing Black operators out of the system by increasing their inspections of Salone's stores. General Manager Smith, Regional Director of Operations Tammy Branham, and Field Operations Manager Noel Blackwood started conducting several unannounced inspections of her restaurants.

599. In March 2016, Smith met with Salone and advised Salone to sell the Decatur store to Keith Muller, a white owner/operator who owned 15 other stores. Salone pled with Smith not to force her out of the system and stated that as a female Black operator with a single store and as a single parent, she would be leaving the system unwillingly. Indeed, Salone had

met with the bank a month earlier, which had told her that she was a long-term operator and McDonald's could easily help in this situation, meaning that the bank could provide additional funds for remodeling and restructuring.

600.    On March 15, 2016, the NBMOA leadership met with Sharlene Smith on behalf of Salone and expressed their concerns that they were forcing a Black single parent out of the system.

601.    McDonald's did not budge. Facing financial concerns and under pressure from McDonald's, Salone put her Buckhead store up for sale for $1 million.

602.    McDonald's urged Keith Muller to buy the store. He initially offered Salone $200,000 before coming back with an offer of $625,000. Salone learned that Smith had offered him 40% towards remodeling the restaurant if he bought the store at the higher price. Muller, as a white owner/operator, had been offered an incentive to purchase the store that McDonald's had never proposed to Salone.

603.    Smith contacted Salone and pressured her to sell the store to Muller, warning her that her circumstances would worsen and she would receive no support from McDonald's if she did not sell. Salone therefore was forced to sell the restaurant to Muller in 2016 at a loss. Had Salone been a white owner/operator, Smith would not have pressured her to sell a profit-generating store. Additionally, this interference in the sale further demonstrated McDonald's racial discrimination, as it forced Salone out of the system at a loss, in favor of its preferred white owner/operator.

604.    As a result of the pressure and financial stress from her time at McDonald's, Salone's mental health has suffered and she has sought therapy.

**Jeremiah Simmons**

605.    Jeremiah Simmons owned and operated two McDonald's stores in the New York region. He is Black.

606.    In 1997, Simmons purchased his first store in Wyandanch, NY, which was supposed to be part of a two-store package. McDonald's reneged on the original agreement and sold the second store to a white owner/operator.

607.    In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees in substandard stores, McDonald's proposed only such stores to Simmons as he sought opportunities to expand. The New York Regional Manager presented him with franchise opportunities in low-income, high-crime areas in Camden, Philadelphia (the same store that was offered to Plaintiff Joseph Mbanefo), and New Jersey. Simmons visited the stores and refused to take them on given their locations in high-crime areas. The Black owner/operator who took over the Camden, Philadelphia location was shot and killed in a robbery at the store. The Regional Manager would not have offered these locations to Simmons but for his race.

608.    In 2002, Simmons sold the Wyandanch store to buy a store in Brooklyn, NY, which required a complete rebuild. Four years later, in 2006, Simmons gave up the Brooklyn store to purchase a two-store package, both in Jamaica, Queens, known as "Parsons 1" and "Parsons 2."

609.    The stores were located in a high crime, low-income neighborhood. Simmons had to employ security guards at both locations.

610.    Given the low volume of Parsons 1, McDonald's asked him to close down the store in 2008.

611.    McDonald's never offered Simmons any opportunities to purchase stores in high-income, suburban areas, solely because of his race.

116

612.    McDonald's denied Simmons financial assistance in the form of rent relief, routinely offered to white owner/operators, solely because he was Black. Given the high rent fee on the Parsons 2 location, 17.25%, Simmons repeatedly asked his Regional Manager and Field Service Manager for rent relief. He approached them with his attorney and accountant. McDonald's never granted his requests.

613.    After the New York co-op voted to install McCafé in all of the region's stores, Simmons was forced to invest in a McCafé for his Parsons 2 location.

614.    Between the McCafé investment, dollar menu additions, his high rent fee, and McDonald's repeated denial of rent relief, Simmons could no longer afford to maintain his store and decided to sell.

615.    Simmons agreed to sell the store for $2.3 million to Dave Galinsky, a white owner/operator, who drew up a contract for the sale. However, USA Senior Vice President and Chief Restaurant Officer Mason Smoot requested to meet with Galinsky over dinner. Two days later, Galinsky rescinded his offer.

616.    The only remaining interested buyer was Bruce Colley, another white/owner operator that McDonald's had hand-picked to take over the store, who purchased the franchise location for $2.1 million in 2010. As a result of McDonald's interfering with the sale, Simmons lost $200,000. This interference in the sale further demonstrated McDonald's racial discrimination, as it forced Simmons out of the system at a loss, in favor of its preferred white owner/operator.

**Floyd Sims**

617.    Floyd Sims is a former owner and operator of seven McDonald's franchise locations in the Atlanta, Georgia, area. He is Black.

618.     In 2000, Sims entered the McDonald's franchise system after completing two years of unpaid training in the Registered Applicant Program and attending Hamburger University. Atlanta Regional Vice President Bill Lamar helped place him in a location in Atlanta on 4334 Fulton Industrial Boulevard ("Fulton" restaurant). In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores in Black neighborhoods, Lamar directed Sims to such a store, telling him that this location was an excellent opportunity for him. The store was in low-income area, but as with many similarly situated African Americans, Sims' choice was either to accept the offer or be denied the chance to become a franchisee, so Sims accepted the offer.

619.     Sims purchased the Fulton restaurant for $510,000 with a percentage rent of 8.5%. Unfortunately for Sims, the Fulton restaurant was plagued with issues from the very moment he received the keys. The store was located in one of the most dangerous areas of Atlanta. Despite the high crime rate of the area and the restaurant's poor track record, Sims was able to make the store profitable.

620.     As a result of his success with the Fulton restaurant, McDonald's soon awarded Sims another store. In 2004, having met the criteria for expansion, Sims entered into another franchise agreement with McDonald's for a store located at 5710 Fulton Industrial Blvd.

621.     In 2007, Sims purchased a store in Mableton, Georgia for $700,000 ("Mableton" restaurant). This store, like others in his organization, was also located in an economically depressed "inner-city" neighborhood.

622.     Shortly thereafter, in 2008, McDonald's built a much larger location nearby Sims' Mableton location. Rather than allowing Sims the opportunity to purchase the store, McDonald's awarded it to another white owner/operator.

623. This new McDonald's restaurant was detrimental to Sims' location. The impact of its competition caused sales at his Mableton store to decrease by approximately $300,000 per year.

624. Simultaneously, Sims' first restaurant, the Fulton restaurant, began losing money as the surrounding neighborhood experienced dramatic deterioration, due to a rise in crime.

625. In 2010, however, Sims was presented with an opportunity to grow his business and balance out his restaurants' financial situation with a better performing restaurant, after being approached by a white owner/operator, J.M. Owens, who wished to sell him four McDonald's locations.

626. Sims was willing and eager to purchase these locations but the sale was initially blocked by QSCVP Debbie Stroud, without providing a legitimate business reason.

627. McDonald's eventually approved the deal and Sims followed through with the purchase of four additional stores in Smyrna, Georgia and Marietta, Georgia, for $2.5 million. Sims became the first African American to own four stores in Cobb County. However, the stores were all older and in need of significant remodeling on tight timelines.

628. After he purchased the Marietta locations, Sims discovered that one of the Marietta locations was infested with roaches. This was something that McDonald's failed to disclose to him.

629. Another of Sims' locations, the Windy Hill Road store in Smyrna, was initially successful. However, in 2014, Sims learned from Max Bacon, Mayor of Smyrna, that McDonald's was building a new store in an area called "The Crossing" at 3260 South Cobb Drive, Smyrna, Georgia, close to the store Sims had just purchased.

