**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

RALPH KING, JOHN TILLMAN, MARCIA TILLMAN, KERISTIN HOLLOWAY, GLORIA HOLLOWAY, GEORGE JONES, JANE JONES, ERROL SERVICE, LAMONIKA JONES, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MELVIN JONES, ARTHUR SCOTT, YVONNE KNOX, LISA GUNTER, F/K/A LISA MCKENZIE, MICHAEL SIMON, JOHN MASON, GEORGE GIPSON, BONNIE GIPSON, KENNETH NELSON, DAVID WHITE, BARBARA WHITE, VICTOR BRUCE, FAYE HOBLEY, PAUL HOSKINS MICHELE HOSKINS, LEWIS ANDERSON, HAYES FERRELL, JOYCE MANCE-ROAN, GARY ROAN, LEROY WALKER, JR., PHILIP DOUGLAS, DARRYL UMPHRIES, AND BERNARD SAFFOLD,

Plaintiffs,

v.

McDONALD'S USA, LLC, a Delaware limited liability company, and McDONALD'S CORPORATION, a Delaware corporation,

Defendants.

Case No.: 1:20-cv-05132

Hon. Judge Steven C. Seeger

**<u>SECOND AMENDED COMPLAINT</u>**

Plaintiffs, Ralph King, John Tillman, Marcia Tillman, Keristin Holloway, Gloria Holloway, George Jones, Jane Jones, Errol Service, LaMonika Jones, as Personal Representative of the Estate of Melvin Jones, Arthur Scott, Yvonne Knox, Lisa Gunter, f/k/a Lisa McKenzie, Michael Simon, John Mason, George Gipson, Bonnie Gipson, Kenneth Nelson, David White, Barbara White, Victor Bruce, Faye Hobley, Paul Hoskins, Michele Hoskins, Lewis Anderson, Hayes Ferrell, Joyce Mance-Roan, Gary Roan, LeRoy Walker, Jr., Philip Douglas, Darryl Umphries, and Bernard Saffold (collectively, "Plaintiffs"), by and through undersigned counsel, hereby bring this action against Defendants McDonald's USA LLC ("McDonald's USA"), McDonald's Corporation ("McDonald's Corp.," together with McDonald's USA, "McDonald's"), for violation of the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982 (Counts I and II) and fraudulent concealment under Illinois law (Count III), demanding a trial by jury.

**INTRODUCTION**

1. McDonald's is the world's leading global food service retailer with over 39,000 locations that generate over $100 billion in annual revenue. Despite a business that generates billions from African-American consumers, McDonald's has a well-documented history of racial discrimination at all levels of its operations, highlighted by recent lawsuits filed by its top C-suite executives, current and former franchisees, and shareholders alike.

2. Plaintiffs are Black, former McDonald's franchisees, who owned and operated McDonald's restaurants in the United States and were subject to McDonald's corporate policies and practices that explicitly differentiated between races and were designed to conceal their adverse impact on Black franchisees. As Black franchisees, Plaintiffs experienced the same pattern and practice of discrimination by McDonald's in contracting and leasing, including, without limitation:

a. Confining Plaintiffs to low-volume stores in locations with higher Black and minority populations, less wealth, lower sales, and consistently higher

operating costs, such as high security costs, insurance, and employee turnover, while awarding White franchisees higher-volume stores in locations with predominantly White, affluent populations, higher sales, and lower costs;

b. Limiting Plaintiffs' growth beyond their existing regions, while offering similarly-situated White operators growth opportunities in other regions;

c. Consistently offering Plaintiffs the least profitable franchises, such as Walmart and McOpCo stores, known to have lower volumes and the highest need for reinvestments and remodels, causing Plaintiffs to incur more debt without profitable locations to offset them;

d. Providing Plaintiffs with misleading financial information through the NBMOA designed to conceal information that would have enabled Plaintiffs to discover renewed discriminatory treatment of Black franchisees at the corporate level, instead focusing on "cash flow" and manipulated data;

e. Requiring Plaintiffs to invest in rebuilds and/or renovations not required of White franchisees;

f. Denying Plaintiffs meaningful support to allow them to overcome financial hardships, while White franchisees were routinely provided such assistance, including, but not limited to, permanent rent relief and impact funding;

g. Retaliating against Plaintiffs, including through targeted, increased, and unreasonable inspections, subjective grading, negative business reviews, and placement on the list of Improvement Process for Underperforming Restaurants (IPUR);

h. Applying different growth and rewrite standards as between Plaintiffs and White franchisees, making exceptions for White franchisees with the same issues it used as pretext to deny Plaintiffs renewal or "rewrite" of their franchise agreements; and/or

i. Arbitrarily denying final approval of Plaintiffs' buyers, so that Plaintiffs had no choice but to exit on McDonald's terms, at a loss.

3. Through this lawsuit, Plaintiffs seek racial justice and economic equality by holding McDonald's accountable for violations of their civil rights in denying them equal franchise opportunities. Plaintiffs further seek to hold McDonald's liable for abusing its relationship of trust with the National Black McDonald's Operators Association ("NBMOA") to fraudulently conceal

evidence confirming McDonald's continued discrimination against Black McDonald's franchisees following (false) promises of equality or "parity" between Black and White McDonald's franchisees.

4. As McDonald's admits, "Black franchisees were having to work harder to make less." *Gianotti, on behalf of McDonald's Corp. v. Dean* (Del. Ch. Case No. 2021-0324) ("Shareholder Derivative Lawsuit") (quoting January 24, 2019, McDonald's Board meeting). This is because, by design, McDonald's fees and profits are based on gross, not net, revenues: McDonald's profits even if a franchisee does not make a single dollar individually because of the consistently higher operating costs, including insurance, security, and employee-turnover, associated with the locations McDonald's steered and then restricted Plaintiffs to—locations where White franchisees refused to operate, and McDonald's needed to attract Black consumers.

5. McDonald's corporate documents not only reveal executive-level admissions of discriminatory treatment of its Black franchisees, but also an affirmative promise by McDonald's to work directly with the NBMOA to overcome the effects of such discrimination. In an April 1996 letter by McDonald's Executive Vice President, Thomas S. Dentice, to NBMOA Chairman, Reggie Webb, attached as **Exhibit "A"** hereto, McDonald's admits, "*the company has placed many Black Franchisees in restaurants that have not allowed them to achieve the same level of economic success as their peers*." McDonald's specifically undertook to work directly with the NBMOA to overcome the effects of its discrimination against them, fully integrate its Black franchisees into the McDonald's system, and achieve equality or "parity" between its Black and White franchisees.

6. In doing so, McDonald's assumed a special relationship with its Black franchisees, through the NBMOA, beginning in the late 1990's, when it specifically undertook the duties of: (1) helping Black franchisees overcome the effects of McDonald's past racist treatment; (2) achieving "parity" with White franchisees; and (3) fully disclosing pertinent system-wide information to Black

franchisees to allow them to compare the performance of their stores with those of White franchisees and otherwise monitor McDonald's promised progress toward supposed parity.

7. However, rather than use the NBMOA to achieve parity among its franchisees, McDonald's instead used it as a mechanism to placate its Black franchisees while fraudulently concealing its renewed discrimination against them. In its special relationship with the NBMOA, McDonald's controlled the narrative and the data that it released and shared with the NBMOA to disguise the gross inequality in profitability between White and Black franchisees that did not disappear but instead grew beginning in 2015 with a shift in McDonald's leadership.

8. Through a change in leadership from McDonald's first Black CEO Don Thompson to then-McDonald's Corp. President and CEO, Steven Easterbrook ("Easterbrook"), and current CEO and then-President of McDonald's USA, Christopher Kempczinski ("Kempczinski"), McDonald's instituted corporate policies that explicitly differentiate on the basis of race. These now well-documented decisions by McDonald's top executives, including Easterbrook, Kempczinski, and regional leader, Charles Strong, pushed Black franchisees out of the McDonald's franchise system, and punished those who spoke out against this racist treatment by not renewing their franchises.

9. As a direct and proximate result of McDonald's renewed systemic racial discrimination, ***one-third*** of McDonald's Black franchisees, including the 1981 and 1982 Plaintiffs, exited the McDonald's franchise system between 2015 and 2019, an attrition rate far above that of White franchisees.

10. Between 2015 and 2019, McDonald's USA terminated 30 African-American executives (Vice Presidents or higher) and demoted 6 more to director positions, reducing the total number of African-American executives at McDonald's USA down from a high of 42 to 6, a decrease of over 80%. White executives, on the other hand, were not terminated or demoted at this rate.

11. Likewise, McDonald's historic high of approximately 400 Black McDonald's franchisees in 1998 has been **more than cut in half**, to fewer than 200 Black franchisees to date. *See* Figure 1 below, based on McDonald's data. At the same time, from 1998 to date, the total number of McDonald's franchised restaurants **more than doubled**. *See id.*

**Exodus of Black Franchisees 1998 - 2020**

| END OF YEAR | BLACK FRANCHISEES |
|---|---|
| 1998 | 377 |
| 1999 | 368 |
| 2000 | 350 |
| 2001 | 347 |
| 2002 | 333 |
| 2003 | 319 |
| 2004 | 320 |
| 2005 | 313 |
| 2006 | 305 |
| 2007 | 304 |
| 2008 | 304 |
| 2009 | 294 |
| 2010 | 285 |
| 2011 | 283 |
| 2012 | 276 |
| 2013 | 270 |
| 2014 | 261 |
| 2015 | 255 |
| 2016 | 236 |
| 2017 | 222 |
| 2018 | 207 |
| 2019 | 194 |
| 2020 | 186 |

**Total Number of Franchised McDonald's Restaurants 1998 - 2020**

| YEAR | TOTAL FRANCHISES |
|---|---|
| 1998 | 15,086 |
| 1999 | 15,949 |
| 2000 | 16,795 |
| 2001 | 17,395 |
| 2002 | 17,864 |
| 2003 | 18,132 |
| 2004 | 18,248 |
| 2005 | 18,334 |
| 2006 | 22,880 |
| 2007 | 24,471 |
| 2008 | 25,465 |
| 2009 | 26,216 |
| 2010 | 26,338 |
| 2011 | 27,075 |
| 2012 | 27,882 |
| 2013 | 28,691 |
| 2014 | 29,544 |
| 2015 | 30,081 |
| 2016 | 31,230 |
| 2017 | 34,108 |
| 2018 | 35,085 |
| 2019 | 36,059 |
| 2020 | 38,999 |

**Figure 1**

12. McDonald's pushed Black franchisees out of the system, as it initiated data collection practices that specifically prohibited separating out the data on African-Americans within the McDonald's system. As exposed by senior, African-American McDonald's executives, Victoria

Guster-Hines ("Guster-Hines") and Domineca Neal ("Neal"), through their January 2020 lawsuit, Guster-Hines v. McDonald's USA LLC (N.D. Ill. Case No. 20-00117) (the "Executives Lawsuit"), McDonald's new corporate leadership grouped racial minorities into "people of color" beginning in 2015 to mask the decline of Black representation among executives and franchisees.

13. According to the most recent race discrimination lawsuit against McDonald's by African-American media entrepreneur Byron Allen, *Entertainment Studios Network, Inc. et al. v. McDonald's USA, LLC* (C.D. Cal. Case No. 21-4972), McDonald's also employs a tiered structure for advertising spending: the African American tier is less favorable than the general market tier because McDonald's pays lower prices for African American advertising.

14. Even though African Americans represent approximately 40 percent of McDonald's U.S. sales, McDonald's spends less than approximately $5 million each year for ***all*** Black-owned media combined of its approximately $1.6 billion annual advertising budget. When McDonald's cut advertising in the Black community beginning in 2015, revenue from African American consumers declined, thereby reducing the number of Black franchisees.

15. As a result, the 1981 and 1982 Plaintiffs' annual sales, on average, fell more than $700,000 below McDonald's national average sales.

16. Yet, at the same time McDonald's decreased revenue in Black communities through advertising cuts, McDonald's instituted new policies that increased capital expenditures for franchisees through growth initiatives such as McDonald's Bigger, Bolder Vision 2020 U.S. Plan ("Bigger, Bolder Vision" or "BBV2020"), beginning in 2017, which fell disproportionately on Black franchisees who owned older restaurants with higher costs, including the 1981 and 1982 Plaintiffs.

17. When the 1981 and 1982 Plaintiffs predictably became unable to pay for these higher costs, McDonald's was able to use subjective criteria to give their restaurants negative "grades" and

generate bad business reviews, which they used as pretext to deny Plaintiffs opportunities for growth and renewal or "rewrite," while making exceptions for White franchisees.

18. As confirmed by a former McDonald's employee, Pamela Rideout, McDonald's awarded new restaurants to White franchisees who were failing inspections and technically not meeting their criteria for growth at the same time it continued to use failed inspections to deny the 1981 and 1982 Plaintiffs these opportunities.

19. According to Guster-Hines and Neal, McDonald's senior executives charged with overseeing rewrite and growth decisions, such as Marty Ranft, current VP and General Manager of McDonald's Corp., and former VP and General Manager of McDonald USA's Raleigh Region, with a 48-year history with McDonald's, were known by McDonald's to have made derogatory and racist comments about Black McDonald's employees and franchisees yet remain there to date. According to Ms. Guster Hines, Mr. Ranft told her that "90%" of what the black franchisees had to say about their experiences at McDonald's was a "goddamn lie," and, "You are a [N-word] like all the rest – you just believe you are better cause you are a smart one."

20. McDonald's prevented Plaintiffs from discovering this renewed pattern and practice of discrimination at the executive level through a campaign of misinformation, abusing the relationship of trust between Plaintiffs and the NBMOA to fraudulently conceal evidence confirming McDonald's continued racial discrimination perpetrated at the highest levels.

21. As reflected in a March 12, 2019, letter from NBMOA Chairman, Larry Tripplett, to McDonald's USA West and East Zone Presidents, Charles Strong and Mario Barbosa, respectively, "***the trajectory of the treatment of African American Owners is moving backwards***," following the transition of leadership to Easterbrook and Kempczinski, in the areas of finance, leadership, rewrite, and security. The March 12, 2019, Letter provides in pertinent part:

> ***In general the trajectory of the treatment of African American Owners is moving backwards***. Through no fault of our own we lag behind the general market in all measures. This is reflected in the loss of sales to African American consumers. We believe that the loss of sales is closely correlated to how African Americans are treated within the Company.
>
> …
>
> ***We believe the Company has a fiduciary responsibility to insure fairness to African American Owners***. Our leadership team receive[s] calls almost daily from constituents who do not feel they have been treated fairly. The current state of affairs for African American Owners can only be described as hostile. We are very concerned that we see no one that looks [*sic*] like us in Senior Management at McDonald's.
>
> …
>
> Continuing dialog and ***definite action from the Company's highest levels is necessary to change the negative trajectory of treatment of the NBMOA***. We are a 47 year old advocacy association we need change now.

A true and correct copy of the March 12, 2019 Tripplett Letter is attached as **Exhibit "B"** hereto.

22. McDonald's failed to disclose to the NBMOA system-wide information that would allow Plaintiffs to accurately compare the performance of their stores with those of White franchisees. Instead, McDonald's intentionally concealed this information and provided the NBMOA with misleading and incomplete information regarding a *de minimis* "cash flow" gap between the stores owned by Black and White franchisees, which was in most cases merely tens of thousands of dollars annually, to create a false perception regarding McDonald's supposed progress toward parity, while concealing the much more significant gap in their net income, which was over $400,000 per year.

23. According to the data McDonald's disclosed to the NBMOA, this cash flow gap ranged from between a total of $19,107 in December 2010 to a high of $68,069 in December 2017, to $56,522 as of March 31, 2020.

24. McDonald's focused on "cash flow," to the exclusion of other metrics, because it is easily susceptible to manipulation. A company's "cash flow" is defined as cash provided by operations less capital expenditures. It does not account for unpaid debt, which McDonald's knew

disproportionately plagued Black franchisees because of their higher operating costs. By using cash flow alone, McDonald's can easily distort a financial picture to mislead Black franchisees into believing that they are performing similarly to White franchisees, as illustrated in Figure 2 below:

| | **Black Franchisee** | **Black Franchisee** | **White Franchisee** |
|---|---|---|---|
| **Average Annual Revenue** | $2,000,000 | $2,000,000 | $2,500,000 |
| **Average expenses** | $1,500,000 | $1,500,000 | $1,500,000 |
| **Debt** | $500,000<br>*PAID DEBT* | $500,000<br>(*UNPAID DEBT*) | $500,000<br>*PAID DEBT* |
| **Cash flow** | $0 | **500,000** | **500,000** |

**Figure 2**

25. Of course, franchisees do not join the McDonald's franchise system, or invest significant sums of money into their stores, to generate favorable "cash flow" statements; they do so to earn a profit, or "net income," which is the true measure of success for individual franchisees.

26. In its meetings with the NBMOA, however, McDonald's never revealed information regarding how the net income of Black franchisees compared to the net income of White franchisees. The reason why is now obvious: unbeknownst to Plaintiffs and similarly-situated Black McDonald's franchisees, due to McDonald's continued discrimination against its Black franchisees, the divide between the net income earned by Black and White franchisees was over $400,000 per year.

27. McDonald's also made it appear to Black franchisees that owning multiple franchise locations was an attainable goal for them, but did not provide information that would have allowed Plaintiffs to see that most of those Black franchisees were awarded low-volume locations, with higher costs, or outdated former corporate-owned stores that McDonald's did not want, and were continually restricted from growing to more profitable locations, as compared to White operators. McDonald's

cut their own losses by promoting those stores to NBMOA leadership as opportunities for Black franchisees to grow, without disclosing the stores' low profits for the individual Black franchisees.

28. Yet, beginning in 1998 through their individual exit dates, Plaintiffs were led to believe that McDonald's history of discrimination was in the past. Plaintiffs all operated under the assumption of parity and fair dealing by McDonald's. Through McDonald's control of information as the franchisor, and public commitment to racial equality, Plaintiffs were unaware, and could not know or have learned through due diligence, that McDonald's would deprive them of franchise opportunities offered to White franchisees.

29. After 1998, during the period of "parity," when Plaintiffs encountered operational difficulties, they were systematically isolated and led to believe that they were "bad operators" and individually responsible for the excessive operational expenses, insufficient sales volume, lost profits, lost business opportunities, and damage to their professional reputations.

30. It was not until the January 7, 2020, filing of the Executives Lawsuit that Plaintiffs learned ***for the first time***, at the corporate level, that McDonald's deliberately divests opportunities from Black franchisees, implements business plans with a discriminatory impact on Black franchisees, grades Black Consumer Market restaurants "differently, in a negative way," and has overall abandoned its prior commitment to racial equality on a company-wide basis.

**JURISDICTION AND VENUE**

31. This Court has subject matter jurisdiction over Plaintiffs' 42 U.S.C. §§ 1981 and 1982 claims pursuant to 28 U.S.C. §§ 1331, 1332, 1343(a)(3), and 42 U.S.C. § 1988.

32. This Court has subject matter jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because they are so related to Plaintiffs' federal question claims that they form part of the same case or controversy.

33. Plaintiffs' claims are properly joined under the permissive joinder provisions of Rule 20, Fed. R. Civ. P., as their claims arise out of the same series of transactions or occurrences and raise common questions of law or fact.

34. This Court has personal jurisdiction over Defendants because McDonald's Corporation is headquartered in this District and McDonald's USA maintains its principal place of business in Chicago, Illinois.

35. Venue is proper pursuant to 28 U.S.C. § 1391 and 18 U.S.C. §1965, because a substantial part of the events or omissions giving rise to the claim have occurred and are occurring in the Northern District of Illinois, and each Defendant transacted affairs and conducted activity that gave rise to the claim of relief in this District, where their principal place of business is located, and they are headquartered. 28 U.S.C. § 1391(b); 18 U.S.C. §1965(a).

## PARTIES

### A. Plaintiffs

36. Plaintiffs are members of a federally-protected class, owned and operated McDonald's domestic franchised restaurant(s), are over the age of 21, and are otherwise *sui juris*.

37. Plaintiff Ralph King is a Missouri citizen and a former Black McDonald's franchise owner/operator who was forced out of the system at a loss in 2019. As a result of McDonald's misconduct alleged herein, Mr. King owned and lost eight (8) Missouri Region stores.

38. Plaintiff John Tillman and his wife, Marcia Tillman, are Texas citizens and former Black McDonald's franchise owner/operators who were forced out of the system at a loss in 2019. As a result of McDonald's continuing misconduct alleged herein, the Tillmans owned and lost fourteen (14) Houston Region stores.

39. Plaintiff Keristin Holloway and his wife, Gloria Holloway, are Texas citizens and former Black McDonald's franchise owner/operators who were forced out of the system at a loss in 2017. As a result of McDonald's continuing misconduct alleged herein, the Holloways owned and lost two (2) Houston Region stores.

40. Plaintiff George Jones and his wife, Jane Jones, are Tennessee citizens and former Black McDonald's franchise owner/operators who were forced out of the system at a loss in 2019. As a result of McDonald's continuing misconduct alleged herein, the Jones owned and lost four (4) Nashville Region stores.

41. Plaintiff Errol Service is a Michigan citizen and a former Black McDonald's franchise owner/operator who was forced out of the system in 2020. As a result of McDonald's continuing misconduct alleged herein, Mr. Service owned and lost seventeen (17) Detroit Region stores.

42. Plaintiff LaMonika Jones, as Personal Representatives of the Estate of her late father, Melvin Jones, a former Black McDonald's franchise owner/operator who was forced out of the system at a loss in 2018. As a result of McDonald's continuing misconduct alleged herein, Mr. Jones owned and lost three (3) Detroit Region stores.

43. Plaintiff Arthur Scott is a Michigan citizen and a former Black McDonald's franchise owner/operator who was forced out of the system at a loss in 2017. As a result of McDonald's continuing misconduct alleged herein, Mr. Scott owned and lost eight (8) Detroit Region stores.

44. Plaintiff Yvonne Knox is a Michigan citizen and a former Black McDonald's franchise owner/operator who was forced out at a loss in 2016. As a result of McDonald's continuing misconduct alleged herein, Ms. Knox owned and lost one (1) Detroit Region store.

45. Plaintiff Lisa Gunter, f/k/a Lisa McKenzie, is a North Carolina citizen and a former Black McDonald's franchise owner/operator who was forced out of the system at a loss in 2018. As

a result of McDonald's continuing misconduct alleged herein, Ms. Gunter owned and lost two (2) Raleigh Region stores.

46. Plaintiff Michael Simon is a New Jersey citizen and a former Black McDonald's franchise owner/operator who was forced out of the system at a loss in 2017. As a result of McDonald's continuing misconduct alleged herein, Mr. Simon owned and lost three (3) Raleigh Region stores.

47. Plaintiff John Mason is a North Carolina citizen and a Black McDonald's franchise owner/operator who was forced out of the system at a loss in 2016. As a result of McDonald's continuing misconduct alleged herein, Mr. Mason owned and lost four (4) Raleigh Region stores.

48. Plaintiff George Gipson and his wife, Bonnie Gipson, are Missouri citizens and former Black McDonald's franchise owner/operators who were forced out of the system at a loss in 2017. As a result of McDonald's continuing misconduct alleged herein, the Gipson's owned and lost three (3) St. Louis Region stores.

49. Plaintiff Kenneth Nelson is a Missouri citizen and a former Black McDonald's franchise owner/operator who was forced out of the system at a loss in 2012. As a result of McDonald's continuing misconduct alleged herein, Mr. Nelson owned and lost five (5) St. Louis Region stores.

50. Plaintiff David White and his wife, Barbara White, are Indiana citizens and former Black McDonald's franchise owner/operators who were forced out of the system at a loss in 2018. As a result of McDonald's continuing misconduct alleged herein, the Whites owned and lost five (5) Indianapolis Region stores.

51. Plaintiff Victor Bruce is an Indiana citizen and a former Black McDonald's franchise owner/operator who was forced out of the system at a loss in 2016. As a result of McDonald's continuing misconduct alleged herein, Mr. Bruce owned and lost three (3) Indianapolis Region stores.

52. Plaintiff Faye Hobley is a Nebraska citizen and a former Black McDonald's franchise owner/operator who was confined to two low-volume, tough, high-crime, and predominantly Black areas of Nebraska, which she rebuilt twice, one high-volume store in suburban area, which McDonald's gave her during parity, but was ultimately forced out of the system at a loss in 2018, post-parity, based on failing food safety inspections, a subjective category used to force out Black franchisees. As a result of McDonald's continuing misconduct alleged herein, Ms. Hobley owned and lost three (3) Minneapolis Region stores.

53. Plaintiff Paul Hoskins and his wife, Michele Hoskins, are Texas citizens and former Black McDonald's franchise owner/operators who were forced out of the system at a loss in 2018. As a result of McDonald's continuing misconduct alleged herein, the Hoskins owned and lost five (5) Houston Region stores.

54. Plaintiff Lewis Anderson is a Florida citizen and a former Black McDonald's franchise owner/operator who was forced out of the system as a result of McDonald's interference in the exit sale in 2016, to ensure quota of Black operators for reporting, at a loss. As a result of McDonald's continuing misconduct alleged herein, Mr. Anderson owned and lost four (4) Great Southern Region stores.

55. Plaintiff Hayes Ferrell is a Georgia citizen and a former Black McDonald's franchise owner/operator who was forced out of the system at a loss in 2016. As a result of McDonald's continuing misconduct alleged herein, Mr. Ferrell owned and lost one (1) Atlanta Region store.

56. Plaintiff Joyce Mance-Roan and her ex-husband, Gary Roan, are Ohio citizens and former Black McDonald's owner/operators who were forced out of the system at a loss in 2014. As a result of McDonald's continuing misconduct alleged herein, the Roans owned and lost four (4) Ohio Region stores.