630.   McDonald's wanted to sell the store to a white owner/operator, but Max Bacon told Sims to communicate to McDonald's that if Sims was not going to be the owner, Bacon would not approve the store's development.

631.   Sims first expressed his reservations about the store's financial projections to McDonald's Finance Manager Steve Stringler and requested a lower rent percentage rate in buying the store, given that he would need to shut down his current store nearby to make the purchase.

632.   McDonald's leadership was unwilling to lock in a permanent rent structure, and instead advised Sims that if the restaurant did not make any sales, then the rate would adjust in the future. They negotiated the percentage rate and McDonald's initially dropped it to 6% in May 2016. But only seven months later, in January 2017, McDonald's doubled the rent to 13%. The rent escalation had a detrimental impact on Sims' business.

633.   At the same time, Sims' original Fulton store continued to struggle financially. Greg Watson and QSCVP Valerie Williams would not entertain any options to close the store or allow Sims to sell it back to them.

634.   At that point, the restaurant had become more of a crime scene than a dining establishment. Multiple shootings and a murder had occurred on the Fulton restaurant's premise—an individual had been shot in the head in the parking lot.

635.   In 2015, Sims reached out to Watson and Williams for help. He detailed the situation with the stores and asked them to consider closing the Fulton restaurant, which had become a money pit and a liability at that point. The Fulton restaurant had also reached its expiration term for the lease and its closure would allow the other stores Sims owned to gain sales and turn a profit.

636.    McDonald's denied Sims financial assistance in the form of rent relief, routinely offered to white owner/operators, solely because he was Black. Specifically, Sims sent a detailed letter to Watson and Stringler that if they insisted on keeping the Fulton restaurant open, he would need their support in paying for an armed security guard and permanent rent reduction. He also asked for rent reduction at the Mapleton restaurant, which had a net positive cashflow of only $26,000 annually. The rent was 11% at that time and he asked for a 5% reduction over the next four years. Watson denied his request without providing a reason. By contrast, McDonald's had provided rent relief to other white owner/operators in the region, including Doug Taper and Stanford Delky.

637.    After McDonald's refused to close the Fulton restaurant, Sims informed them that he would not be seeking to renew the new agreement.

638.    Watson then advised Sims that the non-renewal of one restaurant in a franchise meant non-renewal of all the stores a franchisee owned. Sims did not want to lose all of his stores but was forced to sell the remaining stores.

639.    After rejecting a new 20-year term franchise agreement at the Fulton store, Sims began to feel McDonald's wrath. McDonald's deployed its tactic of forcing Black operators out of the system by increasing their inspections of all of Sims' stores, and he began receiving low marks on his business reviews.

640.    By 2016, McDonald's was trying to force him to sell his restaurants. Watson informed Sims that he needed to sell two of his restaurants. McDonald's eventually closed the Fulton store because no one would buy it.

641.    In 2016, Smyrna announced plans to widen Windy Hill Road. Sims was forced to close his location because of the city's road construction. McDonald's would have known that

these changes were in the works when the second location owned by the white owner/operator was remodeled. However, McDonald's gave Sims no notice of this.

642.    Also in 2016, McDonald's refused to renew Sims' lease on his 13402 Fulton Industrial Blvd location.

643.    McDonald's then approached Sims and told him they wanted him to close two of his four stores—one in Marietta and one in Smyrna. This request fell into McDonald's practice of forcing successful Black franchisees with multiple locations to downsize and thus prevent them from acquiring wealth.

644.    When Sims refused to do what McDonald's requested of him, the company began a retaliation campaign against him.

645.    McDonald's VP Greg Watson ("Watson") removed the field consultant Sims had long worked with and replaced that individual with a series of different field consultants who promptly began a systematic series of unnecessary inspections and gradings designed to rate Sims locations poorly and force him out of business.

646.    Sims received a series of letters from Watson urging him to sell his locations.

647.    In 2016, Sims traveled to McDonald's regional office and attempted to complain about what he viewed as race-related treatment to Watson and Steve Stringler, Finance Manager. Sims' complaints fell on deaf ears.

648.    Also in 2016, McDonald's changed the terms of the lease on his other Smyrna location on South Cobb Drive in an effort to get him to sell. This led to significant financial losses for Sims.

649.     In approximately 2017, QSCVP Valerie Williams told him that if he refused to sell his 20594 Fulton Industrial Boulevard location, the entire region was going to come after him. As a result, in 2017, Sims sold two of his stores for approximately $1.5 million.

650.     McDonald's then went after his final four stores in Cobb County by increasing inspections and trying to force failures.

651.     McDonald's targeted Sims with harsh inspections and enforcement on the pretextual basis of its Bigger Bolder Vision 2020 program, which required operators to heavily invest in order to modernize all restaurants. If the required investments were not made, restaurant owners were considered to be in breach. Sims received a breach letter from McDonald's in December 2017 for his two Marietta restaurants.

652.     When he received passing marks by one field consultant, Wasef, that consultant was replaced by a field consultant willing to do McDonald's bidding. McDonald's began unreasonably, zealously, and selectively searching for imperfections and crawling on floors to give him failing marks.

653.     When the inspections failed to force Sims out of the system, Watson increased the rent on his restaurants and declined his request to provide rent relief.

654.     Sims was finally forced to find a buyer for his restaurants and sell. In 2018, he sold his remaining franchise locations in Cobb County, despite the fact that he did not want to leave the system.

655.     Sims sold these stores to Jeff Hedrick, a white owner/operator, who had more than 25 stores in the Atlanta area.

656.     Sims was in attendance at a Black McDonald's Owner Association meeting where McDonald's CEO Steve Easterbrook walked out of the meeting when confronted by Black owner/operator complaints of discriminatory treatment.

### Allen Stafford

657.     Allen Stafford is a former owner and operator of twelve McDonald's franchise locations in the Atlanta, Georgia, area. He is Black.

658.     Stafford won the Regional Managers Award for the Atlanta Region in 2016.

659.     Stafford originally worked in McDonald's corporate office as special coordinator supervisor and a pathway coordinator. He was approached by Marvin Whaley and Bill Winger who suggested he would be a great owner/operator. Whaley and Winger recruited Stafford to the BFL Program.

660.     Unbeknownst to him, McDonald's saw Stafford as an ideal owner/operator they could use to acquire information about different failing locations.

661.     Stafford purchased his first McDonald's franchise location at the CNN Center in downtown Atlanta, Georgia, in 1992. Whaley placed Stafford in this location. McDonald's wanted the previous owner out and told Stafford that he could make significant profits at this location with McDonald's help.

662.      McDonald's lowered the rent on this location to incentivize Stafford to invest. Approximately a year and half after he purchased it, McDonald's moved the location from one space inside the CNN Center to another, telling Stafford it would increase his profits. McDonald's then raised the rent.

663.     In 1993, Whaley helped Stafford acquire a Special Distribution Store located at Georgia State University. McDonald's raised the rent significantly. Stafford requested rental relief for this location, which was routinely provided to white owner/operators, but was denied

solely because he was Black. By contrast, McDonald's had provided rent relief to other white owner/operators in the region, including Doug Taper and Stanford Delky.

664.     In 1997, Stafford acquired the Sandy Springs location. In 2016, Stafford requested rent relief on this location and was denied. McDonald's requested that he complete renovations on this location but Stafford informed McDonald's he could not afford to do so. By contrast, McDonald's did not require a white owner/operator, Patrick Dennis, in the same region to make any reinvestments to his restaurant after purchasing it.

665.     In 2017 through 2018, McDonald's deployed its tactic of forcing Black operators out of the system by increasing their inspections of Stafford's stores. QSCVP Valerie Williams would frequently come to this location with a consultant inspector and conduct these inspections herself, which was highly unusual.

666.     Frank Phalen was a white owner/operator located a few miles from Stafford's Sandy Springs location who was not subject to the same type or frequency of inspections during this same time period. But for his race, Stafford would not have been subject to such constant, demanding inspections.