57. Plaintiff LeRoy Walker, Jr. is a Mississippi citizen and a former Black McDonald's franchise owner/operator who was forced out of the system at a loss in 2015. As a result of McDonald's continuing misconduct alleged herein, Mr. Walker owned and lost one (1) Mississippi Region store.

58. Plaintiff Philip Douglas is an Illinois citizen and a former Black McDonald's franchise owner/operator who was forced out of the system at a loss in 2014. As a result of McDonald's continuing misconduct alleged herein, Mr. Douglas owned and lost three (3) Chicago Region stores.

59. Plaintiff Darryl Umphries is an Oklahoma citizen and a former Black McDonald's franchise owner/operator who was forced out of the system in 2014. As a result of McDonald's continuing misconduct alleged herein, Mr. Umphries owned and lost two (2) Oklahoma City Region stores.

60. Plaintiff Bernard Saffold is a Wisconsin citizen and a former Black McDonald's franchise owner/operator who was forced out of the system at a loss in 2010. As a result of McDonald's continuing misconduct alleged herein, Mr. Saffold owned and lost one (1) Milwaukee Region store.

61. As a result of Defendants' racial discrimination alleged herein, each of the individual Plaintiffs named above have been subjected to the same pattern and practice of discrimination and suffered substantial damages in the forms described below and amounts that will be proven at trial.

62. At all times material, McDonald's led Plaintiffs to believe that they wanted all franchisees to succeed, were committed to racial equality, and, as such, any losses they suffered were because they were "bad operators" and/or "mismanaged" their organizations.

63. As a result of McDonald's affirmative misrepresentations and omissions, systematic isolation of Plaintiffs throughout their franchise terms, and control of vital information bearing on Plaintiffs' claims, Plaintiffs were unaware, and could not have reasonably known or have learned through the exercise of due diligence, the true nature and extent of McDonald's systematic and covert racial discrimination.

64. By agreement with McDonald's, all viable statutes of limitation applicable to those Plaintiffs named in the Complaint are tolled as of June 8, 2020.

### B. Defendants

65. Defendant McDonald's USA is a Delaware limited liability corporation with its principal place of business located at 110 North Carpenter Street, Chicago, Illinois 60607. McDonald's USA is a wholly-owned subsidiary of McDonald's Corporation and the franchisor of the McDonald's franchise system, which develops, operates, franchises, and services a system of fast-food restaurants in the United States.

66. Defendant McDonald's Corporation is a publicly traded Delaware corporation with its principal place of business located at One McDonald's Plaza, Oak Brook, Illinois. McDonald's Corporation is the sole member of McDonald's USA, and is the worldwide franchisor of the McDonald's franchise system.

## COMMON FACTUAL ALLEGATIONS

### A. McDonald's Franchise Model

67. McDonald's is the leading quick-service restaurant chain in the United States, with total assets of $47.5 billion. McDonald's Corporation owns and controls approximately 55% of the

land and 80% of the buildings for restaurants in its consolidated market. Under this business model, McDonald's has grown to 39,000 restaurants globally in over 100 countries at year-end 2019.

68. McDonald's led aspiring Black entrepreneurs, including Plaintiffs, to believe franchise ownership was a "Golden Opportunity," their ticket to the American dream. The reality was the opposite.

69. Location is the key to a franchisee's success in the McDonald's franchise system, as McDonald's sells more than burgers, it sells real estate. McDonald's revenues from franchised restaurants are therefore largely dependent on the ability of franchisees to grow sales in the locations McDonald's places them in. By design, McDonald's revenue does account for the cost of running the restaurant, including insurance costs, security costs, and employee-turnover costs, which are consistently higher in the locations McDonald's confined Plaintiffs to—locations where White franchisees refused to operate, and McDonald's needed to expand its Black consumer base and sales.

70. With 20-year lease terms with McDonald's as the lessor and franchisor, McDonald's shackled Plaintiffs to underperforming locations with low-volume sales and high expenses and systematically denied Plaintiffs equal opportunities to grow their franchises to offset their low-performing stores.

71. At the same time, McDonald's imposed high upfront capital expenditures on Plaintiffs with the oldest stores, as compared to White franchisees, knowing Plaintiffs had insufficient revenue sales to offset these expenses due to their locations and advertising cuts to African American consumers.

72. Plaintiffs were thus captive tenants, subject to, and in fear of, McDonald's ability to deny them growth opportunities and to easily create pretextual reasons for non-renewal or "rewrite."

**(i)** ***The Franchise Agreement***

73. Under McDonald's standard franchise agreement, McDonald's owns or secures a long-term Operator's Lease for the land and building of the restaurant location for 20-year terms (the Franchise Agreement, Operator's Lease, Franchise Disclosure Document, and any amendment(s) thereto are collectively referred to as, the "Franchise Agreement").[1]

74. Under the Franchise Agreement, McDonald's owns or leases the franchised premises, so that the franchisee is always the tenant. Franchisees are granted the right to operate a restaurant using the McDonald's system through a license and, in most cases, the use of a restaurant facility, through the Lease, which is coterminous with the Franchise Agreement. Failure to renew therefore includes possible eviction and loss of the franchisee's business.

75. Franchisees pay initial fees upon the opening of a new restaurant or grant of a new franchise, as well as continuing rent and royalties to McDonald's based upon a percentage of sales with minimum rent payments. This structure enables McDonald's to generate significant and predictable levels of cash flow.

76. Additionally, franchisees pay for all occupancy costs, including fire and casualty insurance on the real estate, naming McDonald's as the insured, liability insurance protecting McDonald's, equipment and fixtures on the real estate (signs, seating, and décor), property taxes, and site maintenance of the real estate, at the franchisees' **sole cost and expense**, as well as improvements of McDonald's real estate at no cost to McDonald's.

[1] Upon information and belief, Plaintiffs' Franchise Agreements contain the same or substantially similar terms.

77. At the end of the 20-year term, McDonald's maintains control of the underlying real estate and building and can either enter into a new 20-year franchise agreement with the existing franchisee or a different franchisee, or close the restaurant.

78. Through McDonald's standard Franchise Agreement, McDonald's agrees to make available to Franchisee **all** additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes generally available, from time to time, **to all its franchisees** operating McDonald's restaurants.

79. Through McDonald's Franchise Disclosure Document ("FDD"),[2] McDonald's provides prospective franchisees[3] with "Financial Performance Representations," that include *pro forma* statements with the national average **sales** of domestic traditional McDonald's restaurants opened at least one (1) year prior. For example, the 2020 FDD provides, in pertinent part, as follows:

> ***All Domestic Traditional Restaurants***
> Of the approximately 12,032 domestic traditional McDonald's restaurants opened at least 1 year as of December 31, 2019, approximately 79% had annual sales volumes in excess of $2,300,000; approximately 70% had annual sales volumes in excess of $2,500,000; and approximately 60% had annual sales volumes in excess of $2,700,000. The average annual sales volume of domestic traditional McDonald's restaurants open at least 1 year as of December 31, 2019, was $3,009,000 during 2019. The highest and lowest annual sales volume in 2019 for these domestic traditional McDonald's restaurants was $12,654,000 and $654,000, respectively. The median annual sales volume of domestic traditional McDonald's restaurants open at least 1 year as of December 31, 2019, was **$2,910,000 during 2019**.

[2] McDonald's has possession of the disclosure documents it provided to Plaintiffs.
[3] McDonald's provides disclosure documents not only upon entry, but also throughout the franchise term with respect to any additional purchases of a franchise and/or in connection with a sale of a franchise. A "prospective franchisee" is defined by the Franchise Rule as "any person (including any agent, representative, or employee) who approaches or is approached by a franchise seller to discuss the possible establishment of a franchise relationship." 16 C.F.R. Part 436.

> ***Traditional Franchised Restaurants***
>
> Of the approximately 11,435 domestic traditional franchised McDonald's restaurants opened at least 1 year as of December 31, 2019, approximately 78% had annual sales volumes in excess of $2,300,000; approximately 68% had annual sales volumes in excess of $2,500,000; and approximately 58% had annual sales volumes in excess of $2,700,000. The average annual sales volume of domestic traditional franchised McDonald's restaurants open at least 1 year as of December 31, 2019, was $2,970,000 during 2019. The highest and lowest annual sales volume in 2019 for these domestic traditional McDonald's restaurants was $12,654,000 and $654,000, respectively. The median annual sales volume of domestic traditional franchised McDonald's restaurants open at least 1 year as of December 31, 2019, was **<u>$2,867,000 during 2019</u>**.
>
> ***Traditional Company Owned Restaurants***
>
> Of the approximately 597 domestic traditional McOpCo restaurants[4] opened at least 1 year as of December 31, 2019, approximately 99% had annual sales volumes in excess of $2,300,000; approximately 98% had annual sales volumes in excess of $2,500,000; and approximately 95% had annual sales volumes in excess of $2,700,000. The average annual sales volume of domestic traditional McOpCo restaurants open at least 1 year as of December 31, 2019, was $3,758,000 during 2019. The highest and lowest annual sales volume in 2019 for these domestic traditional McOpCo restaurants was $8,182,000 and $2,047,000, respectively. The median annual sales volume of domestic traditional McOpCo restaurants open at least 1 year as of December 31, 2019, was **<u>$3,629,000 during 2019</u>**.

(Emphases added).

80. At all times material hereto, Plaintiffs' average annual sales are hundreds of thousands of dollars less than McDonald's disclosed national sales averages of $2.7 million between 2011 and 2016, and $2.9 million in 2019.

81. McDonald's dictates uniformity of the operational structure and revenue expectations of all its franchisees' restaurants, even though they are cognizant that Black-owned and operated

[4] McDonald's owns and operates these restaurants through a wholly-owned subsidiary called McDonald's Operations Co., colloquially known as McOpCo.

McDonald's franchises generate significantly lower revenue and assume higher operational costs than the national average due to the substandard locations and the related lower revenue and higher costs.

82. Acquisition of a McDonald's franchise under these conditions was nothing short of a financial suicide mission.

**(ii) *Entry into the McDonald's Franchise System***

83. Before McDonald's will consider a candidate for any McDonald's franchise opportunity, a candidate must first satisfactorily complete McDonald's Franchise Applicant Training and Evaluation Program, which may exceed a period of two years on a part-time basis, without compensation, or any commitment or promise of a McDonald's franchise.

84. According to McDonald's website, the decision to offer any franchise opportunity is within McDonald's ***sole*** discretion. *See* https://www.mcdonalds.com/us/en-us/about-us/franchising.html (last visited on Jan. 25, 2021).

85. McDonald's does not offer franchise territories and will ***not*** work with applicants who want a specific geographic location. *See* McDonald's Franchising FAQ ("We do not franchise territories and do not work with applicants who desire a specific restaurant location or limited geographic area."), https://www.mcdonalds.com/us/en-us/about-us/franchising/franchising-faq.html (last visited Jan. 25, 2021).

86. Neither the Franchise Agreement nor the FDD requires a franchisee to live in the same region as their franchise location(s). Yet, Plaintiffs were continuously confined to their own regions without explanation, as White operators were brought in from out of state to purchase restaurants.

87. According to "Your Path to Becoming a McDonald's Franchisee," prospective franchisees can only enter the Franchisee Training Program if they meet the following requirements:

i. Ability to invest a minimum of $500,000 in non-borrowed personal funds;

ii. Divestiture of all existing business interests;

iii. Commitment to an extensive training program that can range from 12-18 months, with a minimum of 20 hours per week;

iv. Relocation based on availability of restaurants.

*See* McDonald's "*Your Path to becoming a McDonald's franchisee*," at p. 23, https://www.mcdonalds.com/content/dam/usa/nfl/documents/franchising/Your_Path_to_Becoming_a_McDonalds_Franchisee.pdf (last visited on Jan. 25, 2021).

**(iii) *The Cost to Own and Operate a McDonald's Franchise***

88. It costs an estimated $1,314,500 - $2,306,500 to open a McDonald's franchise.

89. The initial down payment is 40% of the total cost for a new restaurant, or 25% of the total cost for an existing restaurant, and the balance of the purchase price may only be financed for a maximum of seven years. *Id*.

90. In addition to the initial fees and down payment, McDonald's requires franchisees, to pay the following ongoing fees throughout their franchise terms:

a. **Service fee**: A monthly service fee based upon the restaurant's sales, which, as of this filing date, is an amount equal to four percent (4.0%) of the Gross Sales[5] of the restaurant for the preceding month immediately ended; and

b. **Rent**: Monthly base rent and any pass thru rent, if applicable, plus percentage rent in amounts calculated as a percentage of monthly Gross Sales, and any applicable rent escalations.

91. Gross sales are not impacted by operational costs and neither is McDonald's service fee and/or monthly rent. Operational costs only impact the franchisee's profit, not McDonald's.

[5] "Gross Sales" is defined in the Franchise Agreement as all revenues from sales of the Franchisee based upon all business conducted upon or from the Restaurant, including sales of food, beverages, and tangible property of every kind and nature, promotional or otherwise, and for services performed from or at the Restaurant, together with the amount of all orders taken or received at the Restaurant.

92. Plaintiffs were required to lease the restaurant premises from McDonald's, under an Operator's Lease that is incorporated into the Franchise Agreement. Prospective franchisees must agree to use and occupy the leased premises solely for a McDonald's Restaurant selling only such products and operating in a manner that may be designated by McDonald's and in a manner that will maximize gross sales.

93. Under the Operator's Lease, franchisees are required to pay rent every month of the franchise to McDonald's, along with the related occupancy costs, which include property taxes, insurance, maintenance, and structural repairs.

94. Under this formula, McDonald's derives significant revenue without any significant risk of loss. The base rent gives McDonald's a minimum guarantee of profit, with additional profits obtained through percentage rent.

95. McDonald's also requires franchisees, including Plaintiffs, to rebuild, renovate, and/or make major remodels to their restaurants at franchisees' **sole** cost and expense. McDonald's therefore owns the real estate, franchisees' money pays for it, and all improvements on the real estate by franchisees benefit McDonald's as the owner.

96. Franchisees assume **sole** financial responsibility for advertising and promotion through a mandatory, minimum spend based on a percentage of their **gross** sales per store. At all times material, and upon information and belief regarding historical percentages, McDonald's required Plaintiffs to spend a minimum of 4% of Gross Sales annually for each of their restaurants.

97. Plaintiffs worked with local agencies to place advertisements and, through a U.S. cooperative of McDonald's Owner/Operators known as the Operator's National Advertising (OPNAD) Fund, Plaintiffs and McDonald's combined to purchase national television advertising.

98. While participation in OPNAD is technically "voluntary," McDonald's advised Plaintiffs at the local field levels and through the NBMOA that their consistent involvement with OPNAD is a factor McDonald's uses to measure compliance with the Operator Involvement standard, which Plaintiffs were required to meet to be eligible for growth and rewrite.

**(iv) *The Cost to Own and Operate a Black McDonald's Franchise: A Financial Suicide Mission***

99. Unequal bargaining power characterizes the relationship between franchisees and McDonald's and this bargaining disparity is even more palpable for Black applicants and franchisees like Plaintiffs. This unequal bargaining position made it easy for McDonald's to historically award Black franchisees entering the system the oldest restaurants, with the lowest volume of sales, in need of the most reinvestment, in tough and depressed areas, that had been routinely rejected by White franchisees, many of which McDonald's wanted to close, but needed someone to operate until McDonald's could sell its real estate.

100. Beginning in the 1960's, with an unprecedented, opportunistic expansion of real estate ownership into Black communities on the heels of the American civil rights movement through crudely-termed "zebra" partnerships with silent, White investors, continuing with targeted marketing campaigns aimed at Black consumers, from "*Do Your Dinnertimin' at McDonald's*" advertisements in the late 1970s, to "Calvin Got a Job" commercials in the 1990s,[6] to its recruitment of Black icon Michael Jordan in 1992, as recently revived through a collaboration with Black rap artist Travis Scott, McDonald's sells itself as a friend of Black America, yielding billions in profits to the company, at the expense of its own Black franchisees.

---

[6] McDonald's "Calvin Got a Job" commercials featured a young Black, baggy-clothes wearing teenage character named Calvin from the ghetto, who is depicted as learning responsibility and staying out of trouble by getting a job at McDonald's. *See* https://youtu.be/1p_Fkiwhljs (last visited on July 19, 2021).

101. McDonald's offered Plaintiffs locations with higher operating costs, such as security, insurance, and employee training and turnover, which were historically underperforming in sales to offset these expenses. As McDonald's promised Plaintiffs parity through the NBMOA, it controlled and manipulated the data Plaintiffs relied on at entry and throughout their franchise terms, and placated them with "growth" in their restricted areas, Plaintiffs did not know or have any way to discover the higher cost of doing business as a Black owner/operator of a McDonald's franchise.

102. McDonald's discriminatory practices led to disproportionately low net income for Plaintiffs, individually, and lower debt to income ratios, as compared to White owner operators. Plaintiffs, under long-term contracts, with mounting debt and no way out, isolated every step of the way by McDonald's, were forced to either continue to operate these substandard locations without any individual profit (or at least not comparable to White McDonald's franchisees) or sell at a loss.

103. For McDonald's, it was a win-win strategy to collect high rent and fees for substandard restaurants, built upon a history of discrimination it successfully executed for decades.

## B. <u>McDonald's History of Discrimination Against Black Franchisees</u>

104. The McDonald's franchise system was established in 1955, but Black franchisees were denied entry until 1968, following the assassination of Dr. Martin Luther King Jr., at the height of civil unrest.

105. Through crudely-coined "zebra" and "salt and pepper" partnerships with silent, White investors, McDonald's opportunistically used its Black franchisees to expand its real estate footprint into predominantly Black, inner-city neighborhoods where White franchisees refused to operate, particularly in the face of mounting racial tension in the United States.

106. On December 21, 1968, Herman Petty opened his first restaurant in the inner-city of Chicago, becoming the first Black Owner/Operator of a McDonald's franchise.

**(i) *Boycott in Cleveland 1969***

107. A boycott of McDonald's in 1969 made headlines in Ohio and led to the first Black franchisees in the McDonald's system opening restaurants in depressed areas of Cleveland.

108. In a January 25, 1970, article regarding the first Black owned and operated McDonald's franchise, the New York Times reported: "Spokesman for Negro groups, who banded together to form Operation Black Unity have been demanding black ownership of four existing McDonald's units … ***All are in predominantly Negro areas***." *Cleveland Negro Wins a Franchise*, N.Y. Times (Jan. 25, 1970), https://www.nytimes.com/1970/01/25/archives/cleveland-negro-wins-a-franchise-9month-controversy-over-restaurant.html (emphasis added).

**(ii) *McDonald's uses the NBMOA to Create a Special Relationship of Trust***

109. In 1972, twelve Black McDonald's franchisees created the NBMOA as a mechanism for promoting the growth of Black franchisees in the industry and to advocate for equality.

110. Since the creation of the NBMOA, McDonald's has had, and continues to have, an active role in positioning its communications to Black franchisees. McDonald's has been, and continues to be, intricately involved with the leadership of the NBMOA organization, routinely attending meetings at the local and national level to make franchisees believe they were being treated the same as other franchisees, making it appear that any lack of success was the fault of the individual.

111. McDonald's utilized the NBMOA as its vehicle to intentionally and fraudulently conceal the effects of its continued discriminatory practices from Plaintiffs by, including, among other things:

i. disclosing to them misleading and incomplete information regarding the cash flow of stores owned by Black franchisees as compared to stores owned by White franchisees, in order to create a false perception regarding progress toward parity;

ii. failing to provide Plaintiffs information requested regarding audits, impact studies of initiatives impacting Black franchisees, accurate numbers for the decrease and increase of franchisees, future growth opportunities, and the number of franchisees deemed ineligible for growth; and

iii. communicating a false narrative through NBMOA leadership that McDonald's was addressing the concerns of Plaintiffs, such that it always falsely appeared progress was being made.

112. McDonald's knew Plaintiffs, who had previously been blocked for years from purchasing a McDonald's restaurant, would be fearful to complain and highlight themselves when problems occurred.

113. Plaintiffs only recourse internally was the NBMOA, whose leadership was comprised of some of the very same franchisees that McDonald's used the NBMOA to mislead.

114. McDonald's used the NBMOA leadership as a shield to curb any outcries of discriminatory or hostile treatment.

115. The power of the NBMOA leaders to advocate and make change had limits. The primary role of the NBMOA from McDonald's position was to pacify its Black franchisees through concealment, misinformation, and half-truths and to add credibility to its arbitrary and subjective mistreatment of Black franchisees.

116. During hearings held on April 7 and 8, 1976, before the United States Senate Committee on Commerce regarding the Fairness in Franchising Act, Donald R. Conley, President of the McDonald's Operator's Association, testified that McDonald's primary tool used to force franchisees to sell prior to expiration of their agreements is their power over renewal of franchise agreements, entirely within McDonald's control and discretion, allowing them to discriminate against franchisees. *See* U.S. Senate, Hearing of the Committee on Commerce, S. 2335 (1996), at pp. 381–397.

117. Mr. Conley testified that McDonald's inhibits franchisees' expansion, while encroaching on their territories, with new McDonald's restaurants that cut sales volume, thereby depressing the resale value of the franchise at franchisee's loss and McDonald's gain. *Id*. He explained that because McDonald's franchise agreements have a restrictive covenant that prevents the franchisee from owning any business other than its McDonald's operation, the franchisee is locked into the McDonald's store as his only business such that cutting the sales volume or profitability of that one business by siphoning off sales to additional units is a process employed by McDonald's to devalue the business interest and drive the franchisee out of business. *Id*.

118. In the same hearing, Vice President of McDonald's Corporation is cited in an excerpt from the company's in-house publication, "Insight," as stating that pursuant to McDonald's renewal policy, being a good operator, having high sales volume, and/or being favorably regarding by customers does not entitle a franchisee to renewal. *Id*. at 382. According to McDonald's, renewal can be denied for other completely subjective evaluations at the whim of management, such as "stamina," "attitude," "cooperation," and the like; "McDonald's reserved the right to discriminate against existing franchisees as to renewal." *Id*. at 387.

119. By 1980, Black Franchisees began to question the subjective treatment happening in their restaurants as compared to other non-Black operators in the same region.

120. In 1983, Charles Griffis, a Black McDonald's owner/operator in the Los Angeles market, filed a race discrimination countersuit against McDonald's, alleging, among other things, that McDonald's systematically excluded Black franchisees from buying stores in White neighborhoods.

121. In a March 12, 1984, New York Times article, Griffis detailed his experience:

> **My stores are in hellholes**, he said. They get robbed once or twice a month, and I pay $20,000 a month in security services they don't pay in good neighborhoods. We had a murder in one and we still get the windows smashed and the bathrooms vandalized. **I've upgraded my**

> **<u>stores a lot and I don't see why I shouldn't have a shot at a store in a good neighborhood</u>**.

Tamar Lewin, *McDonald's is Battling with Black Franchisee*, N.Y. Times, March 12, 1984, *available at* https://www.nytimes.com/1984/03/12/business/mcdonald-s-is-battling-with-black-franchisee.html; *see also* excerpt of the article below (emphasis added).




122. In response to McDonald's racial practices, and Griffis' situation, the New York chapter of the NBMOA also wrote to McDonald's New York Regional Vice President at the time to advise that, "**<u>black McDonald's owner-operators are primarily confined to ghetto areas and not allowed to expand as fast as their white counterparts</u>**." *Id.* (emphasis added).

123. Although Griffis' challenge was public, his situation within McDonald's was made to appear as an isolated incident.

***(iii) McDonald's Promises "Parity"***

124. By the late 1990s, McDonald's leadership admitted that McDonald's excluded Black franchisees from franchise opportunities afforded to White franchisees, but they made it appear as if they would reconcile for past wrongs through a parity initiative.

125. Specifically, through Dentice, McDonald's admitted, "*[T]he company has placed many Black Franchisees in restaurants that have not allowed them to achieve the same level of economic success as their peers*." *See* Dentice Letter, Ex. A .

126. Starting with this pronouncement of parity, Black franchisees for over two decades, almost universally believed that McDonald's was in a new era of equality.

127. Yet, despite the beliefs of Black franchisees, parity was never achieved. McDonald's spent the next decade instituting aspirational and temporary measures and promising Black franchisees, including Plaintiffs, that it was working to achieve parity between Black and White McDonald's franchisees.

128. Plaintiffs relied on these representations and had no reason to believe McDonald's was discriminating against them.

129. To McDonald's, parity was a marketing tool, not a change in policies and treatment.

130. On November 14, 2002, NBMOA leadership addressed McDonald's past discriminatory practices in a letter from NBMOA Chairman and CEO, Larry C. Tripplett, to NBMOA Membership, which described its negotiations with McDonald's Leadership "to ensure that Parity is met and maintained." *See* Nov. 14, 2002 Tripplett Letter, **Exhibit "C"** hereto, with excerpts below.

131. In the letter, Larry Tripplett questioned why financial assistance such as temporary rent assistance was given to White franchisees and unevenly provided to Black franchisees, such as Plaintiffs, with on-average the lowest volume stores and in need of the assistance to offset the lower

revenues. The letter also quelled Plaintiffs from any legal action by stating that the organization was not involved in any lawsuit nor planned to engage in any.

NBMOA
National Black McDonald's Operators Association

November 14, 2002

To: NBMOA Membership

From: Larry C. Tripplett, Chairman & CEO
NBMOA

**RE: ORGANIZATION UPDATE**

Dear NBMOA Member:

This letter is written to update each of you as to what your Board of Directors and Executive Committee have been diligently working on for the benefit of African American Franchisees in the McDonald's System and African Americans in general.

First, let me remind you of what you already know. **We are "Free People**." We have the right to expect not to be discriminated against by anyone. Discrimination is illegal in this Country. We make significant contributions to the McDonald's System every day. In some cases, these contributions are made under very difficult dangerous environmenta circumstances. We do so proudly and professionally as we all desire the American Dream of successful Business Ownership. We deserve and will demand nothing less tha equal treatment. **We must continue to stand United and Strong**. We have nothing to fear.