667.     In 2000, Stafford acquired several locations, including another Special Distribution Store location on Marriot and Broad Streets. He also acquired locations on Mitchell Street, Peachtree, and two locations within the Atlanta Zoo. He requested rent relief for all these locations but did not receive it.

668.     McDonald's specifically directed Stafford to the Marriot and Broad Street location, a substandard location with low-volume sales and higher operating costs.

669.     McDonald's induced Stafford to agree to the Marriot and Broad Street acquisition by telling him that if he finished out the existing lease, McDonald's would agree to renew the

lease for a fresh, 20-year term. However, McDonald's never had any intention of renewing the lease, and at the end of the initial lease term, McDonald's closed this location without any warning.

670.    Also in 2000, Bill Lamar suggested that Stafford needed a big store location to help keep his smaller, failing locations afloat. Lamar then helped Stafford acquire the Moreland location. Later, in 2013, Stafford did a rebuild of this large location.

671.    In 2005, at the direction of Bill Lamar, Stafford acquired a location on Glenwood Avenue that had five years remaining on the previous owner's lease (with a right of renewal). This location was in a poor, Black neighborhood and after the lease term was up, McDonald's refused to renew the lease and closed this location.

672.    Stafford asked several McDonald's managers—including Jeff Wilfong, Sharlene Smith, and General Manager of the Atlanta Region Greg Watson—for rent relief for his locations between 2013 and 2017 but was ultimately denied.

673.    McDonald's enforced its renovation standards more stringently on Stafford, as compared to white owner/operators, solely because of his race and in violation of the franchising agreement. In 2018, McDonald's told Stafford he needed to do a Major Renovation Project ("MRP") at several of his locations. Stafford told McDonald's that he could not afford to do an MRP at the Jimmy Carter and Sandy Springs locations.

674.    In 2019, after Stafford complained to McDonald's about their unreasonable demands that he do the MRP, McDonald's retaliated against Stafford by conducting additional inspections and giving poor grades to Stafford's Jimmy Carter location. The Jimmy Carter location was placed on an Improvement Process for Underperforming Restaurants ("IPUR"). At the time, there were far worse locations owned by white owner/operators in Stafford's trading

area that were not on an IPUR but were much worse in terms of operations and sales, including ones that could not pass health inspections. However, these locations were treated differently than Stafford's location because they were owned by white franchisees. But for Stafford being Black, he would not have been placed on an IPUR.

675.    Stafford's son, Allen Stafford Jr., was in the Next Generation program but following Stafford's complaints to McDonald's about their unreasonable directives, McDonald's retaliated by refusing to promote his son out of the program. Two other white candidates that were similarly situated and in the program at the same time as Stafford's son, were, however, promoted. Stafford's son would have been promoted but for his race and but for Stafford's complaints.

676.    Unwilling to continue to be retaliated against, Stafford sold the Jimmy Carter, Sandy Springs, Moreland Avenue, and Powers Ferry locations, his four remaining locations, in July of 2019.

### Serge and Karen Tancrede

677.    Serge Tancrede and his wife, Karen Tancrede, owned and operated four McDonald's stores in Philadelphia, Pennsylvania. They are Black.

678.    Prior to becoming an owner/operator, Karen was a Franchise Manager at McDonald's. She was responsible for interviewing, selecting, and screening potential McDonald's owner/operators up and down the East Coast.

679.    Karen witnessed McDonald's purposeful efforts to place more Black operators into stores to fulfill then-CEO Ed Rensi's pledge of parity for Black operators. She warned General Managers at the time that they needed to be careful not to grow franchisees in markets that were not necessarily prepared for in terms of security concerns. They did not heed her warnings and continued to place them in high-crime locations.

680.    Before becoming an owner/operator, Serge was a Business Consultant for McDonald's. In that role, he conducted inspections of owner/operators' stores. Serge saw firsthand how McDonald's forced out operators that it wanted to eliminate from the system by increasing the frequency of inspections. In doing so, McDonald's increased the likelihood that business consultants would spot issues McDonald's could use to justify an operator's exit.

681.    The Tancredes' journey as McDonald's franchisees began in early 2004, when the owner/operator of the 56th and Vine location in Philadelphia was murdered in a robbery attempt at the store. Serge was the store's Business Consultant and knew and liked the team. He pitched the idea to McDonald's of taking over the store with Karen as joint owner/operators.

682.    QSCVP Rich Doane and Regional General Manager Dave Murphy insisted that if Serge and Karen were to enter the system as owner/operators of 56th and Vine, they would also have to purchase a store on Chestnut Hill. This was in keeping with McDonald's discriminatory practice of casting off undesirable locations it no longer wanted to run to Black franchisees.

683.    The Chestnut Hill location faced serious security issues and had been the target of violence. At one point, its managers were violently injured to the point that a hazmat team was called in to clean up the blood.

684.    The Chestnut Hill store also presented financial concerns, as it had underperformed under its former owner/operator Rosa Rosado. After Rosado failed to achieve positive cash flow on the store and demanded to sell it, McDonald's bought the store back from her. Because McDonald's did not want to operate it, McDonald's cast it off to the Tancredes. If the Tancredes were not Black owner/operators, McDonald's would never have given them an all-or-nothing deal that included the Chestnut Hill store.

685. The Tancredes accepted the two-store package but struggled to run Chestnut Hill. McDonald's failed to disclose that the restaurant was infested with mold. It had also failed to inform them that the street in front of the restaurant would be undergoing construction, though McDonald's was aware of the construction plans. The construction reduced Chestnut Hill's sales by 80%. As a result, the Tancredes were losing an average of $10,000 per month on this location.

686. McDonald's denied the Tancredes financial assistance in the form of rent relief, routinely offered to white owner/operators, solely because they were Black. The Tancredes requested rent relief, given the store's construction and mold issues. They worked with accountants to craft proposals for temporary rent relief, but Rich Doane, on behalf of McDonald's, refused.

687. Upon information and belief, McDonald's had granted rent relief to other similarly situated owner/operators in the region who were not Black, including Rosa Rosado, Chris Chung, and the Dukart family.

688. Bleeding money from the Chestnut Hill store, the Tancredes told Rich Doane they wanted to leave the location and were willing to give it back to McDonald's for nothing. Doane refused, though he had permitted a non-Black operator—Rosado—to sell the store back to McDonald's.

689. Instead of providing the Tancredes with assistance for the Chestnut Hill store, McDonald's sent in a corporate auditor.

690. In approximately 2009–2010, the Tancredes sold the Chestnut Hill location for $1 by including it in a package deal with their more profitable Germantown location.

691. In addition to those two locations, two of the Tancredes' stores—52nd and Vine and 56th and Vine—were located in the highest crime area of Philadelphia. Even so, the

Tancredes worked relentlessly to make the stores a success and became two of the top operators in the Philadelphia region.

692.    Though McDonald's was aware of the security concerns and risks of operating these stores, particularly given the murder of the last owner/operator, McDonald's refused to help offset the cost of the security measures the Tancredes were forced to implement.

693.    Serge and Karen Tancrede worked with a security task force, led by fellow owner/operator John Dawkins, to provide real life examples and suggestions on how inner-city restaurants can be secured, and on the financial support that would be appropriately sought from McDonald's Corporation considering the extensive shared liabilities. Some of the ideas they proposed included upgraded lighting in the restaurants, better security cameras, and bulletproof windows in certain stores. McDonald's also conducted a study to see what solutions could be implemented.

694.    Following that study, McDonald's, including General Manager Deb Massa, chose a select few owner/operators and provided them with financial assistance for security concerns. However, Massa denied the Tancredes' request for such financial assistance.