As you are aware, the NBMOA Executive Committee is in earnest negotiations with the Leadership of McDonald's Corporation to ensure that Parity is met and maintained. believe that each and every African American Franchisee should receive real assuran that when Parity is met, the discriminatory practices of the past will not reoccur.

During these negotiations we ask that you continue to maintain good operations in yo restaurants. We owe this to the Communities we serve. There have been many questi regarding the request to sign release letters for Temporary Rent Adjustment (TRA) us to ostensibly make Parity. We never agreed that release letters should be signed for TRA. We have advised Mike Roberts of this fact. We encourage you to avoid signing any release letter. We suggest before signing such a letter you seek legal counsel and discuss this matter with your NBMOA Board Representative, Chapter President, or Division President. It goes without saying that in many cases TRA may mean the difference of staying in business or not, you must make the best decision for you and your family. Nevertheless, please know that you have the absolute support of the NBMOA Board of Directors and this Chairman. We are determined to resolve this

P.O. Box 8204 • Los Angeles • California • 90008-0204 • 323/296-5495 • Fax: 323/296-6
e-mail:nbmoa@aol.com • webasite: www.nbmoa.org

First, let me remind you of what you already know. **We are "Free People."** We have the right to expect not to be discriminated against by anyone. Discrimination is illegal in this Country. We make significant contributions to the McDonald's System every day. In some cases, these contributions are made under very difficult dangerous environmental circumstances. We do so proudly and professionally as we all desire the American Dream of successful Business Ownership. We deserve and will demand nothing less than equal treatment. **We must continue to stand United and Strong**. We have nothing to fear.

As you are aware, the NBMOA Executive Committee is in earnest negotiations with the Leadership of McDonald's Corporation to ensure that Parity is met and maintained. We believe that each and every African American Franchisee should receive real assurances that when Parity is met, the discriminatory practices of the past will not reoccur.

132. On August 12, 2004, the NBMOA requested an audit by McDonald's to look into the cash flow positions of stores in Chicago, the Great Southern Region, the Midwest, and Ohio, and certain issues regarding sales.

133. The NBMOA also requested a review of the loss of nineteen (19) Black-owned and operated McDonald's restaurants since the promise of parity ended.

134. McDonald's failed to provide the NBMOA with the requested data and refused to conduct the audit as Plaintiffs continued to operate in the dark.

## C. <u>McDonald's Fraudulent Concealment and Discrimination Post-Parity</u>

135. While McDonald's represented to Plaintiffs that such racist treatment was a thing of the past *vis-à-vis* the NBMOA, systemic racism was admittedly (and unbeknownst to Plaintiffs) revived by McDonald's at the highest levels of the corporation.

### (i) ***<u>2009 to 2015</u>: McDonald's Concealment Vis-à-Vis the NBMOA***

136. In 2009, during an NBMOA Board meeting at the Ritz Carlton in Buckhead, Georgia, McDonald's corporate executives, including Debbie Stroud, Marty Ranft, Mason Smoot, Karen King, and Rick Colon, presented incomplete financial information to Plaintiff David White to conceal the information they would have needed to discover that their losses were not individualized, but rather the result of ongoing and systemic racism. *See* NBMOA Board Meeting Minutes (Feb. 6, 2009), attached as **Exhibit "D"** hereto.

137. Karen King, President of McDonald's East Division Office, presented to the NBMOA members that the actual cash flow of Black franchisees was "a little lower than where they wanted it to be." Feb. 6, 2009 NBMOA Board Meeting Minutes (Ex. C), at 2.

138. Mr. Colon, Sr. Vice President McOpCo of the East Division, highlighted McDonald's business perspectives for McOpCo companies and stated, "there was a 10 to 1 odds opportunity to get growth from McOpCo's and 1 out of 18 chances for new store opportunity in 2008," all the while knowing that McOpCo franchises had lower volumes and the highest need for reinvestments and remodels, which would cause the Black franchisees who purchased them to incur more debt without profitable locations to offset them.

139. During the question-and-answer session with members attending the meeting, Mr. Colon quickly shut down any attempts by Black operators to gain more information about purchasing a McOpCo.

> **Comment:** Ernie Adair - stated the cash flow issue is of concern
>
> **Q:** Ernie Adair - What is negotiable and what isn't when buying McOpCo Restaurant?
>
> **A:** Rick Colon – restaurants are valued by a team in Oakbrook There is zero flexibility in adjusting prices on restaurants. What is on the books is rolled back into the rent.
>
> **Q:** Adair: Is there a possibility for the Operator to look at what is on the books?
>
> **A:** Rick Colon – No

Feb. 6, 2009 NBMOA Board Meeting Minutes (Ex. D), at 3.

140. Another Black McDonald's franchisee at the time, Kenneth (Ken) Manning, from Atlanta, asked a question concerning the rent prices, and Mr. Colon stated that there are "things behind the scenes McDonald's did not publicize." (*Id.*)

141. Other operators seeking detailed data regarding cash flow and profitability to make informed decisions were told by McDonald's that they would "get back to them." For example,

> **Comment**: Ken Manning –concerned about the raising of rent based on lease hold improvements. We do not have the opportunity to capture that money back. It is an unfair advantage.
>
> **A:** Rick Colon - There are things behind the scene we don't publicize. We can't always raise the rent for lease hold improvements. I have taken the feedback to the group and will take it back again.
>
> **Q**: Larry Tripplett – have concerns with rolling money that is on the books into the rent vs. the price of the restaurant.
>
> **Q:** Rose Andom: Would like a firm answer on whether we can or cannot see the site profitability. (Site Prof) report

**A**: Karen King - will follow up with getting an answer on this question.

(*Id*.)

142. McDonald's Vice-President & General Manager, McDonald's East Division (Philadelphia), Debbie Mossa, told Black McDonald's franchisees who asked questions about why other operators were ineligible to grow were told that "plans were in place for African American operators," by Debbie Mossa, Vice-President & General Manager, McDonald's East Division (Philadelphia), without ever providing the details of those plans.

143. In 2011, at the Regional NBMOA meeting in Texas, McDonald's executives reviewed U.S. Franchising and financial information from March 31, 2011 and stated that "the numbers shown were moving ahead."

144. On June 23, 2011, during the 2nd Quarterly NBMOA Board of Directors Meeting, McDonald's Finance Officer, Zaida Zavitz, represented to Black franchisees, including Plaintiffs Ralph King, Gloria Holloway, John Tillman, Marcia Tillman, Paul Hoskins, and Darryl Umphries, that "75% of those eligible to co-invest take advantage of opportunity to co-invest, and reduce their rent." *See* NBMOA Board Meeting Minutes, at 4 (June 23, 2011), attached as **Exhibit "E"** hereto. McDonald's Finance Officer further stated, "Minimal sales issues/threshold will assist Owner/Operators to get financial assistance." (*See id.)*

145. During an August 27, 2013, NBMOA Meeting, the focus was on "Closing the CF [Cash Flow] Gap," with a Cash Flow Trend chart from 2006 to 2012 created to intentionally depict a very small gap of no more than $59,000 between the "Region Cash Flow" and "Group [NBMOA members] Cash Flow." An exemplary copy of the types of "Cash Flow Trend" charts that the NBMOA presented to Black franchisees, as presented during a 2013 Meeting, is included below in its original form, with the complete Power Point Presentation attached as **Exhibit "F"** hereto.

Plaintiffs relied on this cash flow data in the form presented to them through the NBMOA, a group created to be their advocates and who they trusted to act as such.




146. Similarly, during a 2014 NBMOA presentation by McDonald's Franchising Officer, Robert Johnson, McDonald's presented NBMOA members, including Plaintiffs, with cash flow financials intended to minimize the net revenue gap between White and Black McDonald's franchisees. A true and correct copy of the graph is reproduced below, showing a cash flow gap of only approximately $30,000, when, in reality, the gap between White and Black McDonald's franchisees based on net revenue (which is the only number that reflects the individual franchisees' success, as opposed to that of the store) was at least $400,000.

**Franchising and Financial Information 12/31/2013**

| Gaps | 12/10 | 12/11 | 12/12 | 9/13 | 12/13 |
|---|---|---|---|---|---|
| Cash Flow | ($20,406) | ($19,107) | ($24,591) | ($30,241) | ($26,255) |
| | | | | Difference of $3986 | |
| Sales | $21,975 | $9,839 | $3,929 | $3,859 | $4,073 |
| A/A Restaurant | 1,349 | 1,394 | 1,406 | 1,413 | 1,410 |
| A/A Operators | 285 | 283 | 276 | 269 | 270 |
| Average A/A | 4.7 | 4.9 | 5.1 | 5.3 | 5.2 |

147. On December 3, 2015, at the NBMOA's 4th Quarter Board of Directors Meeting at the Biltmore in Coral Gables, Florida, Plaintiffs Ralph King and John Tillman, presented a proposal for financial assistance for Black franchisees to McDonald's Chief Executive Officer, Mike Soenke, Karen King, and other McDonald's executives. McDonald's sidestepped the request through then-President of McDonald's USA, Mike Andres, who stated, "A lot of financial assistance was given to operators, double what was given in 2014."

148. McDonald's intentionally failed to disclose the data Plaintiffs would need to determine whether the amount of financial assistance given was meaningful, including whether such relief was temporary or permanent, the original percentage versus the new assistance, and the escalation structure, even after requested by Plaintiffs Ralph King and John Tillman.

149. During the question-and-answer session at the December 3rd meeting, a Black McDonald's franchisee asked:

> **Q:** Have we had any conversation with Mike Andres on Cash Flow Gap across the system and how it affects African American Operators as opposed to other Operators? Did he have comment regarding the loss of African American Operators across the system, and what is driving that loss?

> **A:** Yes. His goal is to turn sales that will help CFG. My goal is to: a) Identify and look at the Bottom 8 markets. This has been agreed to, and we will analyze in the 1st Quarter. b) The second part is loss of sales in the AA community has hurt our Cash Flow. Hopefully, the Atlantic Reconnect Test will be successful. c) We have a brainstorming session with Troy Randolph this afternoon to find creative ways to attract more African American franchisees.

NBMOA Board Meeting Minutes, at 2 (Dec. 3, 2015), attached as **Exhibit "G"** hereto.

150. Similarly, on December 3, 2015, during a Regional update at a Florida NBMOA meeting, information provided by McDonald's continued the narrative that the cash flow issue was not systemic but owner/operator specific or by Region.

151. Similarly, on December 3, 2015, during a Regional update at a Florida NBMOA meeting, information provided by McDonald's continued the narrative that the cash flow issue was not systemic but owner/operator specific or by Region.

152. For example, McDonald's executives presented that, collectively, stores in Florida normally have a "positive cash flow and sales compared to other NBMOAs." (*Id*., at 5).

153. McDonald's provided information intended to lead Plaintiffs to believe that Black franchisees have an equal opportunity to grow, when in reality a disproportionately large number of Black franchisees were deemed ineligible for growth. As much as half, or between 44% to 55% of Black McDonald's franchisees within the NBMOA's Central Division were deemed "ineligible for growth" by McDonald's in 2004, for example.

154. During the same December 3rd meeting, Vice President of U.S. Franchising, McDonald's USA, Troy Brethauer, presented that "while some fundamentals about franchising will not change, [McDonald's] will be more flexible in some ways." (Dec. 3, 2015 NBMOA Board Meeting Minutes, Ex. G, at 5). Mr. Brethauer stated, "McDonald's will begin keeping a "Relocatable

Operators List" to assist relocation & growth of operators." (*Id.*) Black franchisees were never included on this list or provided a list to review.

155. Bill Lowery, Sr. Director, Franchise Relations, McDonald's USA, stated at the December 3, 2015 NBMOA's 4th Quarter Board of Directors Meeting that "as of 9/30/15 there were 255 African American Owner/Operators, and the restaurant net increase for AA Owner/Operators is +13 or 4.8%." (*Id.* at 7).

**(ii) *__2016 to Present:__ McDonald's Uses the NBMOA to Misrepresent the Disparity in Cash Flow Gaps between Black Franchisees and White Franchisees***

156. McDonald's knows that cash flow is easily manipulated and that Black operators in low volume stores will necessarily have less profit than other similarly-situated White franchisees in their Region.

157. McDonald's purposely focused on "cash flow" as a way to compare the viability of stores between Black and White franchisees to conceal any statistics regarding net profits and income, even after requested by Plaintiffs and similarly-situated Black franchisees.

158. McDonald's statistics made it appear as though the gap in success between White and Black franchisees was not significant, and never divulged the real problem of the gap in their net income.

159. McDonald's finance executives knew that manipulating cash flow numbers presented a more positive picture to Black franchisees and concealed their disparate treatment, in that cash flow does not account for a franchisee's unpaid debt, which McDonald's knew was a significant problem associated with the low-volume stores owned by the Black franchisees. For example, the sample chart below demonstrates the misleading nature of attempting to use cash flow to reflect parity between operators:

| | **Black Franchisee** | **Black Franchisee** | **White Franchisee** |
|---|---|---|---|
| **Average Annual Revenue** | $2,000,000 | $2,000,000 | $2,500,000 |
| **Average expenses** | $1,500,000 | $1,500,000 | $1,500,000 |
| **Debt** | $500,000 *PAID DEBT* | $500,000 (*UNPAID DEBT)* | $500,000 *PAID DEBT* |
| **Cash flow** | $0 | **500,000** | **500,000** |

**Figure 2**

160. In minutes from the NBMOA 2nd Quarter Board Meeting at The Westin Philadelphia on June 23 and 24, 2016, McDonald's executives, including Debbie Roberts, President, East Zone, Steve Kerley, VP-General Manager, Philadelphia Region, Jorge Salvat, QSCVP, Philadelphia Region, Bill Lowery, Sr. Director, Franchise Relations, and Cody Teets, Vice President, Franchise Relations, presented to Plaintiffs and similarly-situated Black franchisees.

161. Through its executives, McDonald's represented to Plaintiffs that 85% of temporary rent assistance is allocated to Black franchisees and that there was a potential savings of $140,000 on the Major Remodel Program ("MRP") on the low-volume restaurants. McDonald's stated that Oakland is "working on a plan with the Regional VP to help with rent and other aspects of operation in the inner city."

162. NBMOA Chairman Roland Parish informed McDonald's executives that "attention was due to the African American consumers who provide 20% of sales, while representing 12% of the population, yet receives only 8-9% of the OPNAD Budget."

163. He expressed the disparity in rent formulas stating that the original model was 8.5% rent; however, when special venues were added, e.g., airports, zoos, etc., the model had to change. He stated that the cost structure is different in the inner city, i.e., high security costs, the economic formula should take this into account.

164. Debbie Roberts, President East Zone, McDonald's USA, LLC, stated they visited restaurants in Philadelphia and Detroit and became more acquainted with the situations and dangers operators face on a daily basis, yet Detroit remained one of the areas with the lowest volume for the years following, with many operators still denied rent assistance.

165. During the question-and-answer session, franchisees asked questions regarding diversity:

> **Q:** Will the new Diversity Officer, from the UK, understand race relations in the U.S.?
> **A:** David Fairhurst has more experience with gender diversity than race relations, but he wants to learn. I will invite him to Jamaica. Steve Easterbrook is also meeting with Rev. Jackson, minority groups and is committed to diversity.

NBMOA Board Meeting Minutes, at 5 (June 23, 2016), attached as **Exhibit "H"** hereto.

166. McDonald's executives also informed franchisees from McDonald's Midwest NBMOA that it was working with Karen King on developing a security plan for urban locations, and actively stated that leases may start to include security. To date, no Black operator has received an offset for high security costs.

167. Bill Lowery, Franchise Relations Director, also stated that African American cash flow has "kept pace with the GM cash flow," in terms of percentage of sales.




**Figure 3: 2011-2016 Cash Flow Gaps Between Black and Non-Black Operators**

**(iii)** ***<u>2015-2020</u>: McDonald's Implements Discriminatory Corporate Policies under Easterbrook and Kempczinski's Directive***

168. Beginning in 2015, the 1981 and 1982 Plaintiffs, still struggling with cash flow deficits and low profits, now were faced with new initiatives such as Bigger Bolder Vision 2020 being rolled out by new President CEO Easterbrook, who replaced McDonald's first Black CEO Don Thompson in 2015, and Kempczinski, McDonald's current CEO and then President of McDonald's USA.

169. Under Easterbrook and Kempczinski's leadership, McDonald's instituted discriminatory policies including, but not limited to, rejecting advertising budget modifications to target Black consumers, denying the 1981 and 1982 Plaintiffs opportunities for growth, confining the 1981 and 1982 Plaintiffs to inner-city or urban areas with higher costs, denying the 1981 and 1982

Plaintiffs' requests for rent relief, and implementing initiatives such as the Bigger Bolder Vision, which disproportionately impacted Black franchisees, including the 1981 and 1982 Plaintiffs, and forced them out of the McDonald's franchise system at a loss.

170. McDonald's leadership conducted reports on the impact BBV2020 would have on Black franchisees, knew its detrimental effect, and concealed this information from Plaintiffs Ralph King, John Tillman, Marcia Tillman, Keristin Holloway, Gloria Holloway, George Jones, Jane Jones, Errol Service, LaMonika Jones, as Personal Representative of the Estate of Melvin Jones, Arthur Scott, Lisa Gunter, f/k/a Lisa McKenzie, Michael Simon, George Gipson, Bonnie Gipson, David White, Barbara White, Faye Hobley, Paul Hoskins, and Michele Hoskins.

171. When Plaintiffs asked McDonald's for a review at the national level of the procedures being used by field consultants during business reviews, McDonald's never provided that information, as documented in the March 12, 2019 Letter, Ex. B.

172. Without the data that McDonald's possesses and controls, there was no way for Plaintiffs to know that they were being denied equal franchise opportunities at the time. Moreover, McDonald's presented Plaintiffs with incomplete data through the NBMOA, which had a special relationship with Plaintiffs post-parity.

173. On December 7, 2020, for example, the NBMOA sent an email to members stating that since July 2020, there was "momentum" in sales and guests counts. Specifically, President Joe Erlinger opened the 4th Quarter NBMOA meeting by stating that average rents were now "lower than the general market by 1.24%." He continued by stating the NBMOA cash flow gap "has improved."

174. Mr. Erlinger also stated that there was a focus on growing the NBMOA by 32% through second generation, spousal, and the Registered Applicant program, which is McDonald's process for new franchisee applicants.

175. There were no hard numbers presented to show the actual rent of NBMOA members to compare against the general market, and no data presented on the number of Black franchisees still deemed ineligible for growth and rewrite, including Plaintiffs, or why children of Black franchisees were not included in NextGen program.

176. Moreover, there was no feedback as to why Black children who were approved for the Next Gen program were being offered dated McOpCo stores that would put them immediately in debt upon entering the system.

177. For those franchisees who sought out more information, including actual data on rent improvements, McDonald's again ignored their requests.

178. At bottom, McDonald's used the NBMOA as a conduit to actively mislead and fraudulently conceal its continuing systematic pattern and practice of discriminatory acts from its Black franchisees, including Plaintiffs. Based on the foregoing facts, McDonald's succeeded in its efforts to fraudulently conceal the true nature of its racist and discriminatory acts from Plaintiffs, who did not discover and/or were lulled or induced into delaying the filing of this claim until after the suit filed by McDonald's corporate executives in 2020.

**(iv) *<u>2020</u>: McDonald's Own Corporate Executives File a Lawsuit, Highlighting the Discriminatory Treatment of Black Franchisees***

179. In January 2020, for the first time, the concerns expressed by Black franchisees regarding McDonald's discriminatory treatment and the two-tiered system were revealed.

180. On January 7, 2020, two corporate executives who had also been field consultants and managers assigned to the African American Consumer Markets and who had inspected, reviewed and advised many Black franchisees, filed a complaint alleging years of discriminatory treatment of Black franchisees by the McDonald's system:

> The disproportionate loss of nearly one-third of the African American franchisees in the Easterbrook and Kempczinski era was intentional or, in the alternative, it was in reckless disregard of plainly foreseeable consequences of business decisions made by Easterbrook and Kempczinski and their minions. Without limitation, McDonald's imposed onerous costs on its franchisees by requiring them to make expensive capital expenditures, most notably through a program known as "Big Bolder Vision 2020" (BBV2020) that McDonald's rolled out in 2017, sparking widespread franchisee discontent. McDonald's knew or recklessly disregarded the likelihood that BBV2020 (among other financial stresses imposed by the Company) would put disproportionate financial stress on African American franchisees and cause a disproportionate number of them to leave the system. McDonald's knew but did it anyway.
>
> . . . .
>
> McDonald's uses strong-arm tactics to drive unwanted franchisees out of the system, such as unfairly grading franchised restaurants and jeopardizing a franchisee's rights under his or her franchise agreement; and then preventing an unwanted franchisee from selling his or her restaurants in an open market.

181. Moreover, on April 2, 2021, the NBMOA leadership sent its own message to members acknowledging McDonald's tactics in using the NBMOA to shield its unfair treatment of Black franchisees.

182. Mr. Tripplett, stated in his NBMOA communication that [Black operators] "must never be exploited."

## D. <u>McDonald's Pattern and Practice of Discrimination Against Plaintiffs</u>

183. McDonald's sets Black franchisees up for financial failure through a pattern and practice applicable to Plaintiffs of covert, systemic, and continuous discrimination that includes, among other things: (i) steering and confining Black franchisees to low-volume, high-cost stores in predominantly Black inner-city and/or rural locations, or historically underperforming restaurants, such as McOpCo locations in need of immediate rebuilds and renovations that McDonald's knew would never reap the return on investment; (ii) excluding Black franchisees from growth opportunities to profitable restaurants made available to White franchisees; (iii) restricting Black

franchisees' "growth" to substandard locations in their existing regions, while White franchisees were offered opportunities to buy and sell in across regions; (iv) conducting harassing and targeted inspections and applying subjective and skewed standards, such as guest satisfaction and TV markets, to generate bad business reviews of Black franchisees' restaurants as pretext for denying rewrite of their franchises; and/or (v) controlling the purchase and sale process so that Black franchisees sold at a loss, even when they had their own buyers with better terms, to McDonald's chosen buyer(s).

**(i) *Redlining and Race Matching: Relegating Plaintiffs to High-Cost and Low-Volume Locations with Higher Black and Minority Populations***

184. Throughout Plaintiffs' franchise terms, McDonald's systematically offered Plaintiffs store locations with lower margins and greater and more frequent capital expenditures than similarly-situated White franchisees.

185. McDonald's admittedly participated in "race matching" by offering Plaintiffs, as Black franchisees, stores in locations with higher Black and minority populations. Plagued by high crime rates and patrons with little to no means to purchase significant meal tickets, these locations had consistently higher operating costs in the form of higher insurance rates, security costs, and employee turnover and lower sales volume to offset these costs.

186. In comparison, McDonald's offers White franchisees profitable locations in more affluent and predominantly White areas and continued growth opportunities.

187. McDonald's forced these less desirable locations on Plaintiffs by, among other things, rushing Plaintiffs, telling them that it could take months, if not years, to be offered another restaurant if they turned down a site. McDonald's made Plaintiffs believe that these substandard locations were their only way to obtain a restaurant or continue in the system.

188. Based on McDonald's misrepresentations and omissions regarding the availability of restaurants, their locations, and future growth opportunities, Plaintiffs believed that if they did not

take the restaurant(s) McDonald's offered them, their chances of entering McDonald's franchise system would be extremely limited. Plaintiffs believed that they had equal access to locations within the McDonald's franchise as White franchisees.

189. Unbeknownst to Plaintiffs, McDonald's offered Black franchisees geographic locations in Black neighborhoods where White franchisees did not want to own or operate. Conversely, and upon information and belief, White franchisees were routinely given preferred locations and were able to buy and sell restaurants without restriction, allowing them to prosper.

190. Through this process, McDonald's covertly restricted Plaintiffs to substandard locations throughout their franchise terms, excluded them from purchasing restaurants in the open market, and thereby deprived them of the ability to achieve the same level of economic success as White franchisees.

191. What is more, Plaintiffs had to risk their own safety in these high-crime areas, often contending with drug dealers selling controlled substances inside and outside the restaurant, vagrants hassling customers, and multiple incidents of fights.

192. Plaintiffs often had to carry licensed firearms for their personal security. These dangerous environments made it difficult for Plaintiffs to attract and retain experienced managers and employees.

193. Plaintiffs took the bad to get the good, as McDonald's intentionally misled them by, among other things: (i) providing financial representations that McDonald's knew did not—and could not—accurately reflect the net income and revenues of the locations to which it steered Plaintiffs to; (ii) assurances that these restaurants would be profitable if Plaintiffs made significant initial investments in rebuilds and/or renovations, encouraging debt to force Plaintiffs into debt, bankruptcy, and/or economic duress, and more easily cycle them out of the system at a lower buy-back price; and

(iii) assurances that any losses would be offset by growth opportunities to better locations, which was the key to any successful McDonald's franchise model.

**(ii)** ***McDonald's Requires Black Franchisees to Make Renovations to Locations it Knows Will Not Generate a Return on Their Investment***

194. Despite placing Plaintiffs in locations McDonald's knew could not succeed under its own franchise model, McDonald's required Plaintiffs to invest in rebuilds and/or renovations within a short time, offering initial short-term lower rent, but then rapidly escalating for the remaining franchise term, setting Plaintiffs up for financial failure.

195. McDonald's knew or should have known that the rebuilds and/or renovations it required would not provide increased sales to Plaintiffs' locations sufficient to offset their upfront losses.

196. The 1981 and 1982 Plaintiffs paid for the costs associated with any rebuilds, renovations, and major remodels, often seeking outside financing, and driving them into debt.