695.    Indeed, each time the Tancredes requested financial assistance, they were told that their restaurants performed well above the national average in sales revenue and therefore they did not need McDonald's financial help. While it was accurate that the sales revenue on these two locations was above the national average, it was also true that the profitability and return on investment was well below that of restaurants with the same sales revenue. This was due to the additional cost burdens that came with operating restaurants in an inner-city environment. In fact, only certain owner/operators, namely white franchisees, were granted that financial assistance. McDonald's denied financial assistance to the Tancredes because of their race.

696.    The danger of operating the 52nd and Vine and 56th and Vine stores escalated. In spring 2008, two men followed Serge home from the store and robbed him of $30,000 in cash at gunpoint. The robbers beat Serge, shot at, and almost killed him.

697.    Serge had been transporting some of the cash proceeds home prior to depositing them at the bank. Rather than offering security solutions or support, the General Manager of the region responded by telling Serge that he had put other operators at risk by having cash on him.

698.    Following Serge's assault, McDonald's deployed its tactic of forcing Black operators out of the system by increasing their inspections of the couple's stores. Field Services Manager Stacey Sharpneck and Business Consultant Rosalyn Tyson began conducting frequent and unannounced inspections of the Tancredes' stores. The Tancredes passed all the inspections with flying colors.

699.    Given their prior professional experience in McDonald's corporate, Serge and Karen recognized the increased inspections as McDonald's attempt to force them out of the system. McDonald's was retaliating against them because Serge had been vocal about the differential treatment operators in the region faced.

700.    In conjunction with the inspections, McDonald's made unreasonable requests for the Tancredes to renovate their two remaining stores, including that they build a McCafé at the Vine Street and 52nd and Chestnut locations, as part of McDonald's national roll-out of McCafé.

701.    The Tancredes pled with McDonald's to exclude both of their locations from this plan because it was not economically viable to install a McCafé in a high-crime area of Philadelphia. They pointed to the fact that there were no Starbucks or Dunkin' Donuts in this area of the city. McDonald's did not listen and insisted that they install a McCafé to avoid default.

702.     To protect their mental health and quality of life, the Tancredes were eventually forced to sell off their last remaining restaurant. They notified McDonald's of the closing date for the sale of the two restaurants. Several weeks prior to the sale, at the Tancredes' annual business review, the Tancredes communicated the sale of their last remaining store to Regional Manager Harry Coaxum directly. He lamented, "That's a shame. We were prepared to discuss today relocating you to a multiple store package in Delaware and facilitating the sale of this restaurant." The restaurants in Delaware he was referring to were high-crime areas that McDonald's owned as company stores and were looking to cast off on Black operators.

703.     On the closing date, no one from corporate made themselves available to sign off on the deal, which was highly unusual. The closing date had been clearly identified in the purchase and sale agreement with owner/operator Scott Nigh. McDonald's had financially approved the sale, but it was made clear that McDonald's Corporation did not agree with or support Scott Nigh as the purchaser. Karen had to call personal friends in corporate to force the sale through.

**Gordon Thornton**

704.     Gordon Thornton is a former owner and operator of four McDonald's stores in the Raleigh/Durham, North Carolina, region.

705.     Thornton began working at McDonald's corporate shortly after college. Since then, he has held various positions, including Director of Operations and Ombudsman.

706.     Thornton first became a McDonald's franchise owner/operator in 1993. In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores in Black neighborhoods, between 1993 and 2012, McDonald's placed Thornton in such stores with low-volume sales and higher operating costs due to crime, higher

insurance rates, and higher employee turnover, solely because of his race. Thornton sought to purchase a restaurant in a neighborhood that was not predominantly Black, but McDonald's denied him the opportunity because of his race.

707.    McDonald's denied Thornton financial assistance in the form of rent relief, routinely offered to white owner/operators, solely because he was Black. Around 2012, two of his stores were impacted by eminent domain. Thornton subsequently asked McDonald's for financial assistance but was not provided sufficient relief to supplement the loss to his stores. But for Thornton's race, Thornton would have been provided sufficient relief to offset the impact on his stores.

708.    McDonald's enforced its renovation standards more stringently on Thornton, as compared to white owner/operators, solely because of his race and in violation of the franchising agreement. In 2012, Thornton was required to remodel to meet McDonald's new operating standards. McDonald's knew the remodel was not financially feasible for Thornton but did not provide him with sufficient alternative relief, as white owner/operators were being provided in his region.

709.    As a result, Thornton was forced to sell his stores in 2012. But for Thornton's race, he would not have lost these stores.

**Ronnie Thornton**

710.    Ronnie Thornton is a former owner and operator of five McDonald's stores in the Raleigh/Durham, North Carolina, region. He is Black.

711.    Thornton served his country as a Captain in the U.S. Army. Upon completing his military obligation, Thornton left the military in 1990 and entered the corporate world as a Market Manager with Kentucky Fried Chicken, during which he was responsible for managing

12 KFC restaurants in North Carolina. After successful working as a Market Manager for sever years, Thornton decided to pursue his dream of becoming an entrepreneur and applied to become a McDonald's franchisee. Once he was accepted into the program, he completed the qualification process and successfully completed his Hamburger University training in nine months—a remarkably short period of time.

712.    Thornton became a McDonald's franchise owner/operator in 1998 as part of McDonald's program to increase parity among Black operators. While waiting for an offer for his first store in 1998, he approached McDonald's about acquiring the restaurant near the Greensboro, North Carolina Airport, since it was currently managed by McOpCo and in relatively near proximity to where he lived.  Instead of approving this sale, McDonald's directed Thornton to take over the Summit Ave. location several miles further away, which was also a McOpCo-run store and the oldest McDonald's in the state, as it opened in 1959. In addition, the location was in dire need of rebuild and was guarded around the clock because of its location in a high-crime, low-income area.

713.    McDonald's excluded Thornton from the same opportunities to purchase higher-volume, lower-cost stores offered to white franchisees. In 1998, McDonald's sold the Greensboro Airport location to a white owner/operator, Scott Lang.  But for his race, McDonald's would have allowed Thornton to purchase this restaurant.  Instead, in keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores, McDonald's directed him to a less profitable location.

714.    Throughout the years, McDonald's sold Thornton the first, sixth, and twenty-ninth oldest restaurants in North Carolina, all of which had on-site security and were in desperate need of rebuilds. In one case, McDonald's deployed its tactic of forcing Black operators out of

the system by increasing their inspections of Thornton's store. Business Consultant Mildred Stutts began conducting unreasonable and unequal inspections to generate poor business reviews. Marty Ranft, then Regional Manager, relied on these business reviews to deny Thornton rewrite on the sixth oldest location, which forced Thornton to sell the location and operate as a single-store owner, beginning in 2003. Thornton requested that Stutts be replaced as his consultant, after which he was able to repurchase that location, as well as an additional three locations over the next seven years.

715. McDonald's enforced its renovation standards more stringently on Thornton, as compared to white owner/operators, solely because of his race and in violation of the franchising agreement. This was despite the fact that McDonald's knew Thornton would not be able to readily execute the remodels, as he owned some of the oldest and most dilapidated restaurants in the state.

716. McDonald's denied Thornton financial assistance in the form of rent relief, routinely offered to white owner/operators, solely because he was Black. In 2011, McDonald's sought to build a new restaurant ("Richfield") near his area for no legitimate business reason. When McDonald's informed Thornton of the new store, Thornton advised McDonald's that the new location would lose money for quite some time and that it would also adversely affect the sales and profits at his other two locations in Stanly County, North Carolina. When McDonald's decided to move forward with the Richfield location anyway, Thornton was forced to either purchase the location or suffer the financial impact of a new store eating into his sales. But for Thornton's race, McDonald's would not have forced this new store to be built in Thornton's area.