197. McDonald's compounded the financial pressure caused by these significant initial investments by later demanding long-term franchisees, including Plaintiffs, to make significant and substantial capital investments pursuant to McDonald's modernization programs, such as Bigger Bolder Vision, or assume sole financial responsibility for compliance with McDonald's Corporation's modernization standards, such as Experience of the Future, which McDonald's knew or should have known put disproportionate financial stress on Black franchisees, including Plaintiffs Ralph King, John Tillman, Marcia Tillman, Keristin Holloway, Gloria Holloway, George Jones, Jane Jones, Errol Service, LaMonika Jones, as Personal Representative of the Estate of Melvin Jones, Arthur Scott, Lisa Gunter, f/k/a Lisa McKenzie, Michael Simon, George Gipson, Bonnie Gipson, David White, Barbara White, Faye Hobley, Paul Hoskins, and Michele Hoskins.

198. McDonald's imposed these modernization plans on Plaintiffs without regard for the financial feasibility or benefits for locations it knows or should know cannot sustain the costs and will have the effect of eliminating the older restaurants it steered Plaintiffs to.

199. The renovation requirements imposed by McDonald's on Plaintiffs Ralph King, John Tillman, Marcia Tillman, Keristin Holloway, Gloria Holloway, George Jones, Jane Jones, Errol Service, LaMonika Jones, as Personal Representative of the Estate of Melvin Jones, Arthur Scott, Lisa Gunter, f/k/a Lisa McKenzie, Michael Simon, George Gipson, Bonnie, Gipson, David White, Barbara White, Faye Hobley, Paul Hoskins, and Michele Hoskins under threat of termination are unreasonable, financially untenable, and ultimately discriminatory.

200. In addition to imposing these unreasonable renovation demands on Plaintiffs Ralph King, John Tillman, Marcia Tillman, Keristin Holloway, Gloria Holloway, George Jones, Jane Jones, Errol Service, LaMonika Jones, as Personal Representative of the Estate of Melvin Jones, Arthur Scott, Lisa Gunter, f/k/a Lisa McKenzie, Michael Simon, George Gipson, Bonnie Gipson, David White, Barbara White, Faye Hobley, Paul Hoskins, and Michele Hoskins, McDonald's imposed related costs in connection with these renovations, such as equipment purchases it requires, in excess of market prices.

201. Upon information and belief, White franchisees were not immediately required to rebuild and McDonald's placed White franchisees on a voluntary reinvestment program without the same time restrictions.

202. Once McDonald's USA deems a franchisee ineligible for growth and/or rewrite in its sole discretion, the franchisee is left to foot the bill of any and all rebuild and/or renovation costs imposed by McDonald's Corporation's modernization standards, without any ability to offset the costs through growth opportunities.

203. While Black franchisees, including Plaintiffs, were required to spend millions rebuilding and/or renovating their older restaurants, White franchisees spent their money buying additional McDonald's restaurants and expanding their franchise network.

204. Even McDonald's company-owned "McOpCo" restaurants were kept in disrepair for years until McDonald's turned around and immediately required Plaintiffs to reinvest in significant rebuilds and/or renovations as a condition of purchase.

205. McDonald's rebuild and renovation requirements forced Plaintiffs to sink their own funds into locations McDonald's knew would not provide any return on investment, benefitting McDonald's as the owner of the real estate, while driving Plaintiffs into significant debt.

206. McDonald's further benefitted through targeted sales to Black consumers in locations where White franchisees reject and/or otherwise do not want to operate, at the expense of Plaintiffs' net revenue, safety, and ultimate viability as McDonald's franchisees through little to no individual profit and lost growth opportunities into more profitable locations throughout their franchise terms.

**(iii) *McDonald's Arbitrarily Denies Black Franchisees Opportunities for Growth to Profitable Locations within the Franchise System***

207. The economics of owning McDonald's franchises is to own more than one location so that overhead costs can be absorbed by the multiple locations and yield a profit to the franchise owners.

208. McDonald's new restaurant investments are concentrated in markets with strong returns and/or opportunities for long-term growth, according to its annual reports.

209. Even after Plaintiffs entered the system through substandard locations, McDonald's continued to deny Plaintiffs the opportunity to own and operate franchises in more profitable locations, unless these more profitable locations were packaged with low-volume, high-cost locations.

210. McDonald's knew that to grow a profitable franchise organization in its franchise system, Plaintiffs needed restaurants with higher sales volume and cash flow to offset the low-volume, high-cost restaurants it offered them.

211. Yet, McDonald's refused reasonable proposals from Plaintiffs to expand within the McDonald's system by opening McDonald's restaurants at sites Plaintiffs were ready, willing, and qualified to operate, offering these profitable locations to White franchisees instead.

212. McDonald's thwarted Plaintiffs' opportunities to grow within the system through the purchase of additional high-volume restaurants in their Region, which were instead offered to White operators.

213. McDonald's systematically rejected Plaintiffs' sites and/or failed to provide Plaintiffs with any meaningful assistance to locate better restaurants in better neighborhoods.

214. Plaintiffs waited years before McDonald's made an offer for another store, only to find out they were offering another "hood" restaurant, meaning it was a low-volume store, in an economically distressed community, with a high crime rate. These substandard restaurants were consistently offered to Black owner/operators over White owner-operators.

215. In certain instances, Plaintiffs were given the opportunity to purchase a profitable store, but it was at a significantly higher premium, with oppressive conditions attached, such as an agreement to purchase other substandard locations as part of a "packaged deal."

216. Despite McDonald's representations and continued assurances to Plaintiffs that it would assist in growth opportunities, McDonald's continued to intentionally deprive Plaintiffs of any meaningful assistance to find other viable expansion locations over the course of their franchise relationship.

217. Indeed, McDonald's did the opposite of what it assured Black franchises and went as far as to saturate the market and encroach upon Plaintiffs' locations by opening McDonald's restaurants just miles apart.

218. While McDonald's offered impact funds to offset new store competition to White operators up front before the new, competing restaurant became operational, Black operators, including Plaintiffs King, John Mason, George Jones, Jane Jones, Yvonne Knox, Keristin, Gloria Holloway, and LaMonika Jones, as Personal Representative of the Estate of Melvin Jones, were made to "wait and see," until the actual impact could be assessed. This forced Plaintiffs to continue to operate at a loss, while they waited for the full impact of the competing restaurants to be realized and assessed.

219. McDonald's intentionally limited Plaintiffs' ability to grow and expand their franchise organization throughout their franchise terms by limiting these opportunities to White franchisees and covering up the data that would have allowed Plaintiffs to discover this information at the time.

**(iv) *McDonald's False Promise of "Rent Relief" and Misleading Financial Assistance***

220. Despite Plaintiffs' significant investments and hard work over decades in the McDonald's franchise system, when Plaintiffs requested financial assistance to reduce the rent, McDonald's either denied their requests or rent was temporarily reduced and then escalated causing further financial harm.

221. By offering temporary financial assistance McDonald's knew it would not allow Plaintiffs to profit in the locations to which it steered them. McDonald's set Plaintiffs up for perpetual debt in order to leverage their position against them in all future negotiations.

222. McDonald's knew when it escalated Plaintiffs' rents that it was set too high for Plaintiffs' locations; yet, McDonald's refused to provide Plaintiffs with permanent rent relief, even though McDonald's offered this relief to similarly-situated White franchisees.

223. Through the FDD, McDonald's provided Plaintiffs with a table of total acquisition and development costs, along with Fixed Percentage Rent rates, explaining how McDonald's sets and controls these costs and rent rates as follows:

> The percentages used in computing monthly payments based on Gross Sales are **determined by McDonald's management** in consideration of the rights being granted by the Franchise Agreement, **the drawing power of the McDonald's restaurant**, the value of the McDonald's System as a whole and **McDonald's interests in obtaining a profit in light of competitive conditions**. All payments made by you to McDonald's constitute a single financial arrangement between you and McDonald's which, taken as a whole and without regard to any designation or description, reflect the value of the rights being made available to you by McDonald's and the services being rendered by McDonald's during the franchise term. The percentages may vary among franchises depending upon when the franchise was sold as well as other factors. In unusual circumstances that involve special costs, the fees paid by you may be higher than those outlined in this Item 6.

(Emphasis added).

224. Tellingly, after the filing of current franchisees' class action lawsuit, *Byrd v. McDonald's USA, LLC*, No. 20-06447 (N.D. Ill. 2020), McDonald's began offering retroactive rent relief from 2019, permanent rent reductions, and new high-volume restaurants to current Black franchisees, conditioned upon signing a general release of all claims.

**(v)** ***Targeted and Unreasonable Inspections and Grading***

225. Once Plaintiffs are in dire financial situations and can no longer pay McDonald's its fees and/or rent, or once they refuse to continue to accept restaurants in crime-ridden neighborhoods with low-volume sales, McDonald's pattern and practice is to begin targeted, rigorous, and unreasonable inspections and harsh grading to generate negative business reviews of Plaintiffs' restaurants as pretext for termination or rewrite denial.

226. Plaintiffs who speak up or who have refused to continue to operate in substandard locations, have faced or now face increased and unreasonable inspections by McDonald's, including late at night or at odd hours.

227. Whereas Plaintiffs generally have positive business reviews prior to experiencing financial hardship and/or rejecting McDonald's offer to continue to operate in substandard locations, that immediately shifts once McDonald's begins harsh grading in a manner that disproportionately impacts Black franchisees as compared to White franchisees.

228. McDonald's knows and leverages the fact that Plaintiffs' eligibility for growth and renewal, or "rewrite," of their franchise term depends on business reviews and passing inspections.

229. By instituting harsher grading standards and through unreasonable inspections, McDonald's negatively impacted Plaintiffs' performance ratings as pretext for McDonald's ability to deny Plaintiffs growth and/or rewrite opportunities.

**(vi) *No Choice But to Sell or Operate at a Loss: McDonald's Forced Exit Scheme***

230. At all times material, McDonald's had absolute and sole discretion with respect to whether Plaintiffs may or may not be offered a new term franchise, or "rewrite."

231. Under the oppressive terms of McDonald's USA's Rewrite (New Term) Policy ("McDonald's Rewrite Policy"), attached to the FDD, McDonald's controls the rewrite process as follows: Only McDonald's Rewrite Committee has the authority to offer or decline to offer a new term franchise, the Rewrite Committee's recommendations are submitted by the Vice President of the Field Office of the Rewrite Committee, compromised of members of McDonald's U.S. management. The decision of the Rewrite Committee is final; there is no appeal process for any decision of the Rewrite Committee. McDonald's likewise exercises control in the sale process.

232. There is no appeal process of the Rewrite Committee, and no member from a franchisee organization is a part of the decision committee, leaving operators with no recourse other than to sell the store, normally at loss. McDonald's exercises control in the sale process.

233. When McDonald's concludes that it will not offer a new term franchise, McDonald's will extend an alternative offer, which will give the owner/operator the opportunity to sell the restaurant business to a buyer McDonald's determines is "qualified," prior to the expiration of the current franchise. Subject to the terms stated in the alternative offer, which include a release, McDonald's will commit to offer a new term franchise to the "qualified" buyer.

234. If a franchisee decides to sell the franchise, **McDonald's must consent** in writing, consistent with its customary guidelines for the sale of a McDonald's restaurant franchise, **before** any such transfer may occur.

235. Due to McDonald's controlling the exit process, there is no way for Plaintiffs to know the valuation of their restaurants and the amount if sold in an open market.

236. With the looming threat of further financial penalties, and no process for disputing qualification denials of buyers in the rewrite process controlled by McDonald's, McDonald's places Plaintiffs in an untenable position, without any negotiating power.

237. Plaintiffs have suffered substantial damages in amounts that will be proven at trial, including, but not limited to, lost profits, lost value of the franchise(s), lost capital contributions, lost investments, lost revenue, lost business opportunities, attorneys' fees, and costs as a result of McDonald's discriminatory practices alleged herein.

## INDIVIDUAL FACTUAL ALLEGATIONS

### A. McDonald's Discrimination Against Ralph King

***McDonald's Franchise Owner/Operator from 1983-2019***

238. Plaintiff Ralph King entered the McDonald's franchise system through McDonald's Registered Applicant Program, which McDonald's describes as a "World-Class Training Program," designed for McDonald's to show each owner/operator how to supposedly "run a successful business and build a bright future." *See* McDonald's Website, About Us," https://www.mcdonalds.com/us/en-us/about-us/franchising/training-services.html.

239. Through the Registered Applicant Program, prospective franchisees receive 12-18 months training by McDonald's in a restaurant, participate in seminars, conferences, and operator training classes conducted by local Field Operations and franchising staff, followed by management courses directed by McDonald's through Hamburger University.

240. Mr. King completed the Registered Applicant Program in 9 months, before continuing to Hamburger University in 1982.

241. After transitioning to the McDonald's system, Mr. King was actively involved in the McDonald's system throughout his 37-year career as an owner/operator in the Kansas City Region.

242. Mr. King held leadership positions, serving as President of the Mid-West Division for the NBMOA, Co-op Secretary, Chairman of the AACM OPNAD Committee, National Marketing Task Force Committee, Director of the Ronald McDonald's Children's Charities, Chairman of Big Brother/Big Sister Program, Chairman of Conventions and Symposiums, and Chairman of NBMOA. Mr. King was appointed to the OPNAD Media Sub-Committee and McDonald's Heart of America Executive Board and was selected as the Volunteer Person of the Year.

243. Yet, upon entry and throughout his franchise term, Mr. King was subjected to McDonald's arbitrary system of grading and policies, which McDonald's used to confine him to inner-city stores with higher operational costs, solely because of his race. Sales in these locations were continuously below the national average and any efforts to grow into more profitable locations were "packaged" by McDonald's with inner-city, high-crime and low-volume store(s).

244. In contrast, White operators in the same Region, such as John DeVera, who entered the McDonald's franchise system just a few years after Mr. King, continued to grow and expand their McDonald's organization with high volume stores, with collective sales and net income above the national average, which were not subjected to the arbitrary grading policies or badly packed deals to which Mr. King was subjected.

245. In 1983, following nearly one year of training, McDonald's offered Mr. King his first McDonald's franchise on 5901 Troost Street in Kansas City, Missouri (NSN #2461), which Mr. King purchased for $425,000.00.

246. The Troost Street restaurant that McDonald's offered to Mr. King, like those that followed, was in an urban, inner-city area East of Troost Street in Kansas City, Missouri, with a 70% Black population.

247. Mr. King purchased the restaurant from another African American franchisee, Sam Gregory. Yet, Mr. King did not communicate with the prior owner directly; McDonald's directed the purchase and sale, isolating the respective operators from one another.

248. When Mr. King tried to speak with other operators for more information, including an operator he trained under in the Registered Applicant Program, McDonald's, through its Regional Officer, instructed him not to speak to any other operators during their negotiations.

249. Mr. King complied with the directive, as he was just happy to have the opportunity to purchase a McDonald's franchise and understood that McDonald's held all negotiating power.

250. After purchasing the Troost Street restaurant, Mr. King soon learned that the area was plagued by crime. In the first week, the store was robbed, forcing Mr. King to pay for armed security throughout his franchise term, as well as increased insurance costs and employee turnover as compared to the areas McDonald's offered to White franchisees.

251. Although McDonald's provided certain financial documents to Mr. King, these documents did not reflect the additional security, insurance, and high employee turnover costs that Mr. King was forced to incur because of the franchise location.

252. In 1989, McDonald's relocated Mr. King's East Troost Street restaurant to 6406 Troost Street (NSN #11617). Mr. King had to take on a loan to pay the $1.5 million relocation cost in exchange for a 20-year franchise agreement on the new location, which he operated until 2017.

253. Despite these higher costs, Mr. King was able to grow his franchise network as McDonald's began to push towards supposed parity in the late 1990's and early 2000's. At the height of his career, Mr. King had 10 stores and was a leader in the NBMOA and in his community.

254. Mr. King was one of the seventeen most successful Black owner/operators who then-President of the NBMOA, Reggie Webb, invited to McDonald's headquarters in April 1996, along with Herb Washington, Larry Tripplett, Leroy Walker, and Gordon Thornton, to discuss parity.

255. Following a presentation by McDonald's head of U.S. operations, Ed Rensi, of charts and graphs, Mr. King said, "Mr. Rensi, with all due respect, we don't need to see another damn chart."

256. McDonald's already knew what they needed to know about Black McDonald's: in all but one region, Black owners had fewer stores than the average owner, as well as the lowest volumes,

cash flow, and profits, while carrying the highest debt and paying the highest percentage of gross sales in rent.

257. When Mr. Rensi asked Mr. King and the other Black operators what they wanted, Mr. Walker stood up and said, "Mr. Rensi, take a blank sheet of paper, write down what you want for your community, yourself, your children, your legacy—and sign our damn names to it. Don't leave nothing out. We just want what you want."

258. The executives and the franchisees agreed on a five-year plan to remedy the disparities. Webb says McDonald's eventually began selling more restaurants to Black operators, it lowered rents, permanently for some and temporarily for others.

259. Yet, despite this promise of parity and McDonald's selling more restaurants to Mr. King, they continued to confine Mr. King's growth to the inner city, as it awarded White franchisees, such as John DeVera, more profitable, suburban locations.

260. Mr. King continued to purchase more stores in inner-city neighborhoods and/or locations with lower volume sales and the highest need for reinvestment and remodels because he thought that McDonald's would eventually award him more profitable, suburban stores.

261. By 1990, Mr. King had three stores, the relocated Troost Street restaurant, as well as two additional stores that McDonald's offered Mr. King to purchase from another Black owner, located in the urban, inner city of Kansas City, Kansas, at 605 South 7th Street (NSN #6894), and 901 Minnesota (NSN #514), which was relocated to 812 Minnesota (NSN #11235).

262. In 1991, McDonald's offered Mr. King a drive-through express only restaurant in Kansas City, Missouri, which was closed in 1993 due to lack of volume after McDonald's competed directly by opening a free-standing location at Prospect and I-70. Despite the impact from the competing store, McDonald's did not pay him any compensation for the closure.

263. In 1993, McDonald's offered Mr. King a walk-up only location inside Truman Medical Center in Kansas City, Missouri (NSN #12349). Despite this substandard location, McDonald's required Mr. King to buy the equipment and pay for a buildout of the location, totaling approximately $350,000.00. Before his lease even expired, Mr. King closed the restaurant under pressure from the Administration of Truman Medical Center.

264. In the late 1990s and early 2000s, McDonald's began to sell Mr. King its McOpCo and company-owned restaurants, which it knew had lower volumes and were in need of renovations.

265. In 1996, McDonald's offered Mr. King a McOpCo franchise in Kansas City, Missouri (NSN #10326), which he purchased for $630,000.00, operated for over five years at an individual loss, and lost due to a state rezoning of Highway 71 in 2002. Then-General Manager, Don Allio, promised Mr. King that McDonald's would immediately look for another site to build a replacement. It was not until 2011, nine years later, that McDonald's offered Mr. King this "immediate" replacement, a restaurant located on 11001 Hickman Mills Drive, in Kansas City, Missouri (NSN #29853), which he purchased for $1.8 million, and operated through 2017.

266. In 2000, McDonald's offered Mr. King another McOpCo restaurant in Roeland Park, Kansas (NSN #14341), which he purchased for $1 million. In 2007, Cassie Nelson, then-General Manager of the Kansas City Region asked Mr. King to sell the restaurant to his Area Supervisor for the same price he paid seven years prior. In 2014, Mr. King purchased the restaurant back and resold the restaurant in April of 2017 for $1.7 million.

267. In 2001, McDonald's sold Mr. King two company-owned franchises: (1) a restaurant at 4427 Shawnee Drive, Kansas City, Kansas (NSN #21290) for $1,060,000.00, which he operated until 2017; and (2) a BFL located at 4101 Kansas Avenue in Kansas City, Kansas (NSN #4549).

268. Then-General Manager of the Kansas City Region, Don Allio, promised Mr. King that he could keep the Kansas Avenue restaurant until it was approved for a rebuild.

269. When Monica Boyles became the new General Manager of the Region, she informed Mr. King that all prior deals made by former McDonald's Corporate employees were no longer valid. Mr. King had to pay $350,000.00 to purchase the Kansas Avenue restaurant or give it back.

270. After finding out that Mr. King was going through a divorce and may have difficulty with loans, McDonald's new General Manager told Mr. King that he would have to rebuild the restaurant within 24 months.

271. Afraid that he did not have the financial resources available for the rebuild in that short timeframe, Mr. King was forced to give the restaurant back to McDonald's Corp.

272. McDonald's Corp. sold the store to Ken and Cassandra Salvage, White operators, who did not have the same 24-month rebuild contingency and did not rebuild the store until 2020.

273. In 2014, McDonald's offered Mr. King a restaurant located on 4400 Chouteau Trafficway, in Kansas City, Missouri (NSN #24903), which he bought for $1.9 million and operated until 2017.

274. When McDonald's changed leadership beginning in 2015, Mr. King had seven stores.

275. McDonald's regional leadership, during a business review, informed him that there were three corporate stores for sale. Mr. King understood that the deal for the new stores also included two suburban restaurants. He was ready to purchase, but as usual with McDonald's, they presented him with additional terms and obstacles.

276. As a condition of purchase for the new restaurants, McDonald's required Mr. King to purchase a fourth store as part of the "package deal," a restaurant in a high crime, inner-city area.

277. Mr. King informed McDonald's that he would take the deal as long as he could also purchase a high-volume restaurant, close to one of his existing stores. The additional restaurant had profits of approximately $4 million.

278. McDonald's refused to approve the purchase. He was told he had to take their deal, which included the stores in the economically depressed areas, or take nothing. With no negotiating power or alternatives to the package deal, Mr. King was forced to accept the terms, and the negative financial consequences of operating yet another low-volume store.

279. Mr. King later found out after exiting the system that McDonald's sold the same stores to a White buyer, who did not have to purchase any of the inner-cities stores as part of his deal.

280. Even when Mr. King tried to sell to White franchisees, Glen Nichols and John Bell, McDonald's rejected the buyers and told him he had to sell to a Black operator at a lower price.

281. At the same time, McDonald's cut advertising to Black consumers and targeted White consumers, leading to lower sales at Mr. King's inner-city and predominantly Black stores, with collective sales and net income consistently below the national average.

282. Beginning in 2016, McDonald's began to bring in White franchisees on the fringe of the inner city in Kansas City, blocking Mr. King from growth even within these locations.

283. McDonald's used pretextual reasons to deny Mr. King additional stores, such as his refusal to put in a play place at his Troost location, which McDonald's used to block him from purchasing a new location, selling it to a White operator, John DeVera.

284. In 2017, after nearly 30 years of operation, Mr. King sold 6406 Troost Street to McDonald's for $2,762,000.00, close to $900,000 less than Mr. King's asking price of $3,631,000.00, which reflected the trailing twelve-month sales for this location. McDonald's refused to pay the

asking price because it wanted to sell Mr. King's Troost location with another restaurant that McDonald's built on Emanual Clever Boulevard together at a discounted price at Mr. King's expense.

285. As a result of McDonald's discriminatory practices, unfair retaliation, and fraud alleged herein, Mr. King was forced out of the system in 2019 and suffered substantial economic loss and damages in amounts that will be proven at trial, including, but not limited to, lost profits, lost value of the franchise(s), lost capital contributions, lost investments, lost revenue, lost business opportunities, and all unnecessary, out-of-pocket expenses.

**B. McDonald's Discrimination Against John and Marcia Tillman**

***McDonald's Franchise Owner/Operator 1990 -2019***

286. John and Marcia Tillman first entered the McDonald's system when Mr. Tillman started McDonald's registered applicant program in January of 1989, culminating in Mr. Tillman becoming an owner/operator on February 1, 1990.

287. In November of 1999, the Tillmans were awarded their first store, which was located inside the George Bush Intercontinental Airport in Houston, Texas.

288. The Tillmans expended significant time, energy, and resources in obtaining that first airport store, however, as it required substantial coordination with and lobbying of local government. Through Mr. Tillman's status as a seasoned and prominent minority business owner, and his significant local political and business connections, he obtained the award of the right to operate his first McDonald's restaurant in the Houston International Airport pursuant to Houston's affirmative action policy.

289. Prior to Mr. Tillman successfully obtaining the right to operate his first McDonald's restaurant in the Houston International Airport, McDonald's had tried and failed to secure locations for its stores in that airport.

290. Immediately after opening his first store in the airport, that store became extremely popular, with corresponding high sales volume.

291. Soon thereafter, the Tillmans expanded their enterprise and opened additional stores within other terminals inside the airport.

292. Even though there was no land component to the Tillmans' business relationship with McDonald's, and instead the Tillmans' airport stores only required buildouts, McDonald's still imposed an abusive rent structure on the Tillmans' stores.

293. The base rent was 17%, and was on a scale that often went into the low- to mid-twentieth percentiles.

294. Nevertheless, the Tillmans experienced a great deal of success with their airport stores, including the general manager of one of those stores receiving McDonald's highest honor – the Ray Kroc Award. The store that general manager oversaw was ranked the highest volume McDonald's store in Houston.

295. The Tillmans invested approximately $100,000.00 a year into each of their airport stores, which boosted McDonald's top line sales to between six and eight million dollars a year.

296. McDonald's consistently gave the Tillmans the highest possible operator ratings because of their accumulated financial reserves.

297. Unfortunately, and unforeseeably, the contract with the food vendor at the airport was not renewed, which resulted in the Tillmans needing to remove their businesses, including all equipment and product, from the premises as of June 1, 2015, with very little notice. All of the Tillmans' stores' employees also needed to be terminated or relocated.

298. During this time, despite years of dedicated and extremely lucrative service from the Tillmans, McDonald's did not provide the Tillmans with any support or assistance.