717.    Around 2017, and in conjunction with Bigger Bolder Vision 2020, McDonald's prepared to impose new and more stringent requirements to reinvest in new products and equipment that would put Thornton's business under cash flow stress.  Because he simply could not afford to invest in the new program and three rebuilds, Thornton was forced to sell his stores in 2017.

**Errol Thybulle**

718.    Plaintiff Errol Thybulle owned and operated two restaurants, as well as two satellite restaurants, in the South Bronx, New York. Thybulle is Black.

719.    Thybulle wanted to work in the New York region. In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores in Black neighborhoods, in April 1990, McDonald's awarded him his first franchise location in the South Bronx—one of the highest crime areas of the city. McDonald's told him that it was the only location available.

720.    Thybulle regularly faced security issues at his restaurants, including individuals slashing seats and graffitiing the walls. To maintain the store and ensure staff safety, Thybulle had to hire extra security guards and spend an abnormal amount on maintenance and repairs. Thybulle spent approximately twice the typical amount of maintenance and repair fees and two to four times the normal amount of security fees on his stores.

721.    During his regular operator reviews with then-Regional Manager Paul Facella and field service managers, all of whom were white, Thybulle repeatedly requested rent relief to offset the high cost of security and repairs.

722.    McDonald's denied Thybulle financial assistance in the form of rent relief, routinely offered to white owner/operators, solely because he was Black. While McDonald's

granted white owner/operators rent relief, they allowed Thybulle to financially struggle without stepping in to help.

723.     McDonald's deployed its tactic of forcing Black operators out of the system by increasing their inspections of Thybulle's stores. Field service representatives began conducting unannounced inspections of Thybulle's stores, including on weekend days.

724.     When Thybulle asked white colleagues whether they were ever subject to an unannounced inspection on a Saturday at 5 PM, they responded that it had never happened to them. But for his race, Thybulle would not have been subjected to unannounced inspections at unreasonable hours.

725.     Thybulle was ultimately forced to close his two satellite stores because the security and maintenance costs were too high to maintain, and the stress of operations had become too much to bear.

### William (Pete) Washington

726.     William Washington is a Virginia resident and a former owner/operator of six stores in the Richmond, Virginia, region during his tenure at McDonald's. He is Black.

727.     Washington began working at McDonald's in 1973 and became a franchisee when he purchased his first store in 1998.

728.     During his first year as an owner/operator, McDonald's recognized Washington as "Rookie of the Year." He served as secretary of the Richmond owner/operator co-op and the Virginia Black McDonald's Owner Association for more than 15 years. Washington was also recognized with numerous regional awards during his early years for sales and transaction increases.

729.     In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores in Black neighborhoods, between 1994 and 2016, McDonald's directed Washington into such stores, with low-volume sales and higher operating costs due to crime, higher insurance rates, and higher employee turnover, solely because of his race. Washington sought to buy restaurants from a white owner/operator, Donald J. Both, who owned approximately 17 restaurants in the Richmond region.  But McDonald's did not approve those sales because Washington was Black and allowed him to purchase restaurants only in Black neighborhoods.

730.     In 2010, Washington downsized to two restaurants—the two most challenging stores to run in the highest crime area of the city.

731.     McDonald's deployed its tactic of forcing Black operators out of the system by increasing their inspections of Washington's stores. Between 1994 and 2013, Washington consistently received positive business reviews following inspections. Yet, in or around 2014, McDonald's inspectors began regularly arriving to his stores with the goal of documenting the smallest infraction. For example, he received a lower grade when the corporation told him that his employees were not "smiling enough." But for Washington's race, these unreasonable inspections and grading would not have occurred.

732.     McDonald's required Washington to invest in a relocation of his store within a short timeframe not required of white franchisees in locations McDonald's knew would fail to generate an adequate return on an individual's investment. For example, in 2016, McDonald's required Washington to relocate, even though it would have substantially increased his debt without comparable revenue. The relocation would have also increased his rent from approximately 8 to 14%. Washington requested alternative options where, at the very least, his

rent would not skyrocket. McDonald's denied Washington financial assistance in the form of rent relief, routinely offered to white owner/operators, solely because he was Black. By contrast, McDonald's had provided white owner/operators in the region, like Sue Derlack, meaningful financial assistance in similar circumstances.

733.    As a result of McDonald's discrimination against him, Washington had no choice but to sell his stores in 2016.

## Lance Williams

734.    Plaintiff Lance Williams owned and operated two McDonald's stores in the Atlanta region. He is Black.

735.    Prior to entering the McDonald's franchise system, Williams worked as a McDonald's corporate employee for several years. In 1995, Williams was a business field consultant for five to seven local McDonald's operators, during which time he learned about the franchise system. As a field consultant, McDonald's pressured Williams to "find something wrong" with other franchisees' restaurants whenever McDonald's wanted to force those franchisees out of the system.

736.    In 2001, Williams became a McDonald's franchisee when he acquired two stores in the Mobile, Alabama, region. Williams lived in New Orleans and relocated to Alabama for the opportunity to begin a career as a McDonald's operator.

737.    Within the Mobile metropolitan area, there were approximately 30 McDonald's restaurants at the time. Until 2010, Williams was the only Black owner/operator of those 30 locations.

738.    In 2009, McDonald's started sending field consultants to check on Williams' stores more and more frequently. At one point, field consultants were visiting Williams' stores weekly, but not visiting the other stores in the area with that same regularity.

739.     Beginning in 2012, McDonald's made it increasingly difficult for Williams to successfully operate his stores. McDonald's field consultants reported that there were "food safety issues" at Williams's stores, even though no such issues existed. From his experience as a Field Consultant with McDonald's, Williams knew that consultants reported "food safety issues" to manufacture a breach of contract claim for McDonald's and force an operator out of the system.

740.     The frequency of these visits became so excessive that Williams asked the Field Consultants how he could reduce their visits. The Field Consultant told Williams, "If you get here before we do, there won't be any issues." The next visit by the consultants was at approximately 5:30 am.

741.     McDonald's threatened Williams that if he did not immediately sell his stores, he would be in default and indebted approximately one million dollars. Accordingly, Williams was forced to sell his stores in 2013.

742.     Solely because he was one of the only Black operators in an overwhelmingly white region, McDonald's deployed its tactic of forcing Black operators out of the system by increasing their inspections of Williams' stores. They succeeded and Williams was forced to sell his stores.

**Norman Williams**

743.     Norman Williams owned and operated a McDonald's store in the Richmond region of Virginia. He is Black.

744.     Williams worked for McDonald's for nearly 17 years before becoming a franchisee. His roles included manager trainee, business consultant, supervisor, and field service manager.

745.     Williams became an owner/operator in 1994 in the Indianapolis region. Initially, Williams asked to look at stores near his home in the St. Louis region. But Regional Manager Kevin Don refused and told Williams that he would only recommend him for other regional stores and that McDonald's would not sell him a restaurant in the St. Louis area.

746.     Around the same time, a white colleague who had similarly been pushed out of corporate was searching for purchasing opportunities in the St. Louis area. McDonald's presented him and another white male opportunities to buy restaurants in the St. Louis region. But for being Black, Don would have similarly offered Williams franchise opportunities in his hometown of St. Louis.

747.     McDonald's offered Williams a store in Indianapolis ("1610 E. Washington") as part of a two-store deal. However, the second restaurant had very low volume and Williams turned it down. Williams was never offered new stores that were built in Indianapolis.

748.     Within a year of buying the store, the original owner/operator of 1610 E. Washington bought a McDonald's restaurant down the street and installed a play area. Williams' sales plummeted as a result.

749.     Williams asked for permission to sell the store and relocate many times but, without explanation, Regional Manager James Daughtry told him that he would not assist him or provide a letter of recommendation. White owner-operators were selling their restaurants in the region and relocating without issue. But for his race, Daughtry would have allowed Williams to do the same.

750.     Ultimately, McDonald's allowed him to sell the store and leave the region, but Williams only received $50,000 for the store.