299. Mr. Tillman went to great personal lengths and expense to try to save the airport stores he and Mrs. Tillman had worked so hard to build and grow, including hiring a lobbyist to lobby local government to reconsider the decision to change contractors at the airport. Despite being one of the largest corporations in the world, and holding considerable influence in its own right, McDonald's stood on the sidelines and did not try to assist the Tillmans with saving the successful businesses that comprised a substantial part of their livelihoods.

300. McDonald's did not provide the Tillmans with any assistance with removing and relocating the equipment from their airport stores.

301. McDonald's did not provide the Tillmans with any assistance with relocating their stellar employees.

302. McDonald's did not provide the Tillmans with any assistance in replacing the stores they had lost within the larger McDonald's system, despite their demonstrated success as owner/operators.

303. McDonald's also did not provide the Tillmans with any assistance in the form of short-term rent relief under his franchise agreement while he dealt with the sudden termination of his stores' operations in the Houston International Airport.

304. McDonald's did nothing to help the Tillmans relocate to another store in the Houston area. However, when another owner/operator, Douglas Adcock (who is White) lost one of his stores to an eminent domain action, McDonald's compensated Mr. Adcock for the loss of that store, and made certain Mr. Adcock was provided with a replacement store.

305. In the vacuum McDonald's left open after the Tillmans suddenly lost the significant revenues from their airport operations, the Tillmans took it upon themselves to explore opportunities to purchase one or more additional McDonald's stores.

306. The Tillmans went on to purchase two stores from another Black owner/operator.

307. Both of those stores were located in economically disadvantaged neighborhoods, and did not support anywhere near the sales volume the Tillmans were accustomed to after operating multiple stores in Houston International Airport.

308. The Tillmans reassured themselves that if they applied their usual amount of hard work and determination, those stores would become profitable for both them and McDonald's.

309. However, two years after purchasing those stores, the Tillmans succumbed to the reality that regardless of how hard they worked, they would not be able to generate anywhere near the success they experienced with their airport stores in the neighborhoods their two newest restaurants were located in.

310. The Tillmans also purchased a McOpCo store for $800,000 – a purchase they are still working to recover from due in no small part to McDonald's unfair and discriminatory treatment with respect to this location. Specifically, after the Tillmans purchased this store, road construction was started in that immediate area. The Tillmans requested rent relief from McDonald's while the road construction was ongoing (the construction project ultimately lasted several years), but McDonald's denied the Tillmans' request.

311. The Tillmans obtained multiple private loans to try to keep their businesses afloat, especially under the heavy burden of reinvesting in the stores' internal and external appearances as McDonald's required.

312. Despite the Tillmans' hard work and determination, the low volume, high cost stores they purchased would never be able to generate the cash flow necessary to support a profitable business.

313. Like so many other Black owner/operators in the McDonald's system, the Tillmans had no choice but to sell the stores they had incurred significant personal debt to acquire and improve.

314. The Tillmans had their remaining McDonald's stores listed on the market from September of 2017 until they were finally sold in January of 2019.

315. In marketing his stores for sale, the Tillmans worked with an acquaintance who had recently exited the McDonald's system, along with that acquaintance's CPA. That recent McDonald's franchisee was White. The Tillmans consulted them to help with valuing their own stores and setting an appropriate asking price for them.

316. During the more than a year the Tillmans' stores were up for sale, the Tillmans needed to repeatedly lower their asking price, regardless of what the actual market value of their stores should have been.

317. Despite similar operational details, the Tillmans experienced the reality faced by so many other Black McDonald's franchisees – by virtue of their race, their stores would never be worth as much as their White counterparts' stores were.

318. The Tillmans sold their remaining stores at a significant undervaluation to Steve McKinney, a White owner/operator that McDonald's routed them to.

319. The Tillmans continue to work to recover from the economic damage wrought upon them by McDonald's poor and discriminatory treatment of them as a result of their race.

### C. <u>McDonald's Discrimination against Keristin and Gloria Holloway</u>

***McDonald's Franchise Owner/Operator 1997-2017***

320. Keristin (Kurt) and Gloria Holloway first entered the McDonald's system when they acquired several stores in Louisiana. Unfortunately, those stores were impacted by Hurricane Katrina, leading to Mr. and Mrs. Holloway choosing to sell those stores so they could relocate to Texas.

321. Mr. and Mrs. Holloway purchased their first two stores in Houston in or about April of 2006.

322. When steering Mr. and Mrs. Holloway to this particular location, McDonald's Regional Vice President Larry Zimmerman told them he had a "lily white deal" for them.

323. Before acquiring their first two stores in Houston, both Mr. and Mrs. Holloway each worked as McDonald's employees in several roles and in different cities. Mr. and Mrs. Holloway were thoroughly familiar with the inner workings of running a McDonald's store before becoming owner/operators themselves.

324. During the purchase transaction process McDonald's provided Mr. and Mrs. Holloway with financial projections for the stores' anticipated performance, but did not provide Mr. and Mrs. Holloway with any information regarding whether either or both stores met McDonald's national standards. Mr. and Mrs. Holloway were also not given an opportunity to walk through either store before purchasing them.

325. Unbeknownst to Mr. and Mrs. Holloway, both restaurants were in poor physical condition, including that both stores had outdated interiors and exteriors, as well as outdated and poorly functioning equipment. These factors, coupled with the fact that both stores had lower than average sales volume, started Mr. and Mrs. Holloway off on poor footing within the McDonald's system.

326. Already experiencing lower than average sales volume in both of their Houston stores, Mr. and Mrs. Holloway requested impact relief from McDonald's through Mark Moreno, the General Manager for the Houston Region. The impact relief was requested because McDonald's opened a competing store near Mr. and Mrs. Holloway's Beltway 8 location in or about 2015.

327. Usually, when opening a store within a certain distance from an existing store owned by another owner/operator, McDonald's would convene an Impact Committee to conduct a study of the potential impact of that new store on the existing owner/operator's business. That Impact Committee would also consider what to do to address any impact revealed by the study. Mark Moreno failed to convene an Impact Committee in this instance, and told Mr. Holloway that he would rely on his staff's opinions when assessing what, if any, impact the new store was having on the Holloways' business.

328. Mr. Moreno denied the requested impact relief without any explanation.

329. Mr. and Mrs. Holloway exited the McDonald's system in April of 2017 after selling their restaurants to another owner/operator.

330. As a condition of that sale, McDonald's required Mr. and Mrs. Holloway to address certain aspects of their Highway 6 store that were not compliant with the ADA. As McDonald's knew, when Mr. and Mrs. Holloway purchased that store, the ADA compliance issues already existed. McDonald's did not require the prior owner/operator for that store to address those issues before selling to Mr. and Mrs. Holloway.

331. Importantly, Mr. and Mrs. Holloway's Highway 6 store was sold to Billy Whitaker, a White owner/operator.

332. McDonald's did not provide any explanation for this disparity in treatment to Mr. and Mrs. Holloway.

### D. McDonald's Discrimination against George and Jane Jones

***McDonald's Franchise Owners/Operators 1981-2019***

333. Plaintiff George Jones entered McDonald's system through the Registered Applicant Program. Mr. Jones underwent extensive training through the applicant program and courses at

McDonald's Hamburger University, followed by an apprenticeship, after which McDonald's Corporation approved him as a prospective owner/operator.

334. Mr. Jones, with his wife, Jane Jones, formally entered the McDonald's system in January of 1981, when they purchased their first store in Memphis, Tennessee. Mr. Jones was a member of the NBMOA for over twenty-five (25) years.

335. Upon entry, McDonald's told Mr. and Mrs. Jones that they would have opportunities to expand in that market because there was only one other operator in the area. McDonald's failed to disclose that the only other operator in the area, Fred Tillman (who was White), had territorial rights and rights of first refusal on *any* new proposed locations.

336. McDonald's purposefully concealed this information and steered them to stores located in south Memphis and similar urban, economically depressed areas with a predominantly Black population, low sales volume, and high operating costs.

337. After demanding to either be given the opportunity to expand or have McDonald's buy him out, Mr. Jones did finally begin to grow as a multiple store operator. This growth was limited to opportunities in a geographic area (south Memphis) that was economically depressed and in stores that were historically underperforming.

338. When expansion opportunities in more lucrative areas of the market became available to Mr. and Mrs. Jones, McDonald's consistently deemed them ineligible to take advantage of those opportunities. That decision was always made based on subjective criteria, never because of objective criteria like the Jones' financial capability or their record operating other stores.

339. By contrast, McDonald's instead provided Mr. Tillman, a White operator, with growth opportunities in the region as they arose. To the Joneses' knowledge, there was no material difference between them and Mr. Tillman when it came to their ability and prior successes in operating

McDonald's stores. The only meaningful difference between Mr. and Mrs. Jones and Mr. Tillman was that Mr. and Mrs. Jones are Black and Mr. Tillman is White.

340. For example, when Mr. and Mrs. Jones brought Bullfrog Corner in Southaven, Mississippi to McDonald's attention as a location McDonald's should consider opening a new store and explicitly requested the opportunity to expand their business into this location, McDonald's denied them that opportunity without any reasonable explanation. Instead, McDonald's gave the location to Mr. Tillman, who benefited from the research and diligence the Jones conducted.

341. Similarly, when Mr. and Mrs. Jones explicitly requested the opportunity to expand their business into the Wolfchase location (in Memphis), McDonald's again denied them that opportunity without any reasonable explanation. Instead, and again, Mr. Tillman was given this location, and benefited from the research and diligence the Jones' conducted.

342. As McDonald's implemented new food safety and IPUR criteria in its business reviews, it employed a system of unannounced visits that were subjective and could change depending on the person doing the inspection.

343. McDonald's utilized business reviews like the one Mr. and Mrs. Jones received in June 2017, where they passed all objective criteria (finance, people, quality, service, cleanliness, community involvement, and reinvestment), but failed subjective criteria (food safety and IPUR), as pretext to prevent the Jones from expanding to more lucrative areas.

344. At the same time, McDonald's treated Mike Retzer, a White operator, differently when conducting his business review, making exceptions to allow him to pass all criteria. For example, McDonald's noted several ways that Mr. Retzer could improve his stores' customer service practices, made concessions for Mr. Retzer's shortcomings, and yet gave him a passing "grade" in that area. McDonald's did not do the same for the Jones.

345. McDonald's also stated in Mr. Retzer's 2017 business review that Mr. Retzer did not have a Hamburger University graduate as a store manager in all of his locations, but still passed Mr. Retzer on the applicable metric. In the same 2017 business review for the Jones, McDonald's criticized them for not having a Hamburger University graduate as a store manager at one of their locations, even though their son, a Hamburger University graduate, was running the store.

346. Even after denying the Jones expansion to more profitable locations to offset the high costs of their current substandard locations, McDonald's built a new store near one of the Joneses' locations, knowing that the new store would have a direct, negative impact on sales. McDonald's denied the Jones any impact relief as a result of this opening. McDonald's Regional Manager refused to even entertain a review of the marketing plan Mr. Jones created to help offset the negative impact of McDonald's new store.

347. Mr. Jones' organization of three stores experienced a rapid decrease in sales because of McDonald's decision. Mr. Jones could not pay his accounts receivable.

348. The Jones continued to be deemed ineligible to grow by McDonald's from 2016 to 2018, based on subjective business reviews used as pretext to block their ability to even attempt to purchase high-volume stores to help their organization survive.

349. The Jones were forced to sell a store in 2016, to pay the increasing debt. A buyer offered $1.2 million, but they could not move forward because McDonald's had the store reserved for two White operators to consider first, who ultimately did not want to operate in the economically-depressed area the Jones operated for years.

350. The Jones sold two low-volume stores in 2018, at a loss.

### E. McDonald's Discrimination against Errol Service

***McDonald's Franchise Owner/Operator 1994-2020***

351. Mr. Service entered the McDonald's franchise system in 1994, through a Joint Venture Partnership Program, and went on to operate a large network in the Detroit Region of Michigan over the course of his 26-year franchise career.

352. From 1998 through 2017, Mr. Service operated as many as seventeen (17) stores, including in the inner-city of Detroit where shifting populations and high-crime made it difficult to keep operational costs down. Mr. Service also operated older, McOpCo stores that required significant remodels and renovations.

353. McDonald's offered Mr. Service entry through four (4) McOpCo restaurants that were outdated and in immediate need of rebuilding. Although Mr. Service personally invested in the rebuilds and was able to grow sales, the stores' sales were not high enough to offset the high, upfront cost of the rebuilds.

354. Mr. Service nevertheless worked hard to grow his network through in an effort to offset these high costs.

355. While McDonald's offered Mr. Service additional stores, his growth was limited to McOpCo stores that needed to be remodeled or rebuilt or inner-city locations with high costs and lower sales volume.

356. In 2015, at the same time Easterbrook and Kempczinski took over McDonald's corporate leadership, McDonald's newly-appointed regional leadership team informed Mr. Service that McDonald's wanted to dissolve their partnership and have Mr. Service buy out McDonald's share and close three (3) additional stores.

357. In 2016, McDonald's closed three (3) stores and Mr. Service bought out McDonald's share of the partnership, which included purchasing twelve (12) of the stores. The same year, Mr. Service purchased another store from Black owner/operator and Plaintiff, Yvonne Knox, which was 1.5 miles from one of Mr. Service's existing stores and McDonald's required Mr. Service to remodel. After granting Mr. Service a new 20-year franchise team, McDonald's took it away in less than 8 months, even after sales increased.

358. Between 2016 and 2017, McDonald's required Mr. Service to remodel eight (8) stores and sign a commitment to BBV2020. This level of remodeling, back-to-back, month after month, was not required of White owner/operators, nor would McOpco put that type of financial pressure on itself to undertake so many remodels is such a short period of time.

359. In December 2016, *for the first time* in over twenty years as an owner/operator, and despite a proven track record as a successful operator capable of operating a large franchise network (despite their substandard locations and high costs), Mr. Service was denied eligibility for growth in his Business Review.

360. Knowing that six of his stores were up for rewrite in 2016, Mr. Service requested a meeting with McDonald's, but instead received a letter stating he failed his Business Review.

361. In a matter of months, Mr. Service received nine graded visits and supposedly failed eight out of nine visits based on subjective standards McDonald's used as pretext for rewrite denials. Similarly, for the first time in decades of operation, three of Mr. Service's stores were put on the list of restaurants in IPUR in March 2017.

362. When Mr. Service sought advice from the Ombudsmen, who spoke to the Regional Manager, but McDonald's refused to change the IPUR designation and instead used it to recommend that he not be rewritten in five stores.

363. In June 2017, the Rewrite Committee sent its letter recommending denial of Rewrite and the Ombudsman informed Mr. Service that he would intervene. When the Rewrite meeting was conducted by phone, the Ombudsman never attended on Mr. Service's behalf, despite his promise.

364. Mr. Service could not get the decision reversed since there is no appeal process.

365. In March 2020, after a nearly 30-year career with McDonald's, following the shift in corporate leadership and BBV2020, Mr. Service sold his remaining thirteen (13) stores for less than what McDonald's sold similar franchised stores during that timeframe. In addition, and due to McDonald's discrimination alleged herein, Mr. Service had to close eight (8) stores over the course of his franchise term at a total loss.

**F. <u>McDonald's Discrimination Melvin Jones</u>**

***McDonald's Franchise Owner/Operator 1999-2018***

366. Mr. Jones entered the McDonald's franchise system in 1999 after being employed by DTE Energy, then known as MichCon, from 1973 to 1991. In his tenure with MichCon, Mr. Jones was responsible for managing all of MichCon's real estate, including all operations and financial matters for those holdings.

367. Despite his credentials, McDonald's did not offer Mr. Jones a traditional franchise. Instead, McDonald's offered Mr. Jones a McOpCo franchise in the inner-city of Detroit, Michigan, knowing that it was low volume as compared with its traditional franchises offered to equally qualified White applicants, and had the highest operating costs due to its dangerous location and need for reinvestments and remodels.

368. Mr. Jones remained an operator of that location until his exit in 2018.

369. In fact, he was a single-store operator for close to 10 years until 2009 when he finally purchased his second store.

370. He purchased a third store in 2012, both existing franchises from other Black operators. Once again, both were low volume stores, even though they were in better areas with higher income.

371. Mr. Jones began having trouble with the costs of running his organization, due to low volume sales. He continued to operate, and he was distinguished for his commitment to McDonald's.

372. He held prestigious positions like Chairman of the African-American Marketing Committee (AACM), President of the Urban Plan, Board member of the Ronald McDonald House, and Treasurer of the Detroit Black McDonald's Operators Association, to note a few.

373. In 2015, he instituted several initiatives to increase sales and make his stores more profitable such as adopting 24-hour operations.

374. His efforts were impeded by McDonald's, who built a new store near his location, knowing that the new store would have a direct, negative impact on his sales. Yet, McDonald's denied Mr. Jones any impact relief, with his Regional Manager, Bill Marshall, refusing to even entertain a review of the marketing plan Mr. Jones created to help offset the negative impact of McDonald's new store.

375. Mr. Jones's organization of three stores experienced a rapid decrease in sales because of McDonald's decision. Mr. Jones could not pay his accounts receivable.

376. In 2016, Mr. Jones requested rent relief and was denied. This decision was becoming common place for Black owner/operators after the change in leadership from Don Thompson to Easterbrook and Kempczinski.

377. McDonald's continued to deem Mr. Jones ineligible to grow from 2016 to 2018 after his annual Business Reviews.

378. Mr. Jones had never experienced a negative Business Review in all his years of operation. With this status, he could not be considered as a candidate to purchase high-volume stores to help his organization survive.

379. He was forced to sell his store in 2016, to pay the increasing debt.

380. He was first offered $1.2 million for his store but could not move forward because McDonald's had the store reserved for two White operators to consider first. That deal fell through because the White operators did not want to operate in the economically depressed area.

381. Mr. Jones went back to the original buyer he secured to discuss the $1.2 million, and he was then offered approximately $800,000 less. The potential buyer eventually backed out of the sale.

382. Mr. Jones sold his two low-volume stores in 2018, at a loss, to a Black operator.

**G. McDonald's Discrimination against Arthur Scott**

***McDonald's Franchise Owner/Operator 1994-2017***

383. Mr. Scott entered the McDonald's franchise system in 1994, through a Joint Venture Program with McDonald's, where both parties would share the cost of acquiring and operating the stores with a 50/50 split of profits and reinvestments.

384. Through the Joint Venture Program, McDonald's sold Mr. Scott a "package deal" of six (6) older restaurants in need of significant reinvestment, with low-volume sales, and high percentage rent in the Detroit Region of Michigan.

385. With negative cash flow in five of the six locations that McDonald's included as part of Mr. Scott's "package," Mr. Scott could barely pay the bills, let alone pay himself.

386. The stores McDonald's offered Mr. Scott could not reach the sales volume necessary to offset their higher costs. For example, one of the six stores was in a mall location with under $1 million in annual sales, with another in a grocery store.

387. Following years of hard work, reinvestment, and insufficient sales volume to sustain its costs, McDonald's Regional Manager, Pat Donahue, tried to get Mr. Scott to agree to terminate his joint venture agreements. When Mr. Scott told him that he was not going anywhere, McDonald's retaliated in the form of increased inspections, disparaging comments to his store managers, and recruiting his managers away from his stores for company-owned stores.

388. McDonald's field consultant, Lance Brewer, continuously gave Mr. Scott failing scores, harassing Mr. Scott with calls, and giving failing his stores over issues that McDonald's made exceptions for White operators in the Region.

389. McDonald's field service manager, Brian McKenzie, questioned one of Mr. Scott's managers regarding his qualifications, asking "why is this guy in the business?" and referring to him as a "mistake by the lake (Michigan)."

390. Another McDonald's field consultant, Shannon Miller, tried to recruit Mr. Scott's operation manager and a general manager to work at a company-owned McOpCo, knowing that would hurt Mr. Scott's business.

391. Despite this mistreatment, Mr. Scott refused to relinquish his stores. McDonald's closed three of Mr. Scott's stores, leaving him with three remaining stores.

392. With the push for parity, Mr. Scott was able to purchase two (2) additional stores in the late 1990's. As a result, Mr. Scott was finally re-labeled as eligible to grow his franchise network.

393. Yet, in 2013, when Mr. Scott sought to purchase two profitable stores, McDonald's denied his request in favor of a White operator. Mr. Strong escalated the decision to then-Zone manager, Charles Strong.

394. Mr. Strong retaliated against Mr. Scott for going to higher level management by thereafter denying him opportunities to expand his franchise into profitable locations necessary to offset his remaining low-volume stores. McDonald's, through Mr. Strong, likewise denied Mr. Scott leadership opportunities, including membership in the "People Team," which would have enhanced his visibility as an operator, and blocked his daughter's acceptance into the NextGen Program.

395. In or around 2015, Mr. Scott spoke to his regional manager about his daughter's interest in the legacy NextGen program. Even though Mr. Scott's daughter worked at his restaurants and was promoted to supervisor, McDonald's denied her acceptance into the NextGen program, while accepting White applicants with less experience.

396. This was particularly damaging to Mr. Scott, who had become ill, because he could not continue to grow and expand without his daughter's ability to purchase and open stores and eventually take over his franchise. McDonald's field consultant refused to recognize Mr. Scott's daughter as a supervisor and continued to bypass her.

397. When Mr. Scott's illness progressed, he had no choice but to sell his stores.

398. Mr. Scott found a qualified buyer, and informed McDonald's regional VP at the time, who denied the deal.

399. The buyer who McDonald's finally approved purchased his franchises for less than Mr. Scott's prospective buyer. In 2017, Mr. Scott sold his remaining four (4) stores for $2.7 million and exited the system at a loss.

### H. <u>McDonald's Discrimination against Yvonne Knox</u>

***McDonald's Franchise Owner/Operator 1981-2016***

400. When Ms. Knox entered the McDonald's system as a franchise owner/operator in 1981, she was the first Black woman to become an owner/operator in the Detroit Region of Michigan.

401. In 1985, Ms. Knox purchased the restaurant at 6000 East McNichols Avenue in Detroit. It was in an economically depressed area of Detroit with high costs and low sales.

402. McDonald's offered to relocate that restaurant to an area that was even more dangerous, located near a prison, with an average sales volume of $1.5 million per year. In 1989, the street was closed with the intention of expanding the airport and McDonald's closed the restaurant, later donating it to a church.

403. McDonald's managers told Ms. Knox that they would help her remedy the situation by offering her a profitable store. After waiting five months, McDonald's told Ms. Knox the only store available was a location 45 minutes outside of her current territory, in the suburb of Royal Oak. Not long after Ms. Knox accepted the restaurant, she found out that this was a lie, as a *new* operator purchased three restaurants within her territory, two of which were close enough to Ms. Knox' Gratiot location that she was awarded impact funds.

404. With the new restaurants impacting her only restaurant, the acquired debt from the second location, and the rent escalation by McDonald's of base and percentage rent, Ms. Knox faced pressure to exit the system.

405. In 2013, Ms. Knox wanted to sell the restaurant located in Gratiot, but was told by McDonald's that she must, again, reimage in order to sell. Ms. Knox complied, hoping that this would lead to increased sales and the opportunity to expand and grow her organization.

406. When Ms. Knox inquired about her growth, she was told two things: (1) there was nowhere for her to grow because she was locked in and could not buy outside of her area; (2) her ratio did not meet McDonald's standards.

407. McDonald's leadership told Ms. Knox that she could not buy outside of her area, even though White operators routinely were able to do so.

408. In 2016, after four decades of limited growth opportunities and constant remodel requirements, Ms. Knox sold her store at a loss to another Black owner/operator and co-Plaintiff, Errol Service.

**I. McDonald's Discrimination against Lisa Gunter, f/k/a Lisa McKenzie**

***McDonald's Franchise Owner/Operator 2007-2018***

409. Plaintiff Lisa Gunter (f/k/a Lisa McKenzie) is a former Black McDonald's franchise owner/operator who operated in the Raleigh Region of North Carlina for eleven (11) years, following in her father's legacy.

410. Ms. Gunter began as a McDonald's employee in 1994, working her way up from Assistant Manager to Store Manager, General Manager, Supervisor, and Director of Operations in 2007.

411. In 2005, McDonald's accepted Ms. Gunter into its Second Generation Applicant Program.

412. In 2007, Ms. Gunter purchased her first franchise, a restaurant in Triangle Town Mall, which was operated by her father, Gaffney Gunter.

413. Ms. Gunter purchased her first restaurant, a historically low-volume store inside of a mall, previously operated by her father, a Black Operator. Ms. Gunter purchased the store through a BFL, agreeing to pay a 13% rental fee, in addition to the 4% service fee.

414. McDonald's did not provide Ms. Gunter with a Field Consultant for over a year after purchase, as she struggled to increase sales to offset the high rent in the BFL deal.

415. In 2010, McDonald's offered Ms. Gunter a two-store "package deal" comprised of standalone restaurants, Edenton (NSN #6566) (310 Virginia Road, Edenton, NC 27932) and Plymouth #7263 (432 US Highway 64 East, Plymouth, NC 27962).

416. Ms. Gunter operated these locations for eight years, from 2010 to 2018.

417. With the change in leadership beginning in 2015, McDonald's imposed increased renovation requirements.

418. Through BBV2020, McDonald's sought to require Ms. Gunter to pay a renovation amount of $1,547,672 in 2017, at the end of her lease term, which was expiring in September 2021.

419. Because these renovation demands disproportionately impacted Ms. Gunter and other Black owner/operators with older, low-volume stores, McDonald's, through Debbie Stroud, denied Ms. Gunter eligibility for growth.

420. In 2018, Ms. Gunter sold her stores as a package deal at a loss.

**J. <u>McDonald's Discrimination against Michael Simon</u>**

***McDonald's Franchise Owner/Operator 2013 -2017***

421. Michael Simon is also a former Black McDonald's owner/operator who first entered the McDonald's system through McDonald's Registered Applicant Program, training without pay from 2011 until 2013.