751.     In keeping with McDonald's discriminatory practice of intentionally placing
Black franchisees into substandard stores in Black neighborhoods, the Regional Manager of
Norfolk, Virginia, reached out to Williams about an opportunity to buy two restaurants that were
located in a dangerous area, which he initially turned down. The Regional Manager told him he
was offered these restaurants—all of them urban, high crime, and low volume—because of his
experience as an ex-corporate employee. In that capacity, he said Williams would be able to do
better in these locations than another operator.

752.     Williams knew this was McDonald's coded way of saying that because he was
Black, he would do best with a Black customer base and that he would not have been offered this
undesirable location but for being Black.

753.     Norman ultimately bought two different stores located in Norfolk. Though
Williams was initially satisfied with these stores, his rent payments grew dramatically, with
rental payments increasing at a staggered rate from 9.5% to 12%. No white operator in the area
had a rent payment over 9%.

754.     McDonald's denied Williams financial assistance in the form of rent relief or rent
restructuring, routinely offered to white owner/operators, solely because he was Black. Williams
asked McDonald's to change his staggered rent to a flat rate. McDonald's refused. By contrast,
McDonald's had provided white owner/operators in the region, like Sue Derlack, meaningful
financial assistance in similar circumstances.

755.     The mall near Williams's restaurant closed, which caused a dramatic decrease in
Williams's sales. Even so, McDonald's continued to refuse to provide any rent relief.

756.     Williams' other restaurant ("Norfolk State" or "NS") was also located in a high
crime area, was in poor condition, and its rent fluctuated between 10–14%.

757.    It became apparent that McDonald's was aware how undesirable the stores it had offered Williams were. One of Williams's friends asked Regional Manager Steve Plackton if Williams had good stores, to which he responded "no" and that Williams had "dogs." McDonald's was completely aware that it had discriminatorily placed Williams in unprofitable, difficult locations.

758.    Eventually, Williams was forced to sell his two low-performing stores. McDonald's told him that they would provide him opportunities to buy additional stores after he sold the two low-performing ones. McDonald's never provided those opportunities.

759.    Around 2013, Williams approached Regional Manager Bill Garret for rent assistance. Garret asked him why he should lower his rent if he could just sell the store to someone who could pay full price.

760.    When Williams's store was up for rewrite, Field Operations Officer Barbara Calloway spent roughly five minutes in Williams's restaurant before telling him that she was not going to recommend him for rewrite. Calloway had similarly forced out between three to five other Black owner/operators during her one- to two-year tenure at McDonald's.

761.    Around 2018, Williams received offers to buy his store, including an offer from former Regional Manager Leon Dickey. However, Calloway and Harry Thomas, the new Regional Manager, pressured Williams to sell to another buyer. They knew Dickey had made a verbal offer but refused to approve the sale.

762.    McDonald's placed Williams in an untenable position of economic duress. Williams had no choice but to sell the restaurant for $200,000 less than what Leon had offered him due to McDonald's interference.

**Jacqueline Wynn**

763.    Plaintiff Jacqueline Wynn formerly owned and operated McDonald's stores in the

Alabama and Atlanta Region. She is Black.

764.    In May 1994, McDonald's offered Wynn the opportunity to purchase a franchise

store in Roanoke, Alabama. Roanoke was still a heavily segregated town at the time. For

example, the local high school had banned interracial dating.

765.    Wynn informed McDonald's that she wanted to purchase a store in the Florida or

Atlanta region but did not want to operate a store in Alabama. McDonald's insisted that it was a

good opportunity because Roanoke did not have a McDonald's. However, the town of Roanoke

did not want a McDonald's, particularly one run by a Black woman.

766.    During her time operating the Roanoke store, Wynn was the target of hate crimes,

including individuals leaving Ku Klux Klan pamphlets at the store and property destruction. As a

result, Wynn requested a transfer to another franchise store outside of Alabama.

767.    In keeping with McDonald's discriminatory practice of intentionally placing

Black franchisees into substandard stores in Black neighborhoods, in 1995, McDonald's

transferred Wynn to such a franchise location in Atlanta, Georgia. McDonald's falsely informed

Wynn that the Atlanta store was fully operational and fully staffed. Wynn relied on that

statement in her decision to purchase the Atlanta location.

768.    Upon arriving at the Atlanta store, Wynn noticed that the equipment was damaged

and there was no full-time staff. Wynn soon learned that employee retention was low in part

because of the surrounding area's demographics.

769.    Later on, Wynn was told that the Atlanta store was notoriously difficult to run and

that the last operator had suffered a heart attack from the stress of running the location.

McDonald's transferred her there because they could not find another operator to run it and

144

wanted to wash their hands of the store. But for being Black, McDonald's would not have placed Wynn in such a difficult and unprofitable location.

770.    From the start of Wynn's tenure at the Atlanta store, she was flooded with inspections by McDonald's field consultants. They gave her negative reviews because of her limited staff and the condition of the store's equipment. When she requested help from the field consultants, they offered no support or resources for her. Instead, the business consultants punished Wynn for a problem that McDonald's had created in failing to disclose the state of the equipment and staffing. As a result, Wynn took out loans to repair the equipment and bring on full-time staff.

771.    In 1999, Wynn acquired another franchise location in Gwinnett, Georgia ("Gwinnett"). McDonald's made unreasonable demands of Wynn regarding that store as well. When they demanded that she install a particular type of equipment, Wynn responded that she did not yet have the funds but would install the equipment as soon as she could afford it.

772.    After that, McDonald's retaliated against Wynn and deployed their tactic of forcing Black operators out of the system by increasing their inspections of Wynn's stores. For example, a field consultant reported to the Regional Manager that the Gwinnett store was using out-of-state hamburger buns. Wynn had witnessed the inspection and knew that none of the buns were out-of-state. Instead, field consultants manufactured issues to force Wynn out of the store.

773.    They succeeded and Wynn ended up selling the Gwinnett store in 2009 to Plaintiff Allen Stafford. In turn, McDonald's threatened Stafford that he would not be able to expand to other locations if he did not purchase Wynn's store.

774.    McDonald's enforced its renovation standards more stringently on Wynn, as compared to white owner/operators, solely because of her race and in violation of the franchising

agreement. Throughout her time operating the Atlanta store, Wynn had to partially remodel the store twice to meet the required standards. In 2010, McDonald's went further and demanded that Wynn fully renovate the Atlanta store, despite being in the height of the recession. By contrast, McDonald's did not require a white owner/operator, Patrick Dennis, in the same region to make any reinvestments to his restaurant.

775.    Wynn asked McDonald's to conduct a demographic study to evaluate the cost-benefit ratio of the remodel. McDonald's never completed the study.

776.    Given McDonald's lack of support, Wynn hired an independent firm to conduct a demographic study. The research firm found that the entire area was "dead" in terms of restaurant profits and did not project that the restaurant would turn a profit until 2014 if she completed the remodel.

777.    Subsequently, Wynn informed McDonald's about the study's results, and told the field consultant that it was not financially feasible to tear down the store when it was operating well in its current state.

778.    Shortly thereafter, McDonald's sent Wynn a letter, asking her not to renew her lease on the store. Wynn tried negotiating with McDonald's to renew her lease and even proposed that she could obtain a loan for the remodel, but McDonald's refused to negotiate with her.

779.    McDonald's hand-selected a purchaser of Wynn's Atlanta store. Wynn did not receive market value for the store, but Wynn felt that she had no choice but to sell it to McDonald's pick. Wynn therefore unwillingly sold her remaining franchise store.