422. Before becoming a McDonald's franchisee, Mr. Simon served as an officer in the U.S. Army, and thereafter pursued a career in sales for companies including Merrill Lynch. Mr. Simon went on to open his own business, Maxx Properties, LLC, which he owned and operated from 2001 until 2013.

423. Beginning in 2013, through his exit in 2017, Mr. Simon owned and operated three McDonald's franchises in Virginia.

424. As other Black McDonald's owner/operators, Mr. Simon's stores were lower-volume with higher operating expenses. Mr. Simon's stores, in particular, had disproportionately high operating expenses in the form of employee turnover, training, and dealing with customer complaints regarding store employees, among other personnel-related issues.

425. During a business review meeting on or about January 10, 2015, Mr. Simon formally received an offer to rewrite two of his stores: Store Nos. 16928 and 17752. Those stores' leases were set to expire in 2017.

426. At that time, there was $200,000 of required reinvestment items pending with respect to these particular stores, but the McDonald's employees who attended that business review meeting determined that these remaining reinvestment items should be handled as part of the agreed-upon 2019 rebuild contained in Mr. Simon's rewrite offer. That agreement would have positively impacted Mr. Simon's financial status. The McDonald's employees who attended this business review meeting were Sandy Olson, an Operations Consultant; Mike Floeck, a Director of Operations; and Jayson Saylor, a Field Service Manager.

427. In Mr. Simon's next business review meeting, which took place on or about February 19, 2016, the new Vice President of Quality, Service, and Cleanliness for the Raleigh Region, Tim Fisher, informed Mr. Simon that he was revoking the rewrite previously offered on Store Nos. 16928 and 17752. Mr. Fisher informed Mr. Simon that he would not be able to rewrite those stores unless Mr. Simon completed the $200,000 of outstanding reinvestments. That decision would have had a negative impact on Mr. Simon's financial status.

428. Importantly, the White owner/operator that sold Mr. Simon these stores, Tom Rock, had not been required to complete these substantial reinvestments as a condition of that sale. In fact, the substantial reinvestments required of Mr. Simon in 2017 were not even factored into the sales price for Mr. Rock's stores.

429. Having to complete $200,000 of reinvestments on an expedited basis as a condition of obtaining rewrite, coupled with the financial requirements that came with McDonald's Big Bolder Vision 2020 plan, Mr. Simon was forced to succumb to pressure from McDonald's to sell his stores to Mike Freeman, a White owner/operator. If he had not done so, his lender would have foreclosed on business financing he had obtained for his businesses.

430. Although Mr. Simon did not receive the same benefit when he first purchased these restaurants from Tom Rock, Mr. Simon was required to lower the sales price for his restaurants by the amount of the rebuild costs associated with the Big Bolder Vision 2020 plan (approximately $1.5 million). That significantly decreased the amount of money that Mr. Simon realized from the sale of his restaurants.

431. Notably, Tim Fisher, McDonald's Vice President of Quality, Service, and Cleanliness for the Raleigh Region, routed potential buyers, including Mr. Freeman, to Mr. Simon when he put his stores up for sale. Thereafter, Mr. Fisher put additional pressure on Mr. Simon to sell his stores quickly, informing Mr. Simon that if he did not sell his stores by September of 2017, McDonald's would terminate his franchise agreement and take the stores back.

432. It became clear to Mr. Simon that Mr. Fisher shared this information with Mr. Freeman, which further decreased Mr. Simon's ability to negotiate the most favorable sale terms possible for his stores.

433. Incredibly, Mr. Fisher told Mr. Simon that even if he fulfilled all of McDonald's requirements, Mr. Fisher still would have made Mr. Simon sell his stores.

434. The foregoing, when taken in light of all of the other facts alleged above, demonstrates that McDonald's was motivated to remove certain owner/operators, like Mr. Simon, in order to unfairly advantage other owner/operators who were disproportionately White.

### K. McDonald's Discrimination against John Mason

***McDonald's Franchise Owner/Operator 2004-2016***

435. John Mason started his McDonald's career at just eighteen years old as a crew member in New York City, employed by then-owner/operator Keith Manning.

436. During his career with McDonald's, Mr. Mason was promoted through the ranks from Training Manager to Associate Manager.

437. Before becoming an owner/operator in 2004, Mr. Mason was a McDonald's corporate employee. Over the course of his franchisee career, through 2016, he owned a total of eleven (11) stores, all of which were Walmart locations known to have lower sales volume.

438. In 2004, then-VP and General Manager of McDonald USA's Raleigh Region and current VP and General Manager of McDonald's Corp., Marty Ranft, interviewed Mr. Mason when he applied to become a franchise owner/operator, and supervised his growth during his franchise term.

439. Unbeknownst to Mr. Mason at the time, Mr. Ranft was known by McDonald's executives to have made derogatory and racist comments about Black McDonald's employees and franchisees and is called out in the Executives Lawsuit as making racist remarks, including using the N-word.

440. Mr. Ranft had an inventory of McDonald's restaurants located within Walmart stores that White operators in the Raleigh Region did not want to purchase because they were historically underperforming stores due to low sales volume and their location in urban, less affluent areas, with predominantly Black and minority populations.

441. McDonald's intentionally concealed this information from Mr. Mason, and he had no reason to believe that Mr. Ranft was denying him equal franchise opportunities in the open market.

442. Despite this knowledge, McDonald's, by and through Mr. Ranft, steered Mr. Mason to a 4-store package, take-it-or-leave-it deal that only included McDonald's restaurants within Walmart's. These were historically underperforming locations that White franchisees did not want to purchase.

443. In addition to being low volume stores with little positive cash flow, the Walmart stores cost over $300,000 to open per location, were subject to escalating sliding scale rents, and subject to only a 10-year franchise agreement as opposed to the 20-year terms usually given for traditional stores.

444. Knowing this information, Mr. Ranft nevertheless falsely assured Mr. Mason that he would give Mr. Mason the opportunity to operate traditional franchises if he increased sales in the Walmart stores.

445. Yet, even after Mr. Mason increased sales in his initial Walmart stores, with the expectation that he would be given an opportunity to purchase a traditional store, McDonald's did not offer him a traditional store and instead offered Mr. Mason seven (7) additional Walmart restaurants in the Raleigh Region of North Carolina, New Bern, Roxboro, Henderson, New Hope Road, Cary, Morrisville, and Brier Creek, which he operated through 2016.

446. McDonald's continued to confine Mr. Mason to the Walmart stores known to be underperforming, which White franchisees did not want to operate, and refused his requests for a traditional store.

447. For example, in 2014, McDonald's opened a traditional store on 4212 Wake Forest Road directly in front of one of his Walmart store locations on New Hope Road. When Mr. Mason sought to purchase this store, McDonald's refused to approve, falsely telling him that none were available, while instead approving it for sale to a White franchisee.

448. Not only did McDonald's deny Mr. Mason the opportunity to operate this traditional store in his area, but McDonald's knew or reasonably should have known that the new standalone, traditional store would have a direct and negative impact on Mr. Mason's McDonald's Walmart location. That is exactly what happened.

449. Following the impact of McDonald's competing standalone store, and as a result of being restricted to Walmart stores that had low volume sales and little cash flow, and denied equal access to traditional franchises, McDonald's deemed Mr. Mason "ineligible to grow."

450. McDonald's used the growth restriction designation as pretext to deny Mr. Mason re-write and force his exit on McDonald's terms.

451. In 2016, Mr. Mason was forced to sell his last four (4) remaining restaurants, New Bern, New Hope, Morrisville, and Brier Creek, at a loss.

452. McDonald's further deprived Mr. Mason of equal legacy opportunities, blocking his son, John Mason, Jr., entrance into the NextGen Program, while admitting children of White operators in his Region who were not as qualified.

453. As a result of McDonald's discriminatory practices, fraud, and unfair retaliation alleged herein, Mr. Mason has suffered substantial economic loss and damages in amounts that will

be proven at trial, including, but not limited to, lost profits, lost value of the franchise(s), lost capital contributions, lost investments, lost revenue, lost business opportunities, and unnecessary, out-of-pocket expenses.

### L. McDonald's Discrimination against George and Bonnie Gipson

***McDonald's Franchise Owner Operators 1995-2017***

454. In 1989, Plaintiff George Gipson participated in extensive training through McDonald's Registered Applicant Program.

455. Mr. Gipson trained (without pay) in McDonald's restaurants located in suburban, affluent neighborhoods, with predominantly White populations, such as Troy, Missouri, 56 miles from his home, with an over 90% White population. These training locations were very different from the locations that McDonald's ultimately steered and restricted Mr. Gipson and his wife to.

456. In 1994, Mr. Gipson completed Hamburger University.

457. Shortly thereafter, in September 1994, McDonald's franchising manager, Chris Sneep ("Sneep"), told Mr. Gipson that he had a franchise "opportunity" for him and directed him to "quit [his] job immediately," to prepare to open the restaurant. McDonald's, through Sneep, told Mr. Gipson that the restaurant would be ready soon. In reliance, Mr. Gipson gave two-weeks' notice and quit his job of 24 years, which paid well and included a company car.

458. After weeks of working towards opening, work at the store site suddenly ceased. When Mr. Gipson called Sneep, he advised that the deal had fallen through. When Mr. Gipson reminded Sneep that he had quit his job per his instructions, Sneep replied with, "that's too bad."

459. As a consolation, McDonald's offered Mr. Gipson an opportunity to work as a manager of a company-owned store in Chesterfield Mall that paid 3 times less than the job he quit at

McDonald's request. With two children in high school to support at the time, Mr. Gipson accepted the job out of desperation.

460. When Mr. Gipson began working as a manager, he was shocked to learn that there were only two employees, one of whom did not have a way to get to work unless he picked her up. As Mr. Gipson later discovered, McDonald's local supervisor, Stephanie Mertz, was calling managers of her others stores and using their employees for the Chesterfield restaurant. Ms. Mertz then gave Mr. Gipson two weeks to staff the store.

461. After several months of a difficult working environment, Mr. Gipson approached McDonald's Regional VP and Sneep, who told him that McDonald's was building a new store in Lebanon, 55 miles east of St. Louis. According to Sneep, McDonald's planned to give the store to Gary Peck, a White franchisee with 5 stores in the St. Louis Region, but told Mr. Gipson that he should look at the site and let him know if he was interested.

462. Mr. Gipson and his wife, Bonnie, drove to see the site and were shocked and disappointed by the rural location, a town of 3,700 people, as well as by the store's financial projections. Nevertheless, the Gipsons felt as if they had no choice, as they were dipping into their savings after Mr. Gipson left his job at McDonald's request.

463. In 1994, the Gipsons opened their first restaurant in the small rural town of Lebanon, Illinois, through a Business Facilities Lease (BFL).

464. McDonald's grants franchise leases that include the business facilities in limited cases where a franchisee, like Mr. Gipson, lacks the down payment (in his case, because he had to dip into his down payment savings after quitting his job at McDonald's direction). Through a BFL, McDonald's leases the real property and equipment necessary to run the restaurant for a three-year

term with a conditional option to purchase the equipment after the first year to become a conventional franchisee, extending the franchise term for up to 20 years.

465. The BFL structure enables McDonald's to charge a higher base rent rate for less profitable, company-owned restaurants, with the option to terminate if the prospective franchisee does not purchase the equipment. Following the initial 3-year term, McDonald's determines the final sales price by a percentage of the past year's annual sales.

466. After three years of operations and increasing sales from $900,000 to $1,250,000, McDonald's regional leadership pitched the Gipsons with relocation to Brentwood, Missouri, to operate a new restaurant, promising annual sales projection of $1.3 million, which was consistent with the average national sales for McDonald's at that time.

467. The Gipsons jumped at the seemingly good opportunity and purchased the Missouri restaurant under a traditional franchise agreement in 1999, with long-term plans to eventually expand and bring his daughter into the system as a next generation operator.

468. A few months after opening, despite strong sales, the store faced cash flow problems. When the Gipsons met with their accountants, they discovered that McDonald's understated the cost of the equipment by more than $250,000. The Gipsons met with McDonald's Regional VP, Bob Sanders, to ask McDonald's to approve an addition of $75,000 on the loan, but they refused. McDonald's, through Sanders, instead told the Gipsons that they should sell the store and "go get a job." After taking out a personal loan to remedy the short fall, the Gipsons increased sales and their Brentwood store was the top store in the Region in sales for several years.

469. In the winter of 2001, after Don Thompson's promotion to President of the Midwest division for McDonald's USA, Thompson came to St. Louis to meet with the NBMOA to discuss some of the issues Black operators were having with McDonald's. During the meeting, Mr. Gipson

shared his experience with McDonald's underfunding of the Brentwood store loan and being told to sell his store and go get a job by Bob Sanders.

470. As McDonald's leadership began to hear his and other Black operators' stories, Mr. Gipson experienced a period of growth in the early 2000s, mostly through company-owned stores.

471. In 2001, the Gipsons purchased a third store located at 12120 Manchester Rd., Des Peres, MO 63131, which was a McDonald's-owned McOpCo store.

472. The Gipsons continued to expand. In the spring of 2005, the Gipsons were offered a store about 2 miles from their Brentwood store on Maplewood. The Maplewood store was old, rat-infested, and in serious disrepair, but McDonald's, through Peter Green, promised to rebuild or relocate the store within 18 to 24 months. The Gipsons purchased the store and took on immediate upfront costs, including a $50,000 ISP and POS system, in reliance. McDonald's never followed through on their promise to relocate or rebuild. Despite this, the Gipsons increased sales from $1,400,000 to more than $1,800,000.

473. In the mid-2010's, McDonald's Chief Restaurant and Training Officer, Scott Rockwell made an impromptu visit to the Gipsons' Des Peres store and asked to see the crew schedule. After reviewing the schedule, Mr. Rockwell determined that the store was understaffed for lunch. Gipsons' daughter, who was the store manager, disagreed and Mr. Rockwell became very upset.

474. Mr. Rockwell told Mr. Gipson that his daughter would not be accepted into the second-generation program and that "there was no place in the system for smart asses like me."

475. Following this incident, McDonald's started to harass the Gipsons' stores with extra inspections and negative write ups. Within weeks, two of their stores were on the on the list of

restaurants in Improvement Process for Underperforming Restaurants (IPUR) for the first time. Over the next few months, harassment increased to an almost daily occurrence.

476. When the Gipsons' employees would arrive in the mornings, McDonald's would have people waiting at the door. They would spend most of the day looking for mistakes and writing them up.

477. The Gipsons later discovered that McDonald's was trying to build a new store in the same Big Bend area and, when they did not obtain approval, they started to try to build a case to terminate the Gipsons franchise agreement at Big Bend. The Gipsons approached Mike Procter to sell him the Big Bend store and reached an agreement. The following week, Mr. Proctor mysteriously withdrew his offer to purchase the Big Bend store. The Gipsons later found out later that Rockwell met with Mr. Procter and interfered with the sale.

478. Shortly thereafter, McDonald's asked Mr. Gipson to sign a letter agreeing to sell his store back to McDonald's under the threat of eviction Mr. Gipson signed and McDonald's took the Big Bend Store back.

479. During a meeting in the fall of 2014, McDonald's told Mr. Gipson that their franchises would not be renewed in 2019. He knew that they had no choice but to try to sell and get out.

480. When Mr. Gipson decided to sell, McDonald's Regional Manager blocked him from finding a buyer.

481. Indeed, when Mr. Gipson found a buyer, McDonald's told the buyer not to proceed and pulled its purchase and sale agreement. Mr. Gipson later found out that McDonald's was negotiating with a buyer of its choice, even while the Gipsons still owned the store.

482. McDonald's eventually terminated Mr. Gipson's franchise, reclaimed ownership of the store, and then immediately sold it to an operator of its choice.

483. In 2017, the Gipsons sold their two (2) remaining stores at a loss.

## M. McDonald's Discrimination against Kenneth Nelson

***McDonald's Franchise Owner/Operator 1991 -2012***

484. Plaintiff Kenneth Nelson became a McDonald's franchise owner/operator in 1991.

485. Over the course of 21-years as a McDonald's franchisee, Mr. Nelson owned and operated four (4) McDonald's franchises in the St. Louis Region of Missouri.

486. Upon entry and throughout his franchise term, McDonald's confined Mr. Nelson to older stores in need of rebuilds and renovations in high-crime areas outside of St. Louis. These were historically poor-performing, low-volume stores with higher operational costs, located in economically depressed areas with a majority Black population.

487. In contrast, White operators received preferential treatment in growth opportunities to high-volume stores in safe, affluent areas.

488. Due to the high crime in the areas that McDonald's confined Mr. Nelson to, he had to hire security guards, suffered damage from robberies, vandalism, drug activity, and shootings, to name a few.

489. Like other Black operators, Mr. Nelson took these bad stores with the hope to expand to profitable and safer locations. That promise was never realized, as McDonald's restricted Mr. Nelson's growth to the worst areas and oldest stores.

490. As a result of McDonald's discriminatory practices and fraudulent concealment, Mr. Nelson exited in 2012 at a loss.

## N. McDonald's Discrimination against David and Barbara White

### *McDonald's Franchise Owner/Operator 1997-2018*

491. David White first entered the McDonald's system as an owner/operator in May of 1997. Before that, Mr. White worked as a McDonald's corporate employee for about 20 years. During his tenure as a McDonald's corporate employee, Mr. White held the following positions: middle manager trainee; store manager; area supervisor; field consultant; operations manager; field service manager; and multi-department head (responsible for real estate, construction, and personnel).

492. Soon thereafter, in 1998, Mr. White became an active participant in the NBMOA, including serving as the President of the Indianapolis region from 2000 until 2011.

493. Mr. White also served as the NBMOA Central Division President from 2010 through 2013.

494. Barbara White, who is married to Mr. White, separately entered the McDonald's system as an owner/operator in May of 2015.

495. During Mr. White's regional leadership tenure with the NBMOA, he was an active and consistent voice identifying McDonald's policies and practices that resulted in racial discrimination against Black franchisees, while also actively seeking solutions that would be mutually beneficial.

496. During that tenure, Mr. and Mrs. White learned that two stores within two miles of one of their existing stores, and in which they had expressed interest to Bill McKernan, the Vice President for Quality, Service, and Cleanliness in the Indianapolis region, were sold to an owner/operator from outside of that geographic market. Despite being aware of the Whites' interest in at least pitching to purchase those stores, Mr. McKernan did not give them that opportunity, nor did he even give them the courtesy of informing them those stores had been offered for sale.

497. Although Bill Lowery, McDonald's Senior Director of Franchising Relations/Ombudsman and Charlie Strong, McDonald's Central Division President told Mr. and Mrs. White that they would investigate Mr. McKernan's conduct in connection with those Indianapolis stores and get back to them, Mr. and Mrs. White never heard back from Mr. Lowery or Mr. Strong regarding the results of their review.

498. Over the course of their relationship with McDonald's, especially during and after Mr. White's service as the NBMOA's Central Division President ended in 2013, Mr. and Mrs. White experienced retaliation from McDonald's leadership, including Mr. McKernan, as a result of their advocacy on behalf of Black owner/operators.

499. Specifically, Mr. McKernan directed the field service directors and operators that reported to him, including Domineca Neal, Gary Ely, and Sandi Walter, and field consultant Kent Kramer, to use McDonald's National Franchising Standards to force Mr. White's exit from the McDonald's system.

500. For example, if a single napkin was observed in the parking lot of one of Mr. and Mrs. White's stores, the field consultant would document that observation as though the same parking lot was littered with trash. Meanwhile, White owner/operators in the area, including but not limited to Paul Snyder, routinely passed inspections though their stores had more significant issues than Mr. and Mrs. White's stores did. Under Mr. McKernan's direction, the field service directors and operators that reported to him inconsistently applied McDonald's standards to the advantage of White owner/operators, and to the disadvantage of Black owner/operators like Mr. and Mrs. White.

501. Mr. and Mrs. White's last McDonald's business review in July of 2017 was the first time in Mr. White's then-20 year career as a McDonald's franchisee where his organization failed to meet all of McDonald's National Franchising Standards. This business review was conveniently

timed before Mr. and Mrs. White's rewrite date on their Covert store, which was December 31, 2019. As a result of the July 2017 business review, McDonald's denied Mr. and Mrs. White rewrite, and Mr. and Mrs. White were informed they would need to sell their Covert store before December 31, 2019.

502. While other owner/operators, including White owner/operators, were given the opportunity under similar circumstances to address McDonald's rewrite committee, Mr. and Mrs. White were not offered that opportunity before being forced to sell their stores.

503. McDonald's, through Mr. McKernan, and his regional team, including Ms. Neal, Mr. Ely, Ms. Walter, and Mr. Kramer, placed Mr. and Mrs. White in an impossible, lose-lose bind when it came to being able to obtain a rewrite on their Covert store. In order to qualify, Mr. and Mrs. White would need to complete all outstanding investments (including significant contracting work at their stores) within 60 days. However, if Mr. and Mrs. White managed to complete all of those outstanding investments within that 60-day window, their cash flow would be too tight to meet the McDonald's standards for a rewrite. This lose-lose bind allowed McDonald's, through Mr. McKernan, to discriminate and retaliate against Mr. and Mrs. White because of their race and Mr. White's advocacy on behalf of himself and other Black franchisees.

504. As a direct result of Mr. McKernan's discriminatory animus toward Mr. and Mrs. White specifically, and Black franchisees generally, Mr. and Mrs. White sold all five of their stores at an artificially deflated valuation in 2018 to Rick Mann, a White owner/operator. McDonald's routed Mr. and Mrs. White to Mr. Mann for this sale.

505. Notably, the owner/operator who purchased Mr. and Mrs. White's stores was under no time pressure to complete the rebuilding and renovation requirements that McDonald's used as pressure to force Mr. and Mrs. White to exit the system.

### O. <u>McDonald's Discrimination against Victor Bruce</u>

***McDonald's Franchise Owner/Operator 1994-2016***

506. Victor Bruce began his tenure as an owner/operation with McDonald's in November of 1994 when he was awarded his first of three stores in Indianapolis, Indiana, Store No. 10806.

507. Prior to November of 1994, Mr. Bruce held several different employment positions within McDonald's restaurants and the larger McDonald's corporate system, including Crew Person, Assistant Manager, Store Manager, Area Supervisor, Field Consultant, Senior Area Supervisor, Senior Field Consultant, and Regional Training Manager.

508. In 1992, Mr. Bruce received McDonald's prestigious President's Award, which is only given to the top 1% of McDonald's corporate employees. Mr. Bruce was given this award for his work as a field consultant that resulted in turning around an underperforming, de-franchised store to one of the best stores in his region in a three to four month period.

509. Mr. Bruce felt particularly pressured to purchase Store No. 10806 in Indianapolis in November of 1994 because, according to Patricia Isaacs, the Regional Manager/Senior Vice President who he communicated with regarding this store, Mr. Bruce "need[ed] to purchase this store…[because]…[she did not] see [Mr. Bruce] continuing to grow in the McDonald's Corporation." Ms. Isaacs said this to Mr. Bruce despite his having received the President's Award just two years prior.

510. As it did with other Black franchisees, McDonald's steered Mr. Bruce toward purchasing a store in a low volume, high-cost area when he entered the McDonald's system.

511. At the time he purchased Store No. 10806, Mr. Bruce expressed interest in a higher volume store in a more affluent area, but was told no such stores were available.

512. However, Mr. Bruce was aware that such stores were steadily bought and sold all the time, just McDonald's inexplicably never offered any of those stores to him.

513. During Mr. Bruce's ownership, Store No. 10806 averaged $300,000 - $400,000 less than the market average sales of other McDonald's stores, a significant deviation from that impacted Mr. Bruce's financial standing with McDonald's.

514. That same store was also the site of five robberies, including two at gunpoint, which resulted in overall costs to Mr. Bruce of approximately $16,000.00.

515. Even though McDonald's knew that Mr. Bruce was operating low volume stores in higher cost areas, Mr. Bruce was still required to make significant investments in renovating each of the three stores he came to own and operate in Indianapolis.

516. Over the life of their franchise relationship, McDonald's required Mr. Bruce to expend approximately $3.15 million in renovation and rebuilding costs for Mr. Bruce's three Indianapolis stores.

517. By contrast, McDonald's did not require Roland Long, a White owner/operator in the Bloomington market, to renovate or rebuild any of his approximately four to five stores. Mr. Long sold his stores in or about 2010 or 2011.

518. Ultimately, Mr. Bruce succumbed to the unfair treatment he experienced from McDonald's in the operation of his Indianapolis stores. Mr. Bruce sold his stores and officially exited the McDonald's system in December of 2016.

### P. <u>McDonald's Discrimination against Faye Hobley</u>

***McDonald's Franchise Owner/Operator 1982-2018***

519. Faye Hobley began with McDonald's when her husband, Roy Hobley, entered the McDonald's system as a registered applicant in September of 1982.

520. Mr. Hobley received his McDonald's training after work for several months thereafter. Mr. Hobley did so while also holding a full-time job as a purchasing manager for a company in Skoke, Illinois.

521. The Hobleys were awarded their first McDonald's store in Omaha, Nebraska in September of 1982. The Hobleys quit their respective jobs, sold their home, and used their life savings to purchase Store No. 458 in Omaha.

522. McDonald's steered the Hobleys toward the Omaha, Nebraska store locations, only offering that first Omaha store to them on a "take-it-or-leave-it" basis. The Omaha stores were located in low income, but high crime areas.

523. The Hobleys learned, with respect to Store No. 458 in particular, that it had previously belonged to a White owner/operator who voiced to McDonald's that he did not want to operate that location because of the store's physical condition, the low sales volume, and the surrounding urban location.

524. Over their years operating the Omaha McDonald's locations, the Hobleys' stores experienced low sales volume, especially relative to the national average.