## CAUSES OF ACTION

### COUNT I

#### 42 U.S.C. § 1981—Race Discrimination in Contracting

780.     Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

781.     Each of the Plaintiffs is a member of the class protected by this statute, in that Plaintiffs are all Black.

782.     As described in greater detail above, Defendants intentionally discriminated against Plaintiffs on the basis of their race in their making, performance, modification and/or termination of their franchisor/franchisee contractual relationship with Plaintiffs. In doing so, Defendants denied Plaintiffs the enjoyment of the benefits, privileges, terms, and conditions of this contractual relationship.

783.     If it were not for Defendants' intentional race discrimination, Plaintiffs would not have suffered the harms discussed in this Complaint.

784.     As described in greater detail above, Defendants intentionally discriminated against Plaintiffs on the basis of their race by engaging in misconduct such as:

a.     forcing Plaintiffs to franchise locations that were less profitable, located in lower-income or higher-crime neighborhoods, and in poorer physical condition than the franchise locations made available to white franchisees;

b.     denying Plaintiffs access to profitable franchise locations that were made available to white franchisees;

c.     targeting Plaintiffs for unfair and unreasonable enforcement of their franchisor/franchisee contracts, including unfair and unreasonable expectations and timeliness for physical improvements or renovations to their restaurants, in a manner that was not reflected in Defendants' franchisor/franchisee relationship

with white franchisees;

d.    targeting Plaintiffs for unfair and unreasonable inspections and grading of their

restaurants, in a manner that was not reflected in Defendants'

franchisor/franchisee relationship with white franchisees;

e.    denying Plaintiffs the benefit of programs and opportunities that were offered to

white franchisees; and

f.    denying Plaintiffs' requests to sell their franchises to the buyer of their choosing

at a favorable negotiated price, in a manner that was not reflected in Defendants'

approval decisions with respect to the sale of white-owned franchises.

785.    As a result of Defendants' misconduct described in this Count, Plaintiffs suffered

and continue to suffer damages, including but not limited to lost profits, lost business opportunities,

direct and indirect financial loss and harm, damage to professional reputation, emotional injuries

resulting from Defendants' intentional racial discrimination, and other grievous and continuing

injuries and damages as set forth above.

## COUNT II

### 42 U.S.C. § 1981—Race Discrimination in Contracting (Pattern or Practice)

786.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

787.    Each of the Plaintiffs is a member of the class protected by this statute, in that

Plaintiffs are all Black.

788.    Defendants' misconduct alleged in Count I, and as described in greater detail

above, was part of a pattern or practice of discriminatory decision-making, pursuant to which

Defendants regularly and purposefully discriminated against Black franchisees.

789.    This discriminatory pattern or practice was so pervasive that it amounted to the

Defendants' standard operating procedure with regard to their treatment of Black franchisees.

Defendants' discriminatory pattern and practice includes, as alleged above: forcing Black franchisees to locations that were less profitable than locations offered to white franchisees; unfairly applying standards to Black franchisees that Defendants did not apply to white franchisees; and refusing to agree Black franchisees' proposed sales of their stores and instead forcing Black franchisees to sell to Defendants' preferred purchasers when Defendants did not impose such conditions on white franchisees.

790.    As a result of Defendants' misconduct described in this Count, Plaintiffs suffered and continue to suffer damages, including but not limited to lost profits, lost business opportunities, direct and indirect financial loss and harm, damage to professional reputation, emotional injuries resulting from Defendants' intentional racial discrimination, and other grievous and continuing injuries and damages as set forth above.

## COUNT III

### 42 U.S.C. § 1981—Race Discrimination in Contracting (Retaliation)

791.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

792.    Each of the Plaintiffs is a member of the class protected by this statute, in that Plaintiffs are all Black.

793.    As described in greater detail above, each of the Plaintiffs engaged in protected activity by complaining to Defendants about their intentional race discrimination, including but not limited to the categories of misconduct described in Count I. In particular, Defendants intentionally discriminated against Plaintiffs on the basis of their race in their making, performance, modification and/or termination of their franchisor/franchisee contractual relationship with Plaintiffs. In doing so, Defendants denied Plaintiffs the enjoyment of the benefits, privileges, terms and conditions of this contractual relationship.

149

794.     As described in greater detail above, in retaliation for Plaintiffs' protected activity, Defendants intentionally and knowingly subjected Plaintiffs to adverse treatment in their franchisor/franchisee relationship with Plaintiffs. But for Plaintiffs' protected activity, Defendants would not have taken such acts against Plaintiffs.

795.     Defendants did not subject similarly situated franchisees who had not engaged in protected activity to the same adverse treatment to which Defendants subjected Plaintiffs. This includes white franchisees, who had no basis to complain about racially discriminatory mistreatment and so were not subjected to adverse treatment in retaliation for protected activity.

796.     As a result of Defendants' misconduct described in this Count, Plaintiffs suffered and continue to suffer damages, including but not limited to lost profits, lost business opportunities, direct and indirect financial loss and harm, damage to professional reputation, emotional injuries resulting from Defendants' intentional racial discrimination, and other grievous and continuing injuries and damages as set forth above.

## COUNT IV

### 42 U.S.C. § 1982—Discrimination in the Leasing of Real Property

797.     Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

798.     Each of the Plaintiffs is a member of the class protected by this statute, in that Plaintiffs are all Black.

799.     As described in greater detail above, Defendants intentionally discriminated against Plaintiffs on the basis of their race in the leasing of real property, including but not limited to: Defendants refused to lease favorable, more profitable restaurant locations to Plaintiffs which Defendants made available to white franchisees; Defendants forced Plaintiffs to less profitable, lower quality restaurant locations; and Defendants unfairly and unreasonably

denied Plaintiffs' requests to sell their franchises and transfer their interest in real property to the buyers of their choosing at a favorable negotiated price.

800.    If it were not for Defendants' intentional race discrimination, Plaintiffs would not have suffered the harms discussed in this Complaint.

801.    As a result of Defendants' misconduct described in this Count, Plaintiffs suffered and continue to suffer damages, including but not limited to lost profits, lost business opportunities, direct and indirect financial loss and harm, damage to professional reputation, emotional injuries resulting from Defendants' intentional racial discrimination, and other grievous and continuing injuries and damages as set forth above.

## COUNT V

### 42 U.S.C. § 1982—Discrimination in the Leasing of Real Property (Pattern or Practice)

802.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

803.    Each of the Plaintiffs is a member of the class protected by this statute, in that Plaintiffs are all Black.

804.    Defendants' misconduct alleged in Count IV, and as described in greater detail above, was part of a pattern or practice of discriminatory decision-making, pursuant to which Defendants regularly and purposefully discriminated against Black franchisees.

805.    This discriminatory pattern or practice was so pervasive that it amounted to the Defendants' standard operating procedure with regard to their treatment of Black franchisees. Defendants' discriminatory pattern and practice includes, as alleged above: forcing Black franchisees to locations that were less profitable than locations offered to white franchisees; refusing to allow Black franchisees to lease locations that were more profitable and only providing white franchisees the opportunity to lease such locations; and refusing to agree Black franchisees' proposed sales of their stores and instead forcing Black franchisees to sell to

151

Defendants' preferred purchasers when Defendants did not impose such conditions on white franchisees.

806.   As a result of Defendants' misconduct described in this Count, Plaintiffs suffered and continue to suffer damages, including but not limited to lost profits, lost business opportunities, direct and indirect financial loss and harm, damage to professional reputation, emotional injuries resulting from Defendants' intentional racial discrimination, and other grievous and continuing injuries and damages as set forth above.

## COUNT VI

**42 U.S.C. § 1982—Discrimination in the Leasing of Real Property (Retaliation)**

807.   Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

808.   Each of the Plaintiffs is a member of the class protected by this statute, in that Plaintiffs are all Black.

809.   As described in greater detail above, each of the Plaintiffs engaged in a protected activity by complaining to Defendants about their intentional race discrimination, including but not limited to the categories of misconduct described in Count IV. In particular, Defendants intentionally discriminated against Plaintiffs on the basis of their race in the leasing of real property, including but not limited to: Defendants refused to lease favorable, more profitable restaurant locations to Plaintiffs which Defendants made available to white franchisees; Defendants forced Plaintiffs to less profitable, lower quality restaurant locations; and Defendants unfairly and unreasonably denied Plaintiffs' requests to sell their franchises and transfer their interest in real property to the buyers of their choosing at a favorable negotiated price.