525. Although the Omaha locations generally experienced very low sales volume, their location in a high crime and economically depressed area caused each store to have higher operational expenses. Specifically, the Hobleys' Omaha locations had high employee turnover, and higher overhead in the form of increased security costs.

526. With respect to Store Nos. 458 and 22514 specifically, robberies and employee theft from those locations drove up overhead expenses.

527. Despite the Hobleys' desire to grow in the McDonald's system by acquiring additional stores, especially in areas with better potential sales volume, McDonald's never offered the Hobleys other locations outside of the Omaha area.

528. Moreover, despite meeting every operational criterion McDonald's set out for them except accumulating a certain amount of cash (due to low sales volume), the Hobleys were not

allowed to grow their business to include another store until 1998—16 years after they first became owner/operators.

529. Despite having proven themselves as owner/operators, McDonald's insisted on offering the Hobleys stores only in the Omaha area, where McDonald's knew operational costs were high, but historical sales volume was low.

530. Importantly, every time a new store became available in the Omaha area, that store was awarded to a White owner/operator. For example, when Jim Darmody, a White owner/operator, entered the Omaha market, McDonald's immediately provided him with a new store. As another example, when Steve Leonard (who Mrs. Hobley ultimately sold her stores to, and who is White) shifted from his job in McDonald's corporate's accounting department to becoming an owner/operator in Omaha, McDonald's also provided him with a new store.

531. Unfortunately, in 2017, Mr. Hobley passed away, leaving his interest in their McDonald's stores to Mrs. Hobley. Nevertheless, Mrs. Hobley desired to continue the McDonald's business she and her late husband started together.

532. However, despite Mrs. Hobley's experience and positive track record as an owner/operator, McDonald's Vice President of Quality, Service, and Cleanliness for the Midwest Region, Jean Franco denied Mrs. Hobley a re-write for her McDonald's ownership in 2018.

533. Immediately prior to this decision, Mr. Franco had pushed Mrs. Hobley toward selling all of her Omaha stores packaged with McOpCo stores. Mrs. Hobley refused Mr. Franco's insistent pressuring, and her relationship with McDonald's quickly became adversarial.

534. Mrs. Hobley promptly began receiving failing scores on subjective components of store inspections in December of 2017, which McDonald's used as pretextual justification for denying her a re-write.

535. After that rewrite denial, in 2018, Mrs. Hobley was forced to sell all three of her Omaha stores at a deflated valuation to a White owner/operator, Steve Leonard.

536. At the time, Mr. Leonard owned and operated approximately 20 other McDonald's locations.

537. Mr. Leonard benefitted from Mrs. Hobley's recent rebuilding, at McDonald's insistence, of Store No. 458. Although McDonald's required Mrs. Hobley to rebuild Store No. 458 twice during her ownership of that location, Mrs. Hobley's most recent rebuild cost her approximately $1.7 million.

538. Moreover, Mr. Leonard was offered one of the Omaha locations that Mrs. Hobley declined to purchase at a lower rental rate than the rate initially offered to Mrs. Hobley. Specifically, when she turned down the opportunity to purchase that location at 4404 North 30th Street in Omaha, Mrs. Hobley did so on the basis that the offered rental rate (14%) was too high for a low volume, high cost store in that urban setting. The VP who made the offer to Mrs. Hobley responded that "the rent is, what the rent is."

539. Thereafter, Mr. Leonard, a White owner/operator, was offered the same location at an 11% rental rate without any explanation for the disparity.

540. McDonald's wrongfully denied Mrs. Hobley the opportunity to recoup any return on her recent and substantial investment in Store No. 458, or on any of her other Omaha stores.

541. Instead, Mr. Leonard, a White owner/operator, received the benefit of that investment, and the opportunity to continue profiting from his McDonald's franchise businesses.

542. This outcome for Mrs. Hobley was directly counter to the promises and commitments McDonald's made to her during parity. Specifically, Mrs. Hobley was told that she would be provided with the opportunity to obtain more stores. Mrs. Hobley was also told that she would be

given the opportunity to own and operate a store in a more affluent area with less crime and less associated overhead expenses.

543. While Mrs. Hobley was given the opportunity to own and operate Store No. 11863 in Omaha on or about December 30, 2001, this is the only restaurant Mrs. Hobley was offered during parity. Mrs. Hobley considered Store No. 11863 more favorably located than her other stores in Omaha.

**Q. <u>McDonald's Discrimination against Paul and Michele Hoskins</u>**

***McDonald's Franchise Owner/Operator 2004-2018***

544. Paul and Michele Hoskins first entered the McDonald's system in or about September of 2004. They went on to own and operate five McDonald's stores throughout San Antonio, Texas.

545. Mr. Hoskins started out in the McDonald's system as a registered applicant from Phoenix, Arizona in October of 2000 or 2001. Approximately two and a half years elapsed between when Mr. Hoskins began as a registered applicant and when he and Mrs. Hoskins were awarded their first store. During that time, Mr. Hoskins watched as several White registered applicants and children of current franchisees were awarded restaurants. Mr. Hoskins also held a full time position in sales for Hewlett Packard, which he managed with his registered applicant shifts for McDonald's.

546. As a condition of being awarded their first McDonald's store, Mr. and Mrs. Hoskins were told they would need to relocate to Texas. As indicated above, in September of 2004 they were given the opportunity to purchase their first store in San Antonio, which they took.

547. Only later did Mr. and Mrs. Hoskins learn that the previous owner of that first San Antonio store, a White owner/operator named Dale Peterson, had sold the store because he experienced financial difficulties in operating it.

548. This first San Antonio location was located in a low volume, economically depressed area. Although this store was offered to Mr. and Mrs. Hoskins by Larry Zimmerman, McDonald's

Regional Vice President for that area, Mr. and Mrs. Hoskins later learned that two other owner/operators came into the system around the same time (who were not Black) and were given the opportunity to purchase high performing restaurants.

549. Those owner/operators were able to grow their McDonald's franchise businesses, while Mr. and Mrs. Hoskins encountered cash flow obstacles coupled with McDonald's unreasonably requiring them to make immediate and expensive renovations to their existing stores that cost Mr. and Mrs. Hoskins in excess of $2 million to complete.

550. McDonald's allowed neighboring owner/operators, including Richard Acosta and Shelly Contreas, to postpone undergoing the same kinds of expensive renovations to their stores upon request. Other than the fact they are Black franchisees, Mr. and Mrs. Hoskins are unaware of any other reason why McDonald's denied their requests to postpone costly and unnecessary renovations to their stores.

551. Notwithstanding their solid business performance and substantial investments in physical improvements to their stores, McDonald's Vice President of Operations and Field Service, Vicki Guster Hines, denied Mr. and Mrs. Hoskins rewrite on their existing stores.

552. Prior to that decision, Mr. and Mrs. Hoskins complained to McDonald's corporate leadership about Louis Pekard, their field service consultant at the time. Beginning sometime in 2017, that field service consultant subjected Mr. and Mrs. Hoskins's stores to frequent, unfair, and subjective scrutiny, before but especially after they voiced their concerns about the unfair treatment to McDonald's leadership.

553. In addition to unfairly failing Mr. and Mrs. Hoskins's stores in subjective categories, their assigned field service consultant also visited their stores without any advance notice, something

they had never previously been subjected to during their more than ten years as McDonald's owner/operators.

554. This arbitrary and discriminatory conduct by the assigned field service consultant occurred under the leadership and presumed direction of Mark Moreno, McDonald's Vice President and General Manager of the Houston, Texas Region, and Vicki Gunster Hines, McDonald's Vice President of Operations and Field Service.

555. To Mr. and Mrs. Hoskins's knowledge, other non-Black owner/operators in their region were not subjected to the same unfair and discriminatory treatment.

556. Mr. and Mrs. Hoskins's business relationship with McDonald's never recovered after they first complained about being treated unfairly by their assigned field service consultant. Through increasingly frequent and arbitrary inspections, McDonald's created pressure on Mr. and Mrs. Hoskins to sell their stores and exit the McDonald's system.

557. Mr. and Mrs. Hoskins made the difficult decision to sell their McDonald's stores, which sales culminated in December of 2018, when they sold their remaining stores and officially exited the McDonald's system.

**R. McDonald's Discrimination against Lewis Anderson**

***McDonald's Franchise Owner/Operator 2002 -2016***

558. Prior to becoming a McDonald's franchisee, Plaintiff Lewis Anderson graduated from National University with a master's degree in business. He worked as a banking officer for Wells Fargo Bank and served in the U.S. Navy as a Surface Warfare Officer.

559. Over the course of his thirteen (13) year franchise term, Mr. Anderson owned and operated four (4) McDonald's franchises in the Memphis Region of Tennessee, and served as a member of the NBMOA.

560. Yet, upon entry and throughout his franchise term, Mr. Anderson was confined to poor-performing, low-volume stores with higher operational costs, located in urban, dangerous, and economically depressed areas of Memphis, solely because of his race.

561. In contrast, White operators like Fred Tillman received preferential treatment in growth opportunities to high-volume stores in suburban, safe, and affluent areas.

562. Mr. Anderson entered the McDonald's franchise system through the Registered Applicant Program in 2000, working and training without pay for almost two years through November 2002.

563. In 2002, following this long and extensive training, McDonald's offered Mr. Anderson two (2) historically poor performing restaurants in the inner-city of Memphis, which he purchased from other Black owner/operators, Jim Byrd and The Jones organization.

564. McDonald's offered Mr. Anderson restaurants in low-income, high-crime, inner-city areas. Mr. Anderson paid for a security guard for several years, which was an expense that other White operators in the Memphis Region did not have to incur. Likewise, because of the lower incomes of residents in these locations, sales volume did not offset Mr. Anderson's additional costs.

565. When McDonald's focused its advertising on the Dollar Menu, for example, the increase in Dollar Menu sales negatively and disproportionately impacted Mr. Anderson's bottom line because of his low-sales volume and high operational costs.

566. In November 2010, McDonald's offered Mr. Anderson two (2) additional restaurants in Corinth, Mississippi, 1108 S. Cass Street, Corinth, Mississippi [L/C: 023-0031] and 2301 S. Harper (W*M #105), Corinth, Mississippi [L/S: 023-0127].

567. When McDonald's corporate leadership shifted in 2015, it implemented policies, such as BBV2020, and advertising budget cuts, that pushed operators with smaller franchise organizations

and higher costs, such as Mr. Anderson, out in favor of White operators, like Fred Tillman, who had 60 stores to offset any potentially poor-performing locations.

568. Then, when Mr. Anderson sold his restaurants in 2016, McDonald's made it clear that it had to approve the buyer and thereby controlled the sale.

569. McDonald's directed Mr. Anderson to sell to White owner/operators, Jeff Gamble and Mike Retzer, as it knowingly consolidated ownership to a smaller group and lost over half of its Black franchisees, including Mr. Anderson.

### S. McDonald's Discrimination against Hayes Ferrell

***McDonald's Franchise Owner/Operator 1989-2016***

570. Hayes Ferrell started his career with McDonald's as a corporate employee in October 1974.

571. In 1985, Mr. Ferrell moved to Milwaukee, Wisconsin, where he was promoted to Supervisor. In 1989, McDonald's promoted him again to McOpCo Manager.

572. That same year, Mr. Ferrell purchased his first McDonald's franchise in the Atlanta Region and remained as an owner/operator for 27 years, including as a long-standing member of the NBMOA.

573. Mr. Ferrell's first franchise was in a high-crime area with a large homeless population, many of whom wanted to sleep in the restaurant's bathrooms, leading to employee turnover, and lower sales, as his own customers experienced "snatch and grabs" in the restaurant.

574. McDonald's offered Mr. Ferrell a store in this area of Atlanta because it is comprised of an over 50% Black population, with a median income lower than 50% of people living in Atlanta, according to U.S. Census Bureau Data.

575. Likewise, in 1992, McDonald's offered Mr. Ferrell a second restaurant in area of Atlanta comprised of an over 60% Black population and a poverty rate that exceeds the average for Atlanta, according to U.S. Census estimates.

576. These franchises were known by McDonald's to be underperforming, in areas with higher costs and lower sales. At the same time, White operators with less experience were offered high-volume stores in affluent, suburban areas of Atlanta, as well as growth beyond the Atlanta Region.

577. Despite these challenges, Mr. Ferrell worked hard to increase sales threefold, which benefited McDonald's in the form of percentage fees, but were still insufficient to offset McDonald's renovation and rebuild requirements.

578. These requirements included a sixty-thousand ($60,000.00) dollar renovation, which Mr. Ferrell's stores' sales could not cover. When Mr. Ferrell asked McDonald's to increase the menu prices as an offset, it rejected the request.

579. In 2016, Mr. Ferrell sold at a loss.

**T. <u>McDonald's Discrimination against Joyce Mance-Roan and Gary Roan</u>**

***McDonald's Franchise Owner/Operator 1990-2014***

580. Joyce Mance-Roan and her ex-husband, Gary Roan, are former Black McDonald's owner/operators who operated in high-crime, high-cost areas of McDonald's Ohio Region.

581. The Roans entered the McDonald's system in March of 1990, when they purchased their first store in Dayton, Ohio (Store No. 328). McDonald's steered them to this location, using the oft-employed pressure tactic of telling the Roans that they should acquire the store that was offered to them, as they did not know when, where, or whether another opportunity would arise.

582. When considering purchasing Store No. 328, the Roans were only provided McDonald's financial projections for that location, which turned out to be completely unachievable

based on the store's historical financials. Indeed, the Roans only found out later that the prior owner/operator had consistently been losing money operating that location immediately prior to their ownership.

583. Later that year, in August of 1990, McDonald's offered the Roans a second store – Store No. 1726, also in the Dayton Region. As with Store No. 328, McDonald's provided the Roans with lofty performance projections, not based in the reality of the store's location, coupled with a rent structure of 11.5% that was not based on the land, building, and equipment costs for this store.

584. From (and even prior to) the Roans' ownership of Store Nos. 328 and 1726, the locations were plagued with a large number of criminal incidents, including, but not limited to: (1) bomb threats; (2) shootings and fights in the parking lots; (3) a drug bust of 50 pounds of cocaine and 11 arrests in the parking lot of Store No. 176; (4) an armed kidnapping in one of the stores' drive-thrus; (5) death threats directed to store employees; (6) an armed robbery of one of the stores; (7) criminal trespassing; and (8) the removal of a customer from one of the stores by a police SWAT team.

585. Before the Roans purchased these locations, McDonald's was fully aware of the self-fulfilling cycle present at both – low sales volume, in large part caused by high crime, in turn caused higher-than-advertised operating costs, which in turn caused lower-than-expected financial performance at the store.

586. Nevertheless, McDonald's did not disclose any of these facts to the Roans before they purchased these locations, and instead, pressured them to purchase both locations while providing inflated and incomplete performance projections.

587. On or about February 1, 1993, the Roans informed McDonald's Regional Accountant, Jenny David, of the fact that they had reached the limit of their financial ability to respond to the mounting criminal activity at both locations.

588. More specifically, the Roans informed Ms. David that they had exhausted all possible avenues for increasing their stores' security-related expenditures.

589. The Roans also informed Ms. David that they had learned that their stores' projected operating costs, as prepared by McDonald's, were not established with a full appreciation of the substantially higher costs associated with operating inner-city store locations.

590. The Roans later determined that the initial lease structure for Store No. 328, which included a rental rate of 16.5%, was McDonald's attempt to recoup the investment made by the locations' previous owner/operators, and was not based only on the land and building costs for that location.

591. The Roans also discovered that the same was true for Store No. 1726. The initial lease structure McDonald's provided for this store, including a rental rate of 11.5%, did not reflect the land, building, and equipment costs alone, and instead incorporated costs McDonald's had incurred when it bought out the previous owner/operator of this location.

592. As a result of the initial financial structure put in place at Stores Nos. 328 and 1726, the Roans incurred substantial losses to the point that at one time, their corporate net worth was at a deficit of nearly $1 million.

593. Nevertheless, the Roans were determined not to fail. They worked grueling hours seven days a week to eliminate that deficit and to make their business successful.

594. Eventually, McDonald's recognized just how dangerous Store No. 1726 was to operate after Mr. Roan was nearly shot during a violent criminal incident in that store's lobby. McDonald's decided to trade that location so that the Roans could own and operate Store No. 1268.

595. The very next day, McDonald's closed Store No. 1726 for good.

596. In the ensuing years, the Roans came to own and operate two additional stores in the Ohio Region, both in Dayton – Store No. 11277 and Store No. 18625 (which was located inside of a Walmart).

597. In 2010, in light of the consistently higher-than-average operating costs the Roans incurred operating their stores in high crime, low volume locations, Ms. Mance-Roan formally requested a rent modification for her existing stores.

598. That requested rent modification would have brought the rent structures of those stores more in line with the economic reality of operating those stores (including in light of increased overhead costs in the form of security expenses not incurred by other owner/operators), and would have allowed those stores to operate with better margins to allow for ongoing capital investments and further growth into additional restaurants.

599. McDonald's did not oblige the requested rent modification, and the undue and unfair financial pressure persisted at the Roans' stores.

600. The Roans continuously operated all four of their McDonald's stores until they made the decision to exit the McDonald's system in 2014, with Mr. Roan remaining heavily involved in the day-to-day operations of all of their stores.

601. As a result of McDonald's continuing misconduct alleged herein, the Roans owned and lost four (4) Dayton Region stores.

## U. <u>McDonald's Discrimination against LeRoy Walker, Jr.</u>

***McDonald's Franchise Owner/Operator 1984-2015***

602. Mr. Walker knows the covert and systematic racial discrimination that existed throughout the McDonald's corporation, including without limitation, its franchise system.

603. Mr. Walker saw and experienced firsthand the struggles and disparate treatment suffered by Black franchisees like himself over the 30 years he spent in the system fighting for an equal footing with his White owner/operator counterparts.

604. Mr. Walker owned and operated a combined total of 24 McDonald's franchises in Nebraska and Mississippi. By the time he exited the system in 2015, he was left with just one restaurant.

605. Prior to joining McDonald's, Mr. Walker spent thirteen years as a high school educator in the East St. Louis School District. Mr. Walker is a graduate of Tennessee State University, with a Master's Degree in Public Administration from the University of Illinois.

606. Once he became a McDonald's franchise owner/operator, Mr. Walker held numerous leadership positions, including Meeting and Convention Coordinator for the NBMOA, Liaison for Governmental Relations, and member of the Executive Committee for the BMOA. In 1986, Mr. Walker was President of the Nebraska Owners Co-Op and between 1994 and 1996, Mr. Walker served as the President of the Mid-Mississippi Owners Co-Op.

607. Yet, upon entry and throughout his franchise term, Mr. Walker has been confined to low-volume stores with higher operational costs, solely because of his race, with sales continuously below the national average.

608. Mr. Walker first entered the McDonald's franchise system in 1984, through McDonald's Registered Applicant program.

609. On September 1, 1984, after completing the extensive training program, Mr. Walker was approved to acquire his first restaurant on 48th & Ames under a BFL in Omaha, Nebraska.

610. Over the course of his long franchise career, Mr. Walker owned and operated approximately 22 stores in Mississippi.

611. Like his Black owner/operator counterparts, Mr. Walker's stores were low volume and high cost. At times, he requested relief from McDonald's, but was often denied or offered temporary and minimal rent relief. He was never offered any permanent rent relief or other substantial financial accommodation.

612. On March 27, 2015, Mr. Walker sold his one remaining store located at 1427 W Peace Street, Canton, Mississippi at a loss.

## V. McDonald's Discrimination against Phillip Douglas

### *McDonald's Franchise Owner/Operator 1997-2014*

613. Plaintiff Philip Douglas was a longtime McDonald's franchise employee before he became a McDonald's franchise owner/operator in the Chicago market in 1997. During his 17-year career as a Black owner/operator, he owned and operated a combined total of 12 stores.

614. Mr. Douglas first started working at McDonald's as a teenager in 1975 in Compton, California. He was promoted through the ranks and in 1996 took an opportunity to apply for a franchise under a BFL.

615. During his tenure as a McDonald's franchisee, Mr. Douglas served as Secretary of his Co-Op for approximately three years, served on the Board of the Ronald McDonald House Charities for approximately eight years, and was Treasurer for his local BMOA. Mr. Douglas also won several awards and received recognition for his operations, including a custom-built ice cream parlor in one of his franchise stores.

616. Yet, upon entry and throughout his franchise term, Mr. Douglas has been confined to low-volume stores with higher operational costs, solely because of his race, with sales continuously below the national average.

617. On or about April 1997, McDonald's offered Mr. Douglas his first restaurant, an older store that had to be rebuilt within three months, in the inner-city of Chicago, which he purchased from another Black owner/operator. This store was in a high crime area, requiring Mr. Douglas to take on additional expenses related to placing private security during the lobby hours of operation.

618. Thereafter, Mr. Douglas acquired three additional inner-city stores all through a BFL in Chicago, all of which required private security that White operators did not have to pay.

619. Based on Mr. Douglas' increased sales in his initial four stores, McDonald's offered him a Joint Venture Partnership (JVP) for a 6-store package deal. McDonald's required Mr. Douglas to sell his West Adams store because they told him the store was geographically too far from the stores that were part of the JVP. In contrast, McDonald's did not impose this same proximity requirement on White operators. McDonald's further required Mr. Douglas to include his three existing stores in the deal. As a result, Mr. Douglas became a 9-store operator, but with a much lower equity ownership interest.

620. Mr. Douglas accepted the terms of the deal McDonald's directed because the JVP stores were in the southern suburbs of Chicago, did not require security, and had a mixed ratio of volume stores. Mr. Douglas received the stores as part of the push towards parity, which meant he was given an initial lower rent percentage. However, parity was short lived, and his rents rapidly escalated from approximately 5% to 14%.

621. Next, McDonald's forced him to rebuild two of the stores within three years and to assume a substantial part of the debt.

622. Shortly thereafter, McDonald's terminated the JVP, and Mr. Douglas was only allowed to keep two of his original four stores that he rolled into the JVP. He was now back to running stores in the inner-city, but acquired two additional stores, including, a non-exercisable BFL.

623. Due to McDonald's discriminatory pattern and practices, Mr. Douglas was forced to sell three of his last stores and was ultimately pushed out of the system when he sold his one remaining store in 2014.

**W. <u>McDonald's Discrimination against Darryl Umphries</u>**

***McDonald's Franchise Owner/Operator 2004-2014***

624. Plaintiff Darryl Umphries entered the McDonald's system in 2004, at what appeared to be an opportune time for Black franchisees following the supposed parity agreement whereby McDonald's undertook to assist Black owner/operators achieve equity with their White counterparts.

625. Initially, Mr. Umphries was fast tracked into the system, but this came to an abrupt halt when McDonald's Regional Manager met his diversity quota.

626. Mr. Umphries later learned from his wife, who worked for McDonald's, that Oklahoma had only two Black operators in the state and the managers wanted to push him through the training. The objective of completing the training was met, but Mr. Umphries did not become an owner/operator.

627. Instead, he had to wait two years for an opportunity to purchase a franchise after the BMOA intervened on his behalf and a friend who knew Don Thompson, Regional VP at that time, advocated on his behalf. In 2006, McDonald's finally offered Mr. Umphries an available store.

628. McDonald's offered Mr. Umphries entry through a low-volume store in Houston structured through a BFL agreement.

629. McDonald's told Mr. Umphries that he could purchase the store when he had the funds, but when he approached McDonald's, he was told he had to wait another 18 months for a full

inspection before being able to purchase. Once again, the BMOA had to step in to assist Mr. Umphries, and he was finally able to purchase the store.

630. Mr. Umphries was quickly able to increase sales. Yet, while he remained eligible for growth and rewrite, Mr. Umphries was denied the opportunity to purchase a store.

631. McDonald's did not provide any reason for the delay even though he witnessed White operators in the region with his same organization buying stores.

632. In 2008, at an NBMOA convention in Oklahoma, Mr. Umphries spoke with the other members who stepped in to help him find available stores.

633. With their assistance, he was able to pay off his first store and financed the purchase of his second store that was below the national average and in an economically depressed part of town.

634. Mr. Umphries was forced to operate 24-hours per day by his regional managers. The store began experiencing issues from high-crime to personnel turnover.

635. Against this backdrop, McDonald's regional leadership forced Mr. Umphries to reinvest in a McCafé with no extension of deadline to comply. He was told by regional leadership that it was required despite his documents stating that McDonald's policy did not require reinvestment for sales less than a certain amount.

636. Mr. Umphries provided his regional leadership with a business plan and highlighted that his return on investment would not make sense. His refusal to reinvest in the McCafé deemed him ineligible to grow from 2010 until 2014.

637. Mr. Umphries was then retaliated against by his regional manager for refusing to exercise his vote in his COOP the same as White operators.

638. Mr. Umphries was finally forced to exit the system with two stores in 2014. The store he did not reinvest in and was deemed ineligible to grow by McDonald's, remains one of the worst stores in Oklahoma today.

## X. <u>McDonald's Discrimination against Bernard Saffold</u>

### *McDonald's Franchise Owner/Operator 1999-2010*

639. Bernard Saffold first entered the McDonald's system through its registered applicant program, and received his first store (Store No. 3593) in Milwaukee, Wisconsin in or about October of 1999.

640. Store No. 3593, which McDonald's routed Mr. Saffold to, did not meet McDonald's minimum standards at the time Mr. Saffold took over its operations. At the point he took over that store, McDonald's told him that he would be responsible for bringing it up to the required standards.

641. Before purchasing the store, Mr. Saffold was not allowed to thoroughly evaluate the store's condition. Mr. Saffold later learned that other owner/operators were given the opportunity to identify items that needed to be fixed before they took over their respective store's operations. Mr. Saffold was only allowed a thirty minute walkthrough before he was handed the keys to Store No. 3593.