810.   As described in greater detail above, in retaliation for Plaintiffs' protected activity, Defendants intentionally and knowingly subjected Plaintiffs to adverse treatment in their

franchisor/franchisee relationship with Plaintiffs. But for Plaintiffs' protected activity, Defendants would not have taken such acts against Plaintiffs.

811.    Defendants did not subject similarly situated franchisees who had not engaged in protected activity to the same adverse treatment to which Defendants subjected Plaintiffs. This includes white franchisees, who had no basis to complain about racially discriminatory mistreatment and so who were not subjected to adverse treatment in retaliation for protected activity.

812.    As a result of Defendants' misconduct described in this Count, Plaintiffs suffered and continue to suffer damages, including but not limited to lost profits, lost business opportunities, direct and indirect financial loss and harm, damage to professional reputation, emotional injuries resulting from Defendants' intentional racial discrimination, and other grievous and continuing injuries and damages as set forth above.

## COUNT VII

### Illinois State Law—Breach of Contract

813.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

814.    Each of the Plaintiffs had a valid and enforceable written contract with Defendants.

815.    Plaintiffs performed their obligations under the contract.

816.    As described in greater detail above, Defendants breached the contract by failing to perform their obligations under the contract.

817.    As described in greater detail above, among the contractual obligations that Defendants breached was their obligation to make available to Plaintiffs the same services, facilities, rights, and privileges with respect to their operation of McDonald's franchises as Defendants made generally available to other franchisees, specifically white franchisees. Section

3 of the Franchise Agreement provides that McDonald's must "make available to Franchisee all additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes *generally* available, from time to time, to all its franchisees operating McDonald's restaurants." (Franchise Agreement ¶ 3) (emphasis added). McDonald's breached this obligation by, among other things: not providing Plaintiffs the rent relief and other financial assistance Defendants provided to white franchisees; conducting reviews of Plaintiffs' restaurants at unreasonable times and under unreasonable circumstances that Defendants did not impose on white franchisees; prohibiting Plaintiffs from obtaining loans when McDonald's allowed such loans to white franchisees; and not providing Plaintiffs notice or relief from the opening of other McDonald's locations near Plaintiffs' stores when McDonald's provided such notice and relief to white franchisees.

818.    In addition, Defendants agreed to conduct reviews of Plaintiffs' restaurants only at "*reasonable* times to ensure that [the] Franchisee's operation" complied with McDonald's standards and policies. (Franchise Agreement ¶ 12) (emphasis added). Defendants breached this obligation by conducting reviews of Plaintiffs' restaurants at unreasonable times and under unreasonable circumstances.

819.    Further, Defendants agreed that they would only require Plaintiffs to renovate their stores when Defendants' plans and standards are "*reasonably* changed from time to time by McDonald's." (Franchise Agreement ¶ 12) (emphasis added). Defendants breached this obligation by forcing Plaintiffs to renovate their stores when Defendants' plans and standards had not change or had not reasonably changed.

820.    Further, Defendants' agreed that "consent shall not be arbitrarily withheld" when Plaintiffs attempted to sell their stored. Franchise Agreement § 15(d). Defendants breached this

obligation when they arbitrarily refused to accept the terms of sale proposed by Plaintiffs when they attempted to sell their stores, and when Defendants insisted that Plaintiffs sell their stores to buyers hand-picked by Defendants.

821.    As a result of Defendants' breach of contract described in this Count, Plaintiffs suffered and continue to suffer damages, including but not limited to lost profits, lost business opportunities, direct and indirect financial loss and harm, damage to professional reputation, emotional injuries resulting from Defendants' intentional racial discrimination, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII

### Illinois State Law—Fraud

822.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

823.    As described in greater detail above, Defendants knowingly made one or more false statements of material fact to Plaintiffs, including but not limited to regarding the availability of franchise locations, the past, present or reasonably anticipated future performance or profitability of franchise locations, the physical conditions of franchise locations, and the general availability or lack of general availability of various services, facilities, rights, and privileges that were available to other franchisees.

824.    As described in greater detail above, in knowingly making these false statements of fact, Defendants intended to induce Plaintiffs to act or fail to act.

825.    As described in greater detail above, Plaintiffs relied on Defendants' false statements of material fact, including but not limited to: in making the decision to enter into the franchisor/franchisee contractual relationship, in selecting or accepting franchise locations, in seeking or applying for various services, facilities, rights, and privileges that were available to

other franchisees, and in making countless other strategic business decisions in the purchase, operation, and sale of their franchises.

826.     As a result of Defendants' fraudulent conduct described in this Count, Plaintiffs suffered and continue to suffer damages, including but not limited to lost profits, lost business opportunities, direct and indirect financial loss and harm, damage to professional reputation, emotional injuries resulting from Defendants' intentional racial discrimination, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX

### Illinois State Law—Tortious Interference with Business Relationships

827.     Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

828.     As described in greater detail above, as a result of their status as McDonald's franchisees, Plaintiffs had valid business relationships with one or more individuals or entities, including but not limited to business loans or financing provided by financial institutions or investors.

829.     Defendants had knowledge of these business relationships.

830.     As described in greater detail above, Defendants, without any justification, intentionally interfered with these business relationships, including but not limited to through their racially discriminatory conduct and breach of contract alleged in the Counts above.

831.     As a result of Defendants' interference with business relationships described in this Count, Plaintiffs suffered and continue to suffer damages, including but not limited to lost profits, lost business opportunities, direct and indirect financial loss and harm, damage to professional reputation, emotional injuries resulting from Defendants' intentional racial discrimination, and other grievous and continuing injuries and damages as set forth above.

## COUNT X

### Illinois State Law—Unjust Enrichment

832.     Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

833.     As described in greater detail above, through its fraudulent misrepresentations about the future financial viability of the substandard franchise locations made available to Black franchisees, through its unreasonably stringent and frequent restaurant inspections, and through its unrelenting insistence that Plaintiffs make reinvestments in their restaurant locations to meet McDonald's ever evolving list of strict building and equipment requirements, McDonald's induced Plaintiffs to make substantial repairs, renovations, and other improvements to their restaurants.

834.     Since the land and buildings at all McDonald's locations are ultimately owned by McDonald's, and are only temporarily leased to owner/operators, McDonald's obtained a significant benefit from these improvements made by Plaintiffs, in the form of increased value to the restaurant properties.

835.     As described in greater detail above, in doing so, McDonald's unjustly retained a benefit to Plaintiffs' detriment, and that retention violates the fundamental principles of justice, equity, and good conscience.

836.     As a result of Defendants' unjust enrichment described in this Count, Plaintiffs suffered and continue to suffer damages, including but not limited to lost profits, lost business opportunities, direct and indirect financial loss and harm, damage to professional reputation, emotional injuries resulting from Defendants' intentional racial discrimination, and other grievous and continuing injuries and damages as set forth above.

*     *     *

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their

favor and against Defendants, awarding compensatory damages, punitive damages, attorney's fees, and any other relief this Court deems just and appropriate.

**Jury Demand**

Plaintiffs hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED:
KENNETH MANNING, ET AL.

By: /s/Jon Loevy

Jon Loevy
Roshna Bala Keen
Daniel M. Twetten
Steve Art
Sam Heppell
Quinn K. Rallins
Annie Prossnitz
Loevy & Loevy
311 N. Aberdeen St.
Chicago, IL 60607
jon@loevy.com