642. The very next day, his assigned McDonald's field consultant inspected this store and immediately failed it for not having proper equipment and because several other items were in disrepair.

643. Mr. Saffold was immediately required to purchase thousands of dollars of equipment that should have been in place before he took over the store's operations, including the most simple of items like spatulas and other kitchen utensils.

644. Less than thirty days before this inspection, while under McDonald's ownership, the same field consultant gave Store No. 3593 a passing score. The store was in substantially the same condition when Mr. Saffold took over.

645. At the time Mr. Saffold took over Store No. 3593, McDonald's told him the store had 45 employees, when in reality, the store only had about 14-15 employees.

646. Store No. 3593 was also located in an urban area, with a significant population of homeless people in the area immediately surrounding his store. These conditions contributed to suppressing the sales volume at Store No. 3593.

647. Nevertheless, McDonald's imposed an abusive fee structure on Mr. Saffold for this store, including a 9% rental rate.

648. As it did with many other Black owner/operators, McDonald's also almost immediately required Mr. Saffold to finance approximately $100,000.00 in renovations to Store No. 3593. Mr. Saffold was forced to use a McDonald's-approved contractor to perform the work, who Mr. Saffold complained did a poor job.

649. Instead of assisting Mr. Saffold with pursuing the contractor to remedy the poor workmanship, McDonald's instead compounded Mr. Saffold's operational problems by giving him poor grades on inspections based on that workmanship.

650. The same contractor was later disqualified as a McDonald's-approved contractor, but McDonald's never took any steps to make amends with Mr. Saffold for its unfair treatment of him as a result of this contractor's work.

651. After years of unfair treatment, and after exhausting himself and his personal savings to try to make his McDonald's business successful, Mr. Saffold succumbed to McDonald's pressure and sold Store No. 3593 back to McDonald's in March of 2010.

**Equitable Tolling, the Discovery Rule, and**
**Fraudulent Concealment of Discrimination Claim**

652. Plaintiffs hereby plead and invoke the discovery rule, the doctrine of equitable tolling, and/or 735 ILCS 5/13-215, to the extent necessary.

653. Plaintiffs will show that, after reasonably exercising due diligence, they did not learn that McDonald's actions were intentionally discriminatory and/or fraudulent until after the time periods provided by the applicable statutes of limitations.

654. McDonald's, through misrepresentations and omissions, affirmatively misled Plaintiffs and actively concealed the pattern and practice of racial discrimination against Black owner/operators within the McDonald's franchise system from Plaintiffs and the evidence of its continued discrimination against Plaintiffs and similarly-situated Black franchisees.

655. At all times material to Plaintiffs' claims, McDonald's falsely maintained that it is committed to racial equality, through the Company's Standards of Business Conduct, advertisements, and promises of parity, and misrepresented that it was making progress toward parity by circulating misleading information regarding a *de minimis* cash flow gap between Black and White franchisees in order to conceal the significant net income gap which evidenced McDonald's continued racial discrimination.

656. Indeed, even as of the August 10, 2020 filing of McDonald's Verified Complaint against its former CEO, Stephen J. Easterbrook, McDonald's continues to represent to the public that "ethical operation of its business is not just a legal imperative, but also a cherished value." *McDonald's Corporation v. Easterbrook*, Case Id. 2020-0658, Verified Compl. [D.E. 1], at ⁋ 11 (Del. Ch. Aug. 10, 2020).

657. McDonald's practice of racial discrimination and fraud was not apparent to Plaintiffs when committed, but became so when viewed in light of the later acts representing a

pattern. Plaintiffs were not bad businesspeople, as McDonald's attempted to lead them to believe; they were victims of McDonald's targeted discrimination against Black franchisees, which McDonald's covered up during years of parity deals and false promises.

658. As a result of McDonald's actions, Plaintiffs were unaware, and could not know or have learned through reasonable diligence, that remaining in the McDonald's franchise system was, on the basis of their race, depriving them of franchise opportunities offered to White franchisees, and that the deprivation of those contractual rights were a direct and proximate result of McDonald's unlawful acts and omissions.

659. McDonald's knew this statement, its purported efforts to achieve parity, assurances to its Black franchisees that it no longer discriminated, and promises of assistance to help Black franchisees overcome McDonald's prior racist treatment of them, were false, and made with them intent to deceive its Black franchisees and delay them from discovering and filing their claims.

660. Plaintiffs, as Black McDonald's franchisees, relied upon McDonald's misstatements and thus continued to invest significant resources and money into their doomed stores, did not exit the McDonald's franchise system expeditiously, and did not bring litigation against McDonald's until after the previously non-public, concealed information came to light on January 7, 2020, when the Executives Lawsuit was filed against McDonald's.

661. McDonald's is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality, and nature of the discriminatory McDonald's franchise system because this was non-public information over which McDonald's has exclusive control and McDonald's knew was not available to Plaintiffs.

662. McDonald's fraudulently concealed their discriminatory practices through the conduct described above, including controlling the information they received through the relationship of trust

they created through the NBMOA, designed to prevent the 1981 Plaintiffs discovery of McDonald's ongoing discriminatory practices post-parity.

663. At all times material, McDonald's had actual knowledge of their continuing discriminatory conduct, and despite that knowledge, willfully, wantonly, and recklessly pursued their course of conduct.

664. McDonald's actively and knowingly participated in such conduct, and/or their officers, directors, or managers knowingly condoned, ratified or consented to such conduct.

665. Accordingly, McDonald's is precluded by the discovery rule, equitable tolling, and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

**COUNT I – VIOLATION OF 42 U.S.C. § 1981**
**RACE DISCRIMINATION IN CONTRACTING**
**(On behalf of Plaintiffs Ralph King, John Tillman, Marcia Tillman, Keristin Holloway, Gloria Holloway, George Jones, Jane Jones, Errol Service, LaMonika Jones, as Personal Representative of the Estate of Melvin Jones, Arthur Scott, Lisa Gunter, f/k/a Lisa McKenzie, Michael Simon, John Mason, George Gipson, Bonnie Gipson, David White, Barbara White, Victor Bruce, Faye Hobley, Paul Hoskins, Michele Hoskins, and Hayes Ferrell)**

666. Plaintiffs Ralph King, John Tillman, Marcia Tillman, Keristin Holloway, Gloria Holloway, George Jones, Jane Jones, Errol Service, LaMonika Jones, as Personal Representative of the Estate of Melvin Jones, Arthur Scott, Lisa Gunter, f/k/a Lisa McKenzie, Michael Simon, John Mason, George Gipson, Bonnie Gipson, David White, Barbara White, Victor Bruce, Faye Hobley, Paul Hoskins, Michele Hoskins, and Hayes Ferrell (collectively, the "1981 Plaintiffs"), adopt, reallege, and incorporate the allegations of paragraphs 1 through 665 above as though fully set forth herein.

667. The Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, mandates "[e]qual rights under the law" and prohibits discrimination in the "making and enforcement of contracts" on the basis of race. 42 U.S.C. § 1981(a). The right "to make and enforce contracts" under

Section 1981 "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

668. The 1981 Plaintiffs bring this action to redress the deprivation of rights secured under the laws of the United States, 42 U.S.C. § 1981, for McDonald's company-wide pattern and practice of intentional and systemic racial discrimination against its Black franchisees.

669. The 1981 Plaintiffs are members of a protected class due to their race as Black citizens who have the same right to make and enforce contracts as White citizens pursuant to 42 U.S.C. § 1981.

670. The 1981 Plaintiffs and McDonald's are in a contractual franchise relationship within the meaning of Section 1981, providing that Black citizens have the same right to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the [franchise] relationship" as White citizens. 42 U.S.C. § 1981(b).

671. McDonald's violated 42 U.S.C. § 1981 by denying the 1981 Plaintiffs the same franchise opportunities made available to White franchisees.

672. McDonald's treated the 1981 Plaintiffs differently from other similarly-situated White franchisees through a continued pattern and practice of discriminatory acts, concealed through the misinformation provided by and through the NBMOA, allowing McDonald's to continue to:

(1) Restrict the 1981 Plaintiffs to older, recycled restaurants, in poor-performing and dangerous locations with high operating costs and low-volume sales;

(2) Require the 1981 Plaintiffs to invest in rebuilds and/or renovations not required of similarly-situated White franchisees;

(3) Exclude the 1981 Plaintiffs from the same growth opportunities to more profitable locations offered to White franchisees;

(4) Deny franchise opportunities to 1981 Plaintiffs over many years, while forcing

them to accept poor-performing stores with the promise of future growth to more profitable locations;

(5) Deny the 1981 Plaintiffs meaningful support to allow them to overcome financial hardships, while White franchisees were routinely provided such assistance, including, but not limited to, permanent rent relief and impact funding;

(6) Deprive the 1981 Plaintiffs of the same legacy opportunities offered to White franchisees through McDonald's Next Gen program;

(7) Retaliate against the 1981 Plaintiffs for rejecting offers to continue operations in crime-ridden neighborhoods with low-volume sales, including through targeted, increased, and unreasonable inspections;

(8) Unequal inspections, grading, and business reviews of 1981 Plaintiffs' restaurants, as compared to similarly-situated White franchisees; and/or

(9) Place the 1981 Plaintiffs in untenable positions of economic duress, denying them eligibility for growth and renewal of their agreements, and arbitrarily denying final approval of their buyers, so that they are left with no real choice but to exit on McDonald's terms or continue to operate at a loss.

673. By the conduct described above, Defendants intentionally and willfully deprived 1981 Plaintiffs of the same rights enjoyed by White citizens to be free from racial discrimination in the right to enter into contracts and the right to enjoy all of the privileges and benefits of established contractual relationships in violation of 42 U.S.C. § 1981.

674. As a direct and proximate result of McDonald's conduct, 1981 Plaintiffs collectively lost close to approximately one-hundred (100) stores with compensatory damages averaging between four million dollars ($4,000,000.00) and five million dollars ($5,000,000.00) per store.

675. McDonald's has acted and continues to act with malice or reckless indifference to the rights of the 1981 Plaintiffs, thereby entitling them to punitive damages.

676. At all times material, McDonald's had actual knowledge of the wrongfulness of its conduct and the high probability that injury and/or damage to Plaintiffs would result, and despite that knowledge, willfully, wantonly, and recklessly pursued its course of conduct.

677. McDonald's conduct is so gross and flagrant as to show a reckless disregard or a conscious wanton, reckless indifference to consequences or a grossly careless disregard for the life, safety, and/or rights of the 1981 Plaintiffs, and McDonald's actively and knowingly participated in such conduct, and/or their officers, directors, or managers knowingly condoned, ratified or consented to such conduct.

678. McDonald's willful, wanton, malicious, and/or reckless conduct alleged herein warrants the imposition of punitive damages.

679. The 1981 Plaintiffs shall continue to suffer irreparable injury in the absence of equitable relief.

680. The 1981 Plaintiffs, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that McDonald's conduct, in seeking to prevent discrimination as described herein, violates Section 1981, and other relief so as to assure that similar discriminatory conduct does not reoccur in the future.

681. To remedy McDonald's systemic failure to comply with federal law, the 1981 Plaintiffs hereby request declaratory judgment requiring McDonald's to, *inter alia*:

a. Provide Black franchisees open and equal access to the market of locations to which they are entitled and that meet or exceed McDonald's national average for revenue;

b. Require McDonald's to conform to the mandates of Section 1981 and implement objective standards for decisions relating to Black franchisees, including: (i)

inspections; (ii) grading; (iii) business reviews; (iv) growth opportunities; and/or (v) rewrite decisions;

c. Require McDonald's to ensure that Black franchisees are offered growth opportunities to the same extent that such growth opportunities are available to other franchisees in the same geographic area; and/or

d. Require McDonald's to ensure its grading and inspection standards are fairly and uniformly applied.

682. Accordingly, Plaintiffs seek damages from McDonald's and an order with standards above to be implemented by the Court in equity.

WHEREFORE, the 1981 Plaintiffs pray for declaratory judgment against Defendants, for compensatory damages, punitive damages, reasonable attorneys' fees, expert fees, costs, and an award of pre-judgment and post-judgment interest, to be determined at trial, and for such other and further relief both at law and in equity to which the 1981 Plaintiffs may show to be justly entitled.

**COUNT II – VIOLATION OF 42 U.S.C. § 1982**
**RACE DISCRIMINATION IN SALE OR LEASE OF PROPERTY**
**(On behalf of Plaintiffs Ralph King, John Tillman, Marcia Tillman, Keristin Holloway, Gloria Holloway, George Jones, Jane Jones, Errol Service, LaMonika Jones, as Personal Representative of the Estate of Melvin Jones, Arthur Scott, Lisa Gunter, f/k/a Lisa McKenzie, Michael Simon, John Mason, George Gipson, Bonnie Gipson, David White, Barbara White, Victor Bruce, Faye Hobley, Paul Hoskins, Michele Hoskins, and Hayes Ferrell)**

683. Plaintiffs Ralph King, John Tillman, Marcia Tillman, Keristin Holloway, Gloria Holloway, George Jones, Jane Jones, Errol Service, LaMonika Jones, as Personal Representative of the Estate of Melvin Jones, Arthur Scott, Lisa Gunter, f/k/a Lisa McKenzie, Michael Simon, John Mason, George Gipson, Bonnie Gipson, David White, Barbara White, Victor Bruce, Faye Hobley, Paul Hoskins, Michele Hoskins, and Hayes Ferrell, (collectively, the "1982 Plaintiffs"), adopt,

reallege, and incorporate the allegations of paragraphs 1 through 665 above as though fully set forth herein.

684. Pursuant to 42 U.S.C. § 1982, "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

685. The 1982 Plaintiffs are members of a protected class due to their race as Black citizens who have the same right to make and enforce contracts as White citizens pursuant to 42 U.S.C. § 1982.

686. McDonald's, as the lessor of its franchised restaurants, with full discretion on both initial locations and additional growth opportunities, as well as the buyer upon exit, violated 42 U.S.C. § 1982 by denying the 1981 Plaintiffs the same lease opportunities made available to White franchisees.

687. As alleged, McDonald's offered Black franchisees the worst locations, with low-volume sales and higher operating costs than those locations offered to White franchisees.

688. McDonald's admitted at the highest corporate levels that it used unknowing Black franchisees to expand its real estate footprint into predominantly Black communities where White franchisees refused to operate. Following this admission, McDonald's undertook to correct the effects of this past discrimination and counteract these locations with more profitable stores during a period between 1998 and 2015. Following this period of growth for Black franchisees, McDonald's instituted policies that explicitly differentiated between racial groups and again subjected Black franchisees, including the 1982 Plaintiffs, to unequal opportunities in franchise locations.

689. The 1982 Plaintiffs collectively lost close to approximately one-hundred (100) stores with compensatory damages averaging between four million dollars ($4,000,000.00) and five million dollars ($5,000,000.00) per store.

690. McDonald's has acted and continues to act with malice or reckless indifference to the rights of the 1982 Plaintiffs, thereby entitling them to punitive damages.

691. At all times material, McDonald's had actual knowledge of the wrongfulness of its conduct and the high probability that injury and/or damage to the 1982 Plaintiffs would result, and despite that knowledge, willfully, wantonly, and recklessly pursued its course of conduct.

692. McDonald's conduct is so gross and flagrant as to show a reckless disregard or a conscious wanton, reckless indifference to consequences or a grossly careless disregard for the life, safety, and/or rights of the 1982 Plaintiffs, and McDonald's actively and knowingly participated in such conduct, and/or their officers, directors, or managers knowingly condoned, ratified or consented to such conduct.

693. McDonald's willful, wanton, malicious, and/or reckless conduct alleged herein warrants the imposition of punitive damages.

694. The 1982 Plaintiffs shall continue to suffer irreparable injury in the absence of equitable relief.

695. The 1982 Plaintiffs, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that McDonald's conduct, in seeking to prevent discrimination as described herein, violates Section 1982, and other relief so as to assure that similar discriminatory conduct does not reoccur in the future.

696. To remedy McDonald's systemic failure to comply with federal law, the 1982 Plaintiffs hereby request declaratory judgment requiring McDonald's to, *inter alia*:

a. Provide Black franchisees open and equal access to the market of locations to which they are entitled and that meet or exceed McDonald's national average for revenue and do not have consistently higher costs than those locations offered to White franchisees;

b. Require McDonald's to conform to the mandates of Section 1982 and implement objective standards for decisions relating to Black franchisees, including: (i) rewrite decisions; (ii) terminations; (iii) rent adjustments and other financial assistance, accounting for higher operating costs and lower volume sales in certain locations; and/or (iv) rebuild and renovation requirements;

c. Require McDonald's to ensure that Black franchisees are offered growth opportunities to the same extent that such growth opportunities are available to other franchisees in the same geographic area; and/or

d. Require McDonald's to ensure its grading and inspection standards are fairly and uniformly applied.

697. Accordingly, Plaintiffs seek damages from McDonald's and an order with standards above to be implemented by the Court in equity.

WHEREFORE, the 1982 Plaintiffs pray for declaratory judgment against Defendants, for compensatory damages, punitive damages, reasonable attorneys' fees, expert fees, costs, and an award of pre-judgment and post-judgment interest, to be determined at trial, and for such other and further relief both at law and in equity to which the 1982 Plaintiffs may show to be justly entitled.

**COUNT III – FRAUDULENT CONCEALMENT**
**(On behalf of Plaintiffs)**

698. Plaintiffs adopt, reallege and incorporate the allegations of paragraphs 1 through 665 above as though fully set forth herein.

699. McDonald's concealed material facts from its Black franchisees regarding the growing gap in the net income earned by White franchisees and Black franchisees within the McDonald's franchise system.

700. McDonald's concealed these material facts with the intention of inducing a false belief on the part of its Black franchisees that McDonald's was no longer actively discriminating against its Black franchisees but instead was working toward, and succeeding in, achieving financial parity between its Black and White franchisees.

701. McDonald's affirmatively concealed this information, and misled Plaintiffs, by using its executives, regional management, and the NBMOA to disseminate misleading data regarding a *de minimis* cash flow gap between Black and White franchisees to conceal the real problem, which was the growing net income gap between Black and White franchisees.

702. McDonald's undertook, promoted, and assumed a special relationship of confidence, reliance, superiority, influence, and trust with its Black franchisees such that it had a duty to disclose these material facts so as to enable its Black franchisees to make informed decisions regarding whether they should continue to invest significant resources and money into their stores, remain in the McDonald's franchise system, or bring litigation against McDonald's.

703. McDonald's placed itself in a position of superiority and influence over its Black franchisees by admittedly discriminating against them and steering them to financially non-viable, low income, low volume locations with higher operating costs, where McDonald's held them financially captive.

704. McDonald's then assumed a position of trust and confidence over these financially captive Black franchisees by promising to work and partner with them, through the NBMOA, to assist them in overcoming the effects of its racist treatment of them, to achieve financial parity between

them and the White franchisees, and to fully disclose to Black franchisees system-wide information which would allow them to accurately monitor and assess McDonald's progress toward achieving financial parity and to compare their financial performance with that of White franchisees. Plaintiffs placed their trust and confidence in McDonald's to help them accomplish these objectives, and McDonald's accepted their trust.

705. By promising to fully disclose to Black franchisees system-wide information which would allow them to accurately monitor and assess McDonald's progress toward achieving financial parity and to compare their financial performance with that of White franchisees, McDonald's assumed a legal duty to do so in an a true, accurate, and non-misleading fashion.

706. McDonald's had superior knowledge and absolute control over information regarding the financial conditions of Black franchisees as compared to White franchisees, including the growing gap in their net income.

707. Before this information was first made public on January 7, 2020, with the filing of the complaint in *Guster-Hines v. McDonald's USA LLC*, No. 20-00117, Compl. [D.E. 1], ¶¶ 65, 75 (N.D. Ill. Jan. 1, 2020), Plaintiffs could not have discovered the truth regarding this information through reasonable inquiry or inspection, because it was confidential, only McDonald's had access to it, and McDonald's did not disclose it to Black franchisees—rather, McDonald's concealed it.

708. From the commencement of the franchise terms, Plaintiffs attended and personally participated in all NBMOA meetings, reviewed, and relied upon all misleading cash flow information McDonald's disseminated to the NBMOA.

709. The concealed information was such that Plaintiffs would have acted differently had they been aware of it, namely by mitigating their damages and ceasing to invest significant resources

and money into their doomed stores, exiting the McDonald's franchise system expeditiously, and bringing litigation against McDonald's.

710. Plaintiffs reasonably relied upon McDonald's misleading "cash flow" information designed to conceal the substantial gap in net income earned between Black and White McDonald's franchisees and, based on this misleading information, Plaintiffs believed McDonald's was partnering with them to effectuate equality and parity within the McDonald's franchise system, believed McDonald's conduct was not actionable and thus delayed litigation, remained in the franchise system and continued to invest money into their doomed stores, continued to operate their franchisees under the fraudulently induced belief that the problem was much smaller than it really was and that McDonald's was no longer discriminating against Black franchisees and was working toward closing the net income and cash flow gaps, and believed that each of their diminishing net profits was individualized rather than a systemic problem.

711. As a direct and proximate result of Plaintiffs' reasonable reliance on McDonald's concealment of material facts, Plaintiffs were damaged by incurring excessive operational expenses and insufficient sales volume, resulting in lost profits, lost business opportunities, emotional distress, humiliation, and damage to their professional reputations. Without accurate information, Plaintiffs could not make properly informed decisions about whether or not to continue to invest, purchase additional stores, or remain franchisees in the McDonald's system.

712. McDonald's actively concealed this information by, among other things:

(1) failing to conduct audits when requested by Plaintiffs;

(2) failing to provide accurate financial information regarding the return of investment for remodels during annual business reviews;

(3) issuing misleading emails and presentations during NBMOA meetings and local chapter meetings, about the improvements of cash flow gaps, the number of Black franchisees deemed ineligible for growth and the reasons blocking growth;

(4) seeking to suppress requests for data on McOpCo and the sales of stores by characterizing it as confidential;

(5) refusing to take action or steps to actively reform the practices and policies complained about;

(6) failing to disclose studies conducted about the impact of BBV2020 on Black franchisees;

(7) failing to disclose newbuild restaurants within the region of Black franchisees in a timely manner that could actively impact their current operations and sales; and

(8) failure to disclose the existence of restaurants for sale in an effort to control the market and "reserve" them for White restaurant owners

(9) failing to disclose the real financial data regarding advertising funds.

713. Plaintiffs repeatedly requested information and policies regarding net income, cash flow, eligibility for growth, return on investment after remodels, audits, information regarding practices and policies effecting grading standards and review processes.

714. McDonald's failed to respond to Plaintiffs' inquiries.

715. But for McDonald's fraudulent concealment of the net income gap between Black and White franchisees, Plaintiffs and similarly situated Black franchisees would not have incurred the above referenced damages.

716. The fraud committed by McDonald's further entitles Plaintiffs to punitive damages in an amount to be determined, but at least twice the damages Plaintiffs have suffered as a result of McDonald's fraudulent concealment.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor, and against McDonald's, awarding compensatory and punitive damages in an amount to be proven at trial, along with such other further relief as the Court finds just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against McDonald's and request the following relief from the Court:

a. Declaration that the acts and practices complained of herein are violations of 42 U.S.C. § 1981;

b. Declaration that the acts and practices complained of herein are violations of 42 U.S.C. § 1982;

c. Direct McDonald's to make Plaintiffs whole for all earnings and benefits they would have received but for McDonald's discriminatory treatment;

d. General, compensatory, and consequential damages in amounts to be proven at trial, including, without limitation:

(1) damages in in excess of the jurisdictional limit;

(2) lost business opportunities because of McDonald's unjustifiable refusal to offer such opportunities to Plaintiffs;

(3) excessive and unreasonable costs and expenses due to substandard franchise location;

(4) insufficient sales volume due to substandard franchise location;

(5) loss of profits because of excessive expenses and insufficient sales volume due to substandard franchise location;

(6) loss of franchise value because of inability to extinguish debt and meet operating expenses due to substandard franchise location;

(7) loss of franchises due to discriminatory conduct; and

(8) additional damages for emotional and physical suffering and distress, humiliation, damage to professional reputations, and to future business prospects.

e. an award of punitive damages in an amount sufficient to deter McDonald's similar wrongful conduct in the future;

f. an order for an award of attorney's fees, expert fees, and costs, as provided by law;

g. an award of pre-judgment and post-judgment interest as provided by law; and

h. an order for all such other relief the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all issues so triable as a matter of right.

DATED this 16th day of December, 2022.

Respectfully submitted,

**THE FERRARO LAW FIRM, P.A.**
*Attorneys for Plaintiffs*

*/s/ James L. Ferraro*
James L. Ferraro, Esq.
jferraro@ferrarolaw.com
Daryl Parks, Esq.
dparks@ferrarolaw.com
Brickell World Plaza
600 Brickell Avenue, 38th Floor
Miami, Florida 33131
Telephone: (305) 375-0111
Facsimile: (305) 379-6222

and

William R. Fahey, Esq.
Illinois Bar No.: 3127912
bfahey@cooneyconway.com
Cooney & Conway, PC
120 N. LaSalle Street, 30th Floor
Chicago, IL 60602
Telephone: (312) 236-6166

*Designated as Local Counsel*
*Pursuant to Local Rule 83.15*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 16, 2022, I electronically filed the foregoing document with the Clerk for the United States District Court, Northern District of Illinois electronic case filing system (CM/ECF), which will send a Notice of Electronic Filing (NEF) to the attorneys of record. I further certify that on December 16, 2022, I served the foregoing document on Jon Loevy, Loevy & Loevy, 311 N. Aberdeen, Third Floor, Chicago, IL 60607, (312) 243-5900, jon@loevy.com, via email.

By: */s/ James L. Ferraro*
James L. Ferraro, Esq.